## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **INTERMEC IP CORP.**, a Delaware corporation, | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **C.A. No. 06-411-GMS** |
| **ALIEN TECHNOLOGY CORP.,** a Delaware corporation, | ) ) ) | |
| **Defendant.** | ) ) | |

### DECLARATION OF MATTHEW J. KRAMER
### IN SUPPORT OF INTERMEC'S
### ANSWERING BRIEF IN OPPOSITION TO ALIEN'S MOTION TO
### <u>DISMISS OR STAY, OR, IN THE ALTERNATIVE, TRANSFER</u>

I, Matthew J. Kramer, declare as follows:

1.    I am an attorney with the law firm of FREEBORN & PETERS LLP, counsel for the Plaintiff, Intermec IP Corp., in this action.

2.    Attached hereto as Exhibit A is a true and correct copy of Alien Technology Corp.'s ("Alien") First Amended Complaint for Declaratory Judgment, filed on June 16, 2006 in the United States District Court for the District of North Dakota.  ("Alien's North Dakota Complaint").

3.    Attached hereto as Exhibit B is a true and correct copy of the Declaration of Kenneth Cohen dated June 22, 2006.  This document was also filed in support of Intermec's Motion to Dismiss Alien's North Dakota Complaint.

4.    Attached hereto as Exhibit C is a true and correct copy of the Transcript of the Intermec, Inc. Earnings Conference Call, Dated May 8, 2006.

5.    Attached hereto as Exhibit D is a true and correct copy of Intermec's Motion to Dismiss Alien's North Dakota Complaint and Supporting Memoranda, filed on June 29, 2006 in the District of North Dakota.

6.    On September 29, 2006, I personally viewed Alien's corporate website, located at <u>www.alientechnology.com</u>.

7.     The document attached hereto as Exhibit E was printed from the "About Us" section of Alien's website, at www.alientechnology.com/about/index.php.

8.     Attached hereto as Exhibit F is a true and correct copy of the Affidavit of David S. Becker regarding the comparative cost of travel between Alien's headquarters and the two venues where these matters are currently pending.

9.     On October 2, 2006, I performed a search of the CM/ECF electronic docketing system on the websites for the Districts of Delaware and North Dakota.  I searched for all patent cases filed during the calendar year 2006.

10.     Attached hereto as Exhibit G is a printout of the results of the search referenced in Paragraph 9 in the District of North Dakota, indicating that two (2) patent cases were filed during the 2006 calendar year.

11.     Attached hereto as Exhibit H is a printout of the results of the search referenced in Paragraph 9 in the District of Delaware, indicating that 91 patent cases were filed during the 2006 calendar year.

12.     Attached hereto as Exhibit I is a printout of Judge Gregory M. Sleet's Memorandum Opinion and Order in *Angiodynamics, Inc. v. Diomed Holdings, Inc.*, C.A. No. 06-02-GMS (D. Del. 2006), which was obtained at Docket Entry No. 18 on this case's page on the District of Delaware's CM/ECF system.

Pursuant to 29 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in Chicago, Illinois, on October 2, 2006.

Matthew J. Kramer

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on October 2, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Frederick L. Cottrell, III
> RICHARDS, LAYTON & FINGER

I also certify that copies were caused to be served on October 2, 2006 upon the following in the manner indicated:

### BY HAND

> Frederick L. Cottrell, III
> Richards, Layton & Finger
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899

### BY FEDERAL EXPRESS

> Gregory P. Stone
> Munger, Tolles & Olson LLP
> 355 South Grand Avenue, 35th Floor
> Los Angeles, CA  90071-1560

> */s/ Rodger D. Smith II*
> Rodger D. Smith II (#3778)
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> Wilmington, DE  19801
> (302) 658-9200
> rsmith@mnat.com

EXHIBIT D

(PART 1 OF 2)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORP., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:06-CV-51 |
| v. | ) ) | |
| INTERMEC, INC., a Delaware corporation, INTERMEC TECHNOLOGIES CORP., a Delaware corporation, and INTERMEC IP CORP., a Delaware corporation, | ) ) ) ) ) | Judge Rodney S. Webb Magistrate Judge Karen K. Klein |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT AND REQUEST FOR ORAL ARGUMENT

Defendants Intermec, Inc., Intermec Technologies Corp., and Intermec IP Corporation, by and through their attorneys FREEBORN & PETERS LLP and SERKLAND LAW FIRM, move to dismiss Plaintiff's Complaint and state as follows:

1.    For the reasons set forth in Defendants' memorandum in support of their motion to dismiss, Local Rule 7.1(B)(1) Statement of Material Facts, and supporting declarations and exhibits, this Court should dismiss, without leave to amend, Plaintiff's First Amended Complaint.

2.    Specifically, Defendant's seek dismissal of Plaintiff's First Amended Complaint without leave to amend because: (1) this Court lacks subject matter jurisdiction and the defect cannot be cured; (2) this Court lacks personal jurisdiction over Intermec, IIP and ITC and the defect cannot be cured; and (3) Plaintiff failed to identify the products supposedly at risk of a patent-infringement suit with the specificity required by law.

EXHIBIT
D

3.    Defendants request an oral argument on its motion to dismiss at a time to be designated by the Court.

Respectfully Submitted,

INTERMEC, INC., INTERMEC TECHOLOGIES CORP., and INTERMEC IP CORP.

By: s/ Ronald H. McLean
One of Its Attorneys

Carson P. Veach
David S. Becker
FREEBORN & PETERS LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000 phone
(312) 360-6595 fax

*Of Counsel:*
Ronald H. McLean
Jane L. Dynes
SERKLAND LAW FIRM
10 Roberts Street
P.O. Box 6017
Fargo, ND 58108-6017
(701) 232-8957 phone
(701) 237-4049 fax

Dated: June 29, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORP., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:06-CV-51 |
| v. | ) ) | |
| INTERMEC, INC., a Delaware corporation, INTERMEC TECHNOLOGIES CORP., a Washington corporation, and INTERMEC IP CORP., a Delaware corporation, | ) ) ) ) ) | Judge Rodney S. Webb

Magistrate Judge Karen K. Klein |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION TO DISMISS**

## TABLE OF AUTHORITIES

I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION .......................................................6

*BP Chemicals Ltd. v. Union Carbide Corp.,*
    4 F.3d 975 (Fed. Cir. 1993)...........................................................................6, 10

*Shell Oil Co. v. Amoco Corp.,*
    970 F.2d 885 (Fed. Cir. 1992)..........................................................................6, 9

*Gibbs v. Buck,*
    307 U.S. 66, 59 S.Ct. 725 (1939)..........................................................................7

*Antonius v. Spalding,*
    275 F.3d 1066 (Fed. Cir. 2002)......................................................................8, 16

Fed.R.Civ.P. 11 .......................................................................................................8

*American Needle and Novelty, Co. v. Schuessler Knitting Mills,*
    379 F.2d 376 (7th Cir. 1967) ...............................................................................8

*Cygnus Therapeutics Systems v. Alza Corp.,*
    92 F.3d 1153 (Fed. Cir. 1996), *overruled on other grounds, Nobelpharma AB
    v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) ........................8, 9

*West Interactive Corp. v. First Data Resources, Inc.,*
    972 F.3d 1295 (Fed. Cir. 1992)............................................................................9

*International Harvester Co. v. Deere & Co.,*
    623 F.2d 1207 (7th Cir. 1980) .............................................................................9

*McPherson's Ltd. v. Never Dull, Inc.,*
    960 F.2d 156, 1992 WL 52140 (Fed. Cir. 1992) .....................................................10

*Sierra App'd Sciences, Inc. v. Advanced Energy Inds., Inc.,*
    363 F.3d 1361 (Fed. Cir. 2004)..........................................................................10

*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,*
    57 F.3d 1051 (Fed. Cir. 1995)............................................................................10

*GAF Building Materials Corp. v. Elk Corp. of Dallas,*
    90 F.3d 479 (Fed. Cir. 1996).............................................................................10

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,*
    846 F.2d 731 (Fed. Cir. 1988).................................................................10

II.     THIS COURT LACKS PERSONAL JURISDICTION OVER INTERMEC IP ...............11

*Silent Drive, Inc. v. Strong Industries, Inc.,*
    326 F.3d 1194 (Fed. Cir. 2003)............................................................11

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.,*
    148 F.3d 1355 (Fed. Cir. 1998).......................................................11, 12

*World-Wide Volkswagon v. Woodson,*
    444 U.S. 286, 297, 100 S.Ct. 559 (1980)............................................11

*Northpole US, LLC v. Price,*
    No. 4:06CV0148 TCM, 2006 WL 1520641 (E.D. Mo. May 31, 2006) ...............11, 12

*Helicopteros Nacionales de Columbia, S.A. v. Hall,*
    466 U.S. 408, 104 S.Ct. 1868 (1984)....................................................12

*Burger King v. Rudzewicz,*
    471 U.S. 462, 476, 105 S.Ct. 2174 (1985)..............................................12

III.    THIS COURT LACKS PERSONAL JURISDICTION OVER INTERMEC, INC..........13

*See supra* at § II

IV.     THIS COURT LACKS PERSONAL JURISDICTION OVER INTERMEC
TECHNOLOGIES ...........................................................................13

*Ensign v. Bank of Baker,*
    676 N.W.2d 786 (N.D. 2004) ...............................................................14

*Stairmaster Sports/Medical Prods., Inc. v. Pacific Fitness Corp.,*
    916 F. Supp. 1049 (W.D. Wash. 1994), *aff'd* 78 F.3d 602 (Fed. Cir. 1996)................14

*McGill Tech. Ltd. v. Gourmet Tech., Inc., et al.,*
    300 F. Supp. 2d 501 (E.D. Mich. 2004)..............................................14, 15

*Hockerson-Halberstadt, Inc. v. Propet USA, Inc.,*
    62 Fed. Appx. 322 (Fed. Cir. 2003) .....................................................14

*See also supra* at § II

V.    VENUE IS NOT PROPERLY LAID IN THIS DISTRICT ...........................................................15

      28 U.S.C., § 1391 (b) and (c) ...........................................................................................15

VI.    ALIEN'S COMPLAINT FAILS TO STATE A CLAIM ...........................................................15

      Fed.R.Civ.P. 8 .............................................................................................................15

      *Conley v. Gibson*,
          355 U.S. 41, 47, 78 S.Ct. 99 (1957) ..................................................................15

      *Ondeo Nalco Co. v. Eka Chems., Inc.*,
          Case No. Civ.A. 01-537-SLR, 2002 U.S. Dist. LEXIS 26195
          (D.Del. June 10, 2002) .....................................................................................16

      *Antonius v. Spalding*,
          275 F.3d 1066 (Fed. Cir. 2002) ..................................................................8, 16

**INTRODUCTION**

Alien Technology Corporation ("Alien") started this lawsuit in this Court on June 1, 2006 by filing a Complaint for a declaratory judgment against Intermec, Inc. ("Intermec") and Intermec IP Corp. ("IIP"). During the next two weeks, Alien apparently decided that it needed to add one more party to this action. Accordingly, Alien filed its First Amended Complaint on June 16, 2006, several days before the deadline for original defendants to answer or otherwise respond to the original Complaint. The only difference between the original and the First Amended Complaints was the addition of Intermec Technologies Corp. ("ITC") as a defendant.

Alien alleges that this Court has subject matter jurisdiction over Alien's claims for declaratory relief "by reason of Title 28, United States Code, Sections 1331 and 1338(a)." First Amended Complaint ("Am. Compl.), attached to the Decalaration of David S. Becker ("Becker Decl.") as Exhibit A, at ¶ 5. The only basis for this claim is the assertion that, on May 8, 2006, Intermec, IIP and ITC (the "Intermec defendants") threatened to sue Alien for patent infringement and engaged in other conduct that has created in Alien an objectively reasonable apprehension of suit." Am. Compl. at ¶ 1.

The First Amended Complaint goes on to request that this Court declare that 10 radio frequency identification ("RFID") patents owned by IIP (the "patents-in-suit") are "invalid and further to declare that, by making, using, or offering to sell its products, Alien does not infringe any valid claim of the patents in suit." Am. Compl. at ¶ 1. Although Alien was required to describe the Alien products that were the subject of the alleged threat, it failed to do so. *See generally* Am. Compl.

Alien alleges that this Court can exercise personal jurisdiction over Intermec, IIP and ITC. Am. Compl. at ¶ 6. The only basis for this claim is the "information and belief" assertion that "the Intermec Defendants provide supply chain information products, services, and systems to companies in hundreds of industries around the world, and the Intermec Defendants serve thousands of customers worldwide, including customers in the State of North Dakota." Am. Compl. at ¶ 6.

Alien also alleges that venue is properly laid in this Court. The only basis for this claim is the same one given in support of the personal jurisdiction claim – i.e., the "information and belief" allegation that "the Intermec Defendants provide supply chain information products, services and systems to companies in hundreds of industries around the world, and the Intermec Defendants serve thousands of customers worldwide, including customers in this District." Am. Compl. at ¶ 6.

For the reasons set forth below, the First Amended Complaint must be dismissed without leave to amend because this Court lacks subject matter jurisdiction and the defect cannot be cured. The First Amended Complaint must also be dismissed without leave to amend because this Court lacks personal jurisdiction over Intermec, IIP and ITC and this defect cannot be cured. Finally, the First Amended Complaint must be dismissed for failure to state any claim for which relief can be granted because Alien failed to identify the products supposedly at risk to a patent infringement suit with the specificity required by law.

2

## STATEMENT OF THE FACTS

The Plaintiff.  Alien, is incorporated in the State of Delaware and has its principal place of business in Morgan Hill, California. Am. Compl. at ¶ 2. "Alien is a manufacturer of [RFID] products." *Id.*

The Defendants.  Intermec and IIP are incorporated under the laws of Delaware. Declaration of Kenneth Cohen ("Cohen Decl."), attached to Becker Decl. as Exhibit B, at ¶¶ 8, 15.  ITC is incorporated under the laws of Washington.  *Id.* at ¶ 22.  Intermec and ITC are headquartered in Everett Washington and IIP is headquartered in Henderson, Nevada. Cohen Decl. at ¶¶ 8, 15, 22.

Contrary to Alien's assertions, Intermec is nothing more than a holding company.  Cohen Decl.. at ¶ 9.  Intermec does not manufacture or sell any products or sell any services of any kind whatsoever.  Cohen Decl. at ¶ 9.  Intermec does not have any customers in North Dakota or anywhere else. Cohen Decl. at ¶ 9, 10.  Intermec has no offices or employees located in North Dakota and Intermec does not own any assets located in that state.  Cohen Decl. at ¶ 9-11. Intermec has never paid taxes in the State of North Dakota and has never filed suit in that state. Cohen Decl. at ¶ 13, 14.

IIP is a wholly-owned subsidiary of ITC and the sole owner of the RFID patents-in-suit. Cohen Decl. at ¶¶ 16, 22.  IIP's only business is to own patents, enforce them, and collect royalties.  Cohen Decl. at ¶ 16.  IIP has no offices or employees in North Dakota and it has never paid taxes or filed suit in that state.  Cohen Decl. at ¶¶ 18, 20, 21.

ITC, a wholly-owned subsidiary of Intermec, manufacturers and sells automated identification and data collection ("AIDC") products, systems and related services, including

RFID products, systems and services.  Cohen Decl. at ¶ 23.  ITC does not manufacture any products in North Dakota, it has no offices or employees in that state, it does not own any assets located in that state and it has never paid taxes or filed suit in that state.  Cohen Decl. at ¶¶ 24, 25, 27, 30.

In its most recent fiscal year (2005), ITC sold products into and provided services elsewhere for entities in North Dakota of less than $270,000.  Cohen Decl. at ¶ 28.  This is only .0571 percent of ITC's 2005 U.S. sales of $472,670,567.  *Id.*  Of ITC's North Dakota sales, $182,000 or 67% were made to a single customer largely for services provided outside the state of North Dakota.  *Id.*  None of those North Dakota sales were for the types of RFID products at issue in this case.  Cohen Decl. at ¶ 29.

The Non-Existent Threat.    As noted earlier, Alien has alleged that the Intermec defendants threatened to sue Alien for infringement of the patents-in-suit on May 8, 2006.  That assertion is completely false since none of the Intermec defendants directly informed Alien of any intent to file an infringement suit involving the patents-in-suit on May 8, 2006 or any date prior to June 1, 2006 when the original Complaint was filed.  *See* Cohen Decl. at ¶ 5, 6, 7; *see also generally* Transcript of the Intermec, Inc. Earning Conference Call, Dated May 8, 2006 ("Earnings Call Tr."), attached to Becker Decl. as Exhibit C, at pp. 11-12, 15-16.

The only thing that happened prior to the filing of the original Complaint on June 1, 2006 was Intermec's earnings call on May 8, 2006 (the "Earnings Call").  Cohen Decl. at ¶ 6.  Nothing said during the Earnings Call could possibly create an objectively reasonable apprehension that Alien was in immediate jeopardy of being sued for infringement by IIP, the sole owner of the RFID patents-in-suit.  *See* Earnings Call Tr. at 11-12, 15-16.

Possible infringers like Alien were only mentioned twice during the Earnings Call.  The first occurred when Steve Winter, Senior Vice President of Intermec was asked the following question and gave the following answer from Intermec's headquarters in Everett, Washington:

**Question**

<p align="center">*        *        *</p>

One question on RFID and royalty revenues on a go-forward basis.  You have a number of non-licensed companies out there selling products, some of which are winning large size contracts,.  How long can you wait before needing to step in and enforce the Rapid Start program?

**Answer**

<p align="center">*        *        *</p>

It's obviously disappointing if any customer were to do business with a supplier that is not licensed.  But you know, we have consistently stated we will be pursuing infringers.  We are putting together cases.  We are looking at those who are most disruptive to the industry right now.  And basically, preparations are underway with respect to unlicensed suppliers like Alien and others.  And we expect those enforcement actions by the end of the year, or within this year.

Earnings Call Tr. at pp. 11-12.

The second and last reference to Alien during the Earnings Call occurred when Intermec's Chairman and Chief Executive Officer, Larry Brady was asked the following question and gave the following response from Intermec's headquarters in Everett, Washington:

**Question**

In terms of the fact that you mentioned on this call that you might be taking some legal action against folks that have not been signed up so far for Rapid Start at some point during the year, could you give us some color as to what potential impact on your SG&A line could be of taking such action, or whether similar to the (indiscernible) settlements you might have it not impacting you expense line in the near-term?

**Answer**

<p align="center">*        *        *</p>

> I think given the circumstances that we are currently looking at – that is, the amazing propensity of people to take business well below cost, and the amazing publicity which such actions receive – that we are apt to move in advance of where we would have originally intended. And indeed, the limitation on when we will take action now is more related to just the [wickets] that we have to go through – that is, get the product, and disassemble the product and understand that infringement is occurring. Because we've got a certain obligation, before we can just go out and willy nilly start filing lawsuits, to demonstrate that there's a cause of action. So that is the path that we are currently on.

Earnings Call Tr. at pp. 15-16.

## ARGUMENT

### I.   THIS COURT LACKS SUBJECT MATTER JURISDICTION.

For a declaratory-judgment action for non-infringement or invalidity of a patent to survive a motion to dismiss on subject matter jurisdiction grounds, the plaintiff must establish that two conditions have been satisfied. First, as of the date of the complaint, there must have been an explicit threat or other action by the patent owner that creates an objectively reasonable apprehension on the part of the plaintiff that it is about to be sued for patent infringement. Second, as of the date of the complaint, there must be activity that would constitute infringement or concrete steps taken with the intent to conduct such activity. *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 979 (Fed. Cir. 1993). The burden of pleading and proving the existence of an actual controversy is on the plaintiff. *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 887 (Fed. Cir. 1992).

Alien's claim that a case or controversy existed as of the date of the original Complaint (June 1, 2006) rests on a single, conclusory reference to May 8, 2006, a time when Alien alleges that Intermec "threaten[ed] to sue Alien for patent infringement . . . ." Am. Compl. at ¶¶ 1, 20, 26, 32, 38, 44, 50, 56, 62, 68, and 74. Unsupported conclusions, however, are insufficient to withstand a motion to dismiss and this Court may look behind the complaint and view the actual

facts to determine whether a controversy actually exists.  *Gibbs v. Buck*, 307 U.S. 66, 72, 59

S.Ct. 725 (1939) ("The burden of showing by the admitted facts that the federal court has

jurisdiction rests upon the complainants.  If there were any doubt of the good faith of the

allegations, the court might have called for their justification by evidence.")

The only possibly relevant event that occurred on May 8, 2006 was the Earnings Call in

which Intermec executives gave a statement to and answered questions posed by a group of

financial analysts.  Possible infringers like Alien were only mentioned twice during the Earnings

Call and no reasonable person could conclude from those comments that a patent infringement

lawsuit by Intermec against Alien was imminent. .

During the question-and-answer portion of the Earnings Call, Steve Winter, President and

C.O.O. of Intermec, gave the following answer regarding potential infringement actions against

third parties:

> But you know, we have consistently stated we will be pursuing infringers. We are
> putting together cases. We are looking at those who are most disruptive to the
> industry right now. And basically, preparations are underway with respect to
> unlicensed suppliers like Alien and others.  And we expect those enforcement
> actions by the end of the year, or within this year.

Earnings Call Tr. at pp. 11-12.  Later in the Earnings Call, Larry Brady, President, Chairman and

CEO of Intermec, explained the "preparations" that were underway:

> I think given the circumstances that we are currently looking at -- that is, the
> amazing propensity of people to take business well below cost, and the amazing
> publicity which such actions receive -- that we are apt to move in advance of
> where we would have originally intended. *And indeed, the limitation on when we
> will take action now is more related to just the wickets that we have to go
> through -- that is, get the product, and disassemble the product and understand
> that infringement is occurring. Because we've got a certain obligation, before
> we just go out and willy nilly start filing lawsuits, to demonstrate that there's
> cause of action.* So that is the path that we are currently on.

Earnings Call Tr. at p. 16 (emphasis added).

The only conclusion that can be drawn from these May 8 comments is that Intermec was conducting an investigation of *potential* infringement against unlicensed companies selling RFID products and that the investigation involved a comparison of potentially-infringing products with the RFID patents owned by IIP. Nothing said by Messrs. Winter or Brady established that any Intermec entity had reached a conclusion about patent infringement with respect to Alien or any other unlicensed company, or that any Intermec entity was on the verge of filing a patent-infringement action against Alien or anyone else. The only conclusion that could be drawn from those comments is that Intermec had undertaken a Rule 11 investigation of RFID products sold by Alien and other unlicensed companies. *See, e.g., Antonius v. Spalding*, 275 F.3d 1066 (Fed. Cir. 2002) (a pre-filing investigation and determination of infringement is required under FED.R.CIV.P. 11).

Disclosure of a Rule 11 investigation which is not yet complete and which includes no statement of the results of the investigation is not a threat of suit sufficient to sustain a declaratory judgment action. *American Needle and Novelty, Co. v. Schuessler Knitting Mills*, 379 F.2d 376, 379 (7th Cir. 1967) (the patentee "should have the privilege of making a fair investigation as to the possible infringement of his patent without calling down on his head . . . [a] declaratory judgment suit . . . .").

In addressing a remarkably similar situation, the Federal Circuit noted that statements of a patentee, reassuring investors that it will enforce its patent portfolio, cannot give rise to a reasonable apprehension of suit on the part of an unlicensed company. *Cygnus Therapeutics Systems v. Alza Corp.*, 92 F.3d 1153, 1160 (Fed. Cir. 1996), *overruled on other grounds*, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998). In *Cygnus*,

an executive of the declaratory-judgment defendant attended a "highly visible private investment conference," and made the following statement regarding enforcement of intellectual property rights:

> The question is that I mentioned a number of companies are developing products that are covered by our patents, what is our policy.   They won't market the products because we're not going to give them licenses and the patents are valid.  In many cases, they've already been challenged and upheld.   And our policy will be that we have spent a great deal of money developing this technology and we have a very strong proprietary position.

*Cygnus*, 92 F.3d at 1156.   Despite defendant's mentioning specific companies and making affirmative statements that no license would be granted, the Federal Circuit held that the statements could not give rise to the reasonable apprehension of suit required to support a declaratory judgment action. *Id.* at 1160.

Apart from the wholly inadequate reference to the Earnings Call, Alien pleads no facts to support its claim of an objectively reasonable apprehension of a patent infringement suit.   Alien alleges no facts showing any contact between it and any of the Intermec Defendants regarding the patents-in-suit. *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.3d at 1295, 1297-98 (Fed. Cir. 1992) (no reasonable apprehension of suit where there was no contact between a plaintiff and a defendant); *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 889 (Fed. Cir. 1992) (no actual controversy where declaratory-judgment defendant had made no assertive contact concerning the patents at issue).

Alien does not claim that any of the Intermec Defendants contacted any of its customers concerning the patents-in-suit. *International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1211 (7th Cir. 1980) (lack of contact between defendant and customers supported holding of no case-or-controversy).   Alien also fails to identify a single Alien product as the target of the allegedly

impending infringement action, even though the pleading rules for declaratory judgment actions of this type require such specificity. *See McPherson's Ltd. v. Never Dull, Inc.*, 960 F.2d 156, 1992 WL 52140 (Fed. Cir. 1992) (dismissing a declaratory judgment action for failing to identify the products supposedly accused of infringement.); *Sierra App'd Sciences, Inc. v. Advanced Energy Inds., Inc.*, 363 F.3d 1361, 1374-5 (Fed. Cir. 2004) (requiring specific allegations of apprehension of suit for each specific product for which declaratory judgment was sought).

Alien's "case or controversy" allegations are so skimpy because nothing transpired prior to the filing of the original Complaint which would give rise to an objectively reasonable apprehension that Intermec was about to file a patent-infringement suit against Alien. At most, Alien's complaint shows it has a subjective fear of an infringement suit but, subject matter jurisdiction for a declaratory judgment action cannot be based on the "nervous mind" of a potential infringer. *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki* Kaisha, 57 F.3d 1051, 1053 (Fed. Cir. 1995) ("The reasonable apprehension of suit requires more than the nervous state of mind of a possible infringer; it requires that the objective circumstances support such an apprehension."); *BP Chems. v. Union Carbide Corp.*, 4 F.3d 975, 979 (Fed. Cir. 1993) ("a subjective apprehension is insufficient without objective substance").

Since there was no objective evidence to support Alien's fear of a patent infringement suit on the date that the original Complaint was filed, the absence of subject matter jurisdiction cannot be cured. *GAF Building Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 482 (Fed. Cir. 1996) ("Justiciability must be judged as of the time of filing, not as of some indeterminate future date... ."); *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734 n.2 (Fed. Cir. 1988) ("The presence or absence of jurisdiction must be determined on the facts

existing at the time the complaint under consideration was filed."). This Court must therefore

dismiss the First Amended Complaint without leave to amend.

**II.    THIS COURT LACKS PERSONAL JURISDICTION OVER INTERMEC IP.**

In order for this Court to exercise personal jurisdiction over any of the defendants, Alien

must make a *prima facie* showing that personal jurisdiction is appropriate in this forum as to

each defendant. *Silent Drive, Inc. v. Strong Industries, Inc.*, 326 F.3d 1194, 1201 (Fed. Cir.

2003). The court considers the parties' pleadings and affidavits and makes the determination of

whether there are adequate contacts with the forum to warrant the exercise of personal

jurisdiction. *Id.*

Personal jurisdiction in a patent-declaratory-judgment action requires a showing of

constitutionally-sufficient minimum contacts with the chosen jurisdiction. *Red Wing Shoe Co. v.*

*Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1358-59 (Fed. Cir. 1998) *citing World-Wide*

*Volkswagon v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559 (1980) (jurisdiction in a patent-

declaratory-judgment action is controlled by Federal Circuit precedent; where the state's long-

arm statute is co-extensive with minimum due process requirements, defendant must have

sufficient "minimum contacts" "such that [it] should reasonably anticipate being haled into" the

particular district court).

The minimum-contacts test can be met where there is either general jurisdiction or

specific jurisdiction. *Northpole US, LLC v. Price*, No. 4:06CV0148 TCM, 2006 WL 1520641, at

*3 (E.D. Mo. May 31, 2006), *citing Red Wing Shoe*, 148 F.3d at 1359. General jurisdiction

refers to situations where the defendant purposefully directs activities at residents of the forum.

*Id.* In such a situation, a defendant whose contacts with the jurisdiction are continuous and

11

systematic may be subject to jurisdiction even though the cause of action is unrelated to the

defendant's contacts with the jurisdiction. *Red Wing Shoe*, 148 F.3d at 1359, *citing Helicopteros*

*Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414-16, 104 S.Ct. 1868 (1984). Specific

jurisdiction refers to situations where the cause of action arises out of or is related directly to a

defendant's activities in the forum. *Red Wing Shoe*, 148 F.3d at 1359, *citing Burger King v.*

*Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174 (1985). Whether general or specific jurisdiction is

claimed by the plaintiff, random, fortuitous or attenuated contacts do not count nor do contacts

resulting from unilateral activity of persons other than the defendant. *Northpole*, 2006 WL

1520641, at *3.

General jurisdiction does not exist in this district with respect to IIP because it does not

make, sell or provide any products, systems or services to residents of North Dakota or residents

of any other jurisdiction. Cohen Decl. at ¶¶ 16, 17. IIP's only business is to own patents,

enforce them, and collect royalties from patent licensees. Cohen Decl. at ¶ 16. IIP has no offices

or other assets or employees or agents in North Dakota and it has never paid taxes or filed suit in

that state. Cohen Decl. at ¶¶ 18, 20, 21.

Specific jurisdiction is also lacking with respect to IIP. Alien's cause of action arises out

of a threat supposedly made on May 8, 2006 to file a patent-infringement action. Not only was

there no threat, but the only way that such a threat could give rise to specific jurisdiction in North

Dakota is if the threat was to file a patent infringement action in the State of *North Dakota*.

Nothing was said during the May 8, 2006 Earnings Call could be interpreted as a threat to file a

patent infringement lawsuit against Alien in North Dakota.  *See generally* Earnings Call Tr.  In fact, there was not a single reference to North Dakota during the Earnings Call.  *Id.*[1]

III.   **THIS COURT LACKS PERSONAL JURISDICTION OVER INTERMEC, INC.**

General jurisdiction does not exist in this district with respect to Intermec because it is just a holding company.  Intermec does not make, sell or provide any product, system or service to anyone, let alone residents of the State of North Dakota.  Cohen Decl. at ¶¶ 9, 10.  Intermec is not incorporated in North Dakota, its principal place of business is not located in North Dakota and it has no offices, factories, warehouses, or other assets and no employees or agents in North Dakota.  Cohen Decl. at ¶¶ 8, 9, 10, 11.

Specific jurisdiction in this district is also lacking with respect to Intermec.  As noted earlier, Alien's cause of action arises out of an alleged threat supposedly made on May 8, 2006 to file a patent-infringement action.  Not only was there no threat, but the only way that such a threat could give rise to specific jurisdiction in North Dakota is if the threat was to file a patent-infringement action in the State of *North Dakota*.  Nothing said during the May 8, 2006 Earnings Call could be interpreted as a threat to file a patent infringement lawsuit against Alien in North Dakota.  *See generally* Earnings Call Tr.  In fact, there was not a single reference to North Dakota during the Earnings Call.  *Id.*[2]

IV.   **THIS COURT LACKS PERSONAL JURISDICTION OVER INTERMEC TECHNOLOGIES.**

ITC is not subject to general jurisdiction in North Dakota because its contacts with North Dakota are, at best, random, sporadic and attenuated.  ITC is a Washington corporation with its

---

[1] It cannot be *presumed* that the hypothetical patent infringement lawsuit would be filed in North Dakota.  There are a number of other states where Alien can be found or is transacting business, including but not limited to the state in which it is incorporated (Delaware) and the state where its principal place of business is located (California).

[2] *See* note 1, *supra*.

principal place of business in Everett, Washington. Cohen Decl. at ¶ 22. It does not manufacture any products in the North Dakota nor does it maintain any offices or have any employees residing in North Dakota. Cohen Decl. at ¶¶ 24, 25. It does not have a license to do business in the North Dakota and has never filed a tax return there. Cohen Decl. at ¶¶ 26, 27. ITC has not brought suit in any federal or state court in North Dakota. Cohen Decl. at ¶ 31.

Since ITC is not found in North Dakota, the only other way to obtain general jurisdiction in that state is to establish that ITC has substantial sales in North Dakota. That showing cannot be made because ITC's sales in North Dakota are *de minimis* in the extreme.

In its most recent fiscal year (2005), ITC's U.S. sales revenues were $472,670,567. Cohen Decl. at ¶ 28. Of that total, less than $270,000 or 0.0571% were sales to customers in the State of North Dakota and most of those revenues were generated from a single customer. Cohen Decl. at ¶ 28. This is obviously insufficient contact to give rise to general jurisdiction in North Dakota. *See Ensign v. Bank of Baker*, 676 N.W.2d 786, 791-92 (N.D. 2004) (holding defendant, who had no physical presence in North Dakota and provided only a limited amount of its products to North Dakota was not subject to personal jurisdiction); *Stairmaster Sports/Medical Prods., Inc. v. Pacific Fitness Corp.*, 916 F. Supp. 1049, 1053 (W.D. Wash. 1994), *aff'd* 78 F.3d 602 (Fed. Cir. 1996) (applying Federal Circuit law, court rejected personal jurisdiction over out-of-state defendant with less than 3% of total sales in forum state); *McGill Tech. Ltd. v. Gourmet Tech., Inc., et al.*, 300 F. Supp. 2d 501, 508 (E.D. Mich. 2004), *citing Hockerson-Halberstadt, Inc. v. Propet USA, Inc.*, 62 Fed. Appx. 322 (Fed. Cir. 2003) (same in case where out-of-state defendant had less that .25% of sales in forum state).

14

Specific jurisdiction is also lacking with respect to ITC. As noted earlier, Alien's cause of action arises out of an alleged threat supposedly made on May 8, 2006 to file a patent infringement action. Not only was there no threat, but the only way that such a threat could give rise to specific jurisdiction in North Dakota is if the threat was to file a patent-infringement action in the State of *North Dakota*. Nothing said during the May 8, 2006 Earnings Call could be interpreted as a threat to file a patent infringement lawsuit against Alien in North Dakota. *See generally* Earning Call Tr. In fact, there was not a single reference to North Dakota during the Earnings Call. *Id.*[3]

## V.     VENUE IS NOT PROPERLY LAID IN THIS DISTRICT

Since none of the Intermec defendants are found in the State of North Dakota and personal jurisdiction does not exist in North Dakota with respect to any of those defendants, venue is not properly laid in this district. 28 U.S.C., § 1391 (b) and (c).

## VI.     ALIEN'S COMPLAINT FAILS TO STATE A CLAIM.

Even if subject matter and personal jurisdiction existed, Alien's complaint would have to be dismissed for failure to satisfy the pleading requirements of FED.R.CIV.P. 8 as that rule has been applied in declaratory-judgment actions involving patents. Rule 8 requires that a complaint give fair notice of what the plaintiff's claim is and the grounds upon which it rests in the form of "short and plain statement of the claim showing that the pleader is entitled to relief. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99 (1957). In patent cases (both infringement actions and declaratory-judgment actions), failure to identify specific products that are supposedly non-

---

[3] *See* note 1, *supra.*

infringing renders the complaint so unclear as to require dismissal. *See, e.g., McPhereson, Ltd.*, 960 F.2d 156, 1992 WL at *3.

Alien's non-infringement contentions provide no useful information about which Alien products are supposedly non-infringing. Comp., ¶¶ 23, 29, 35, 41, 47, 53, 59, 65, 71, and 77. ("[n]one of [Alien's] products, ***including but not limited to***, its RFID tags and readers, infringe any valid claim of the . . . patent"). Pleading that a group of unidentified products do not infringe is the same as not pleading any facts at all. *See, e.g., Ondeo Nalco Co. v. Eka Chems., Inc.*, Case No. Civ.A. 01-537-SLR, 2002 U.S. Dist. LEXIS 26195, 3-5 (D.Del. June 10, 2002) (dismissing counterclaims because "the pleadings are too vague to provide plaintiff with fair notice of which products are accused of infringing defendant's patents.").

This lack of specificity is unacceptable because it would force the Intermec defendants to conduct a Rule 11 analysis of each product ever made by Alien to determine whether any of those products infringe any of the 10 patents-in-suit and to complete all of this before the deadline for answering the First Amended Complaint. *Antonius v. Spalding*, 275 F.3d 1066 (Fed. Cir. 2002). The only way to avoid this manifestly unfair situation is to dismiss the complaint for failure to state a claim for which relief can be granted.

## CONCLUSION

For the above stated reasons, Alien's First Amended Complaint must be dismissed without leave to amend for lack of subject matter and personal jurisdiction and improper venue. In the alternative, the First Amended Complaint must be dismissed for failure to state a claim for which relief may be granted.

Respectfully Submitted,

INTERMEC, INC., INTERMEC TECHOLOGIES
CORP., and INTERMEC IP CORP.


By: s/ Ronald H. McLean_____
    One of Its Attorneys

Carson P. Veach
Leland W. Hutchinson, Jr.
David S. Becker
Jacob D. Koering
FREEBORN & PETERS LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000 phone
(312) 360-6595 fax

*Of Counsel:*
Ronald H. McLean
Jane L. Dynes
SERKLAND LAW FIRM
10 Roberts Street
P.O. Box 6017
Fargo, ND  58108-6017
(701) 232-8957 phone
(701) 237-4049 fax

Dated:  June 29, 2006

17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORP., a<br>Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:06-CV-51 |
| v. | ) ) ) | |
| INTERMEC, INC., a Delaware corporation,<br>INTERMEC TECHNOLOGIES CORP., a<br>Delaware corporation, and INTERMEC IP<br>CORP., a Delaware corporation, | ) ) ) ) ) | Judge Rodney S. Webb<br><br>Magistrate Judge Karen K. Klein |
| Defendants. | ) ) | |

**DEFENDANTS' RULE 7.1(B)(1) STATEMENT OF MATERIAL FACTS
IN SUPPORT OF THEIR OF THEIR MOTION TO DISMISS**

Pursuant to Local Rule 7.1(B)(1), Defendants' Intermec, Inc., Intermec Technologies Corp., and Intermec IP Corp. submit the following concise statement of facts

1.      Plaintiff, Alien, is incorporated in the state of Delaware and has its principal place of business in Morgan Hill, California.  First Amended Complaint for Declaratory Judgment ("Am. Compl."), attached to the Declaration of David Becker ("Becker Decl.") as Exhibit A, at ¶ 2.

2.      Alien "is a manufacturer of Radio Frequency Identification ("RFID") products…" *Id.*

3.      Defendants, Intermec, Inc. ("Intermec") and Intermec IP Corp. ("IIP") are incorporated under the laws of Delaware.  Declaration of Kenneth Cohen ("Cohen Decl."), attached to Becker Decl. at Exhibit B, at ¶¶ 8, 15.

4.      Intermec Technologies Corp. ("ITC") is incorporated under the laws of Washington.  Cohen Decl. at ¶ 22.

5.    Intermec and ITC are headquartered in Everett Washington and Intermec IP is headquartered in Henderson, Nevada. Cohen Decl.. at ¶¶ 8, 15, 22.

6.    Intermec is a holding company. Cohen Decl.. at ¶ 9.

7.    Intermec does not manufacture or sell any products or sell any services. Cohen Decl. at ¶ 9.

8.    Intermec does not have any customers in North Dakota or elsewhere. Cohen Decl. at ¶¶ 9, 10.

9.    Intermec has no offices or employees located in North Dakota and does not own any assets in North Dakota. Cohen Decl. at ¶¶ 9-11.

10.    Intermec has never paid taxes in the State of North Dakota and has never filed suit in that state. Cohen Decl. at ¶¶ 13, 14.

11.    IIP is a wholly-owned subsidiary of ITC and the sole owner of the RFID patents-in-suit. Cohen Decl. at ¶¶ 16, 22.

12.    IIP's sole business is to own patents, enforce them, and collect royalties. Cohen Decl. at ¶ 16.

13.    IIP has no offices or employees in North Dakota and it has never paid taxes or filed suit in that state. Cohen Decl. at ¶¶ 18, 20, 21.

14.    ITC is a wholly-owned subsidiary of Intermec. Cohen Decl. at ¶ 23.

15.    ITC manufactures and sells automated identification and data collection ("AIDC") products, systems and related services, including RFID products, systems and services. *See* Cohen Decl. at ¶ 23.

16.    ITC does not manufacture any products in North Dakota; it has no offices or employees and that state; it does not own any assets located in that states; and it never paid taxes or filed suit in that state. Cohen Decl. at ¶¶ 24, 25, 27, 30.

17.    In its most recent fiscal year (2005), ITC sold products into and provided services elsewhere for entities in North Dakota of less than $270,000, or .0571 percent of Intermec's total United States sales of $472,670,567 ($182,000 of these sales were to one customer and were largely for services provided outside the state). Cohen Decl. at ¶ 28.

18.    None of the sales in North Dakota were of products based on RFID technology. Cohen Decl. at ¶ 29.

19.    During the Intermec analyst call of May 8, 2006 Intermec's Senior Vice President, Steve Winter, was asked the following question and gave the following answer:

**Question**

                    *        *        *

One question on RFID and royalty revenues on a go-forward basis. You have a number of non-licensed companies out there selling products, some of which are winning large size contracts,. How long can you wait before needing to step in and enforce the Rapid Start program?

**Answer**

                    *        *        *

It's obviously disappointing if any customer were to do business with a supplier that is not licensed. But you know, we have consistently stated we will be pursuing infringers. We are putting together cases. We are looking at those who are most disruptive to the industry right now. And basically, preparations are underway with respect to unlicensed suppliers like Alien and others. And we expect those enforcement actions by the end of the year, or within this year.

Transcript of the Intermec, Inc. Earning Conference Call, Dated May 8, 2006 ("Earnings Call Tr."), attached to Becker Decl. as Exhibit C, at pp. 11-12.

20.     Later in the call in response to another question Intermec's Chairman and Chief

Executive Officer, Larry Brady added:

**Question**

In terms of the fact that you mentioned on this call that you might be taking some
legal action against folks that have not been signed up so far for Rapid Start at
some point during the year, could you give us some color as to what potential
impact on your SG&A line could be of taking such action, or whether similar to
the (indiscernible) settlements you might have it not impacting you expense line
in the near-term?

**Answer**

*     *     *

I think given the circumstances that we are currently looking at – that is, the
amazing propensity of people to take business well below cost, and the amazing
publicity which such actions receive – that we are apt to move in advance of
where we would have originally intended. And indeed, the limitation on when
we will take action now is more related to just the [wickets] that we have to go
through – that is, (indiscernible) product, and disassemble the product and
understand that infringement is occurring. Because we've got a certain
obligation, before we can just go out and willy nilly start filing lawsuits, to
demonstrate that there's a cause of action. So that is the path that we are
currently on.

Earnings Call Tr. at pp. 15-16.

21.     The statements of Mr. Winter and Mr. Brady were made in the State of

Washington. Cohen Decl. at ¶ 7.

22.     As of June 1, 2006 these are the only public statements of which Defendants are

aware that were made by any of the Defendants concerning investigating a possible suit for

patent infringement against Alien. Cohen Decl. at ¶ 7.

23.     On June 1, 2006 Alien filed a Complaint in the United States District Court for

the District of North Dakota seeking a declaratory judgment that its products do not infringe the

patents in suit. Alien's Complaint for Declaratory Judgment, attached to Becker Decl. at Ex. D,

at 1.

24.    Alien's Complaint does not indicate which Alien products are being accused of infringement by Defendants. *See generally* Am. Compl.

25.    The Complaint does not include any allegation that Intermec has accused Alien of infringing the specific patents in suit. *See generally* Am. Compl.

26.    On June 16, 2006, Alien filed an Amended Complaint which is identical to its original complaint except for the addition of ITC as a defendant. *See* Am. Compl.

<div style="margin-left: 40%;">

Respectfully Submitted,

INTERMEC, INC., INTERMEC TECHOLOGIES
CORP., and INTERMEC IP CORP.


By: s/ Ronald H. McLean
One of Its Attorneys

</div>

Carson P. Veach
David S. Becker
FREEBORN & PETERS LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000 phone
(312) 360-6595 fax

*Of Counsel:*
Ronald H. McLean
Jane L. Dynes
SERKLAND LAW FIRM
10 Roberts Street
P.O. Box 6017
Fargo, ND 58108-6017
(701) 232-8957 phone
(701) 237-4049 fax

Dated: June 29, 2006

# EXHIBIT D

# (PART 2 OF 2)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORP., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 3:06-CV-51 |
| INTERMEC, INC., a Delaware corporation, INTERMEC TECHNOLOGIES CORP., a Delaware corporation, and INTERMEC IP CORP., a Delaware corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF DAVID S. BECKER
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

I, David S. Becker, declare as follows:

1.    I am an attorney with the law firm of FREEBORN & PETERS LLP, counsel for the

Defendants, Intermec, Inc., Intermec Technologies Corp., and Intermec IP Corp. in this action.

2.    Attached hereto as Exhibit A is a true and correct copy of Plaintiff's First

Amended Complaint for Declaratory Judgment. This document was filed with the Court on June

1, 2006.

3.    Attached hereto as Exhibit B is a true and correct copy of the Declaration of

Kenneth Cohen dated June 22, 2006.

4.    Attached hereto as Exhibit C is a true and correct copy of the Transcript of the

Intermec, Inc. Earning Conference Call, Dated May 8, 2006.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 28, 2006 in Chicago, Illinois.

David S. Becker

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 4 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 1 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 1 of 15

FILED

1 16 2006

U.S. CLERK
NORTH DAKOTA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

ALIEN TECHNOLOGY CORPORATION, )
              Plaintiff,       )
                          )
                          )
              v.            )
                          )
INTERMEC, INC., INTERMEC     )
TECHNOLOGIES CORPORATION,  )
and INTERMEC IP CORP.,       )
              Defendants.  )

Civil Action No. 3:06 CV 51 (RSW)

**JURY TRIAL DEMANDED**

FILED

JUN 16 2006

EDWARD J. KLECKER, CLERK
U.S. DISTRICT COURT-NORTH DAKOTA

## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

        Plaintiff, Alien Technology Corporation ("Alien"), by its undersigned attorneys,

as and for its First Amended Complaint against defendants Intermec, Inc. ("Intermec"), Intermec

Technologies Corporation ("Intermec Technologies"), and Intermec IP Corp. ("Intermec IP")

(collectively "Intermec Defendants"), alleges as follows:

### INTRODUCTION

      1.    This action concerns the invalidity and non-infringement of the following

United States Patents, which, on information and belief, are owned by Intermec IP: U.S. Patent

No. 5,030,807; U.S. Patent No. 5,777,561; U.S. Patent No. 5,828,693; U.S. Patent No.

5,850,181; U.S. Patent No. 5,912,632; U.S. Patent No. 5,995,019; U.S. Patent No. 6,288,629;

U.S. Patent No. 6,400,274; U,S. Patent No. 6,429,775, and U.S. Patent No. 6,812,841

(collectively "patents-in-suit"). The Intermec Defendants have threatened to sue Alien for patent

infringement and engaged in other conduct that has created in Alien an objectively reasonable

apprehension of suit. Accordingly, as set forth below, Alien asks this Court to declare the

1191166.1
4839-2392-2177\1



EXHIBIT
A

Case 1:06-cv-00411-GMS     Document 16-4     Filed 10/02/2006     Page 5 of 47
Case 3:06-cv-00051-RSW-KKK     Document 9-2     Filed 06/29/2006     Page 2 of 15
Case 3:06-cv-00051-RSW-KKK     Document 4-1     Filed 06/16/2006     Page 2 of 15

patents-in-suit invalid and further to declare that, by making, using, selling, or offering to sell its

products, Alien does not infringe any valid claim of the patents-in-suit.

## THE PARTIES

2.     Plaintiff Alien is a manufacturer of Radio Frequency Identification

("RFID") products, including tags and readers.  Alien is incorporated under the laws of the State

of Delaware, and has its principal place of business at 18220 Butterfield Blvd., Morgan Hill,

California 95037.

3.     Since 2004, Alien has maintained a manufacturing facility at 1700 42nd

Street SW, Fargo, North Dakota 58103.  Alien contracts with numerous local businesses to

support its manufacturing efforts in Fargo, including, but not limited to, IT infrastructure and

networking support vendors, communications suppliers, office materials suppliers, and janitorial

vendors.  In addition, Alien has invested approximately $15 million in a new manufacturing

facility located in the North Dakota State University Research and Technology Park in Fargo.

Over the next two years, Alien plans to invest an additional $25 million to further expand the

facility and intends to employ approximately 100 people, including engineers and technicians.

However, in light of the Intermec Defendants' allegations of patent infringement, Alien's long-

term plans regarding its Fargo facility and related operations may be in jeopardy.

4.     On information and belief, the Intermec Defendants manufacture

technologies that identify, track, and manage supply chain assets using RFID technology.  On

information and belief, Intermec is incorporated under the laws of the State of Delaware, and has

its principal place of business at 6001 36th Ave. West, Everett, Washington 98203.  On

information and belief, Intermec Technologies, a wholly-owned subsidiary of Intermec, is

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 6 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 3 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 3 of 15

incorporated under the laws of the State of Washington, and has its principal place of business at

6001 36th Ave. West, Everett, Washington 98203. On information and belief, Intermec IP, a

wholly-owned subsidiary of Intermec Technologies, is incorporated under the laws of the State

of Delaware, and has its principal place of business at 6001 36th Ave. West, Everett, Washington

98203.

## JURISDICTION AND VENUE

5.      This Complaint seeks declaratory relief under the Declaratory Judgment

Act, Title 28, United States Code, Sections 2201 and 2202. This Court has subject matter

jurisdiction of the claims asserted thereunder by reason of Title 28, United States Code, Sections

1331 and 1338(a).

6.      Personal jurisdiction exists over the Intermec Defendants because they

have continuous, systematic, and substantial contacts with the State of North Dakota. On

information and belief, the Intermec Defendants provide supply chain information products,

services, and systems to companies in hundreds of industries around the world, and the Intermec

Defendants serve thousands of customers worldwide, including customers in the State of North

Dakota.

7.      Venue is proper in this District under Title 28, United States Code,

Sections 1391(b) and 1400 (b). On information and belief, the Intermec Defendants provide

supply chain information products, services, and systems to companies in hundreds of industries

around the world, and the Intermec Defendants serve thousands of customers worldwide,

including customers in this District.

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 7 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 4 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 4 of 15

8.    Venue is proper in the Southeastern Division of this District Pursuant to Local Rule 3.1(A).  On information and belief, the Intermec Defendants provide supply chain information products, services, and systems to companies in hundreds of industries around the world, and the Intermec Defendants serve thousands of customers worldwide, including customers in the Southeastern Division of this District.

## THE PATENTS

9.    On information and belief, on July 9, 1991, the United States Patent and Trademark Office ("PTO") issued U.S. Patent No. 5,030,807 ("the '807 patent") to Alfred R. Koelle and Jeremy Landt for their invention entitled "System for reading and writing data from and into remote tags."  On information and belief, Intermec IP owns all rights and title to the '807 patent, a copy of which is attached hereto as Exhibit A.

10.    On information and belief, on July 7, 1998, the PTO issued U.S. Patent No. 5,777,561 ("the '561 patent") to Trieu Can Chieu, Thomas Anthony Cofino, Harley Kent Heinrich, Paul Jorge Sousa, and Li-Cheng Richard Zai  for their invention entitled "Method of grouping RF transponders."  On information and belief, Intermec IP owns all rights and title to the '561 patent, a copy of which is attached hereto as Exhibit B.

11.    On information and belief, on October 27, 1998, the PTO issued U.S. Patent No. 5,828,693 ("the '693 patent") to Wesley M. Mays, Aaron J. Kam Siu, and Mike D. Fontanarosa for their invention entitled "Spread spectrum frequency hopping reader system." On information and belief, Intermec IP owns all rights and title to the '693 patent, a copy of which is attached hereto as Exhibit C.

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 8 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 5 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 5 of 15

12.    On information and belief, on December 15, 1998, the PTO issued U.S. Patent No. 5,850,181 ("the '181 patent") to Harley Kent Heinrich, Rene Dominic Martinez, Paul Jorge Sousa, and Li-Cheng Richard Zai for their invention entitled "Method of transporting radio frequency power to energize radio frequency identification transponders." On information and belief, Intermec IP owns all rights and title to the '181 patent, a copy of which is attached hereto as Exhibit D.

13.    On information and belief, on July 15, 1999, the PTO issued U.S. Patent No. 5,912,632 ("the '632 patent") to David E. Dieska, Daniel Joseph Friedman, Kenneth Alan Goldman, and Harly Kent Heinrich for their invention entitled "Single chip RF tag oscillator circuit synchronized by base station modulation frequency." On information and belief, Intermec IP owns all rights and title to the '632 patent, a copy of which was is attached hereto as Exhibit E.

14.    On information and belief, on November 30, 1999, the PTO issued U.S. Patent No. 5,995,019 ("the '019 patent") to Trieu Can Chieu, Thomas Anthony Cofino, Harley Kent Heinrich, Paul Jorge Sousa, and Li-Cheng Richard Zai for their invention entitled "Method for communicating with RF transponders." On information and belief, Intermec IP owns all rights and title to the '019 patent, a copy of which is attached hereto as Exhibit F.

15.    On information and belief, on September 11, 2001, the PTO issued U.S. Patent No. 6,288,629 ("the '629 patent") to Thomas Anthony Cofino, Daniel Joseph Friedman, Kenneth Alan Goldman, and Harley Kent Heinrich for their invention entitled "Method of using write--ok flag for radio frequency (RF) transponders (RF Tags)." On information and belief,

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 9 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 6 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 6 of 15

Intermec IP owns all rights and title to the '629 patent, a copy of which is attached hereto as Exhibit G.

16.    On information and belief, on June 4, 2002, the PTO issued U.S. Patent No. 6,400,274 ("the '274 patent") to Dah-Weih Duan, Daniel J. Friedman, Harley Kent Heinrich, Ian Bardwell-Jones, and Lou Ruggiero for their invention entitled "High-performance mobile power antennas." On information and belief, Intermec IP owns all rights and title to the '274 patent, a copy of which is attached hereto as Exhibit H.

17.    On information and belief, on August 6, 2002, the PTO issued U.S. Patent No. 6,429,775 ("the '775 patent") to Rene D. Martinez, Harley Kent Heinrich, Paul J. Sousa, and Li-Cheng R. Zai for their invention entitled "Apparatus for transporting radio frequency power to energize radio frequency identification transponders." On information and belief, Intermec IP owns all rights and title to the '775 patent, a copy of which is attached hereto as Exhibit I.

18.    On information and belief, on November 2, 2004, the PTO issued U.S. Patent No. 6,812,841 ("the '841 patent") to Harley Kent Heinrich, Vigay Pillai, and David E. Dieska for their invention entitled "Passive RFID tag that retains state after temporary loss of power." On information and belief, Intermec IP owns all rights and title to the '841 patent, a copy of which is attached hereto as Exhibit J.

## COUNT I

(Declaratory Judgment for Invalidity and Non-Infringement of the '807 patent)

19.    The averments of paragraphs 1-18 are repeated and realleged as if fully set forth herein.

Case 1:06-cv-00411-GMS   Document 16-4   Filed 10/02/2006   Page 10 of 47
Case 3:06-cv-00051-RSW-KKK   Document 9-2   Filed 06/29/2006   Page 7 of 15
Case 3:06-cv-00051-RSW-KKK   Document 4-1   Filed 06/16/2006   Page 7 of 15

20. The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

21. Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

22. There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '807 patent.

23. None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '807 patent.

24. The '807 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT II

(Declaratory Judgment for Invalidity and Non-Infringement of the '561 patent)

25. The averments of paragraphs 1-24 are repeated and realleged as if fully set forth herein.

26. The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

27. Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

1191166.1
4839-2392-2177\1

7

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 11 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 8 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 8 of 15

28.    There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '561 patent.

29.    None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '561 patent.

30.    The '561 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT III

(Declaratory Judgment for Invalidity and Non-Infringement of the '693 patent)

31.    The averments of paragraphs 1-30 are repeated and realleged as if fully set forth herein.

32.    The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

33.    Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

34.    There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '693 patent.

35.    None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '693 patent.

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 12 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 9 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 9 of 15

36.    The '693 patent and each of its claims are invalid, in whole or in part, for

failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT IV

(Declaratory Judgment for Invalidity and Non-Infringement of the '181 patent)

37.    The averments of paragraphs 1-36 are repeated and realleged as if fully set

forth herein.

38.    The Intermec Defendants' actions, including, but not limited to,

threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien

an objectively reasonable apprehension of suit.

39.    Alien manufactures RFID tags and readers, which, on information and

belief, the Intermec Defendants allege infringe the patents-in-suit.

40.    There is, therefore, a substantial, actual, and continuing controversy

between Alien and the Intermec Defendants as to the validity and infringement of the '181

patent.

41.    None of Alien's products, including, but not limited to, its RFID tags and

readers, infringe any valid claim of the '181 patent.

42.    The '181 patent and each of its claims are invalid, in whole or in part, for

failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT V

(Declaratory Judgment for Invalidity and Non-Infringement of the '632 patent)

43.    The averments of paragraphs 1-42 are repeated and realleged as if fully set

forth herein.

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 13 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 10 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 10 of 15

44.     The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

45.     Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

46.     There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '632 patent.

47.     None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '632 patent.

48.     The '632 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## <u>COUNT VI</u>

### (Declaratory Judgment for Invalidity and Non-Infringement of the '019 patent)

49.     The averments of paragraphs 1-48 are repeated and realleged as if fully set forth herein.

50.     The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

51.     Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 14 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 11 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 11 of 15

52.    There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '019 patent.

53.    None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '019 patent.

54.    The '019 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT VII

(Declaratory Judgment for Invalidity and Non-Infringement of the '629 patent)

55.    The averments of paragraphs 1-54 are repeated and realleged as if fully set forth herein.

56.    The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

57.    Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

58.    There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '629 patent.

59.    None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '629 patent.

1191166.1
4839-2392-2177\1

11

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 15 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 12 of 15

Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 12 of 15

60.    The '629 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT VIII

(Declaratory Judgment for Invalidity and Non-Infringement of the '274 patent)

61.    The averments of paragraphs 1-60 are repeated and realleged as if fully set forth herein.

62.    The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

63.    Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

64.    There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '274 patent.

65.    None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '274 patent.

66.    The '274 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT IX

(Declaratory Judgment for Invalidity and Non-Infringement of the '775 patent)

67.    The averments of paragraphs 1-66 are repeated and realleged as if fully set forth herein.

Case 1:06-cv-00411-GMS     Document 16-4     Filed 10/02/2006     Page 16 of 47
Case 3:06-cv-00051-RSW-KKK     Document 9-2     Filed 06/29/2006     Page 13 of 15
Case 3:06-cv-00051-RSW-KKK     Document 4-1     Filed 06/16/2006     Page 13 of 15

68.     The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

69.     Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

70.     There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '775 patent.

71.     None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '775 patent.

72.     The '775 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT X

(Declaratory Judgment for Invalidity and Non-Infringement of the '841 patent)

73.     The averments of paragraphs 1-72 are repeated and realleged as if fully set forth herein.

74.     The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

75.     Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 17 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 14 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 14 of 15

76.     There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '841 patent.

77.     None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '841 patent.

78.     The '841 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

WHEREFORE, ALIEN PRAYS FOR THE FOLLOWING RELIEF:

A.     A declaration that (i) Alien's products do not infringe the patents-in-suit, and (ii) the patents-in-suit are invalid.

B.     A permanent injunction enjoining and restraining the Intermec Defendants, their respective officers, agents, servants, employees, attorneys, and all persons acting in concert with them, and each of them:

1.     From making any claims to any person or entity that Alien's products infringe any of the patents-in-suit;

2.     From interfering with, or threatening to interfere with, the manufacture, sale, license, or use of Alien's products by Alien, its distributors, customers, licensees, successors or assigns, and others; and

3.     From instituting or prosecuting any lawsuit or proceeding, placing in issue the right of Alien, its distributors, customers, licensees, successors or assigns, and others to make, use, or sell Alien's products.

1191166.1
4839-2392-2177\1

14

Case 1:06-cv-00411-GMS    Document 16-4    Filed 10/02/2006    Page 18 of 47
Case 3:06-cv-00051-RSW-KKK    Document 9-2    Filed 06/29/2006    Page 15 of 15
Case 3:06-cv-00051-RSW-KKK    Document 4-1    Filed 06/16/2006    Page 15 of 15

C.    Recovery of Alien's attorneys' fees and costs of suit incurred herein; and

D.    Any other relief the Court deems just and proper.


Dated:  June 16, 2006                          DORSEY & WHITNEY LLP

                                               _____
                                               Sarah Andrews Herman (03399)
                                               51 Broadway, Suite 402
                                               PO Box 1344
                                               Fargo, ND 58107-1344
                                               (701) 235-6000

                                               and

                                               Gregory P. Stone
                                               Munger, Tolles & Olson LLP
                                               355 South Grand Avenue
                                               35th Floor
                                               Los Angeles, CA  90071
                                               (213) 683-9100

                                               ATTORNEYS FOR PLAINTIFF ALIEN
                                               TECHNOLOGY CORPORATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORP., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 3:06-CV-51 |
| v. | ) ) ) | Judge Rodney S. Webb |
| INTERMEC, INC., a Delaware corporation, INTERMEC TECHNOLOGIES CORP., a Delaware corporation, and INTERMEC IP CORP., a Delaware corporation, | ) ) ) ) | Magistrate Judge Karen K. Klein |
| Defendants. | ) ) | |

## DECLARATION OF KENNETH COHEN

I, Kenneth Cohen, declare as follows:

1.     I am a Vice President and the Treasurer of Intermec Inc.

2.     I am also a Vice President and the Treasurer of Intermec IP Corp.

3.     I am also a Vice President and the Treasurer of Intermec Technologies Corp.

4.     In my positions with Intermec, Inc., Intermec Technologies Corp., and Intermec IP Corp. I have first-hand knowledge of the operation, line of business, and corporate structure of these companies.

5.     Both Intermec, Inc. and Intermec IP Corp. received service of the Complaint filed by Alien in this matter on June 5, 2006. Intermec Technologies Corp. became aware that it had been named as an additional defendant in this case on or about June 21, 2006.

1

EXHIBIT
B

6.      As of June 1, 2006, the date I understand that Alien filed its Complaint, I was not aware of any statements of Intermec, Inc referencing Alien that could be referred to in Alien's Complaint other than the statements contained in the Transcript of the Q1 2006 Intermec, Inc. Earning Conference Call, dated May 8, 2006.

7.      The Q1 2006 Intermec, Inc. Earnings Conference Call was conducted from Everett, Washington and involved the asking of questions by a group of financial analysts.  I am not aware of any analyst, located in the State of North Dakota, who participated in that call.

**INTERMEC, INC.**

8.      Intermec, Inc. is incorporated under the laws of Delaware and has its principal place of business in Everett, Washington.

9.      Intermec, Inc. is a holding company that does not manufacture any products and does not provide any services.  It does not hold any assets in the State of North Dakota and does not serve any customer there or anywhere else.

10.     Intermec, Inc. does not manufacture any products or provide any services in the State of North Dakota.

11.     Intermec, Inc. does not maintain any offices or have any employees operating in the State of North Dakota.

12.     Intermec, Inc does not have a license to do business in the State of North Dakota.

13.     Intermec, Inc. has never filed a tax return in the State of North Dakota.

14.     Intermec, Inc. has not brought suit or, prior to Alien's initiation of this litigation, been sued in federal or state court in the State of North Dakota.

2

INTERMEC IP CORP.

15.    Intermec IP Corp. is incorporated under the laws of the State of Delaware and has its principal place of business in Henderson, Nevada.

16.    Intermec IP Corp. is a wholly-owned subsidiary of Intermec Technologies Corp. and its sole business is to own patents, license them, and collect royalties.  It is the owner of all of the patents identified in Alien's First Amended Complaint for Declaratory Judgment, but does not manufacture any products and does not provide any services.

17.    Intermec, IP Corp. does not manufacture any products or provide any services in the State of North Dakota.

18.    Intermec IP Corp. does not maintain any offices or have any employees operating in the State of North Dakota and it does not own any assets located in that state.

19.    Intermec IP Corp. does not have a license to do business in the State of North Dakota.

20.    Intermec IP Corp. has never filed a tax return in the State of North Dakota.

21.    Intermec IP Corp. has not brought suit or, prior to Alien's initiation of this litigation, been sued in federal or state court in the State of North Dakota.

INTERMEC TECHNOLOGIES CORP.

22.    Intermec Technologies Corp. is incorporated under the laws of the State of Washington and has its principal place of business in Everett, Washington.

23.    Intermec Technologies Corp. is a wholly-owned subsidiary of Intermec, Inc. that manufactures and sells automated identification and data collection ("AIDC") products, systems and related services including RFID products, systems and services.

3

24.    Intermec Technologies Corp. does not manufacture any products in the State of North Dakota.

25.    Intermec Technologies Corp. does not maintain any offices or have any employees residing in the State of North Dakota and does not own any assets located in that state.

26.    Intermec Technologies Corp. does not have a license to do business in the State of North Dakota.

27.    Intermec Technologies Corp. has never filed a tax return in the State of North Dakota.

28.    In 2005, Intermec Technologies Corp. had $472,670,567.05 worth of sales in the United States. Of that total domestic sales figure, less than $270,000 was to customers located in the State of North Dakota. That represents approximately .0571% of Intermec Technologies' 2005 sales in the United States. Approximately $182,000 of the $270,000 represents sales to a single customer.

29.    Intermec Technologies Corp. has not sold any RFID products in the state of North Dakota.

4

30.     Intermec Technologies Corp. has not brought suit or, prior to Alien's initiation of this litigation, been sued in federal or state court in the State of North Dakota.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 28, 2006 in Everett, Washington.

Kenneth Cohen



## Thomson StreetEvents

### IN - Q1 2006 Intermec, Inc. Earnings Conference Call

Event Date/Time: May. 08. 2006 / 5:00PM ET



EXHIBIT

C


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Kevin McCarty**
*Intermec, Inc. - Director of Investor Relations and Analysis*

**Larry Brady**
*Intermec, Inc. - Chairman, President and CEO*

**Steve Winter**
*Intermec, Inc. - President and COO*

**Rick Anderson**
*Intermec, Inc. - VP, Controller and Acting CFO*

## CONFERENCE CALL PARTICIPANTS

**Philip Alling**
*Bear Stearns - Analyst*

**Reik Read**
*Robert W. Baird & Co - Analyst*

**Andrew Abrams**
*Avian Securities - Analyst*

**Jeffrey Kessler**
*Lehman Brothers - Analyst*

**Chris Quilty**
*Raymond James - Analyst*

**David Sterman**
*Jesup & Lamont - Analyst*

**Ajit Pai**
*Thomas Weisel Partners - Analyst*

## PRESENTATION

**Operator**

Welcome to the Intermec first quarter 2006 earnings conference call. At this time, all participants are in a listen-only mode. After the presentation, we will conduct a question-and-answer session. (OPERATOR INSTRUCTIONS). Today's conference is being recorded. Should anyone object, they may disconnect at this time.

It is now my pleasure to turn the meeting over to your host, Mr. Kevin McCarty. Sir, you may begin your conference.

---

**Kevin McCarty** - *Intermec, Inc. - Director of Investor Relations and Analysis*

Thank you. Good afternoon, everyone, and welcome to Intermec's first quarter fiscal year 2006 earnings release conference call. Joining me on the call this afternoon is Larry Brady, Intermec's Chairman and Chief Executive Officer, Steve Winter, President and Chief Operating Officer, and Rick Anderson, Controller and acting Chief Financial Officer. Once we conclude our remarks this afternoon, we will open up the call for our question-and-answer period.

Before we begin our prepared remarks, I wish to remind investors that statements made during the course of this conference call that express the Company's or management's intentions, hopes, beliefs, expectations or predictions of the future are forward-looking statements. These forward-looking statements are contained within the meaning of the Securities Litigation

---

| THOMSON | www.streetevents.com | Contact Us |  |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

Reform Act of 1995. It is also important to note that such -- that the Company's actual results could differ materially from those projected in such forward-looking statements. Additional information concerning factors that could cause actual results to differ maturely is contained in the Company's press releases and in its filings with the Securities and Exchange Commission, including, but not limited to, the Company's annual report on Form 10-K for the year ending December 31, 2005, and other reports filed from time to time with the SEC. Copies of these filings may be obtained by contacting the Company or the SEC.

With that, I would like to turn the call over to Larry Brady, Intermec's Chairman and CEO. Larry?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Thank you, Kevin. Our first-quarter performance, as indicated in our press release, indicates revenues of $227 million and earnings from continuing operations of $0.23 per share. On the surface, these are strong results for the first quarter. However, when we take into consideration several events of the quarter, our operating result is below expectations. In order to focus the later discussion on operating results, we will first discuss these individual events.

In March, we announced a final settlement with Hewlett-Packard concerning our battery management intellectual property. This settlement represents the last of the laptop computer manufacturers to settle. The entire proceedings have stretched over seven years, and resulted in settlements in our favor totaling more than $200 million.

The second item concerns the intended shutdown of our Swedish research facilities. You may recall that we implemented a cost reduction in 2003 involving the shutdown of our manufacturing facilities in Goteborg, but retained our research effort in the location. Our current strategy, aimed at the further improvement in our competitive posture, requires the relocation of all the contributing functions to Southeast Asia, including research and the supplier base.

As our press release indicated, this will entail a onetime cost of about $6 million. Of this cost, about 1 million is included as a charge to this quarter's result, and the remaining amount will be taken over the next three quarters. The approximate $8 million in annual savings, which this restructuring will allow, will commence when the required notification period for employees has been completed. The first of these savings will begin in the fourth quarter, and the full annualized rate should be reached in the first quarter of next year. Some reinvestment of the savings is intended.

Moving now to operating performance, we achieved product and service sales of $204 million, a 3.7% increase over the prior year and a historic high for a first quarter. First-quarter revenue also represents a 5 point growth advantage over the weighted average of our two largest competitors. However, the revenue figure is $5 million below the product and service range of 209 to $219 million that we provided at the beginning of the quarter.

Our GAAP EPS from continuing operations of $0.23 was favorably impacted by the IP settlement with HP in the amount of $0.16 per share. Restructuring charges related to our manufacturing centers in Sweden -- that is our research centers in Sweden -- was $1 million, impacting EPS by a negative $0.01 per share. The Company's GAAP earnings and EPS also include $1.9 million, or a negative $0.02 per share, of compensation expense recorded under the provisions of FAS 123(R). The tax provisions for the first quarter of 2006 was favorably impacted by $2.2 million from the conclusion of a Canadian tax audit, resulting in an effective tax rate of 21%.

In looking beyond the headline figures, results for our product lines and geographies varied significantly. In our largest region, North America, which represents 63% of total sales, revenues increased 19% over the first quarter of 2004.

However, in Europe, our second-largest region at 27% of total sales, revenues were considerably softer. Revenues in Europe fell 17% versus the prior year period. The currency impact on European revenues of a stronger dollar versus a year ago was a little over $5 million. Therefore, on a local currency basis, Europe's decline was about 9%.

THOMSON | www.streetevents.com | Contact Us 

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

This regional weakness, which has impacted the market for the past year, has negatively impacted our performance for the last two quarters. The smaller regions, Asia-Pacific and Latin America, were also mixed, with revenues up 19% and down 22%, respectively.

The same pattern also applies to our product revenues, although it is less severe. Our core Systems and Solutions product revenues were up 7.4% over the prior year period. The printer media business was down 9.9%, and our service business was up 8.5%. The decline in printer media was fully attributable to the European region.

Gross margins for the Company were slightly under 40%. Compared to the first quarter of 2005, declines were largely attributable to product margins and currency. The ratio of enterprise accounts in the top 50 customer group were about 30% of the total, versus the 40% level in the fourth quarter of 2005 and the 25% level in the first quarter of last year. So, mix was less a factor.

On a regional basis, the majority of the gross margin decline was in Europe, although margins in that region remained the highest of all regions.

Our SG&A expense of $77.8 million, including corporate expense, was off about $5 million. The increase in expense is due to two items primarily. Our research and development expense increased about $3 million; also, the current quarter includes about $2 million of stock option expense resulting from the adoption of FAS 123(R). As explained on our prior conference call, our R&D expenses are front-end loaded, and reflect the combination of product release timing and European regulatory compliance costs. The remainder of our expenses were effectively flat compared to the prior year period, as productivity and SG&A offset inflationary pressures from these costs.

Moving from the financial detail to a broader perspective, the sale of our last industrial automation business in the fourth quarter of last year is now providing benefit to our current performance. One contributor to the SG&A productivity just discussed is reduced corporate expense. The run rate of these expenses has declined from last year's first quarter run rate of about $23 million per year, to this year's first quarter run rate of under $20 million.

The approximate $100 million in improved net cash position achieved last year, largely from the proceeds of the sales of the industrial automation group, has enabled our anticipated share buyback. In March, our Board of Directors authorized the repurchase of $100 million in Intermec shares. It is also worthy of note that we generated a further $47 million improvement in our cash balance during the first quarter.

Two further events have occurred that deserve mention. First, Datalogic joined the list of Intermec RFID licensees as a result of their purchase of PSC. A provision of the Rapid Start license enables acquirers of licensees to be considered for license transfer. We approved this transfer for Datalogic in return for additional fees that will be treated as deferred revenue.

The second significant event which followed quarter end was the testimony to the continued strength of our Cisco alliance. Intermec was named Cisco Systems' Integrator of the Year for the second year in a row. This award follows a very successful cooperation between the two companies during the past year, the most recent evidence of which is cooperation in two commercial initiatives -- firstly, the Forklift of the Future, a design alliance between Intermec, Cascade, Red Prairie and Cisco; and two, the Digital Communities Initiative, joining Intermec, Intel, Panasonic and Cisco, among other technology leaders, to help municipalities take advantage of mobile and wireless computing systems.

Before moving to our outlook for the quarter and the year, let me summarize our view of the current situation. Weak European markets are offsetting strong performance in North America. The markets in Europe have displayed general weakness for the past year, and have seen further deterioration as a result of the strong dollar for the last six months, and the customers' uncertainty associated with the pending implementation of the Reduction of Hazardous Substance regulations. The weak market is also contributing to declining margins, albeit from a relatively high level.



| www.streetevents.com | Contact Us |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08, 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

Last year, Intermec revenues grew by about 11%. Our two largest competitors grew at a weighted average growth rate of 3%. This large differential is difficult to sustain, as we saw in this year's first quarter, where our gross advantages shrunk to 5 points, from the 8 point advantage of last year. In this environment, we believe that growth for the second quarter will be about 5% over last year's second quarter. Growth for the full year should be about 7.5% over 2005.

We anticipate some strengthening in the second half of the year as a result of the European regulatory deadline on June 30, the current weakening of the dollar, and strong new product introductions. Specifically, our projected range of revenue for the second quarter is from 223 to $233 million. The projected sales for the full year range from 948 to $978 million, including the HP settlement.

EPS for the second quarter is projected to be $0.09, plus or minus $0.02, and for the year to be $0.82, plus or minus $0.10. All EPS forecasts are GAAP numbers, and include option expense, the individual items cited in the first quarter, as well as all restructuring costs for the year for the Swedish research changes. Kevin?

---

**Kevin McCarty** - *Intermec, Inc. - Director of Investor Relations and Analysis*

Great. Thanks, Larry. Operator, at this time, we now would like to open up our call for our question-and-answer period.

---

## QUESTIONS AND ANSWERS

**Operator**

(OPERATOR INSTRUCTIONS). Philip Alling, Bear Stearns.

---

**Philip Alling** - *Bear Stearns - Analyst*

With respect to the lower guidance range that you just gave for EPS for the full year, is that inclusive of the impact of the HP settlement?

---

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes it is, Philip. Those are all GAAP numbers, and so they have got all three or four of what you would call individual items in them, including HP, including the research facility restructuring costs, including the option expense.

---

**Philip Alling** - *Bear Stearns - Analyst*

With respect to the 16.5 million in operating profit that you mentioned as far as the — I just wanted to get a better sense of that in terms of the HP settlement in the current quarter. What tax rate did you apply to that for that to translate to a $0.16 impact?

---

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

We took the $23 million worth of revenues, subtract the $6.5 million worth of costs, applied a normalized 37% tax rate, and that's how we got the EPS number.

---

THOMSON | www.streetevents.com | Contact Us | 

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Philip Alling** - *Bear Stearns - Analyst*

With respect to the Datalogic joining the Rapid Start program, I did see that the deferred revenue was up sequentially in the quarter. Should we just assume that the -- well, perhaps you could give a little bit more color with respect to the increase in deferred from -- compared to last quarter. And did that really reflect a payment from Datalogic to be part of that program?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

You know, there are a lot of items in deferred revenue, in addition to simply this activity. It is not a material amount relative to the amounts that we have talked about in the past.

**Philip Alling** - *Bear Stearns - Analyst*

Could you give us any color with respect to the royalty reports that you have received from the existing licensees to your Rapid Start program thus far?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

As you know, we said before we will not and cannot give you that color because we are violating the very confidentiality that is required of somebody who pulls those kind of numbers together. That would be -- that would just be a serious flaw in our process were we to do that.

**Philip Alling** - *Bear Stearns - Analyst*

What general could you make about trends in the RFID space in terms of spending?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Again, the issue that we can comment on is our experience as compared to industry experience. Steve can certainly do that.

**Steve Winter** - *Intermec, Inc. - President and COO*

I think we can give you some general color on our feeling about the industry and where it's going. We have had -- as of the end of the first quarter, we have about Gen 2 RFID pilots going. We are seeing good results from those pilots, a lot of interest in the products and its capabilities. We are seeing ever-increasing performance improvements from our own products, as well as other companies' products. And so, I think many of those customers are getting more confident that the Gen 2 product will provide the kind of capabilities they are interested in. And these pilots are starting to prove that out.

So, we anticipate we will see increasing activity through the year, and that, as we have said before, that 2006 will largely be proof of the Gen 2 pilots, with increasing installations in the second half. And 2007, we think, will be the year of significant installations of the product.

**Philip Alling** - *Bear Stearns - Analyst*

With respect to the CFO position, is there an update there in terms of the search that you have had underway?

THOMSON    |    www.streetevents.com    |    Contact Us    

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Sure is. We are down to two finalists. We are having our board meeting in mid May, and we'll take that opportunity when the folks are in to have those folks interviewed by the Audit Committee, and we would anticipate a decision shortly after that.

**Operator**

Reik Read, Robert W. Baird & Co.

**Reik Read** - *Robert W. Baird & Co - Analyst*

Larry, I just wanted to ask a little bit more about Europe. If I look at where the currency was, say, a couple of months ago versus where it is today, it is not that much of a change. So, I don't think — I would assume that currency wasn't a big surprise to you in terms of how things shook out sequentially. So that would leave RoHS. And I'm wondering, is that something that kind of caught you by surprise that slowed Europe down, or were there other factors as well?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

I will let Steve answer that question. I think the answer broadly is that we understood the spending required and we understood the changes required. Some of the customer uncertainty came as a bit of a surprise in terms of — not the confusion so much as the the — before June 30, you have got product that isn't qualified. And after June 30, you have got product that is. And so some people are slowing down purchases as it relates to — I just prefer to get — even though it is okay, I would still prefer to get product that is qualified. So, I will let Steve expand on that.

**Steve Winter** - *Intermec, Inc. - President and COO*

That basically is exactly what is happening. As customers start finding themselves approaching the deadline, as they consider new purchases, it has slowed them down as they look around and decide whether or not they want to finish up rollouts or start new rollouts with non-RoHS-compliant product, or wait until they're certain that they have RoHS-compliant product.

The other thing that's contributing to that is there is a lot of uncertainty in the EU about how certification of compliance will occur, and that varies by country. So, we anticipate over the next two months that a lot of that uncertainty will get resolved, and that we will see increasing sales in the third and fourth quarter in Europe, as companies become comfortable with those resolutions and start to buy again.

**Reik Read** - *Robert W. Baird & Co - Analyst*

You, Larry, had mentioned new products as part of your remarks. Can you give us a sense for how much new product development has been underway, what might be coming out over the course of — in broad brush strokes, what might be coming out over the course of the next couple of months?

**Steve Winter** - *Intermec, Inc. - President and COO*

Sure, I will be glad to do that. We have several major introductions that will be happening in the third quarter, and a few in the second quarter. We will introduce a new scan engine, laser MEM scan engine this quarter, and other one in the third quarter, which completes our product line in that area.

THOMSON     www.streetevents.com     |     Contact Us     

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

We will be introducing new vehicle mount units, new terminals, specifically aimed at transportation logistics and warehousing distribution. We continue to RFID enable virtually all of our commercial products that have an RFID application. And so, you will see more units coming out with RFID enablement in the printer area, and more fixed readers — portal readers, that type of thing. So, we'll continue to fill out our Gen 2 product line. We already have product in each one of the categories. But we'll continue to fill that out. And we'll see a new printer version released as well, a new metal value printer release.

**Reik Read** - *Robert W. Baird & Co - Analyst*

Have you guys seen any changes with respect to the compensation programs and/or how you incent resellers as changing any of your business in the — say, since the beginning of the year?

**Steve Winter** - *Intermec, Inc. - President and COO*

We haven't made significant changes to our compensation program for the channel. We have made some continued refinements, but we haven't made any significant changes. And so we haven't seen impacts as a result of that; none that we could point to as affecting results one way or the other.

**Operator**

Andrew Abrams, Avian Securities

**Andrew Abrams** - *Avian Securities - Analyst*

I was wondering if you could give us a little bit more on the European margins. If I remember correctly from the last conference call, you had a couple of large customers who were high-margin customers in Europe kind of postpone for at least some time. Would you expect as that business starts to recover in third and fourth quarter, margins to be coming back to where they had been historically? Or would you expect, because of RoHS and the fact that these guys are carrying almost two sets of inventory here and there, that margins will be a little on the lighter side? And also, if you could give us an update on progress with the DOD.

**Steve Winter** - *Intermec, Inc. - President and COO*

Let me start with European margins. We don't specifically report European margins, so — but let me just comment in general. The things that have affected margins on a quarter-on-quarter basis — so, Q1 2005 to Q1 2006 — currency did have a significant impact. It was a little over $3 million between those two quarters. So, that had a significant impact. And we expect that the currency issue will improve as we go through the year, as the dollar has shown a trend to weaken a little bit.

The customers holding off purchases because of RoHS isn't specifically a margin issue; it's more a revenue issue for us. And we do expect improved revenues in the second half of the year from two things — one, RoHS gets resolved, and people get comfortable; and number two, we have several new products that are being introduced that will have a substantial impact in the second half. Those are products that are specifically interesting to the European market, where we are strong in transportation logistics and retail. So, we expect to see some success there from those products, as in other areas of the world as well.

The other thing that you asked was an update on the DOD. The AIT contract continues to be a good source of revenue for us. We recently won a substantial program with the government for their ammunition systems with the Army. And the — on the RFID side, it has been somewhat slow on the RFID side because I think there is still some uncertainty within the DOD about Gen 1 versus Gen 2. But there are new basic ordering agreements being issued for Gen 2-specific product, which should clear that up. And I would expect to see that continue to build in volume in the DOD as well.

| THOMSON | www.streetevents.com | Contact Us |  |
|---------|---------------------|-----------|---|

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Andrew Abrams** - *Avian Securities - Analyst*

Would you expect to see any substantial DOD revenue this year, or would we assume that that is all going to come in 2007?

---

**Steve Winter** - *Intermec, Inc. - President and COO*

With regard to RFID, or in general?

---

**Andrew Abrams** - *Avian Securities - Analyst*

RFID, AIT excluded.

---

**Steve Winter** - *Intermec, Inc. - President and COO*

No, we would see commercial being more significant this year than the DOD.

---

**Operator**

Jeffrey Kessler, Lehman Brothers.

---

**Jeffrey Kessler** - *Lehman Brothers - Analyst*

First, your tax rate benefited this quarter. The calculations for the remainder of the year, I believe you have said, are based on a full tax rate? (multiple speakers)

---

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes, let me explain that. We have talked off and on about different normalized tax rates. If you look at our tax rate for the full year, it's about 35%. It's the result of a 21% this quarter and about 37% in the remaining three quarters of the year.

---

**Jeffrey Kessler** - *Lehman Brothers - Analyst*

A follow-up channel question on the channel, and that is – did you see any – was there any marked difference in your channel sales versus your direct sales, with regard to any trends as far as Europe, either geographic or vertical market trends on channel versus direct?

---

**Steve Winter** - *Intermec, Inc. - President and COO*

Well, we saw, as Larry talked about in his remarks, we actually saw enterprise sales – high-volume, lower-margin enterprise sales decline as a percentage of total revenue compared to Q3 and Q4 of last year. And so – and that was spread broadly across the world. We saw more of our sales coming from our traditional higher-margin enterprise customers and our channel than we did from our low-margin enterprise customers. So, if anything, it was – that less of a factor in the channel, and traditional enterprise business was more positive in the quarter.

---

| THOMSON | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Jeffrey Kessler** - *Lehman Brothers - Analyst*

And speaking of vertical markets, was there any — did you make any incursions into either new vertical markets, or was there any material gain in any specific vertical market that — other than warehousing and manufacturing that you might want to note?

**Steve Winter** - *Intermec, Inc. - President and COO*

Well, we continue to focus pretty much exclusively on our five vertical markets, which is industrial, transportation logistics, retail, consumer packaged goods, and government. And so those are the five that we focus pretty much exclusively on ourselves. Some of our channel partners also sell our products into other verticals. But it's not a specific target.

**Jeffrey Kessler** - *Lehman Brothers - Analyst*

I guess misstated my question a little bit, and that essentially was, was there any shift that you saw amongst those — amongst your core verticals in the quarter?

**Steve Winter** - *Intermec, Inc. - President and COO*

There wasn't a substantial shift. There is a continued trend toward strength in transportation logistics, and growth for us in retail; those are growing at higher rates than the other three markets. And that continued.

**Operator**

Chris Quilty, Raymond James.

**Chris Quilty** - *Raymond James - Analyst*

I just want to get some clarification on the guidance. The guidance that you provided, does that include the ongoing restructuring charges, anticipated restructuring charges with Goteborg?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes, $6 million is included in that number for the full year.

**Chris Quilty** - *Raymond James - Analyst*

And that also includes stock option expenses, all the onetime items in this quarter, and the HP?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Right. And the only issue there — all of that is true, Chris. The only issue is $1 million of that 6 is in this quarter; the remaining 5 are in the remaining three quarters, of the restructuring.

---


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Chris Quilty** - *Raymond James - Analyst*

Fair enough. Just a clarification on the stock option expensing this quarter, you had said to expect $0.03. You say in your press release $0.02. When I run the numbers on 1.9 million on your share count, I come up with $0.02. I guess I am trying to get at -- when I filter through all these numbers and put out my pro forma number here for the quarter, which I know you guys are not allowed to mention that word, if it is $0.02 of stock option expenses, then you reported 0.05 relative to your guidance range of $0.04 to $0.08.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

It is $0.02. That is what we say in the press release.

**Chris Quilty** - *Raymond James - Analyst*

What is different about the math there?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

It depends on which part. What the first part of the math are option expenses lower than we had communicated because of the different handling in one set of options versus a different one, and we were just wrong in our estimate. And so that is the delta there. The 1.9 million, as you point out, is $0.02, and that is what is included in our GAAP number. I think that's the way I say it.

**Chris Quilty** - *Raymond James - Analyst*

I thought -- if I plug in 1.9 million in your share base, however, I come up with $0.03. There is a math issue there.

**Steve Winter** - *Intermec, Inc. - President and COO*

You have to tax-effect the 1.9 million.

**Chris Quilty** - *Raymond James - Analyst*

So that is pre-tax?

**Steve Winter** - *Intermec, Inc. - President and COO*

The 1.9 million is pretax.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

I'm sorry. The 1.9 is pre-tax. That's correct.

**Chris Quilty** - *Raymond James - Analyst*

And generally, we use the same corporate average tax rate?

| THOMSON | www.streetevents.com | Contact Us | 10 |
|---------|---------------------|------------|-----|

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Generally, we are using — to try to bridge this conversation of an all-GAAP conversation, we are using a 37% incremental tax rate for those items for which we are doing a calculation of EPS impact.

**Chris Quilty** - *Raymond James - Analyst*

Got you. I will send my thank you letter to the SEC to make reporting that much easier.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes indeed.

**Chris Quilty** - *Raymond James - Analyst*

With regard to your Q2 guidance, it looks like you are guiding relatively weak relative to last year, and to where most of the consensus sits right now. Obviously, you have a look at where most of the models were for Q2. Is the biggest delta there between our expectations and where you are guiding to in your European outlook, or how would you characterize that?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

It's hard to say, because other people aren't talking about what their European outlook is. But I would guess that is the case. Chris, as you know, Europe tended to show its softness in retail first. And so our competitors took something of a hit in the first half of last year as it relates to Europe, which showed up for us in the latter half. And that is what I think the distinction is. But that is a bit of a guess since other people aren't doing their forecast by region.

**Chris Quilty** - *Raymond James - Analyst*

And with regard to retail, you had some notable success in the second half of 2004, and we haven't seen much activity since. What is your outlook? And I know you don't have a huge exposure to the retail market. And how key are partners — and I know in the past, Cisco has been a good partner in that regard — towards addressing the retail market?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Cisco has been critical just in terms of the vertical awareness. And so they wind up being a big help for us in terms of the credibility in a market where we have got limited share. But I think what you are talking about is not so much a conversation that we talk about all of our wins in retail, as it's the only way we can wind up getting around to explaining margin differentials. And it is certainly fair to say that we continue, as Steve said, to have success in the vertical market, but it is a larger number of smaller individual wins that characterizes our performance in the — so we are winning 5 and 10 instead of 20 and $30 million accounts at this point.

**Chris Quilty** - *Raymond James - Analyst*

One question on RFID and royalty revenues on a go-forward basis. You have a number of non-licensed companies out there selling products, some of which are winning large size contracts. How long can you wait before needing to step in and enforce the Rapid Start program?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.



FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

A secondary question to that — and I don't want to go off into a mindless technology debate — but recent developments in HF technology, specifically in pharma — does that run the risk of sapping away some of your future royalty streams, if it all moves — at the item level, it moves to HF? Or is it your general feeling that that will all swing back to a near-field UHF Gen 2 Rapid Start technology?

**Steve Winter** - *Intermec, Inc. - President and COO*

Let me take the first part first, which had to do with enforcement of IP rights. You know, with the Rapid Start program, we did provide a substantial choice of license suppliers to the industry. We have 19 licensees, multiple licensees in every product category. So, we think there is an excellent choice out there.

It's obviously disappointing if any customer were to do business with a supplier that is not licensed. But you know, we have consistently stated we will be pursuing infringers. We are putting together cases. We are looking at those who are most disruptive to the industry right now. And basically, preparations are underway with respect to unlicensed suppliers like Alien and others. And we expect those enforcement actions by the end of the year, or within this year.

The second part of your question had to do with high frequency. There is a significant debate going on about high frequency versus Gen 2. Some of the majors are saying that they would not allow multiple RFID technologies within the confines of their businesses, especially those that do more than just pharma; but they do pharma as well as grocery and general merchandising. But there also is a camp that says that high frequency, especially in pharma, is something that is useful and a good standard for them. So I think the answer is the debate is still on. I don't think that it has been decided yet. And I think there is going to be a lot of resistance to having multiple technologies in a store, especially since that is going to add to the cost of the overall system, as you have multifrequency reading devices and multifrequency tags, several tag types in a store.

So I think that is still an open debate. We don't think that it will impact our overall royalty streams, based on what we have been projecting and talking about. We think that the market will basically mature at the kinds of rates that we have been talking about. So, it wouldn't detract from the kind of royalty streams we have been talking about in our guidance.

**Chris Quilty** - *Raymond James - Analyst*

Great. If I can sneak one more in with regard to guidance. The plus or minus $0.10, which, I think, is what you gave as the spread on the $0.82 baseline guidance — what would you attribute to that broader range? The original guidance you gave us back several months ago gave an all-in $0.10 range, and you basically doubled the variance here. Is that primarily due to RFID licensing, or are there other factors?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

It's a really good question, Chris. And the best explanation I can give you is one is safer than the other, having come from where we have come from. But the spending is pretty crisp, and I think that we are getting very comfortable with margin being fundamentally an upside as compared to a downside surprise. And therefore, the answer -- the legitimate answer to your question — and it doesn't explain why the change in range — but the answer to your question is that the sales level and industry growth and market growth are, at a time of transition, the biggest uncertainties in our numbers.

**Operator**

David Sterman, Jesup & Lamont.


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec Inc. Earnings Conference Call

**David Sterman** - *Jesup & Lamont - Analyst*

This is a little bit of a rehash of some recent questions, but just looking at the gross margin and the comments you just made about maybe a little bit of an upside bias to gross margins in here, rather than a downside -- backing out currency effects and other factors, can you give us just a little sense of what you think from the new product introductions, from what you are seeing, pricing out there, and other factors -- that maybe you could shed light on why you might see gross margin strengthening from here, and maybe -- and not a further deterioration?

**Steve Winter** - *Intermec, Inc. - President and COO*

Sure. When we were reviewing our first-quarter results, we saw some encouraging signs that unfortunately got overshadowed by a revenue miss in an important category, which is service. But basically, when we look at our product gross margins, our overall product gross margins, in the first quarter we had an uptick of about 0.5% versus the fourth quarter, which was what we had expected. And we saw the same sort of increase in our supplies business. Service was down, and it was down primarily because of the revenue miss. It's pretty heavily impacted when the revenue is missed.

So, that aside, we think, going forward we're on with the predictions we have for absorption, based on the current forecast for product revenue, with the additional material purchase efficiencies that we'll get through the year. We think there is plenty of reason to believe that we are going to have an improvement in gross margins. Last year we didn't obtain the typical improvement in gross margins that we did this -- that we have in the past. That was primarily a result of the large influx of enterprise business in the second half. But as we look at enterprise business levels going forward, we look at absorption and material efficiencies, we think we'll see the traditional uptick in gross margins throughout the year.

**David Sterman** - *Jesup & Lamont - Analyst*

And is it safe to say that, again, currency notwithstanding, or sales mix issues notwithstanding, that pricing is relatively stable last quarter and now here into the second quarter?

**Steve Winter** - *Intermec, Inc. - President and COO*

The pricing is -- the erosion that we are seeing in pricing is not unusual compared to what we have been seeing over the last couple of years, and not outside of the planning parameters that we use for declines in ASPs. So, we don't see anything unusual there.

**David Sterman** - *Jesup & Lamont - Analyst*

You have been kind of building up the balance sheet here for, I guess, several years now with the divestitures and the cash flow. Beyond the share buyback, is there anything else that you can talk about in terms of uses of cash?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

I don't think so at this time. I think we are -- having excess cash is a new experience for us, and so we are moving fairly cautiously in that arena until we sort out being comfortable with the approach we are taking. And I think it's undeniably true that when we conclude this existing authorization, that we'll revisit the question of how should we be spending our money. And the fact of the matter is that RFID will be further along the development trail at the time, and we'll have more of a sense of investment required to grow, as well as any potential for adding to our technology capabilities through acquisition. So, I think that is a jury that is still out. We would like to continue to be on the conservative side of the way we run our balance sheet in the near-term.


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**David Sterman** - *Jesup & Lamont - Analyst*

Is it your sense that the share buyback will be taking place here at current levels, or is it more of — should the share price weaken further?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

No, I think our intention is to buy back shares, and I think we'll probably commence reasonably soon. We obviously haven't been buying back shares during the quiet period. But we would anticipate that we will commence that activity in the not-too-distant future.

**Operator**

Ajit Pai, Thomas Weisel Partners.

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

When you look at your balance sheet at the end of December and then April, if you look at the current assets and net after-tax assets, you dropped them by about 50 million, from 100.6 million to 49.6 million. And your long-term (indiscernible) tax assets go up. Is that because your business plan for this year, in terms of the expected profitability, has changed?

**Rick Anderson** - *Intermec, Inc. - VP, Controller and Acting CFO*

This is Rick Anderson. That had to do with the transaction in Europe and the fact that we are no longer permanently reinvesting our retained earnings in the UK entities from our IAS division that we divested. So, that was previously in the current deferred tax asset at year-end because of that utilization of tax ramifications (indiscernible) it had to do with repatriating those earnings.

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

So that decision was made after December 31, 2005?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Correct.

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

Even though the divestiture was complete before that date?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Correct. The transfer of funds and then the subsequent transition of funds occurred in 2006.


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Ajit Pai -** *Thomas Weisel Partners - Analyst*

So, nothing to do with a change in your perception of broad profitability by geography?

---

**Larry Brady -** *Intermec, Inc. - Chairman, President and CEO*

No. Absolutely not. (multiple speakers)

---

**Ajit Pai -** *Thomas Weisel Partners - Analyst*

The second question would be -- just looking at your gross margins, we spent a lot of time on it -- I think a number of questions. (indiscernible) broadly looking out, maybe three to four years in the future, historically you have said that competing with your two competitors -- [Zebra] on the barcode printer side, and now your mobile printer side as well, and then Symbol on the mobile computing and scanner side -- their gross margins have been significantly, I think, maybe 600 to 1000 basis points higher than yours when you look at that separately.

You have always said that there isn't really -- scale doesn't provide such significant advantage in this business. Can you give us sort of a refresh on your strategy, about where you think the gross margins can go to over time? And even over the past maybe six quarters, you have grown faster than both of your peers. What would it take to get gross margins to comparable gross margin to them?

---

**Larry Brady -** *Intermec, Inc. - Chairman, President and CEO*

Just broadly -- and Steve may want to comment in more detail -- broadly, I think what we have said is that scale can provide as much as about a 3 point advantage in gross margin. It's not something that knocks us out of the box, but it is that sort of advantage. It is our belief that historically we have been disadvantaged by royalties included in the gross margin, and in the future we are going to be advantaged by gross margins in the future. So, we see that as one major offset or shift in the way those margin numbers operate.

The second thing is it is undeniably true -- and I think we have said that in the past -- with the manufacturer -- that the research and development manufacturer and supply chain activities carried out through our Swedish facilities have disadvantaged us in product costs in the printer area, which is a part of the reasoning behind the relocation that you are seeing now. And we could see -- now understanding it's only a percent of our total business, so it has a weighted average that is less than the complete number -- but we can see an improvement in margins in the printer area north of 5 points.

---

**Ajit Pai -** *Thomas Weisel Partners - Analyst*

In the printer area. But for the overall business, what would you expect the gross margins to be, maybe about three years out?

---

**Larry Brady -** *Intermec, Inc. - Chairman, President and CEO*

I hesitate to make any conclusion about three years out, because it depends on competitive behavior. But if you just talk about the trends that I just described, the answer would be 3, 4 points.

---

**Ajit Pai -** *Thomas Weisel Partners - Analyst*

In terms of the fact that you mentioned on this call that you might be taking some legal action against folks that have not been signed up so far for Rapid Start at some point during this year, could you give us some color as to what the potential impact on


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May 08. 2006 / 5:00PM, IN – Q1 2006 Intermec, Inc. Earnings Conference Call

your SG&A line could be of taking such action, or whether similar to the (indiscernible) settlements you might have it not impacting your expense line in the near-term?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

The answer to the question which you asked that we have given in the past and are still comfortable with is that -- A., we intend to defend ourselves; B., that we see the annual expense of that defense as being equal to or less than the amount of deferred revenue that we are getting from the fixed fees on the front end of the program; so, a number of less than, say, 4.5 million annually. I hate to be more specific about that, because we don't want to constrain our ability to defend. And I think it is also fair to say that in the past, what we have said is it's only logical that we would wait until the recovery from an action, at least would manage to pay us back our court cost, before we would launch such a program.

I think given the circumstances that we are currently looking at -- that is, the amazing propensity of people to take business well below cost, and the amazing publicity which such actions receive -- that we are apt to move in advance of where we would have originally intended. And indeed, the limitation on when we will take action now is more related to just the [wickets] that we have to go through -- that is, (indiscernible) product, and disassemble the product and understand that infringement is occurring. Because we've got a certain obligation, before we just go out and willy nilly start filing lawsuits, to demonstrate that there's cause of action. So that is the path that we are currently on.

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

When you are looking at the verticals right now -- you've talked about what happened in Europe, but when you look at the U.S. markets, are there any verticals right now that you see are still very significant in terms of how robust they are? And which verticals do you think are most at risk of becoming weaker?

**Steve Winter** - *Intermec, Inc. - President and COO*

The verticals that are the strongest worldwide are, for us, primarily transportation logistics. We are seeing a lot of strength in that vertical. And we continue to see that a lot of our growth is occurring there. We are seeing a lot of good growth in field service, which is both an application and a vertical. But field service has tended to be a very good growth opportunity as well. And we see that continuing to be a very strong opportunity.

Retail for us -- because we are a smaller player, and so there is a lot of good growth opportunity for us -- has been good. And so from a pure growth year-on-year perspective, those three areas are providing the most strength. There is still reasonable growth -- market rate growth in transportation -- excuse me -- in industrial, consumer packaged goods, and the DOD and government area. As far as risk of downturn, retail probably tends to be the most volatile. The others are showing fairly steady growth.

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

And when you look at the DOD, and you look at the (indiscernible) are you watching a reallocation of resources there temporarily that might create a stronger rebound in this business maybe next year?

**Steve Winter** - *Intermec, Inc. - President and COO*

What do you mean by reallocation?

 
© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

(indiscernible) the resources that perhaps are allocated for the supply chain and tightening it which would actually result in spending — right now, near-term spending on the kind of products that you would provide the DOD with, or other departments, defense departments — are you seeing any kind of cutback in spending in those areas to be — that is orders getting pushed out, or are you not seeing any of that right now?

**Steve Winter** - *Intermec, Inc. - President and COO*

What we are seeing is that the — certainly the Iraq war has pulled funds away from what would traditionally be spent on programs such as supply chain improvements and in-transit visibility. And what we are seeing is a concentration of spending in programs that will have a more direct impact on the outcome. So ammunition tracking systems, for example, is an area where money is being spent. Standard retail systems are not — which retail to the government means supply chain — are not being spent on as they have been in the past, at the same levels. We do anticipate that as the conflict tapers off, and as more budget becomes available, that those programs continue to have a huge return on investment opportunity, and therefore would be attractive targets for additional spending.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

You disappointed me. You didn't ask me about the (multiple speakers)

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

The sale of the Cincinnati [land]? I thought if you had some news there, you might volunteer it.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

The fact is we have made some progress. We have gotten environmental approval for the Brownfield site. We are more optimistic today about concluding that activity this year than we have ever been.

**Operator**

Chris Quilty, Raymond James.

**Chris Quilty** - *Raymond James - Analyst*

You had mentioned that most of the printer and media business was weak due to Europe. Does that thereby imply that you had a very strong North American sales with the Systems and Solutions business? And can you give us sort of a sense of where that strength primarily was, either by product line or vertical market, within the North American market?

**Steve Winter** - *Intermec, Inc. - President and COO*

Sure, I can do that. We grew about 19% in North America, is what we reported. So we did have a very robust growth. That was — we had good sales growth in Printer and Media in North America, but not unusual growth. But the primary growth was in the Systems and Solutions area. And the primary growth by vertical was in field service and transportation and logistics. Systems and Solutions, for example, was 24% up in North America; 19% overall, 24% for Systems and Solutions.

THOMSON    www.streetevents.com    Contact Us    

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Chris Quilty** - *Raymond James - Analyst*

And is that driven by — I mean, you gave us your enterprise mix. But are these generally, the higher growth rates, due to a higher concentration of enterprise in North America? Or is it pretty much status quo in terms of the size of the orders you brought in in the first quarter?

**Steve Winter** - *Intermec, Inc. - President and COO*

No. In fact, the orders are tending to be a little bit smaller and a little bit broader than they were in the fourth quarter of last year and the third quarter of last year.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes, the enterprise mix quarter-on-quarter, Chris, is up slightly from 25 to 30% of the largest 50. But that's not material.

**Chris Quilty** - *Raymond James - Analyst*

Your Q2 guidance, obviously, includes what you are seeing halfway up through the second quarter here. But can you give us a little bit better analysis of what you saw on perhaps a month-by-month basis going back to January, and how you see the order book trending going out into the end of the June quarter?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes. It's a really dangerous place to go, because the first month in the quarter is just not very reflective of how we are going to see it happen. And so what we would be doing is misleading you if we said January and February were weak and March came on strong, or that we have seen a shift in — we haven't seen any shift in the generalized trends and weaknesses versus strengths that we saw from -- the difference between January and May.

**Chris Quilty** - *Raymond James - Analyst*

Did you give an assumed foreign exchange range associated with your guidance?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

We did not, but we typically have been using 124, Chris, for the Euro, which is the big thing for us. So, it's slightly favorable right now at 1.27, and in the first quarter it was running about 120.

**Chris Quilty** - *Raymond James - Analyst*

And for your stock option expenses, you didn't provide a breakout by cost of goods sold and SG&A, which somewhat clouds our year-ago comparables. Is that something that you will provide in the 10-Q, or is it something you are just not going to break out?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

We will provide it in the Q.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Chris Quilty** - *Raymond James - Analyst*

Do you have those numbers with you?

**Rick Anderson** - *Intermec, Inc. - VP, Controller and Acting CFO*

No, but the cost of sales is a fairly small number out of the total stock option expenses.

**Chris Quilty** - *Raymond James - Analyst*

For primarily SG&A?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes.

**Chris Quilty** - *Raymond James - Analyst*

I just wanted to make sure, after working through the numbers, in terms of your guidance that you provided — if I take the $0.16 benefit from Goteborg — or sorry, from HP, pull that out of your guidance, add back $0.06 for the facility shutdown, that gets me to about $0.72. If I scratch out another $0.02 from that from the tax benefit you had in this quarter, it gets me to about $0.70, plus or minus 10 — your presumed range here, minus those onetime items, looks like it's $0.60 to $0.90, and the prior guidance had been $0.75 to $0.85. Am I doing the math right?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

I am struggling a little bit. We tried to — the 16 is correct. The 6 is correct. I think the number that you gave me for stock option expense was a quarter as compared to the year.

**Chris Quilty** - *Raymond James - Analyst*

No, I didn't include stock option expense, because you had a $0.02 benefit here in the first quarter, which I wouldn't give you credit for, on a sort of pro forma basis.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes, I can't go to pro forma. I don't recognize the term. But what we tried to do is give you that in the press release specifically by individual calculation of EPS. And it is true that relative to the full year number, it includes $16.5 million, which we are saying is $0.16, from — because, roughly, $1 million pre-tax is $0.01. $0.16 from the HP settlement and $0.06 from the Goteborg offsetting that, for about a $0.10 benefit associated with those two items. Is that the question you asked? Is there another element?

**Chris Quilty** - *Raymond James - Analyst*

The only other thing I wouldn't give you credit for is a $0.02 tax benefit here in the first quarter.

 
© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

I understand. That's the 35 versus 37% number. I'm sorry; it was 21% in the first quarter. We think it's going to be 37 in each of the next three, which will average 35 for the full year.

**Chris Quilty** - *Raymond James - Analyst*

Right, and that's what (multiple speakers)

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

You are right about not giving us credit for that.

**Chris Quilty** - *Raymond James - Analyst*

And I think most models reflect probably a 37% tax rate.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Plus or minus.

**Chris Quilty** - *Raymond James - Analyst*

Can you give us anymore color on the Forklift initiative, which is something new here?

**Steve Winter** - *Intermec, Inc. - President and COO*

The Forklift initiative is, basically we introduced a Forklift of the Future concept in Q1, which was a collaboration between Cisco, Intermec, Red Prairie and Cascade. Cascade is the world's largest provider of material handling systems for forklifts; so basically, the forks, the clamps, the other things that you put onto the front of the fork truck, or lift truck, to have them handle the material.

There are several pieces of that which -- that are important. One is a specially-designed load backrest and clamping mechanism to accept antenna systems for RFID, in a way the gives you maximum reading performance. The second piece of that is a new terminal -- vehicle-mounted terminal which Intermec is introducing in the third quarter, which will provide some new capabilities. And then the next is some real-time location systems capabilities using Cisco as a partner to add some productivity enhancements to the way forklifts can be used that go beyond just the benefits of RFID itself.

So, it's kind of -- it's a productivity enhancement system, marrying the capabilities of the four companies -- including Red Prairie on warehouse management systems -- that goes beyond what you could get by just slapping RFID on a forklift by itself.

**Chris Quilty** - *Raymond James - Analyst*

And your sense or business case for this relative to focusing on fixed mounted portal sort of readers is -- do you think this is going to become a bigger market or equally sized market to the fixed readers?

---

THOMSON | www.streetevents.com | Contact Us | 

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Steve Winter** - *Intermec, Inc. - President and COO*

We actually think it will have more appeal than the traditional dock door system. And the reason is, there is typically one forklift for four dock doors. And so it's just less expensive to go that way. The other reason is, by putting the RFID reading on the forklift, you can automate multiple transactions, multiple separate transactions that occur today in one transaction on a forklift. You can do receipts processing, PO verification, cross-docking, put-away, all in kind of one fell swoop by putting it on a forklift as opposed to having those being separate transactions. So, it's a significant productivity enhancement as well, as a result of doing it with a forklift.

---

**Operator**

I am showing no further questions at this time, sir.

---

**Kevin McCarty** - *Intermec, Inc. - Director of Investor Relations and Analysis*

Great. Thank you, operator. That will conclude our call for the this afternoon. We want to thank everybody for joining us, and goodnight.

---

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2006, Thomson Financial. All Rights Reserved.

 
© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORP., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil No.: 3:06-CV-51 |
| vs. | ) ) ) | CERTIFICATE OF SERVICE |
| INTERMEC, INC., a Delaware corporation, INTERMEC TECHNOLOGIES CORP., a Delaware corporation, and INTERMEC IP CORP., a Delaware corporation, | ) ) ) ) ) | |
| Defendant. | ) ) | |

I hereby certify that on Thursday, June 29 , 2006, the following document:

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT AND REQUEST FOR ORAL ARGUMENT;**

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS;**

**DEFENDANTS' RULE 7.1(B)(1) STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION TO DISMISS; AND**

**DECLARATION OF DAVID S. BECKER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS.**

was hereby electronically filed with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

> **Sarah A. Herman**
> **51 Broadway, Suite 402**
> **PO Box 1344**
> **Fargo, ND 58107-1344**

I further certify that a copy of the foregoing document will be mailed by first class mail, postage paid, to the following non-ECF participants:

> **Gregory P. Stone**         **David S. Becker**
> **Munger, Tolles & Olson LLP**   **Freeborn & Peters LLP**
> **355 South Grand Avenue**    **311 South Wacker Drive, Suite 3000**
> **35th Floor**              **Chicago, IL 60606-6677**
> **Los Angeles, CA 90071**

**Carson P. Veach**
**Freeborn & Peters LLP**
**311 South Wacker Drive, Suite 3000**
**Chicago, IL 60606-6677**

Dated June 29, 2006.

                              SERKLAND LAW FIRM


                              s/ Ronald H. McLean
                              Ronald H. McLean (ID# 03260)
                              Jane L. Dynes (ID #04495)
                              10 Roberts Street
                              P.O. Box 6017
                              Fargo, North Dakota 58108-6017
                              Tel. No. (701) 232-8957

# EXHIBIT E

Alien Technology - About Us

Page 1 of 1

about us   news & events   support   contact us

Products   Services   Technology   Partners   Applications   **Markets**

Management
**Board of Directors**
Investors
Careers

# About Us

Alien Technology provides UHF Radio Frequency Identification (RFID) products and services to customers in retail, consumer goods, manufacturing, defense, transportation and logistics, pharmaceuticals and other industries. Organizations use Alien's RFID products and services to improve the effectiveness, efficiency and security of their supply chains, logistics and asset tracking operations. Alien's products include RFID tags, RFID readers and related training and professional services. Alien's patented Fluidic Self Assembly (FSA) technology and related proprietary manufacturing processes are designed to enable the manufacture of high volume, low cost RFID tags.

Alien was founded in 1994 and employees about 235 people worldwide. The company's facilities include: its corporate headquarters in Morgan Hill, CA; an RFID tag manufacturing facility in Fargo, ND; the Alien RFID Solutions Center, in the Dayton, Ohio area, and sales offices in the US, Europe and Asia. Alien is a member of EPCGlobal.

Terms of Use | Privacy Policy | Home |
©Copyright 2005 Alien Technology Corporation. All rights reserved.

**Addtional Info**

Alien Quick Facts:
Founded in 1995
Headquartered in Morgan Hill, California
200+ employees
Funding: US$200 million in venture backing

9/29/2006



http://www.alientechnology.com/about/index.php

EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERMEC IP CORP., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 06-411-GMS |
| ALIEN TECHNOLOGY CORP., a Delaware corporation, | ) ) ) | |
| Defendant. | ) | |

**DECLARATION OF DAVID S. BECKER IN SUPPORT OF
INTERMEC'S ANSWERING BRIEF IN OPPOSITION TO
ALIEN'S MOTION TO DISMISS, STAY OR TRANSFER**

I, David S. Becker, declare as follows:

1.    I am an attorney with the law firm of FREEBORN & PETERS LLP, counsel for the Plaintiff Intermec IP Corp. in this action.

2.    According to its corporate website, Alien Technology Corp.'s headquarters are located in Morgan Hill, California. According to the commercial internet site Mapquest.com, the nearest airport to Morgan Hill, California is the airport located in San Jose, California.

3.    Based on my own knowledge and understanding, the courthouse for the United State District Court for the District of Delaware is located in Wilmington, Delaware and is most easily reached by flying into the airport in Philadelphia, Pennsylvania and then traveling by car to Wilmington.

4.    Based on my own knowledge and understanding, there is an airport located in Fargo, North Dakota which provides the most convenient access to the courthouse for the United States District Court for the District of North Dakota.



5.      On September 13, 2006, I conducted several searches on the Orbitz commercial travel website to obtain prices for travel between San Jose, California and both Fargo, North Dakota and Philadelphia, Pennsylvania.

6.      Attached hereto as Exhibit 1 is a true and accurate print-out of the results of my search for prices for a round-trip ticket from San Jose, California to Philadelphia, Pennsylvania, for purchase approximately fourteen days prior to travel.  The search revealed that there are no non-stop flights available and that the price for coach airfare would be at least $218.00.

7.      Attached as Exhibit 2 is a true and accurate print-out of the results of my search for prices for a round-trip ticket from San Jose, California to Philadelphia, Pennsylvania, for purchase approximately one day prior to travel.  The search revealed that there are no non-stop flights available and that the price for coach airfare would be at least $218.00.

8.      Attached as Exhibit 3 is a true and accurate print-out of the results of my search for prices for a round-trip ticket from San Jose, California to Fargo, North Dakota, for purchase approximately fourteen days prior to travel.  The search revealed that there are no non-stop flights available and that the price for coach airfare for a one-stop itinerary would be at least $931.00.

9.      Attached as Exhibit 4 is a true and accurate print-out of the results of my search for prices for a round-trip ticket from San Jose, California to Fargo, North Dakota, for purchase approximately one day prior to travel.  The search revealed that there are no non-stop flights available and that the price for coach airfare for a one-stop itinerary would be at least $931.00.

10.     Review of the available itineraries for flights from San Jose to Philadelphia demonstrate that travel from San Jose to Delaware, controlling for time changes, would take approximately eight or eight and one half hours.

11.    Review of the available itineraries for flights from San Jose to Fargo demonstrate that travel from San Jose to Fargo, controlling for time changes, would take approximately  six and one half or seven hours.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on October 1, 2006 in Chicago, Illinois.

David S. Becker

Orbitz: Flight Search Results

Page 1 of 6


**monster** Accelerate your time-to-hire with Resume Search.    Learn More


**ORBITZ** AND GO!

Welcome to Orbitz.  Sign in | Reg
Sil

| Quick Search | Vacation Packages | Hotels | Flights | Cars & Rail | Cruises | Activities |
|---|---|---|---|---|---|---|

My Trips | My Account | Deals | Customer Service
MY STUFF



DEEPER DISCOUNTS   Below published fares, even last minute. Be flexible, save more.   Search Pr

## My Search

**Nearby airports**
from total $304

**Find flights by:**

Airline

| | Multiple Carriers | America West | United Airlines | American Airlines | US Airways |
|---|---|---|---|---|---|

Stops  Price

**Non-stop**

| | | | | | |
|---|---|---|---|---|---|
| **1 stop** | $218 total $259 | $218 total $263 see below | $253 total $300 | | $263 total $308 |
| **2+ stops** | $218 total $266 | $218 total $266 | $262 total $313 | $252 total $302 | $1,215 total $1,264 |

Fares are per person in US dollars, using e-tickets. Total fare includes all taxes and fees.
Some itineraries require paper tickets at an additional charge. Changes after purchase are subject to change fees.

**Sort flights by:**   **Lowest price**   **Departure time**   **Shortest flight**        Airport cc

Showing **America West** flights with 1 stop or less (11 flights out of 101 total)     See all 101 flights
Find more flights for America West

| Select | **$218 + $45 taxes & fees = $263** per person | OTLC Part of OrbitzTLC |
|---|---|---|

| Leave | **Tue, Oct 24** | **America West 220** | | Choose this departure |
|---|---|---|---|---|
| | Depart: 6:15am | San Jose, CA (SJC) | | |
| | Arrive: 8:09am | Phoenix, AZ (PHX) | | |
| | **1 stop** | Economy | 1hr 54min | Airbus A320 | View seats | |

Change planes. Time between flights: **2hr 6min**

| | | **America West 5328** |
|---|---|---|
| | | **operated by US Airways – US 1192** |
| | Depart: 10:15am | Phoenix, AZ (PHX) |
| | Arrive: 5:44pm | Philadelphia, PA (PHL) |
| | | Economy | 4hr 29min | Airbus A321 | View seats |
| | | Total duration: 8hr 29min |

| Return | **Wed, Oct 25** | **America West 1971** | | Choose this return |
|---|---|---|---|---|
| | | **operated by US Airways – US 0749** | | |
| | Depart: 8:30pm | Philadelphia, PA (PHL) | | |
| | Arrive: 10:55pm | Las Vegas, NV (LAS) | | |
| | **1 stop** | Economy | 5hr 25min | Boeing 757 | View seats | |

Change planes. Time between flights: **1hr 4min**

| | | **America West 2799** |
|---|---|---|
| | | **operated by Mesa Airlines dba America West Express** |
| | Depart: 11:59pm | Las Vegas, NV (LAS) |
| | Arrive: 1:29am | San Jose, CA (SJC) |
| | | Economy | 1hr 30min | Canadair 900 | View seats |
| | | Total duration: 7hr 59min |

This is an overnight flight.

**EXHIBIT**
**F-1**
tabbies®

Select    **$218 + $45 taxes & fees = $263** per person    *Orbitz TLC*    Part of OrbitzTLC

| Leave | Tue, Oct 24 | America West 2741 | |
|---|---|---|---|
| | | operated by Mesa Airlines dba America West Express | Choose this departure |
| | Depart: 7:40am | San Jose, CA (SJC) | |
| | Arrive: 9:30am | Phoenix, AZ (PHX) | |
| 1 stop | | Economy | 1hr 50min | Canadair 900 | View seats | |

Change planes. Time between flights: 0hr 45min

| | | America West 5328 | |
|---|---|---|---|
| | | operated by US Airways -- US 1192 | |
| | Depart: 10:15am | Phoenix, AZ (PHX) | |
| | Arrive: 5:44pm | Philadelphia, PA (PHL) | |
| | | Economy | 4hr 29min | Airbus A321 | View seats | |
| | | Total duration: 7hr 4min | |

| Return | Wed, Oct 25 | America West 1971 | |
|---|---|---|---|
| | | operated by US Airways -- US 0749 | Choose this return |
| | Depart: 8:30pm | Philadelphia, PA (PHL) | |
| | Arrive: 10:55pm | Las Vegas, NV (LAS) | |
| 1 stop | | Economy | 5hr 25min | Boeing 757 | View seats | |

Change planes. Time between flights: 1hr 4min

| | | America West 2799 | |
|---|---|---|---|
| | | operated by Mesa Airlines dba America West Express | |
| | Depart: 11:59pm | Las Vegas, NV (LAS) | |
| | Arrive: 1:29am | San Jose, CA (SJC) | |
| | | Economy | 1hr 30min | Canadair 900 | View seats | |
| | | Total duration: 7hr 59min | |

This is an overnight flight.

---

Select    **$218 + $47 taxes & fees = $265** per person    *Orbitz TLC*    Part of OrbitzTLC

| Leave | Tue, Oct 24 | America West 220 | |
|---|---|---|---|
| | Depart: 6:15am | San Jose, CA (SJC) | Choose this departure |
| | Arrive: 8:09am | Phoenix, AZ (PHX) | |
| 1 stop | | Economy | 1hr 54min | Airbus A320 | View seats | |

Change planes. Time between flights: 2hr 6min

| | | America West 5328 | |
|---|---|---|---|
| | | operated by US Airways -- US 1192 | |
| | Depart: 10:15am | Phoenix, AZ (PHX) | |
| | Arrive: 5:44pm | Philadelphia, PA (PHL) | |
| | | Economy | 4hr 29min | Airbus A321 | View seats | |
| | | Total duration: 8hr 29min | |

| Return | Wed, Oct 25 | America West 251 | |
|---|---|---|---|
| | Depart: 6:15pm | Philadelphia, PA (PHL) | Choose this return |
| | Arrive: 8:31pm | Phoenix, AZ (PHX) | |
| 1 stop | | Economy | 5hr 16min | Airbus A320 | View seats | |

Change planes. Time between flights: 1hr 1min

| | | America West 283 | |
|---|---|---|---|
| | Depart: 9:32pm | Phoenix, AZ (PHX) | |
| | Arrive: 11:21pm | San Jose, CA (SJC) | |
| | | Economy | 1hr 49min | Airbus A320 | View seats | |
| | | Total duration: 8hr 6min | |

---

Select    **$218 + $47 taxes & fees = $265** per person    *Orbitz TLC*    Part of OrbitzTLC

| Leave | Tue, Oct 24 | America West 2741 | |
|---|---|---|---|
| | | operated by Mesa Airlines dba America West Express | Choose this |



|  | Depart: | 7:40am | San Jose, CA (SJC) | departure |
|  | Arrive: | 9:30am | Phoenix, AZ (PHX) |  |
|  | **1 stop** | | Economy │ 1hr 50min │ Canadair 900 │ <u>View seats</u> |  |

**Change planes. Time between flights: 0hr 45min**

|  | | | **America West 5328**<br>**operated by US Airways -- US 1192** |  |
|  | Depart: | 10:15am | Phoenix, AZ (PHX) |  |
|  | Arrive: | 5:44pm | Philadelphia, PA (PHL) |  |
|  | | | Economy │ 4hr 29min │ Airbus A321 │ <u>View seats</u><br>Total duration: 7hr 4min |  |

| Return | **Wed, Oct 25** | | **America West 251** | <u>Choose</u> |
|  | Depart: | 6:15pm | Philadelphia, PA (PHL) | <u>this return</u> |
|  | Arrive: | 8:31pm | Phoenix, AZ (PHX) |  |
|  | **1 stop** | | Economy │ 5hr 16min │ Airbus A320 │ <u>View seats</u> |  |

**Change planes. Time between flights: 1hr 1min**

|  | | | **America West 283** |  |
|  | Depart: | 9:32pm | Phoenix, AZ (PHX) |  |
|  | Arrive: | 11:21pm | San Jose, CA (SJC) |  |
|  | | | Economy │ 1hr 49min │ Airbus A320 │ <u>View seats</u><br>Total duration: 8hr 6min |  |

---

| Select | **$253** + $44 taxes & fees = **$297** per person | *TLC* Part of OrbitzTLC |

| Leave | **Tue, Oct 24** | | **America West 165** | <u>Choose</u> |
|  | Depart: | 9:35am | San Jose, CA (SJC) | <u>this</u> |
|  | Arrive: | 10:57am | Las Vegas, NV (LAS) | <u>departure</u> |
|  | **1 stop** | | Economy │ 1hr 22min │ Airbus A319 │ <u>View seats</u> |  |

**Change planes. Time between flights: 0hr 33min**

|  | | | **America West 1942**<br>**operated by US Airways -- US 0774** |  |
|  | Depart: | 11:30am | Las Vegas, NV (LAS) |  |
|  | Arrive: | 7:09pm | Philadelphia, PA (PHL) |  |
|  | | | Economy │ 4hr 39min │ Boeing 757 │ <u>View seats</u><br>Total duration: 6hr 34min |  |

| Return | **Wed, Oct 25** | | **America West 1971**<br>**operated by US Airways -- US 0749** | <u>Choose</u> |
|  | Depart: | 8:30pm | Philadelphia, PA (PHL) | <u>this return</u> |
|  | Arrive: | 10:55pm | Las Vegas, NV (LAS) |  |
|  | **1 stop** | | Economy │ 5hr 25min │ Boeing 757 │ <u>View seats</u> |  |

**Change planes. Time between flights: 1hr 4min**

|  | | | **America West 2799**<br>**operated by Mesa Airlines dba America West Express** |  |
|  | Depart: | 11:59pm | Las Vegas, NV (LAS) |  |
|  | Arrive: | 1:29am | San Jose, CA (SJC) |  |
|  | | | Economy │ 1hr 30min │ Canadair 900 │ <u>View seats</u><br>Total duration: 7hr 59min |  |

This is an overnight flight.

---

| Select | **$253** + $45 taxes & fees = **$298** per person | *TLC* Part of OrbitzTLC |

| Leave | **Tue, Oct 24** | | **America West 220** | <u>Choose</u> |
|  | Depart: | 6:15am | San Jose, CA (SJC) | <u>this</u> |
|  | Arrive: | 8:09am | Phoenix, AZ (PHX) | <u>departure</u> |
|  | **1 stop** | | Economy │ 1hr 54min │ Airbus A320 │ <u>View seats</u> |  |

**Change planes. Time between flights: 0hr 45min**

|  | | | **America West 250** |  |
|  | Depart: | 8:54am | Phoenix, AZ (PHX) |  |

|  | Arrive: | 4:39pm | Philadelphia, PA (PHL) |
|--|---------|--------|------------------------|

Economy | 4hr 45min | Airbus A320 | View seats
Total duration: 7hr 24min

**Return**  **Wed, Oct 25**  **America West 1971**
operated by US Airways -- US 0749

| Depart: | 8:30pm | Philadelphia, PA (PHL) |
| Arrive: | 10:55pm | Las Vegas, NV (LAS) |

**1 stop**        Economy | 5hr 25min | Boeing 757 | View seats

Choose
this return

**Change planes.** Time between flights: **1hr 4min**

**America West 2799**
operated by Mesa Airlines dba America West Express

| Depart: | 11:59pm | Las Vegas, NV (LAS) |
| Arrive: | 1:29am | San Jose, CA (SJC) |

Economy | 1hr 30min | Canadair 900 | View seats
Total duration: 7hr 59min

This is an overnight flight.

---

**Select**    **$253 + $45 taxes & fees = $298** per person    Part of OrbitzTLC

**Leave**  **Tue, Oct 24**  **America West 2741**
operated by Mesa Airlines dba America West Express

| Depart: | 7:40am | San Jose, CA (SJC) |
| Arrive: | 9:30am | Phoenix, AZ (PHX) |

**1 stop**        Economy | 1hr 50min | Canadair 900 | View seats

Choose
this
departure

**Change planes.** Time between flights: **2hr 26min**

**America West 259**

| Depart: | 11:56am | Phoenix, AZ (PHX) |
| Arrive: | 7:27pm | Philadelphia, PA (PHL) |

Economy | 4hr 31min | Airbus A320 | View seats
Total duration: 8hr 47min

**Return**  **Wed, Oct 25**  **America West 1971**
operated by US Airways -- US 0749

| Depart: | 8:30pm | Philadelphia, PA (PHL) |
| Arrive: | 10:55pm | Las Vegas, NV (LAS) |

**1 stop**        Economy | 5hr 25min | Boeing 757 | View seats

Choose
this return

**Change planes.** Time between flights: **1hr 4min**

**America West 2799**
operated by Mesa Airlines dba America West Express

| Depart: | 11:59pm | Las Vegas, NV (LAS) |
| Arrive: | 1:29am | San Jose, CA (SJC) |

Economy | 1hr 30min | Canadair 900 | View seats
Total duration: 7hr 59min

This is an overnight flight.

---

**Select**    **$253 + $45 taxes & fees = $298** per person    Part of OrbitzTLC

**Leave**  **Tue, Oct 24**  **America West 83**

| Depart: | 8:50am | San Jose, CA (SJC) |
| Arrive: | 10:39am | Phoenix, AZ (PHX) |

**1 stop**        Economy | 1hr 49min | Airbus A320 | View seats

Choose
this
departure

**Change planes.** Time between flights: **1hr 17min**

**America West 259**

| Depart: | 11:56am | Phoenix, AZ (PHX) |
| Arrive: | 7:27pm | Philadelphia, PA (PHL) |

Economy | 4hr 31min | Airbus A320 | View seats
Total duration: 7hr 37min



| Return | Wed, Oct 25 | | America West 1971 | | | | Choose this return |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Depart: | 8:30pm | operated by US Airways -- US 0749 | | | | |
| | Arrive: | 10:55pm | Philadelphia, PA (PHL) | | | | |
| | | | Las Vegas, NV (LAS) | | | | |
| | **1 stop** | | Economy | 5hr 25min | Boeing 757 | View seats | |
| | **Change planes. Time between flights: 1hr 4min** | | | | | | |
| | | | America West 2799 | | | | |
| | Depart: | 11:59pm | operated by Mesa Airlines dba America West Express | | | | |
| | Arrive: | 1:29am | Las Vegas, NV (LAS) | | | | |
| | | | San Jose, CA (SJC) | | | | |
| | | | Economy | 1hr 30min | Canadair 900 | View seats | |
| | | | Total duration: 7hr 59min | | | | |
| | This is an overnight flight. | | | | | | |

**Select**    $253 + $45 taxes & fees = $298  per person    🎁 TLC  Part of OrbitzTLC

| Leave | Tue, Oct 24 | | America West 165 | | | | Choose this departure |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Depart: | 9:35am | San Jose, CA (SJC) | | | | |
| | Arrive: | 10:57am | Las Vegas, NV (LAS) | | | | |
| | **1 stop** | | Economy | 1hr 22min | Airbus A319 | View seats | |
| | **Change planes. Time between flights: 0hr 33min** | | | | | | |
| | | | America West 1942 | | | | |
| | Depart: | 11:30am | operated by US Airways -- US 0774 | | | | |
| | Arrive: | 7:09pm | Las Vegas, NV (LAS) | | | | |
| | | | Philadelphia, PA (PHL) | | | | |
| | | | Economy | 4hr 39min | Boeing 757 | View seats | |
| | | | Total duration: 6hr 34min | | | | |
| Return | Wed, Oct 25 | | America West 251 | | | | Choose this return |
| | Depart: | 6:15pm | Philadelphia, PA (PHL) | | | | |
| | Arrive: | 8:31pm | Phoenix, AZ (PHX) | | | | |
| | **1 stop** | | Economy | 5hr 16min | Airbus A320 | View seats | |
| | **Change planes. Time between flights: 1hr 1min** | | | | | | |
| | | | America West 283 | | | | |
| | Depart: | 9:32pm | Phoenix, AZ (PHX) | | | | |
| | Arrive: | 11:21pm | San Jose, CA (SJC) | | | | |
| | | | Economy | 1hr 49min | Airbus A320 | View seats | |
| | | | Total duration: 8hr 6min | | | | |

**Select**    $253 + $47 taxes & fees = $300  per person    🎁 TLC  Part of OrbitzTLC

| Leave | Tue, Oct 24 | | America West 220 | | | | Choose this departure |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Depart: | 6:15am | San Jose, CA (SJC) | | | | |
| | Arrive: | 8:09am | Phoenix, AZ (PHX) | | | | |
| | **1 stop** | | Economy | 1hr 54min | Airbus A320 | View seats | |
| | **Change planes. Time between flights: 0hr 45min** | | | | | | |
| | | | America West 250 | | | | |
| | Depart: | 8:54am | Phoenix, AZ (PHX) | | | | |
| | Arrive: | 4:39pm | Philadelphia, PA (PHL) | | | | |
| | | | Economy | 4hr 45min | Airbus A320 | View seats | |
| | | | Total duration: 7hr 24min | | | | |
| Return | Wed, Oct 25 | | America West 251 | | | | Choose this return |
| | Depart: | 6:15pm | Philadelphia, PA (PHL) | | | | |
| | Arrive: | 8:31pm | Phoenix, AZ (PHX) | | | | |
| | **1 stop** | | Economy | 5hr 16min | Airbus A320 | View seats | |
| | **Change planes. Time between flights: 1hr 1min** | | | | | | |
| | | | America West 283 | | | | |
| | Depart: | 9:32pm | Phoenix, AZ (PHX) | | | | |

Arrive:  11:21pm    San Jose, CA (SJC)

Economy | 1hr 49min | Airbus A320 | View seats
Total duration: 8hr 6min

---

Select    **$253** + $47 taxes & fees = **$300** per person                     Part of OrbitzTLC

Leave    **Tue, Oct 24**
         Depart:  8:50am    **America West 83**                                          Choose
         Arrive:  10:39am   San Jose, CA (SJC)                                           this
                            Phoenix, AZ (PHX)                                            departure
         **1 stop**         Economy | 1hr 49min | Airbus A320 | View seats

         **Change planes. Time between flights: 1hr 17min**

         Depart:  11:56am   **America West 259**
         Arrive:  7:27pm    Phoenix, AZ (PHX)
                            Philadelphia, PA (PHL)

                            Economy | 4hr 31min | Airbus A320 | View seats
                            Total duration: 7hr 37min

Return   **Wed, Oct 25**
         Depart:  6:15pm    **America West 251**                                         Choose
         Arrive:  8:31pm    Philadelphia, PA (PHL)                                       this return
                            Phoenix, AZ (PHX)
         **1 stop**         Economy | 5hr 16min | Airbus A320 | View seats

         **Change planes. Time between flights: 1hr 1min**

         Depart:  9:32pm    **America West 283**
         Arrive:  11:21pm   Phoenix, AZ (PHX)
                            San Jose, CA (SJC)

                            Economy | 1hr 49min | Airbus A320 | View seats
                            Total duration: 8hr 6min

---

**Didn't find the right combination of flights in one itinerary?**
Build your own itinerary. Start by choosing an outbound or return flight above.

See all 101 flights  |  Find more flights for America West                    Return to top

My Trips | My Account | Flight status | Site map | Contact Us | Site feedback | About Orbitz | Corporate Travel Solutions | Advertise on Orbitz
Become an affiliate | Careers | Media | Low Fare Promise | Low Price Guarantee | Terms and conditions | Your Privacy Rights
Flights | Hotels | Car Rental | Vacation Packages | Travel Deals | Travel Guides | Cruises | Activities | Orbitz Games | Sports Travel    Add
Orbitz feeds [RSS]

Orbitz guards your privacy and security. We're certified by TRUSTe and Verisign.
© 2001 - 2006, Orbitz, LLC. All rights reserved.
CST 2063530-50; Hawaii TAR-5627; Iowa 644; Nevada 2003-0387; Washington 602-102-724



#1 **2005 2004 2003**
Online Customer Respect Study

#1 **BEST IN BUSINESS TRAVEL**
**2005  2004  2003**
Business Traveler Magazine



"Highest Customer Satisfaction
For Independent Travel
Web Sites – Hotels"

Orbitz: Flight Search Results

Page 1 of 8



**It's time for Treo.**      Email Phone Web  palm

**ORBITZ** AND GO!™

Welcome to Orbitz.  Sign in | Reg
Si

| Quick Search | Vacation Packages | Hotels | Flights | Cars & Rail | Cruises | Activities |

My Trips  My Account  Deals  Customer Service
MY STUFF

 **DEEPER DISCOUNTS**  Below published fares, even last minute. Be flexible, save more.   Search Pr

**My Search**



SUPER SAVINGS!

**Flight + Hotel deals for Philadelphia**

Find flights by:

| | | America West | Multiple Carriers | US Airways | American Airlines | United Airlines |
|---|---|---|---|---|---|---|
| Airline | | | | | | |
| Stops | Price | | | | | |

Non-stop

| 1 stop | $218 total $262 see below | $228 total $272 | $238 total $282 | | $359 total $407 |
|---|---|---|---|---|---|
| 2+ stops | $218 total $265 | $277 total $328 | $1,215 total $1,264 | $252 total $302 | $262 total $313 |

Fares are per person in US dollars, using e-tickets. Total fare includes all taxes and fees.
Some itineraries require paper tickets with an additional charge. Changes after purchase are subject to change fees.

Sort flights by:    **Lowest price**    **Departure time**    **Shortest flight**

Airport cc

Showing **America West** flights with 1 stop or less (14 flights out of 104 total)    See all 104 flights
Find more flights for America West

| Select | $218 + $44 taxes & fees = $262 per person | | |
|---|---|---|---|
| Leave | **Tue, Oct 10** | | Part of OrbitzTLC |

Leave  **Tue, Oct 10**
Depart: 7:15am    **America West 439**    San Jose, CA (SJC)
Arrive: 8:37am    Las Vegas, NV (LAS)                    Choose this departure
**1 stop**    Economy | 1hr 22min | Airbus A319 | View seats

Change planes. Time between flights: **2hr 53min**

**America West 1942**
Depart: 11:30am    **operated by US Airways -- US 0774**
Arrive: 7:09pm    Las Vegas, NV (LAS)
Philadelphia, PA (PHL)
Economy | 4hr 39min | Boeing 757 | View seats
Total duration: 8hr 54min

Return  **Wed, Oct 11**    **America West 1971**
Depart: 8:30pm    **operated by US Airways -- US 0749**
Arrive: 10:55pm    Philadelphia, PA (PHL)                Choose this return
Las Vegas, NV (LAS)
**1 stop**    Economy | 5hr 25min | Boeing 757 | View seats

Change planes. Time between flights: **1hr 4min**

**America West 2799**
Depart: 11:59pm    **operated by Mesa Airlines dba America West Express**
Arrive: 1:29am    Las Vegas, NV (LAS)
San Jose, CA (SJC)
Economy | 1hr 30min | Canadair 900 | View seats
Total duration: 7hr 59min
This is an overnight flight.

**EXHIBIT**
**F-2**

9/13/2006



Select    **$218** + $44 taxes & fees = **$262** per person    Part of OrbitzTLC

| Leave | **Tue, Oct 10** | **America West 165** | Choose this departure |
|---|---|---|---|
| | Depart: 9:35am | San Jose, CA (SJC) | |
| | Arrive: 10:57am | Las Vegas, NV (LAS) | |
| | **1 stop** | Economy \| 1hr 22min \| Airbus A319 \| View seats | |

Change planes. Time between flights: **0hr 33min**

**America West 1942**
operated by US Airways -- US 0774
Depart: 11:30am    Las Vegas, NV (LAS)
Arrive: 7:09pm    Philadelphia, PA (PHL)
Economy \| 4hr 39min \| Boeing 757 \| View seats
Total duration: 6hr 34min

Return    **Wed, Oct 11    America West 1971**    Choose this return
operated by US Airways -- US 0749
Depart: 8:30pm    Philadelphia, PA (PHL)
Arrive: 10:55pm    Las Vegas, NV (LAS)
**1 stop**    Economy \| 5hr 25min \| Boeing 757 \| View seats

Change planes. Time between flights: **1hr 4min**

**America West 2799**
operated by Mesa Airlines dba America West Express
Depart: 11:59pm    Las Vegas, NV (LAS)
Arrive: 1:29am    San Jose, CA (SJC)
Economy \| 1hr 30min \| Canadair 900 \| View seats
Total duration: 7hr 59min

This is an overnight flight.

---

Select    **$218** + $45 taxes & fees = **$263** per person    Part of OrbitzTLC

| Leave | **Tue, Oct 10** | **America West 220** | Choose this departure |
|---|---|---|---|
| | Depart: 6:15am | San Jose, CA (SJC) | |
| | Arrive: 8:09am | Phoenix, AZ (PHX) | |
| | **1 stop** | Economy \| 1hr 54min \| Airbus A320 \| View seats | |

Change planes. Time between flights: **2hr 6min**

**America West 5328**
operated by US Airways -- US 1192
Depart: 10:15am    Phoenix, AZ (PHX)
Arrive: 5:44pm    Philadelphia, PA (PHL)
Economy \| 4hr 29min \| Airbus A321 \| View seats
Total duration: 8hr 29min

Return    **Wed, Oct 11    America West 1971**    Choose this return
operated by US Airways -- US 0749
Depart: 8:30pm    Philadelphia, PA (PHL)
Arrive: 10:55pm    Las Vegas, NV (LAS)
**1 stop**    Economy \| 5hr 25min \| Boeing 757 \| View seats

Change planes. Time between flights: **1hr 4min**

**America West 2799**
operated by Mesa Airlines dba America West Express
Depart: 11:59pm    Las Vegas, NV (LAS)
Arrive: 1:29am    San Jose, CA (SJC)
Economy \| 1hr 30min \| Canadair 900 \| View seats
Total duration: 7hr 59min

This is an overnight flight.

Select

**$218** + $45 taxes & fees = **$263** per person

*TLC* Part of OrbitzTLC

| | | | |
|---|---|---|---|
| Leave | **Tue, Oct 10** | **America West 2741** | Choose this departure |
| W | Depart: **7:40am** <br> Arrive: **9:30am** | operated by Mesa Airlines dba America West Express <br> San Jose, CA (SJC) <br> Phoenix, AZ (PHX) | |
| | **1 stop** | Economy | 1hr 50min | Canadair 900 | <u>View seats</u> | |

Change planes. Time between flights: **0hr 45min**

| | | | |
|---|---|---|---|
| W | Depart: **10:15am** <br> Arrive: **5:44pm** | **America West 5328** <br> operated by US Airways -- US 1192 <br> Phoenix, AZ (PHX) <br> Philadelphia, PA (PHL) | |
| | | Economy | 4hr 29min | Airbus A321 | <u>View seats</u> <br> Total duration: 7hr 4min | |
| Return | **Wed, Oct 11** | **America West 1971** | Choose this return |
| W | Depart: **8:30pm** <br> Arrive: **10:55pm** | operated by US Airways -- US 0749 <br> Philadelphia, PA (PHL) <br> Las Vegas, NV (LAS) | |
| | **1 stop** | Economy | 5hr 25min | Boeing 757 | <u>View seats</u> | |

Change planes. Time between flights: **1hr 4min**

| | | | |
|---|---|---|---|
| W | Depart: **11:59pm** <br> Arrive: **1:29am** | **America West 2799** <br> operated by Mesa Airlines dba America West Express <br> Las Vegas, NV (LAS) <br> San Jose, CA (SJC) | |
| | | Economy | 1hr 30min | Canadair 900 | <u>View seats</u> <br> Total duration: 7hr 59min | |

This is an overnight flight.

---

Select    **$253** + $44 taxes & fees = **$297** per person

*TLC* Part of OrbitzTLC

| | | | |
|---|---|---|---|
| Leave | **Tue, Oct 10** | **America West 165** | Choose this departure |
| W | Depart: **9:35am** <br> Arrive: **10:57am** | San Jose, CA (SJC) <br> Las Vegas, NV (LAS) | |
| | **1 stop** | Economy | 1hr 22min | Airbus A319 | <u>View seats</u> | |

Change planes. Time between flights: **3hr 13min**

| | | | |
|---|---|---|---|
| W | Depart: **2:10pm** <br> Arrive: **9:45pm** | **America West 5288** <br> operated by US Airways -- US 0729 <br> Las Vegas, NV (LAS) <br> Philadelphia, PA (PHL) | |
| | | Economy | 4hr 35min | Boeing 757 | <u>View seats</u> <br> Total duration: 9hr 10min | |
| Return | **Wed, Oct 11** | **America West 1971** | Choose this return |
| W | Depart: **8:30pm** <br> Arrive: **10:55pm** | operated by US Airways -- US 0749 <br> Philadelphia, PA (PHL) <br> Las Vegas, NV (LAS) | |
| | **1 stop** | Economy | 5hr 25min | Boeing 757 | <u>View seats</u> | |

Change planes. Time between flights: **1hr 4min**

| | | | |
|---|---|---|---|
| W | Depart: **11:59pm** <br> Arrive: **1:29am** | **America West 2799** <br> operated by Mesa Airlines dba America West Express <br> Las Vegas, NV (LAS) <br> San Jose, CA (SJC) | |
| | | Economy | 1hr 30min | Canadair 900 | <u>View seats</u> <br> Total duration: 7hr 59min | |

This is an overnight flight.

---

**Select**     $253 + $45 taxes & fees = $298  per person     *TLC* Part of OrbitzTLC

| Leave | **Tue, Oct 10** | **America West 220** | |
|---|---|---|---|
| ⟨W⟩ | Depart: 6:15am<br>Arrive: 8:09am | San Jose, CA (SJC)<br>Phoenix, AZ (PHX) | Choose<br>this<br>departure |
| | **1 stop** | Economy | 1hr 54min | Airbus A320 | <u>View seats</u> | |

**Change planes. Time between flights: 0hr 45min**

| ⟨W⟩ | Depart: 8:54am<br>Arrive: 4:39pm | **America West 250**<br>Phoenix, AZ (PHX)<br>Philadelphia, PA (PHL) | |
|---|---|---|---|
| | | Economy | 4hr 45min | Airbus A320 | <u>View seats</u><br>Total duration: 7hr 24min | |

| Return | **Wed, Oct 11** | **America West 1971**<br>**operated by US Airways -- US 0749** | |
|---|---|---|---|
| ⟨W⟩ | Depart: 8:30pm<br>Arrive: 10:55pm | Philadelphia, PA (PHL)<br>Las Vegas, NV (LAS) | Choose<br>this return |
| | **1 stop** | Economy | 5hr 25min | Boeing 757 | <u>View seats</u> | |

**Change planes. Time between flights: 1hr 4min**

| ⟨W⟩ | Depart: 11:59pm<br>Arrive: 1:29am | **America West 2799**<br>**operated by Mesa Airlines dba America West Express**<br>Las Vegas, NV (LAS)<br>San Jose, CA (SJC) | |
|---|---|---|---|
| | | Economy | 1hr 30min | Canadair 900 | <u>View seats</u><br>Total duration: 7hr 59min | |

This is an overnight flight.

---

**Select**     $253 + $45 taxes & fees = $298  per person     *TLC* Part of OrbitzTLC

| Leave | **Tue, Oct 10** | **America West 439** | |
|---|---|---|---|
| ⟨W⟩ | Depart: 7:15am<br>Arrive: 8:37am | San Jose, CA (SJC)<br>Las Vegas, NV (LAS) | Choose<br>this<br>departure |
| | **1 stop** | Economy | 1hr 22min | Airbus A319 | <u>View seats</u> | |

**Change planes. Time between flights: 2hr 53min**

| ⟨W⟩ | Depart: 11:30am<br>Arrive: 7:09pm | **America West 1942**<br>**operated by US Airways -- US 0774**<br>Las Vegas, NV (LAS)<br>Philadelphia, PA (PHL) | |
|---|---|---|---|
| | | Economy | 4hr 39min | Boeing 757 | <u>View seats</u><br>Total duration: 8hr 54min | |

| Return | **Wed, Oct 11** | **America West 251** | |
|---|---|---|---|
| ⟨W⟩ | Depart: 6:15pm<br>Arrive: 8:31pm | Philadelphia, PA (PHL)<br>Phoenix, AZ (PHX) | Choose<br>this return |
| | **1 stop** | Economy | 5hr 16min | Airbus A320 | <u>View seats</u> | |

**Change planes. Time between flights: 1hr 1min**

| ⟨W⟩ | Depart: 9:32pm<br>Arrive: 11:21pm | **America West 283**<br>Phoenix, AZ (PHX)<br>San Jose, CA (SJC) | |
|---|---|---|---|
| | | Economy | 1hr 49min | Airbus A320 | <u>View seats</u><br>Total duration: 8hr 6min | |

---

**Select**     $253 + $45 taxes & fees = $298  per person     *TLC* Part of OrbitzTLC

| Leave | **Tue, Oct 10** | **America West 2741**<br>**operated by Mesa Airlines dba America West Express** | |
|---|---|---|---|
| ⟨W⟩ | Depart: 7:40am<br>Arrive: 9:30am | San Jose, CA (SJC)<br>Phoenix, AZ (PHX) | Choose<br>this<br>departure |
| | **1 stop** | Economy | 1hr 50min | Canadair 900 | <u>View seats</u> | |

Orbitz: Flight Search Results

Change planes. Time between flights: **2hr 26min**

| | | | |
|---|---|---|---|
| | Depart: 11:56am <br> Arrive: 7:27pm | **America West 259** <br> Phoenix, AZ (PHX) <br> Philadelphia, PA (PHL) | |

Economy | 4hr 31min | Airbus A320 | View seats
Total duration: 8hr 47min

Return | **Wed, Oct 11**

Depart: 8:30pm <br> Arrive: 10:55pm | **America West 1971** <br> operated by US Airways -- US 0749 <br> Philadelphia, PA (PHL) <br> Las Vegas, NV (LAS)

Choose this return

**1 stop** | Economy | 5hr 25min | Boeing 757 | View seats

Change planes. Time between flights: **1hr 4min**

Depart: 11:59pm <br> Arrive: 1:29am | **America West 2799** <br> operated by Mesa Airlines dba America West Express <br> Las Vegas, NV (LAS) <br> San Jose, CA (SJC)

Economy | 1hr 30min | Canadair 900 | View seats
Total duration: 7hr 59min

This is an overnight flight.

---

Select      $253 + $45 taxes & fees = $298 per person      Part of OrbitzTLC

Leave | **Tue, Oct 10**
Depart: 8:50am <br> Arrive: 10:39am | **America West 83** <br> San Jose, CA (SJC) <br> Phoenix, AZ (PHX)

Choose this departure

**1 stop** | Economy | 1hr 49min | Airbus A320 | View seats

Change planes. Time between flights: **1hr 17min**

Depart: 11:56am <br> Arrive: 7:27pm | **America West 259** <br> Phoenix, AZ (PHX) <br> Philadelphia, PA (PHL)

Economy | 4hr 31min | Airbus A320 | View seats
Total duration: 7hr 37min

Return | **Wed, Oct 11**
Depart: 8:30pm <br> Arrive: 10:55pm | **America West 1971** <br> operated by US Airways -- US 0749 <br> Philadelphia, PA (PHL) <br> Las Vegas, NV (LAS)

Choose this return

**1 stop** | Economy | 5hr 25min | Boeing 757 | View seats

Change planes. Time between flights: **1hr 4min**

Depart: 11:59pm <br> Arrive: 1:29am | **America West 2799** <br> operated by Mesa Airlines dba America West Express <br> Las Vegas, NV (LAS) <br> San Jose, CA (SJC)

Economy | 1hr 30min | Canadair 900 | View seats
Total duration: 7hr 59min

This is an overnight flight.

---

Select      $253 + $45 taxes & fees = $298 per person      Part of OrbitzTLC

Leave | **Tue, Oct 10**
Depart: 9:35am <br> Arrive: 10:57am | **America West 165** <br> San Jose, CA (SJC) <br> Las Vegas, NV (LAS)

Choose this departure

**1 stop** | Economy | 1hr 22min | Airbus A319 | View seats

Change planes. Time between flights: **0hr 33min**

Depart: 11:30am <br> Arrive: 7:09pm | **America West 1942** <br> operated by US Airways -- US 0774 <br> Las Vegas, NV (LAS) <br> Philadelphia, PA (PHL)

Orbitz: Flight Search Results



| | | |
|---|---|---|
| Return | **Wed, Oct 11** | Economy | 4hr 39min | Boeing 757 | <u>View seats</u> |
| | Depart: 6:15pm | Total duration: 8hr 34min |
| | | **America West 251** |
| | Depart: 6:15pm | Philadelphia, PA (PHL) |
| | Arrive: 8:31pm | Phoenix, AZ (PHX) |
| | **1 stop** | Economy | 5hr 16min | Airbus A320 | <u>View seats</u> |

**Choose this return**

**Change planes.** Time between flights: **1hr 1min**

| | Depart: 9:32pm | **America West 283** |
| | Arrive: 11:21pm | Phoenix, AZ (PHX) |
| | | San Jose, CA (SJC) |
| | | Economy | 1hr 49min | Airbus A320 | <u>View seats</u> |
| | | Total duration: 8hr 6min |

---

**Select**      **$253** + **$47** taxes & fees = **$300** per person

*FTLC* Part of OrbitzTLC

| Leave | **Tue, Oct 10** | **America West 220** |
| | Depart: 6:15am | San Jose, CA (SJC) |
| | Arrive: 8:09am | Phoenix, AZ (PHX) |
| | **1 stop** | Economy | 1hr 54min | Airbus A320 | <u>View seats</u> |

**Choose this departure**

**Change planes.** Time between flights: **2hr 6min**

| | | **America West 5328** |
| | | **operated by US Airways -- US 1192** |
| | Depart: 10:15am | Phoenix, AZ (PHX) |
| | Arrive: 5:44pm | Philadelphia, PA (PHL) |
| | | Economy | 4hr 29min | Airbus A321 | <u>View seats</u> |
| | | Total duration: 8hr 29min |

| Return | **Wed, Oct 11** | **America West 251** |
| | Depart: 6:15pm | Philadelphia, PA (PHL) |
| | Arrive: 8:31pm | Phoenix, AZ (PHX) |
| | **1 stop** | Economy | 5hr 16min | Airbus A320 | <u>View seats</u> |

**Choose this return**

**Change planes.** Time between flights: **1hr 1min**

| | Depart: 9:32pm | **America West 283** |
| | Arrive: 11:21pm | Phoenix, AZ (PHX) |
| | | San Jose, CA (SJC) |
| | | Economy | 1hr 49min | Airbus A320 | <u>View seats</u> |
| | | Total duration: 8hr 6min |

---

**Select**      **$253** + **$47** taxes & fees = **$300** per person

*FTLC* Part of OrbitzTLC

| Leave | **Tue, Oct 10** | **America West 2741** |
| | | **operated by Mesa Airlines dba America West Express** |
| | Depart: 7:40am | San Jose, CA (SJC) |
| | Arrive: 9:30am | Phoenix, AZ (PHX) |
| | **1 stop** | Economy | 1hr 50min | Canadair 900 | <u>View seats</u> |

**Choose this departure**

**Change planes.** Time between flights: **0hr 45min**

| | | **America West 5328** |
| | | **operated by US Airways -- US 1192** |
| | Depart: 10:15am | Phoenix, AZ (PHX) |
| | Arrive: 5:44pm | Philadelphia, PA (PHL) |
| | | Economy | 4hr 29min | Airbus A321 | <u>View seats</u> |
| | | Total duration: 7hr 4min |

| Return | **Wed, Oct 11** | **America West 251** |
| | Depart: 6:15pm | Philadelphia, PA (PHL) |
| | Arrive: 8:31pm | Phoenix, AZ (PHX) |
| | **1 stop** | Economy | 5hr 16min | Airbus A320 | <u>View seats</u> |

**Choose this return**

**Change planes.** Time between flights: **1hr 1min**

| | Depart: | 9:32pm | **America West 283** |
| | Arrive: | 11:21pm | Phoenix, AZ (PHX) |
| | | | San Jose, CA (SJC) |

Economy  |  1hr 49min  |  Airbus A320  |  View seats
Total duration: 8hr 6min

---

**Select**     **$288** + $48 taxes & fees = **$336**  per person     *Orbitz* Part of OrbitzTLC

| Leave | **Tue, Oct 10** | | **America West 220** | Choose |
| | Depart: | 6:15am | San Jose, CA (SJC) | this |
| | Arrive: | 8:09am | Phoenix, AZ (PHX) | departure |
| | **1 stop** | | |

Economy  |  1hr 54min  |  Airbus A320  |  View seats

**Change planes.** Time between flights: **0hr 45min**

| | Depart: | 8:54am | **America West 250** |
| | Arrive: | 4:39pm | Phoenix, AZ (PHX) |
| | | | Philadelphia, PA (PHL) |

Economy  |  4hr 45min  |  Airbus A320  |  View seats
Total duration: 7hr 24min

| Return | **Wed, Oct 11** | | **America West 251** | Choose |
| | Depart: | 6:15pm | Philadelphia, PA (PHL) | this return |
| | Arrive: | 8:31pm | Phoenix, AZ (PHX) | |
| | **1 stop** | | |

Economy  |  5hr 16min  |  Airbus A320  |  View seats

**Change planes.** Time between flights: **1hr 1min**

| | Depart: | 9:32pm | **America West 283** |
| | Arrive: | 11:21pm | Phoenix, AZ (PHX) |
| | | | San Jose, CA (SJC) |

Economy  |  1hr 49min  |  Airbus A320  |  View seats
Total duration: 8hr 6min

---

**Select**     **$288** + $48 taxes & fees = **$336**  per person     *Orbitz* Part of OrbitzTLC

| Leave | **Tue, Oct 10** | | **America West 83** | Choose |
| | Depart: | 8:50am | San Jose, CA (SJC) | this |
| | Arrive: | 10:39am | Phoenix, AZ (PHX) | departure |
| | **1 stop** | | |

Economy  |  1hr 49min  |  Airbus A320  |  View seats

**Change planes.** Time between flights: **1hr 17min**

| | Depart: | 11:56am | **America West 259** |
| | Arrive: | 7:27pm | Phoenix, AZ (PHX) |
| | | | Philadelphia, PA (PHL) |

Economy  |  4hr 31min  |  Airbus A320  |  View seats
Total duration: 7hr 37min

| Return | **Wed, Oct 11** | | **America West 251** | Choose |
| | Depart: | 6:15pm | Philadelphia, PA (PHL) | this return |
| | Arrive: | 8:31pm | Phoenix, AZ (PHX) | |
| | **1 stop** | | |

Economy  |  5hr 16min  |  Airbus A320  |  View seats

**Change planes.** Time between flights: **1hr 1min**

| | Depart: | 9:32pm | **America West 283** |
| | Arrive: | 11:21pm | Phoenix, AZ (PHX) |
| | | | San Jose, CA (SJC) |

Economy  |  1hr 49min  |  Airbus A320  |  View seats
Total duration: 8hr 6min

---

**Didn't find the right combination of flights in one itinerary?**
Build your own itinerary. Start by choosing an outbound or return flight above.

See all 104 flights  |  Find more flights for America West

Return to top

My Trips | My Account | Flight status | Site map | Contact Us | Site feedback | About Orbitz | Corporate Travel Solutions | Advertise on Orbitz
Become an affiliate | Careers | Media | Low Fare Promise | Low Price Guarantee | Terms and conditions | Your Privacy Rights

Flights | Hotels | Car Rental | Vacation Packages | Travel Deals | Travel Guides | Cruises | Activities | Orbitz Games | Sports Travel       Add
Orbitz feeds [RSS]

Orbitz: Flight Search Results

Page 1 of 5



It's time for Treo.    Email Phone Web.    palm



ORBITZ AND GO!™

Welcome to Orbitz.   Sign in | Reg
Sil

Quick Search | Vacation Packages | Hotels | Flights | Cars & Rail | Cruises | Activities

My Trips | My Account | Deals | Customer Service
MY STUFF

MATRIX    DEEPER DISCOUNTS    Below-published fares, even last minute. Be flexible, save more.   Search Pr

**My Search**

Find flights by:

Airline     Multiple Carriers     United Airlines

Stops   Price

**Non-stop**

| 1 stop | $1,013 total $1,062 | $931 total $979 see below |
| 2+ stops | $402 total $453 | $789 total $840 |

Fares are per person in US dollars, using e-tickets. Total fare includes all taxes and fees . Some itineraries require paper tickets with an additional charge. Changes after purchase are subject to change fees.

Sort flights by:    Lowest price    Departure time    Shortest flight            Airport cc

Showing **United Airlines flights with 1 stop or less (7 flights out of 89 total)**     See all 89 flights
Find more flights for United Airlines

| Select | **$931** + $48 taxes & fees = **$979** per person |  | TLC Part of OrbitzTLC |  |

Leave    **Tue, Oct 24**    **United Airlines 102**
Depart: 6:20am   San Jose, CA (SJC)
Arrive: 9:57am    Denver, CO (DEN)                  Choose this departure
**1 stop**
Economy  |  2hr 37min  |  Boeing 737  |  View seats

**Change planes. Time between flights: 2hr 33min**

**United Airlines 6574**
operated by UNITED EXPRESS/SKYWEST
Depart: 12:30pm   Denver, CO (DEN)
Arrive: 3:11pm    Fargo, ND (FAR)
Economy  |  1hr 41min  |  Canadair  |  View seats
Total duration: 6hr 51min

Return    **Wed, Oct 25**    **United Airlines 6769**
operated by UNITED EXPRESS/SKYWEST
Depart: 6:52pm   Fargo, ND (FAR)                  Choose this return
Arrive: 7:43pm   Denver, CO (DEN)
**1 stop**
Economy  |  1hr 51min  |  Canadair  |  View seats

**Change planes. Time between flights: 1hr 2min**

**United Airlines 461**
Depart: 8:45pm   Denver, CO (DEN)
Arrive: 10:21pm  San Jose, CA (SJC)
Economy  |  2hr 36min  |  Boeing 737  |  View seats
Total duration: 5hr 29min

My Trips | My Account | Flight status | Site map | Contact Us | Site feedback | About Orbitz | C
Become an affiliate | Careers | Media | Low Fare Promise | Low Price Guarantee | Terms and                                        tise on Orbitz

http://www.orbitz.com/App/ViewFlightSearchResults?z=55c2&r=2mm

**EXHIBIT**
**F-3**

9/13/2006

Orbitz: Flight Search Results

---

| Select | $931 + $48 taxes & fees = $979 per person | TLC Part of OrbitzTLC |
|---|---|---|

| Leave | **Tue, Oct 24** | **United Airlines 266** | Choose |
|---|---|---|---|
| | Depart: 6:30am | San Jose, CA (SJC) | this |
| | Arrive: 12:39pm | Chicago, IL (ORD) | departure |
| | **1 stop** | Economy \| 4hr 9min \| Airbus A319 \| View seats | |

Change planes. Time between flights: **2hr 46min**

| | | **United Airlines 6907** | |
|---|---|---|---|
| | | **operated by UNITED EXPRESS/SKYWEST** | |
| | Depart: 3:25pm | Chicago, IL (ORD) | |
| | Arrive: 5:19pm | Fargo, ND (FAR) | |
| | | Economy \| 1hr 54min \| Canadair \| View seats | |
| | | Total duration: 8hr 49min | |

| Return | **Wed, Oct 25** | **United Airlines 6769** | Choose |
|---|---|---|---|
| | | **operated by UNITED EXPRESS/SKYWEST** | this return |
| | Depart: 6:52pm | Fargo, ND (FAR) | |
| | Arrive: 7:43pm | Denver, CO (DEN) | |
| | **1 stop** | Economy \| 1hr 51min \| Canadair \| View seats | |

Change planes. Time between flights: **1hr 2min**

| | | **United Airlines 461** | |
|---|---|---|---|
| | Depart: 8:45pm | Denver, CO (DEN) | |
| | Arrive: 10:21pm | San Jose, CA (SJC) | |
| | | Economy \| 2hr 36min \| Boeing 737 \| View seats | |
| | | Total duration: 5hr 29min | |

---

| Select | $931 + $48 taxes & fees = $979 per person | TLC Part of OrbitzTLC |
|---|---|---|

| Leave | **Tue, Oct 24** | **United Airlines 336** | Choose |
|---|---|---|---|
| | Depart: 7:35am | San Jose, CA (SJC) | this |
| | Arrive: 11:12am | Denver, CO (DEN) | departure |
| | **1 stop** | Economy \| 2hr 37min \| Boeing 737 \| View seats | |

Change planes. Time between flights: **1hr 18min**

| | | **United Airlines 6574** | |
|---|---|---|---|
| | | **operated by UNITED EXPRESS/SKYWEST** | |
| | Depart: 12:30pm | Denver, CO (DEN) | |
| | Arrive: 3:11pm | Fargo, ND (FAR) | |
| | | Economy \| 1hr 41min \| Canadair \| View seats | |
| | | Total duration: 5hr 36min | |

| Return | **Wed, Oct 25** | **United Airlines 6769** | Choose |
|---|---|---|---|
| | | **operated by UNITED EXPRESS/SKYWEST** | this return |
| | Depart: 6:52pm | Fargo, ND (FAR) | |
| | Arrive: 7:43pm | Denver, CO (DEN) | |
| | **1 stop** | Economy \| 1hr 51min \| Canadair \| View seats | |

Change planes. Time between flights: **1hr 2min**

| | | **United Airlines 461** | |
|---|---|---|---|
| | Depart: 8:45pm | Denver, CO (DEN) | |
| | Arrive: 10:21pm | San Jose, CA (SJC) | |
| | | Economy \| 2hr 36min \| Boeing 737 \| View seats | |
| | | Total duration: 5hr 29min | |

---

| Select | $931 + $48 taxes & fees = $979 per person | TLC Part of OrbitzTLC |
|---|---|---|

| Leave | **Tue, Oct 24** | **United Airlines 688** | Choose |
|---|---|---|---|
| | Depart: 8:19am | San Jose, CA (SJC) | this |
| | Arrive: 2:28pm | Chicago, IL (ORD) | departure |
| | **1 stop** | Economy \| 4hr 9min \| Airbus A320 \| View seats | |

[RSS]hange planes. Time between flights: 0hr 57min

**United Airlines 6907**
| | | | |
Depart:    3:25pm    operated by UNITED EXPRESS/SKYWEST
Arrive:    5:19pm    Chicago, IL (ORD)
                     Fargo, ND (FAR)

Economy  |  1hr 54min  |  Canadair  |  View seats
Total duration: 7hr 0min

Return    **Wed, Oct 25**    **United Airlines 6769**
                             operated by UNITED EXPRESS/SKYWEST
Depart:    6:52pm    Fargo, ND (FAR)
Arrive:    7:43pm    Denver, CO (DEN)

**1 stop**    Economy  |  1hr 51min  |  Canadair  |  View seats

Choose
this return

Change planes. Time between flights: **1hr 2min**

Depart:    8:45pm    **United Airlines 461**
Arrive:    10:21pm   Denver, CO (DEN)
                     San Jose, CA (SJC)

Economy  |  2hr 36min  |  Boeing 737  |  View seats
Total duration: 5hr 29min

---

Select    **$931** + $48 taxes & fees = **$979** per person    [TLC] Part of OrbitzTLC

Leave    **Tue, Oct 24**    **United Airlines 588**
Depart:    10:44am    San Jose, CA (SJC)
Arrive:    2:10pm     Denver, CO (DEN)

**1 stop**    Economy  |  2hr 26min  |  Airbus A320  |  View seats

Choose
this
departure

Change planes. Time between flights: **1hr 30min**

**United Airlines 6769**
operated by UNITED EXPRESS/SKYWEST
Depart:    3:40pm    Denver, CO (DEN)
Arrive:    6:21pm    Fargo, ND (FAR)

Economy  |  1hr 41min  |  Canadair  |  View seats
Total duration: 5hr 37min

Return    **Wed, Oct 25**    **United Airlines 6769**
                             operated by UNITED EXPRESS/SKYWEST
Depart:    6:52pm    Fargo, ND (FAR)
Arrive:    7:43pm    Denver, CO (DEN)

**1 stop**    Economy  |  1hr 51min  |  Canadair  |  View seats

Choose
this return

Change planes. Time between flights: **1hr 2min**

Depart:    8:45pm    **United Airlines 461**
Arrive:    10:21pm   Denver, CO (DEN)
                     San Jose, CA (SJC)

Economy  |  2hr 36min  |  Boeing 737  |  View seats
Total duration: 5hr 29min

---

Select    **$991** + $48 taxes & fees = **$1,039** per person    [TLC] Part of OrbitzTLC

Leave    **Tue, Oct 24**    **United Airlines 336**
Depart:    7:35am    San Jose, CA (SJC)
Arrive:    11:12am   Denver, CO (DEN)

**1 stop**    Economy  |  2hr 37min  |  Boeing 737  |  View seats

Choose
this
departure

Change planes. Time between flights: **4hr 28min**

**United Airlines 6769**
operated by UNITED EXPRESS/SKYWEST
Depart:    3:40pm    Denver, CO (DEN)
Arrive:    6:21pm    Fargo, ND (FAR)

Economy  |  1hr 41min  |  Canadair  |  View seats
Total duration: 8hr 46min

Return    **Wed, Oct 25**    **United Airlines 6769**

Choose

Orbitz: Flight Search Results

| | Depart: | 6:52pm | operated by UNITED EXPRESS/SKYWEST |
|---|---|---|---|
| | Arrive: | 7:43pm | Fargo, ND (FAR) |
| | | | Denver, CO (DEN) |

this return

**1 stop**          Economy | 1hr 51min | Canadair | View seats

**Change planes.** Time between flights: **1hr 2min**

**United Airlines 461**
Depart: 8:45pm   Denver, CO (DEN)
Arrive: 10:21pm   San Jose, CA (SJC)

Economy | 2hr 36min | Boeing 737 | View seats
Total duration: 5hr 29min

---

**Select**    **$991 + $48 taxes & fees = $1,039** per person          Part of OrbitzTLC

**Leave**    **Tue, Oct 24**    **United Airlines 588**
Depart: 10:44am   San Jose, CA (SJC)
Arrive: 2:10pm    Denver, CO (DEN)

Choose this departure

**1 stop**          Economy | 2hr 26min | Airbus A320 | View seats

**Change planes.** Time between flights: **5hr 21min**

**United Airlines 6702**
operated by UNITED EXPRESS/SKYWEST
Depart: 7:31pm   Denver, CO (DEN)
Arrive: 10:12pm   Fargo, ND (FAR)

Economy | 1hr 41min | Canadair | View seats
Total duration: 9hr 28min

**Return**    **Wed, Oct 25**    **United Airlines 6769**
operated by UNITED EXPRESS/SKYWEST
Depart: 6:52pm   Fargo, ND (FAR)
Arrive: 7:43pm   Denver, CO (DEN)

Choose this return

**1 stop**          Economy | 1hr 51min | Canadair | View seats

**Change planes.** Time between flights: **1hr 2min**

**United Airlines 461**
Depart: 8:45pm   Denver, CO (DEN)
Arrive: 10:21pm   San Jose, CA (SJC)

Economy | 2hr 36min | Boeing 737 | View seats
Total duration: 5hr 29min

---

**Didn't find the right combination of flights in one itinerary?**
Build your own itinerary. Start by choosing an outbound or return flight above.

See all 89 flights | Find more flights for United Airlines          Return to top

My Trips | My Account | Flight status | Site map | Contact Us | Site feedback | About Orbitz | Corporate Travel Solutions | Advertise on Orbitz
Become an affiliate | Careers | Media | Low Fare Promise | Low Price Guarantee | Terms and conditions | Your Privacy Rights
Flights | Hotels | Car Rental | Vacation Packages | Travel Deals | Travel Guides | Cruises | Activities | Orbitz Games | Sports Travel     Add
Orbitz feeds RSS

Orbitz guards your privacy and security. We're certified by TRUSTe and Verisign.
© 2001 - 2006, Orbitz, LLC. All rights reserved.
CST 2063530-50; Hawaii TAR-5627; Iowa 644; **Nevada 2003-0387**; Washington 602-102-724




Orbitz: Flight Search Results





"Highest Customer Satisfaction
For Independent Travel
Web Sites – Hotels"

Page 1 of 5



    Welcome to Orbitz.  Sign in | Reg
Sil

Quick Search | Vacation Packages | Hotels | Flights | Cars & Rail | Cruises | Activities     My Trips | My Account | Deals | Customer Service
MY STUFF

    DEEPER DISCOUNTS    Below-published fares, even last minute. Be flexible, save more.    Search Pr

**My Search**

Nearby airports
from total $875

Other times
from total $979



Flight + Hotel deals
for Fargo

Find flights by:    

Airline

**Multiple Carriers**    **United Airlines**

Stops    Price

**Non-stop**

| | | |
|---|---|---|
| 1 stop | $1,013 total $1,062 | $931 total $979 see below |
| 2+ stops | $392 total $443 | $789 total $840 |

Fares are per person in US dollars, using e-tickets. Total fare includes all taxes and fees.
Some itineraries require paper tickets with an additional charge. Changes after purchase are subject to change fees.

Sort flights by:    **Lowest price**    **Departure time**    **Shortest flight**          Airport co

Showing **United Airlines** flights with 1 stop or less (7 flights out of 106 total)    See all 106 flights
Find more flights for United Airlines

| | | | |
|---|---|---|---|
| Select | **$931 + $48 taxes & fees = $979** per person | | Part of OrbitzTLC |
| Leave | Tue, Oct 10 | **United Airlines 102** | Choose this departure |
| | Depart: 6:20am Arrive: 9:57am | San Jose, CA (SJC) Denver, CO (DEN) | |
| | **1 stop** | Economy \| 2hr 37min \| Boeing 737 \| View seats | |
| | **Change planes. Time between flights: 2hr 33min** | | |
| | | **United Airlines 6574** operated by UNITED EXPRESS/SKYWEST | |
| | Depart: 12:30pm Arrive: 3:11pm | Denver, CO (DEN) Fargo, ND (FAR) | |
| | | Economy \| 1hr 41min \| Canadair \| View seats Total duration: 6hr 51min | |
| Return | Wed, Oct 11 | **United Airlines 6769** operated by UNITED EXPRESS/SKYWEST | Choose this return |
| | Depart: 6:52pm Arrive: 7:43pm | Fargo, ND (FAR) Denver, CO (DEN) | |
| | **1 stop** | Economy \| 1hr 51min \| Canadair \| View seats | |
| | **Change planes. Time between flights: 1hr 2min** | | |
| | | **United Airlines 461** | |
| | Depart: 8:45pm Arrive: 10:21pm | Denver, CO (DEN) San Jose, CA (SJC) | |
| | | Economy \| 2hr 36min \| Boeing 737 \| View seats Total duration: 5hr 29min | |

http://www.orbitz.com/App/ViewFlightSearchResults?z=f24a&r=4p0

**EXHIBIT**
**F-4**

9/13/2006

Orbitz: Flight Search Results

**RSS**

**Select**  **$931 + $48 taxes & fees = $979** per person    *OTLC*  Part of OrbitzTLC

| | | | |
|---|---|---|---|
| Leave | **Tue, Oct 10** | **United Airlines 266** | Choose |
| | Depart:  6:30am | San Jose, CA (SJC) | this |
| | Arrive:  12:39pm | Chicago, IL (ORD) | departure |
| | **1 stop** | Economy \| 4hr 9min \| Airbus A319 \| View seats | |

Change planes. Time between flights: **2hr 46min**

| | | |
|---|---|---|
| | | **United Airlines 6907** |
| | | **operated by UNITED EXPRESS/SKYWEST** |
| | Depart:  3:25pm | Chicago, IL (ORD) |
| | Arrive:  5:19pm | Fargo, ND (FAR) |
| | | Economy \| 1hr 54min \| Canadair \| View seats |
| | | Total duration: 8hr 49min |

| | | | |
|---|---|---|---|
| Return | **Wed, Oct 11** | **United Airlines 6769** | Choose |
| | | **operated by UNITED EXPRESS/SKYWEST** | this return |
| | Depart:  6:52pm | Fargo, ND (FAR) | |
| | Arrive:  7:43pm | Denver, CO (DEN) | |
| | **1 stop** | Economy \| 1hr 51min \| Canadair \| View seats | |

Change planes. Time between flights: **1hr 2min**

| | | |
|---|---|---|
| | Depart:  8:45pm | **United Airlines 461** |
| | Arrive:  10:21pm | Denver, CO (DEN) |
| | | San Jose, CA (SJC) |
| | | Economy \| 2hr 36min \| Boeing 737 \| View seats |
| | | Total duration: 5hr 29min |

---

**Select**  **$931 + $48 taxes & fees = $979** per person    *OTLC*  Part of OrbitzTLC

| | | | |
|---|---|---|---|
| Leave | **Tue, Oct 10** | **United Airlines 336** | Choose |
| | Depart:  7:35am | San Jose, CA (SJC) | this |
| | Arrive:  11:12am | Denver, CO (DEN) | departure |
| | **1 stop** | Economy \| 2hr 37min \| Boeing 737 \| View seats | |

Change planes. Time between flights: **1hr 18min**

| | | |
|---|---|---|
| | | **United Airlines 6574** |
| | | **operated by UNITED EXPRESS/SKYWEST** |
| | Depart:  12:30pm | Denver, CO (DEN) |
| | Arrive:  3:11pm | Fargo, ND (FAR) |
| | | Economy \| 1hr 41min \| Canadair \| View seats |
| | | Total duration: 5hr 36min |

| | | | |
|---|---|---|---|
| Return | **Wed, Oct 11** | **United Airlines 6769** | Choose |
| | | **operated by UNITED EXPRESS/SKYWEST** | this return |
| | Depart:  6:52pm | Fargo, ND (FAR) | |
| | Arrive:  7:43pm | Denver, CO (DEN) | |
| | **1 stop** | Economy \| 1hr 51min \| Canadair \| View seats | |

Change planes. Time between flights: **1hr 2min**

| | | |
|---|---|---|
| | Depart:  8:45pm | **United Airlines 461** |
| | Arrive:  10:21pm | Denver, CO (DEN) |
| | | San Jose, CA (SJC) |
| | | Economy \| 2hr 36min \| Boeing 737 \| View seats |
| | | Total duration: 5hr 29min |

---

**Select**  **$931 + $48 taxes & fees = $979** per person    *OTLC*  Part of OrbitzTLC

| | | | |
|---|---|---|---|
| Leave | **Tue, Oct 10** | **United Airlines 688** | Choose |
| | Depart:  8:19am | San Jose, CA (SJC) | this |
| | Arrive:  2:28pm | Chicago, IL (ORD) | departure |
| | **1 stop** | Economy \| 4hr 9min \| Airbus A320 \| View seats | |

**BSS**hange planes. Time between flights: 0hr 57min

**United Airlines 6907**
operated by UNITED EXPRESS/SKYWEST
Depart:    3:25pm    Chicago, IL (ORD)
Arrive:    5:19pm    Fargo, ND (FAR)

Economy  |  1hr 54min  |  Canadair  |  View seats
Total duration: 7hr 0min

Return    **Wed, Oct 11**    **United Airlines 6769**
operated by UNITED EXPRESS/SKYWEST        Choose
Depart:    6:52pm    Fargo, ND (FAR)        this return
Arrive:    7:43pm    Denver, CO (DEN)

**1 stop**    Economy  |  1hr 51min  |  Canadair  |  View seats

Change planes. Time between flights: 1hr 2min

**United Airlines 461**
Depart:    8:45pm    Denver, CO (DEN)
Arrive:    10:21pm    San Jose, CA (SJC)

Economy  |  2hr 36min  |  Boeing 737  |  View seats
Total duration: 5hr 29min

---

Select    **$931** + $48 taxes & fees = **$979** per person    **TLC** Part of OrbitzTLC

Leave    **Tue, Oct 10**    **United Airlines 588**        Choose
Depart:    10:44am    San Jose, CA (SJC)        this
Arrive:    2:10pm    Denver, CO (DEN)        departure

**1 stop**    Economy  |  2hr 26min  |  Airbus A320  |  View seats

Change planes. Time between flights: 1hr 30min

**United Airlines 6769**
operated by UNITED EXPRESS/SKYWEST
Depart:    3:40pm    Denver, CO (DEN)
Arrive:    6:21pm    Fargo, ND (FAR)

Economy  |  1hr 41min  |  Canadair  |  View seats
Total duration: 5hr 37min

Return    **Wed, Oct 11**    **United Airlines 6769**
operated by UNITED EXPRESS/SKYWEST        Choose
Depart:    6:52pm    Fargo, ND (FAR)        this return
Arrive:    7:43pm    Denver, CO (DEN)

**1 stop**    Economy  |  1hr 51min  |  Canadair  |  View seats

Change planes. Time between flights: 1hr 2min

**United Airlines 461**
Depart:    8:45pm    Denver, CO (DEN)
Arrive:    10:21pm    San Jose, CA (SJC)

Economy  |  2hr 36min  |  Boeing 737  |  View seats
Total duration: 5hr 29min

---

Select    **$991** + $48 taxes & fees = **$1,039** per person    **TLC** Part of OrbitzTLC

Leave    **Tue, Oct 10**    **United Airlines 336**        Choose
Depart:    7:35am    San Jose, CA (SJC)        this
Arrive:    11:12am    Denver, CO (DEN)        departure

**1 stop**    Economy  |  2hr 37min  |  Boeing 737  |  View seats

Change planes. Time between flights: 4hr 28min

**United Airlines 6769**
operated by UNITED EXPRESS/SKYWEST
Depart:    3:40pm    Denver, CO (DEN)
Arrive:    6:21pm    Fargo, ND (FAR)

Economy  |  1hr 41min  |  Canadair  |  View seats
Total duration: 8hr 46min

Return    **Wed, Oct 11**    **United Airlines 6769**        Choose

Orbitz: Flight Search Results

Page 4 of 5

|  | Depart: | 6:52pm | operated by UNITED EXPRESS/SKYWEST | this return |
|  | | | Fargo, ND (FAR) | |
|  | Arrive: | 7:43pm | Denver, CO (DEN) | |
|  | **1 stop** | | Economy \| 1hr 51min \| Canadair \| View seats | |

**Change planes. Time between flights: 1hr 2min**

|  | | | **United Airlines 461** | |
|  | Depart: | 8:45pm | Denver, CO (DEN) | |
|  | Arrive: | 10:21pm | San Jose, CA (SJC) | |
|  | | | Economy \| 2hr 36min \| Boeing 737 \| View seats | |
|  | | | Total duration: 5hr 29min | |

---

**Select    $991 + $48 taxes & fees = $1,039 per person**    Part of OrbitzTLC

| Leave | **Tue, Oct 10** | | **United Airlines 588** | Choose |
|  | Depart: | 10:44am | San Jose, CA (SJC) | this |
|  | Arrive: | 2:10pm | Denver, CO (DEN) | departure |
|  | **1 stop** | | Economy \| 2hr 26min \| Airbus A320 \| View seats | |

**Change planes. Time between flights: 5hr 21min**

|  | | | **United Airlines 6702** | |
|  | | | operated by UNITED EXPRESS/SKYWEST | |
|  | Depart: | 7:31pm | Denver, CO (DEN) | |
|  | Arrive: | 10:12pm | Fargo, ND (FAR) | |
|  | | | Economy \| 1hr 41min \| Canadair \| View seats | |
|  | | | Total duration: 9hr 28min | |

| Return | **Wed, Oct 11** | | **United Airlines 6769** | Choose |
|  | | | operated by UNITED EXPRESS/SKYWEST | this return |
|  | Depart: | 6:52pm | Fargo, ND (FAR) | |
|  | Arrive: | 7:43pm | Denver, CO (DEN) | |
|  | **1 stop** | | Economy \| 1hr 51min \| Canadair \| View seats | |

**Change planes. Time between flights: 1hr 2min**

|  | | | **United Airlines 461** | |
|  | Depart: | 8:45pm | Denver, CO (DEN) | |
|  | Arrive: | 10:21pm | San Jose, CA (SJC) | |
|  | | | Economy \| 2hr 36min \| Boeing 737 \| View seats | |
|  | | | Total duration: 5hr 29min | |

---

**Didn't find the right combination of flights in one itinerary?**
Build your own itinerary. Start by choosing an outbound or return flight above.

See all 106 flights  |  Find more flights for United Airlines          Return to top

My Trips | My Account | Flight status | Site map | Contact Us | Site feedback | About Orbitz | Corporate Travel Solutions | Advertise on Orbitz
Become an affiliate | Careers | Media | Low Fare Promise | Low Price Guarantee | Terms and conditions | Your Privacy Rights

Flights | Hotels | Car Rental | Vacation Packages | Travel Deals | Travel Guides | Cruises | Activities | Orbitz Games | Sports Travel    Add
Orbitz feeds [RSS]

Orbitz guards your privacy and security. We're certified by TRUSTe and Verisign.
© 2001 - 2006, Orbitz, LLC. All rights reserved.
CST 2063530-50; Hawaii TAR-5627; Iowa 644; Nevada 2003-0387; Washington 602-102-724




http://www.orbitz.com/App/ViewFlightSearchResults?z=f24a&r=4p0          9/13/2006

Orbitz: Flight Search Results





"Highest Customer Satisfaction
For Independent Travel
Web Sites – Hotels"

EXHIBIT G

# Select A Case

| 3:06-cv-00051-RSW-KKK | Alien Technology Corporation v. Intermec, Inc. et al | filed 06/01/06 | | 830 (Patent) |
|---|---|---|---|---|
| 4:06-cv-00035-DLH-CSM | New Products Marketing Corp. v. Lowe's Companies, Inc. | filed 04/27/06 | closed 09/25/06 | 830 (Patent) |

<table>
<tr><td colspan="5" align="center"><b>PACER Service Center</b></td></tr>
<tr><td colspan="5" align="center"><b>Transaction Receipt</b></td></tr>
<tr><td colspan="5" align="center">10/02/2006 10:26:38</td></tr>
<tr><td><b>PACER Login:</b></td><td>fp0009</td><td><b>Client Code:</b></td><td colspan="2"></td></tr>
<tr><td><b>Description:</b></td><td>Search</td><td><b>Search Criteria:</b></td><td colspan="2">NOS: 830 Filed From: 1/1/2006 Filed To: 10/2/2006</td></tr>
<tr><td><b>Billable Pages:</b></td><td>1</td><td><b>Cost:</b></td><td colspan="2">0.08</td></tr>
</table>



EXHIBIT
G

EXHIBIT H

# Select A Case

| | | | | |
|---|---|---|---|---|
| <u>1:06-cv-00002-GMS</u> | AngioDynamics Inc. v. Diomed Holdings Inc. | filed 01/03/06 | closed 09/07/06 | 830 (Patent) |
| <u>1:06-cv-00013-SLR</u> | Sentillion Inc. v. Carefx Corp. | filed 01/06/06 | | 830 (Patent) |
| <u>1:06-cv-00028-KAJ</u> | McKesson Automation Inc. v. Swisslog Holding AG et al | filed 01/13/06 | | 830 (Patent) |
| <u>1:06-cv-00032-JJF</u> | R.R. Donnelley & Sons Company v. Quark Inc. et al | filed 01/17/06 | | 830 (Patent) |
| <u>1:06-cv-00033-SLR</u> | Takeda Pharmaceutical Company LTD. et al v. Teva Pharmaceuticals USA Inc. | filed 01/17/06 | | 830 (Patent) |
| <u>1:06-cv-00041-JJF</u> | Amazon.com Inc. et al v. Cendant Corporation et al | filed 01/23/06 | | 830 (Patent) |
| <u>1:06-cv-00043-SLR</u> | Transaction Holdings Ltd v. IYG Holding Co. et al | filed 01/23/06 | | 830 (Patent) |
| <u>1:06-cv-00045-GMS</u> | Nichia Corporation v. Intermatic Inc. | filed 01/24/06 | closed 06/09/06 | 830 (Patent) |
| <u>1:06-cv-00054-GMS</u> | Illinois Tool Works Inc. v. Frito-Lay North America Inc. | filed 01/27/06 | | 830 (Patent) |
| <u>1:06-cv-00060-JJF</u> | Fairplay Electric Cars LLC v. Textron Innovations Inc. et al | filed 01/30/06 | closed 05/15/06 | 830 (Patent) |

EXHIBIT

_H_

tabbies®

| | | | |
|---|---|---|---|
| 1:06-cv-00077-JJF | Baldwin Graphic Systems Inc. v. BBA Nonwovens Simpsonville Inc. et al | filed 02/03/06 | 830 (Patent) |
| 1:06-cv-00082-KAJ | Landis+Gyr Inc. v. Elster Electricity LLC | filed 02/06/06   closed 09/27/06 | 830 (Patent) |
| 1:06-cv-00089-JJF | Pfizer Inc v. Teva Pharmaceuticals USA et al | filed 02/08/06 | 830 (Patent) |
| 1:06-cv-00090-JJF | Pfizer Inc v. Sandoz Inc. et al | filed 02/08/06 | 830 (Patent) |
| 1:06-cv-00091-SLR | Callaway Golf Company v. Acushnet Company | filed 02/09/06 | 830 (Patent) |
| 1:06-cv-00098-KAJ | Secure Elements Inc. v. Citadel Security Software Inc. | filed 02/14/06 | 830 (Patent) |
| 1:06-cv-00105-SLR | Nuance Communications Inc. et al v. Tellme Networks Inc. | filed 02/17/06 | 830 (Patent) |
| 1:06-cv-00108-JJF | Zoetics Inc. et al v. Yahoo! Inc. | filed 02/21/06 | 830 (Patent) |
| 1:06-cv-00113-KAJ | Sepracor Inc. v. Dey LP et al | filed 02/22/06 | 830 (Patent) |
| 1:06-cv-00115-SLR | Avago Technologies General IP Pte Ltd et al v. Finisar Corporation | filed 02/22/06   closed 03/08/06 | 830 (Patent) |
| 1:06-cv-00164-SLR | MedPointe Healthcare Inc. v. Apotex Inc. et al | filed 03/10/06 | 830 (Patent) |

| | | | |
|---|---|---|---|
| <u>1:06-cv-00170-JJF</u> | CashEdge Inc. v. Yodlee Inc. | filed 03/14/06   closed 07/27/06 | 830 (Patent) |
| <u>1:06-cv-00187-GMS</u> | Automotive Technologies International Inc. v. American Honda Motor Company et al | filed 03/17/06 | 830 (Patent) |
| <u>1:06-cv-00197-SLR</u> | Teles AG Informationstechnologien v. Quintum Technologies Inc. | filed 03/24/06 | 830 (Patent) |
| <u>1:06-cv-00222-JJF</u> | Wyeth v. Impax Laboratories Inc. | filed 04/05/06 | 830 (Patent) |
| <u>1:06-cv-00230-GMS</u> | Merck & Co. Inc. v. Apotex Inc. | filed 04/07/06 | 830 (Patent) |
| <u>1:06-cv-00234-SLR</u> | Bayer Healthcare AG et al v. Teva Pharmaceuticals USA Inc. | filed 04/05/06 | 830 (Patent) |
| <u>1:06-cv-00239-SLR</u> | CooperVision Inc. v. CIBA Vision Corporation | filed 04/11/06 | 830 (Patent) |
| <u>1:06-cv-00242-KAJ</u> | DuPont Performance Elastomers L.L.C. v. Dow Chemical Company | filed 04/11/06   closed 08/07/06 | 830 (Patent) |
| <u>1:06-cv-00251-GMS</u> | US Philips Corporation v. Eastman Kodak Company | filed 04/18/06 | 830 (Patent) |
| <u>1:06-cv-00255-JJF</u> | Epic Systems Corporation v. Acacia Research Corporation et al | filed 04/19/06 | 830 (Patent) |
| <u>1:06-cv-00259-KAJ</u> | Amgen Inc. et al v. Ariad Pharmaceuticals Inc. | filed 04/20/06 | 830 (Patent) |

| | | | |
|---|---|---|---|
| [1:06-cv-00268-JJF](#) | Ajinomoto Heartland LLC v. Global Bio-Chem Technology Group Company Limited et al | filed 04/25/06 | 830 (Patent) |
| [1:06-cv-00282-KAJ](#) | IGT v. Bally Gaming International Inc. et al | filed 04/28/06 | 830 (Patent) |
| [1:06-cv-00286-GMS](#) | Aventis Pharmaceuticals Inc. et al v. Barr Laboratories Inc. | filed 05/02/06 | 830 (Patent) |
| [1:06-cv-00291-JJF](#) | Broadband Technology Innovations, LLC et al v. Verizon Internet Services Inc. et al | filed 05/03/06 | 830 (Patent) |
| [1:06-cv-00297-GMS](#) | Rohm and Haas Electronic Materials LLC v. Honeywell Electronic Materials Inc. et al | filed 05/05/06 | 830 (Patent) |
| [1:06-cv-00307-SLR](#) | Arcelor France v. Mittal Steel USA Inc. | filed 05/09/06 | 830 (Patent) |
| [1:06-cv-00310-GMS](#) | Merck & Co. Inc. v. Teva Pharmaceuticals USA Inc. | filed 05/10/06   closed 07/06/06 | 830 (Patent) |
| [1:06-cv-00311-JJF](#) | Nice Systems Inc. et al v. Witness Systems Inc. | filed 05/10/06 | 830 (Patent) |
| [1:06-cv-00316-KAJ](#) | E.I. DuPont de Nemours and Company v. Bio-Rad Laboratories Inc. | filed 05/12/06 | 830 (Patent) |
| [1:06-cv-00332-JJF](#) | Fujinon Corporation v. Samsung Telecommunications America LP et al | filed 05/19/06 | 830 (Patent) |
| [1:06-cv-00346-GMS](#) | Analog Devices Inc. v. Linear Technology Corp. | filed 05/25/06 | 830 (Patent) |

| | | | |
|---|---|---|---|
| <u>1:06-cv-00350-KAJ</u> | Block Drug Company, Inc. v. Sedona Laboratories Inc. | filed 05/25/06 | 830 (Patent) |
| <u>1:06-cv-00358-SLR</u> | AstraZeneca AB et al v. Dexcel Ltd. et al | filed 05/30/06 | 830 (Patent) |
| <u>1:06-cv-00369-GMS</u> | Finjan Software Ltd. v. Secure Computing Corporation et al | filed 06/05/06 | 830 (Patent) |
| <u>1:06-cv-00375-SLR</u> | 3M Innovative Properties Company et al v. Assuretec Systems Inc. | filed 06/06/06   closed 07/19/06 | 830 (Patent) |
| <u>1:06-cv-00381-JJF</u> | Knova Software Inc. et al v. Inquira Inc. | filed 06/09/06 | 830 (Patent) |
| <u>1:06-cv-00383-SLR</u> | Alcoa Inc. v. Alcan Inc. et al | filed 06/13/06 | 830 (Patent) |
| <u>1:06-cv-00386-GMS</u> | Black & Decker Inc. et al v. Techtronics Industries Co. Ltd. et al | filed 06/14/06 | 830 (Patent) |
| <u>1:06-cv-00387-KAJ</u> | Time Warner Cable Inc. v. USA Video Technology Corp. | filed 06/15/06 | 830 (Patent) |
| <u>1:06-cv-00391-GMS</u> | Automotive Technologies International Inc. v. Hyundai Motor America et al | filed 06/16/06 | 830 (Patent) |
| <u>1:06-cv-00394-KAJ</u> | Coxcom Inc. v. USA Video Technology Corp. | filed 06/19/06 | 830 (Patent) |

| | | | |
|---|---|---|---|
| 1:06-cv-00403-JJF | St. Clair Intellectual Property Consultants Inc. v. Siemens AG et al | filed 06/26/06 | 830 (Patent) |
| 1:06-cv-00404-JJF | St. Clair Intellectual Property Consultants Inc. v. LG Electronics Inc. et al | filed 06/26/06 | 830 (Patent) |
| 1:06-cv-00407-KAJ | Comcast Cable Communications LLC et al v. USA Video Technology Corp. | filed 06/27/06 | 830 (Patent) |
| 1:06-cv-00411-GMS | Intermec IP Corp. v. Alien Technology Corp. | filed 06/29/06 | 830 (Patent) |
| 1:06-cv-00414-SLR | Oracle Corporation et al v. Epicrealm Licensing LP | filed 06/30/06 | 830 (Patent) |
| 1:06-cv-00417-GMS | Colgate-Palmolive Company v. Ranir L.L.C. | filed 06/30/06 | 830 (Patent) |
| 1:06-cv-00424-SLR | Tandberg Telecom AS v. Starbak Communications Inc. | filed 07/07/06 | 830 (Patent) |
| 1:06-cv-00425-JJF | EchoStar Satellite LLC et al v. Finisar Corporation | filed 07/10/06 | 830 (Patent) |
| 1:06-cv-00429-KAJ | Intel Corporation v. Amberwave Systems Corporation | filed 07/11/06 | 830 (Patent) |
| 1:06-cv-00438-GMS | Elan Pharma International Limited v. Abraxis Bioscience Inc. | filed 07/19/06 | 830 (Patent) |
| 1:06-cv-00446-JJF | Saint-Gobain Glass France v. Automotive Components Holdings LLC | filed 07/21/06 | 830 (Patent) |

| 1:06-cv-00453-GMS | USA Technologies Inc. v. Transaction Network Services Inc. | filed 07/25/06 | 830 (Patent) |
|---|---|---|---|
| 1:06-cv-00476-GMS | Linear Technology Corporation v. Monolithic Power Systems Inc. | filed 08/03/06 | 830 (Patent) |
| 1:06-cv-00482-JJF | 4titude Ltd. v. Bio-Rad Laboratories Inc. | filed 08/04/06 | 830 (Patent) |
| 1:06-cv-00491-KAJ | Cordance Corporation v. Amazon.com Inc. | filed 08/08/06 | 830 (Patent) |
| 1:06-cv-00495-SLR | Quinstreet Inc. v. Epicrealm Licensing LP | filed 08/08/06 | 830 (Patent) |
| 1:06-cv-00500-KAJ | ZymoGenetics Inc. v. Bristol-Myers Squibb Co. et al | filed 08/14/06 | 830 (Patent) |
| 1:06-cv-00514-GMS | Abbott Diabetes Care Inc. v. DexCom Inc. | filed 08/17/06 | 830 (Patent) |
| 1:06-cv-00515-JJF | Technology Licensing Corporation et al v. Rational Cooking Systems Inc. | filed 08/18/06 | 830 (Patent) |
| 1:06-cv-00527-JJF | Ansell Healthcare Products LLC. v. Tillotson Corporation | filed 08/25/06 | 830 (Patent) |
| 1:06-cv-00530-SLR | Ablaise Ltd. et al v. Bank of America Corporation | filed 08/28/06 | 830 (Patent) |
| 1:06-cv-00540-KAJ | Roquette Freres v. SPI Pharma Inc. | filed 08/31/06 | 830 (Patent) |

| 1:06-cv-00543-GMS | Ronald A. Katz Technology Licensing, L.P. v. Reliant Energy Inc. et al | filed 09/01/06 | | 830 (Patent) |
| 1:06-cv-00544-GMS | Ronald A Katz Technology Licensing LP v. TD Banknorth Inc. et al | filed 09/01/06 | | 830 (Patent) |
| 1:06-cv-00545-GMS | Ronald A. Katz Technology Licensing, L.P. v. Ahold USA Inc. et al | filed 09/01/06 | | 830 (Patent) |
| 1:06-cv-00546-GMS | Ronald A. Katz Technology Licensing, L.P. v. Time Warner Cable Inc. et al | filed 09/01/06 | | 830 (Patent) |
| 1:06-cv-00547-GMS | Ronald A. Katz Technology Licensing, L.P. v. American International Group, Inc. et al | filed 09/01/06 | | 830 (Patent) |
| 1:06-cv-00554-KAJ | Pharmacia & Upjohn Company LLC v. Mayne Pharma (USA) Inc. | filed 09/07/06 | closed 09/15/06 | 830 (Patent) |
| 1:06-cv-00557-SLR | Solvay S.A. v. Honeywell Specialty Materials LLC et al | filed 09/07/06 | | 830 (Patent) |
| 1:06-cv-00558-GMS | Glaxo Group Ltd. v. Spectrum Pharmaceuticals Inc | filed 09/08/06 | | 830 (Patent) |
| 1:06-cv-00564-JJF | Pulmonetic Systems Inc. v. VersaMed Medical Systems Inc. | filed 09/12/06 | | 830 (Patent) |
| 1:06-cv-00579-SLR | Viasys Respiratory Care Inc. et al v. VersaMed Medical Systems Inc. | filed 09/15/06 | | 830 (Patent) |
| 1:06-cv- | | | | |

| 00593-UNA | 3V Inc. v. CIBA Specialty Chemicals Corporation | filed 09/25/06 | 830 (Patent) |
|---|---|---|---|
| 1:06-cv-00594-UNA | Label$Dollars Corp. v. Premark FEG L.L.C. | filed 09/25/06 | 830 (Patent) |
| 1:06-cv-00601-UNA | Laboratory Skin Care Inc. et al v. Limited Brands Inc. et al | filed 09/26/06 | 830 (Patent) |
| 1:06-cv-00604-UNA | Sepracor Inc. v. Dey LP et al | filed 09/27/06 | 830 (Patent) |
| 1:06-cv-00606-UNA | American Medical Systems Inc. et al v. Celsion Corporation | filed 09/28/06 | 830 (Patent) |
| 1:06-cv-00613-UNA | Abbott Laboratories et al v. Johnson and Johnson Inc. et al | filed 09/29/06 | 830 (Patent) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/02/2006 11:09:29 | | | |
| PACER Login: | fp0009 | Client Code: | |
| Description: | Search | Search Criteria: | NOS: 830 Filed From: 1/1/2006 Filed To: 10/2/2006 |
| Billable Pages: | 4 | Cost: | 0.32 |

EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANGIODYNAMICS, INC., )
)
Plaintiff, )
)
v. )     C.A. No.  06-02 GMS
)
DIOMED HOLDINGS, INC., )
)
Defendant. )
)

## MEMORANDUM

## I.   INTRODUCTION

On January 3, 2006, AngioDynamics, Inc. ("AngioDynamics") brought this declaratory judgment action against Diomed Holdings, Inc. ("Diomed").  Presently before the court are Diomed's Motion to Dismiss (D.I. 8), and AngioDynamics' Motion to Amend (D.I. 10).  For the following reasons, the court will grant Diomed's motion to dismiss and deny AngioDynamics' motion to amend.

## II.   BACKGROUND

A subsidiary of Diomed, Diomed Inc., owns U.S. Patent Nos. 6,981,971 (the "'971 patent") and 6,986,766 (the "'766 patent") (collectively, the "patents-in-suit").  The patents-in-suit are directed to product features, which include markings along an introducer sheath, of a system for delivering laser energy to the walls of a vein, and a method directed to the use of a product with those features.  (D.I. 4 ¶¶ 13, 16-17.)  The method of delivering laser energy to the walls of a vein is known as endovenous laser treatment.  (D.I. 11, at 4.)  Both Diomed and AngioDynamics offer



products relating to endovenous laser treatment. Diomed, however, has the exclusive rights in three patents, including the patents-in-suit, that relate to endovenous laser treatment.

AngioDynamics alleges that the issuance of the patents-in-suit, as well as Diomed's conduct, including the filing of a lawsuit against it and other companies for infringement of a different patent and the making of certain statements regarding the patents-in-suit, have given it a reasonable apprehension that Diomed would sue it for patent infringement. (D.I. 4 ¶ 31.) Accordingly, AngioDynamics has filed a declaratory judgment action, asking the court to declare all claims of the patents-in-suit invalid, non-infringed, and unenforceable. (Id. at Prayer for Relief.)

On January 31, 2006, Diomed filed a motion to dismiss for lack of subject matter jurisdiction. On February 14, 2006, AngioDynamics filed a motion to amend its first amended complaint.

## III.  DISCUSSION

Diomed contends that the court should dismiss both counts of the declaratory judgment action because AngioDynamics had no objectively reasonable apprehension of imminent suit on the '971 and '776 patents and, therefore, AngioDynamics' claim is premature. In other words, Diomed contends the court lacks subject matter jurisdiction over AngioDynamics' declaratory judgment action.

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the jurisdiction of the Court to address the merits of a plaintiff's complaint. Such a challenge may present either a facial or a factual challenge to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). When asserting a facial challenge, a defendant contends that the complaint alleges facts that, even if true, would be insufficient to establish the Court's jurisdiction. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir.

2

2000).  The present motion presents a facial challenge to the complaint because the jurisdictional

facts are not in dispute.  Such a motion requires the court to consider the allegations of the complaint

as true and to make all reasonable inferences in the plaintiff's favor.  *See id.*  Additionally, the court

must test the existence of jurisdiction as of the time the complaint was filed.  *Lang v. Pacific Marine*

*& Supply Co.*, 895 F.2d 761, 764 (Fed. Cir. 1990).

The Declaratory Judgment Act (the "Act") provides that "[i]n a case of actual controversy

. . . [a court of competent jurisdiction] may declare the rights and other legal relations of any

interested party seeking such declaration, whether or not further relief is or could be sought."  28

U.S.C. § 2201(a).  Thus, before a court may exercise jurisdiction over a declaratory judgment action,

the Act requires an "actual controversy between the parties."  *Medimmune, Inc. v. Centocor, Inc.*,

409 F.3d 1376, 1378-79 (Fed. Cir. 2005) (citing *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d

1324, 1331 (Fed. Cir. 2005)).  "In general, the presence of an 'actual controversy' within the

meaning of the statute depends on 'whether the facts alleged, under all the circumstances, show that

there is a substantial controversy between parties having adverse legal interests, of sufficient

immediacy and reality to warrant the issuance of a declaratory judgment.'"  *EMC Corp. v. Norand*

*Corp.*, 89 F.3d 807, 810 (Fed. Cir. 1996) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*,

312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941)).

However, a district court does not have jurisdiction to hear the action when there is no actual

controversy.  *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 634 (Fed. Cir. 1991), *cert. denied*,

112 S. Ct. 658 (1991).  Moreover, "even assuming [the existence of] an actual controversy, the

exercise of a court's jurisdiction over a declaratory judgment action is discretionary."  *Telectronics*

*Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1526 (Fed. Cir. 1992) (citations omitted).

In the patent context, the Federal Circuit has developed a two-part test for determining whether the declaratory judgment action is justiciable: (1) an explicit threat or other action by the patentee which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit; and (2) present activity by the declaratory judgment plaintiff which could constitute infringement, or concrete steps taken by the declaratory judgment plaintiff with the intent to conduct such activity. *See Goodyear Tire & Rubber Co. v. Releasomers Inc.*, 824 F.2d 953, 955 (Fed. Cir. 1987) (citations omitted). In addition, the declaratory judgment plaintiff bears the burden of proving the existence of facts underlying its allegations of the existence of an actual controversy. *Jervis B. Webb Co. v. S. Sys., Inc.*, 742 F.2d 1388, 1399 (Fed. Cir. 1984).

Here, neither party disputes that the second element has been satisfied. Thus, the court's determination turns on whether AngioDynamics has a reasonable apprehension of suit. "When the defendant's conduct, including its statements falls short of an express charge [or threat], one must consider the 'totality of the circumstances' in determining whether that conduct meets the first prong of the test." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988) (quoting *Goodyear*, 824 F.3d at 955). AngioDynamics, therefore, must be able to demonstrate that it has a reasonable apprehension of imminent suit. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (this requirement of imminence reflects the mandate in Article III of the U.S. Constitution that the injury in fact be "concrete," and "actual or imminent, not conjectural or hypothetical"); *see Teva Pharms. v. Pfizer, Inc.*, 395 F.3d 1324, 1333

4

(Fed. Cir. 2005); *E.I. DuPont de Nemours & Co. v. Great Lakes Chem. Corp.*, 383 F. Supp. 2d 642, 647 (D. Del. 2005).[1]

In the present case, AngioDynamics contends that the following facts, when viewed in their totality, create a reasonable apprehension of an infringement suit by Diomed: (1) Diomed's history of defending its patents, as demonstrated by its lawsuits against AngioDynamics and other companies for infringement of U.S. Patent No. 6,398,777 (the "'777 patent"); (2) Diomed's lawsuit against Vascular Solutions, Inc. ("Vascular Solutions") and a former Diomed employee for trade secret misappropriation; and (3) a statement made by James Wylie ("Wylie"), Diomed's President and Chief Executive Officer, at a July 28, 2005 conference call set up to review the company's second quarter financial results.

After having considered these facts in the context of the relevant case law, the court is unpersuaded that AngioDynamics has demonstrated a reasonable apprehension of imminent suit. First, although AngioDynamics has shown that Diomed brings lawsuits for patent infringement to

---

[1] AngioDynamics maintains that the suit does not have to be imminent for a reasonable apprehension to exist and attempts to distinguish *Teva Pharms. v. Pfizer, Inc.*, 395 F.3d 1324 (Fed. Cir. 2005), a recent case in which the Federal Circuit stated that an "actual controversy" exists between parties when there is a reasonable apprehension of *imminent* suit. 395 F.3d at 1333 (emphasis in original). AngioDynamics contends that *Teva* is distinguishable from the case at bar because it "involved a pharmaceutical drug application that was subject to compliance with provisions of the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act." (D.I. 11, at 16.) According to AngioDynamics, "when the *Teva* Court stated that the suit must be imminent for 'reasonable apprehension,' it was addressing the unique situation that arises in Hatch-Waxman cases." (Id. at 17.) The court cannot agree with AngioDynamics' position. While it is true that the declaratory judgment subject matter jurisdiction issue in *Teva* arose as a result of a pharmaceutical drug application, that fact was not critical to the court's statement regarding imminency of suit. Indeed, the court set forth the imminency requirement for reasonable apprehension in the context of discussing the standard that it must apply to determine whether the suit was fit for judicial review. Moreover, the court did not, as AngioDynamics suggests, single out or distinguish Hatch-Waxman cases as "unique" during its discussion of the reasonable apprehension element of the two-part test.

protect its investments, it has not argued that Diomed has sued any party for infringement of either of the patents-in-suit. Thus, while relevant to the court's analysis, Diomed's lawsuits for infringement of the '777 patent do not lead the court to a finding of reasonable apprehension. *See DuPont Dow Elastomers, L.L.C. v. Green Tweed of Delaware*, 148 F. Supp. 2d 412, 415 (D. Del. 2001) (granting motion to dismiss declaratory judgment action based, in part, on the fact that the defendant did not have a pattern of suing on the patent-in-suit).

Likewise, Diomed's lawsuit against Vascular Solutions and a former Diomed employee for trade secret misappropriation does not lend credence to AngioDynamics' contention of a reasonable apprehension. To support its contention, AngioDynamics cites to *Vanguard Research, Inc. v. PEAT, Inc.*, 304 F.3d 1249 (Fed. Cir. 2002) and *Goodyear Tire & Rubber Co. v. Releasomers Inc.*, 824 F.2d 953 (Fed. Cir. 1987), two cases in which the Federal Circuit concluded that the plaintiff had a reasonable apprehension of suit, based partly on prior litigation involving trade secret misappropriation. What AngioDynamics fails to mention in its briefing, however, is the fact that the prior lawsuits for trade secret misappropriation in both *Vanguard* and *Goodyear* were lawsuits filed by the patentee against the declaratory judgment plaintiff. *See Vanguard*, 304 F.3d at 1255; *Goodyear*, 824 F.2d at 954. Here, in contrast, Diomed filed its trade misappropriation lawsuit against another company and one of its own former employees.

Additionally, the Federal Circuit did not just look at the prior lawsuit against the declaratory judgment plaintiffs in *Vanguard* and *Goodyear*. In *Vanguard*, the patentee also had informed the plaintiff's customers that the plaintiff was using patented technology without a license. *See Vanguard*, 304 F.3d at 1255. In the present case, AngioDynamics has neither alleged nor presented evidence regarding conduct on the part of Diomed directed to its customers. *See DuPont Dow*, 148

6

F. Supp. 2d at 415 (dismissing case for lack of declaratory judgment jurisdiction based, in part, on the absence of conduct interfering with the plaintiff's customer relations). In *Goodyear*, the patentee had told the plaintiff's representative that, when the patents-in-suit issued, the parties "would have to talk about infringement of the patents by Goodyear and possible licensing since Goodyear might be liable for past patent infringement," and that "the parties might wind up in Federal Court on these issues." *Goodyear*, 824 F.2d at 956 n.5. Here, as will be discussed below, Diomed did not directly discuss the newly issued patents with AngioDynamics, and did not use any language in statements about the patents that would give AngioDynamics a reasonable apprehension of suit. As such, Diomed's present lawsuit for trade secret misappropriation does not support of finding of reasonable apprehension, even when considered together with its lawsuits for infringement of the '777 patent.

Finally, AngioDynamics points to Wylie's statement during Diomed's second quarter 2005 earnings conference call. According to the amended complaint, Wylie stated the following:

> It is important to note that on July 26, Diomed announced that it had received a Notice of Allowance from the U.S. Patent and Trademark Office for a patent on Diomed's proprietary technique of using a marked introducer sheath to control the rate of withdrawal of an optical fiber during an intravenous laser procedure. Diomed introduced a marked introducing sheath especially configured for use in the proprietary technology in the fourth quarter of 2003. Currently, all EVLT procedure kits sold by Diomed contain a marked introducer sheath for use in the method covered by the allowed patent. Notably, both AngioDynamics and Vascular Solutions are offering marked introducer sheaths particularly for use in a technique *embraced by* the now allowed Diomed patent. Further, it is important to point out that this case is not connected to the U.S. Patent 6,398,777 infringement lawsuits for which I will now provide an update.

(D.I. 4 ¶ 22.) (emphasis added). The Federal Circuit, on many occasions, has addressed statements made by the patentee to either potential infringers or third parties. On the one hand, the Federal Circuit has stated that the test for finding a controversy "cannot turn on whether the parties used

polite terms in dealing with one another." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811 (Fed. Cir. 1996). That is, "'in light of the subtleties in lawyer language,' *Arrowhead*, 846 F.2d at 736, the Federal Circuit has not required . . . 'magic words' to create a justiciable controversy." *DuPont Dow*, 148 F. Supp. 2d at 415. On the other hand, "the 'reasonable apprehension of suit' test requires more than the nervous state of mind of a possible infringer; it requires that the objective circumstances support such an apprehension." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053-54 (Fed. Cir. 1995). Indeed, the court has determined that a patentee does not create a reasonable apprehension when the patentee states directly to the potential infringer that its activities "fall within," "are covered by," and are "operations under" the patent. *Shell Oil v. Amoco*, 970 F.2d 885, 889 (Fed. Cir. 1992). Additionally, the Federal Circuit has held that a "patentee's statement that it intend[s] to enforce [its] patent [does] not . . . create a reasonable apprehension of suit." *Phillips Plastics*, 57 F.3d at 1054.

In the present case, the court is not convinced that Wylie's statement that AngioDynamics' products are "embraced by" the patents-in-suit was sufficient to give rise to a reasonable apprehension of suit. The statement was not made to AngioDynamics directly; rather, it was made during a conference call that Diomed utilized to announce and discuss its financial results with investors and other interested third parties.[2] Moreover, the statement is consistent with the types of

_____

[2] According to AngioDynamics, Diomed "must have reasonably anticipated" that at least one representative of AngioDynamics would have participated in the conference call because it was "broad[ly] advertise[d]" in a Diomed press release inviting any "interested parties" to participate. (D.I. 11, at 8.) Thus, AngioDynamics asserts that Wylie's statement was made to the general industry, including its customers, and "broadcast specifically to [it]." (Id.) AngioDynamics; assertion is of no moment, however, because the court concludes that the statement "embraced by" is not one which would trigger a reasonable apprehension of suit. The court's conclusion is confirmed by the fact that AngioDynamics has neither alleged nor argued that the statement has interfered with its customer relations. *See, e.g., Arrowhead*, 846 F.3d at

8

statements that the Federal Circuit has already determined do not create a reasonable apprehension on the part of the potential infringer. *See, e.g., Shell*, 970 F.2d at 889; *Phillips Plastics*, 57 F.3d at 1054. Lastly, while AngioDynamics contends that the "embraced by" language used in the conference call was enough to create a reasonable apprehension on its part, it ignores the remainder of the call, during which Wylie, in response to a question from a caller, stated that he did not "want to get into a discussion on the call relative to infringement" and did not "want to comment" on what Diomed would do with the patent. (D.I. 9, Ex. A at 35:32-36:35.) These statements could not have created any apprehension of an imminent suit in AngioDynamics, much less an objectively reasonable apprehension.

Essentially, the facts of the present case boil down to the following: Diomed has sued AngioDynamics and other companies for infringement of a patent "not directly related to" either of the patents-in-suit. (See D.I. 11, at 14.) Diomed has also sued Vascular Solutions and one of its former employees for trade secret misappropriation involving the technology that is the subject of the patents-in-suit. Additionally, Diomed's ownership of the patents-in-suit may serve as a potential roadblock to AngioDynamics' sales of its endovenous laser treatment system. However, Diomed has not expressly threatened to sue AngioDynamics, and its statements regarding the patents-in-suit were made during a 2005 second quarter earnings conference call with investors and interested third parties. Moreover, during that conference call, Wylie refused to "comment on what we [Diomed] will potentially do or not do with this [recently allowed] patent." (D.I. 9, Ex. A at 35:32-36:35.) To conclude that Diomed's conduct provided AngioDynamics with a reasonable apprehension of suit

---

737 (noting that the patentee's conduct "produced an apprehension of litigation serious enough to cause a demand for indemnification from the potential infringer's customers); *Vanguard*, 304 F.3d at 1251 (discussing patentee's interference with potential infringer's customers).

would amount to a finding that "a reasonable apprehension of suit arises when a patentee does nothing more than exercise its lawful commercial prerogatives and, in so doing, puts a competitor in the position of having to choose between abandoning a particular business venture or bringing matters to a head by engaging in arguably infringing activity," which does not meet the objective test for determining declaratory justiciability. *Cygnus Therapeutics Sys. v. ALZA Corp.*, 92 F.3d 1153, 1160 (Fed. Cir. 1996); *see Nokia Corp. v. Interditigal Commc'ns*, No. Civ. A. 05-16-JJF, 2005 WL 3525696, at *3 (D. Del. Dec. 21, 2005). Accordingly, the court will dismiss AngioDynamics' complaint.[3]

Dated: September 7, 2006          /s/ Gregory M. Sleet
                               UNITED STATES DISTRICT JUDGE

---

[3] AngioDynamics has filed a Motion to Amend (D.I. 10) in order to correct the name of the defendant and state with more particularity its allegations with respect to unenforceability. "[A] court should deny leave to amend if the moving party is guilty of undue delay, bad faith, dilatory motive, prejudice, or his or her amended claims are futile." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). Because AngioDynamics' second amended complaint would not cure the defect in the court's jurisdiction, allowing it to amend would be futile. Thus, the court will deny AngioDynamics' motion to amend.

10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ANGIODYNAMICS, INC.,         ) | |
|         ) | |
|     Plaintiff,         ) | C.A. No. 06-02 GMS |
|         ) | |
|     v.         ) | |
|         ) | |
| DIOMED HOLDINGS, INC.,         ) | |
|         ) | |
|     Defendant.         ) | |

## <u>ORDER</u>

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

1.      The defendant's Motion to Dismiss (D.I. 8) is GRANTED.

2.      The First Amended Complaint (D.I. 4) shall be dismissed without prejudice.

3.      The plaintiff's Motion to Amend (D.I. 10) is DENIED.

Dated: September 7, 2006                  /s/ Gregory M. Sleet
                                         UNITED STATES DISTRICT JUDGE

EXHIBIT A

Case 1:06-cv-00411-GMS     Document 16-6     Filed 10/02/2006     Page 2 of 45

Case 3:06-cv-00051-RSW-KKK     Document 9-2     Filed 06/29/2006     Page 1 of 15
Case 3:06-cv-00051-RSW-KKK     Document 4-1     Filed 06/16/2006     Page 1 of 15

FILED

1 16 2006

U.S. CLERK
NORTH DAKOTA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

ALIEN TECHNOLOGY CORPORATION, )
           Plaintiff, )
                              )
                              )
          v. )
                              )
INTERMEC, INC., INTERMEC )
TECHNOLOGIES CORPORATION, )
and INTERMEC IP CORP., )
           Defendants. )

Civil Action No. 3:06 CV 51 (RSW)

**JURY TRIAL DEMANDED**

FILED

JUN 16 2006

EDWARD J. KLECKER, CLERK
U.S. DISTRICT COURT-NORTH DAKOTA

## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

    Plaintiff, Alien Technology Corporation ("Alien"), by its undersigned attorneys,

as and for its First Amended Complaint against defendants Intermec, Inc. ("Intermec"), Intermec

Technologies Corporation ("Intermec Technologies"), and Intermec IP Corp. ("Intermec IP")

(collectively "Intermec Defendants"), alleges as follows:

### INTRODUCTION

    1.    This action concerns the invalidity and non-infringement of the following

United States Patents, which, on information and belief, are owned by Intermec IP: U.S. Patent

No. 5,030,807; U.S. Patent No. 5,777,561; U.S. Patent No. 5,828,693; U.S. Patent No.

5,850,181; U.S. Patent No. 5,912,632; U.S. Patent No. 5,995,019; U.S. Patent No. 6,288,629;

U.S. Patent No. 6,400,274; U.S. Patent No. 6,429,775, and U.S. Patent No. 6,812,841

(collectively "patents-in-suit"). The Intermec Defendants have threatened to sue Alien for patent

infringement and engaged in other conduct that has created in Alien an objectively reasonable

apprehension of suit. Accordingly, as set forth below, Alien asks this Court to declare the

1191166.1
4839-2392-2177\1



EXHIBIT

A

patents-in-suit invalid and further to declare that, by making, using, selling, or offering to sell its products, Alien does not infringe any valid claim of the patents-in-suit.

## THE PARTIES

2.    Plaintiff Alien is a manufacturer of Radio Frequency Identification ("RFID") products, including tags and readers. Alien is incorporated under the laws of the State of Delaware, and has its principal place of business at 18220 Butterfield Blvd., Morgan Hill, California 95037.

3.    Since 2004, Alien has maintained a manufacturing facility at 1700 42nd Street SW, Fargo, North Dakota 58103. Alien contracts with numerous local businesses to support its manufacturing efforts in Fargo, including, but not limited to, IT infrastructure and networking support vendors, communications suppliers, office materials suppliers, and janitorial vendors. In addition, Alien has invested approximately $15 million in a new manufacturing facility located in the North Dakota State University Research and Technology Park in Fargo. Over the next two years, Alien plans to invest an additional $25 million to further expand the facility and intends to employ approximately 100 people, including engineers and technicians. However, in light of the Intermec Defendants' allegations of patent infringement, Alien's long-term plans regarding its Fargo facility and related operations may be in jeopardy.

4.    On information and belief, the Intermec Defendants manufacture technologies that identify, track, and manage supply chain assets using RFID technology. On information and belief, Intermec is incorporated under the laws of the State of Delaware, and has its principal place of business at 6001 36th Ave. West, Everett, Washington 98203. On information and belief, Intermec Technologies, a wholly-owned subsidiary of Intermec, is

1191166.1
4839-2392-2177\1

incorporated under the laws of the State of Washington, and has its principal place of business at 6001 36th Ave. West, Everett, Washington 98203.  On information and belief, Intermec IP, a wholly-owned subsidiary of Intermec Technologies, is incorporated under the laws of the State of Delaware, and has its principal place of business at 6001 36th Ave. West, Everett, Washington 98203.

## JURISDICTION AND VENUE

5.    This Complaint seeks declaratory relief under the Declaratory Judgment Act, Title 28, United States Code, Sections 2201 and 2202.  This Court has subject matter jurisdiction of the claims asserted thereunder by reason of Title 28, United States Code, Sections 1331 and 1338(a).

6.    Personal jurisdiction exists over the Intermec Defendants because they have continuous, systematic, and substantial contacts with the State of North Dakota.  On information and belief, the Intermec Defendants provide supply chain information products, services, and systems to companies in hundreds of industries around the world, and the Intermec Defendants serve thousands of customers worldwide, including customers in the State of North Dakota.

7.    Venue is proper in this District under Title 28, United States Code, Sections 1391(b) and 1400 (b).  On information and belief, the Intermec Defendants provide supply chain information products, services, and systems to companies in hundreds of industries around the world, and the Intermec Defendants serve thousands of customers worldwide, including customers in this District.

1191166.1
4839-2392-2177\1

3

Case 1:06-cv-00411-GMS     Document 16-6     Filed 10/02/2006     Page 5 of 45
Case 3:06-cv-00051-RSW-KKK     Document 9-2     Filed 06/29/2006     Page 4 of 15
Case 3:06-cv-00051-RSW-KKK     Document 4-1     Filed 06/16/2006     Page 4 of 15

8.     Venue is proper in the Southeastern Division of this District Pursuant to Local Rule 3.1(A).  On information and belief, the Intermec Defendants provide supply chain information products, services, and systems to companies in hundreds of industries around the world, and the Intermec Defendants serve thousands of customers worldwide, including customers in the Southeastern Division of this District.

## THE PATENTS

9.     On information and belief, on July 9, 1991, the United States Patent and Trademark Office ("PTO") issued U.S. Patent No. 5,030,807 ("the '807 patent") to Alfred R. Koelle and Jeremy Landt for their invention entitled "System for reading and writing data from and into remote tags."  On information and belief, Intermec IP owns all rights and title to the '807 patent, a copy of which is attached hereto as Exhibit A.

10.     On information and belief, on July 7, 1998, the PTO issued U.S. Patent No. 5,777,561 ("the '561 patent") to Trieu Can Chieu, Thomas Anthony Cofino, Harley Kent Heinrich, Paul Jorge Sousa, and Li-Cheng Richard Zai  for their invention entitled "Method of grouping RF transponders."  On information and belief, Intermec IP owns all rights and title to the '561 patent, a copy of which is attached hereto as Exhibit B.

11.     On information and belief, on October 27, 1998, the PTO issued U.S. Patent No. 5,828,693 ("the '693 patent") to Wesley M. Mays, Aaron J. Kam Siu, and Mike D. Fontanarosa for their invention entitled "Spread spectrum frequency hopping reader system." On information and belief, Intermec IP owns all rights and title to the '693 patent, a copy of which is attached hereto as Exhibit C.

1191166.1
4839-2392-2177\1

4

12.     On information and belief, on December 15, 1998, the PTO issued U.S. Patent No. 5,850,181 ("the '181 patent") to Harley Kent Heinrich, Rene Dominic Martinez, Paul Jorge Sousa, and Li-Cheng Richard Zai for their invention entitled "Method of transporting radio frequency power to energize radio frequency identification transponders." On information and belief, Intermec IP owns all rights and title to the '181 patent, a copy of which is attached hereto as Exhibit D.

13.     On information and belief, on July 15, 1999, the PTO issued U.S. Patent No. 5,912,632 ("the '632 patent") to David E. Dieska, Daniel Joseph Friedman, Kenneth Alan Goldman, and Harly Kent Heinrich for their invention entitled "Single chip RF tag oscillator circuit synchronized by base station modulation frequency." On information and belief, Intermec IP owns all rights and title to the '632 patent, a copy of which was is attached hereto as Exhibit E.

14.     On information and belief, on November 30, 1999, the PTO issued U.S. Patent No. 5,995,019 ("the '019 patent") to Trieu Can Chieu, Thomas Anthony Cofino, Harley Kent Heinrich, Paul Jorge Sousa, and Li-Cheng Richard Zai for their invention entitled "Method for communicating with RF transponders." On information and belief, Intermec IP owns all rights and title to the '019 patent, a copy of which is attached hereto as Exhibit F.

15.     On information and belief, on September 11, 2001, the PTO issued U.S. Patent No. 6,288,629 ("the '629 patent") to Thomas Anthony Cofino, Daniel Joseph Friedman, Kenneth Alan Goldman, and Harley Kent Heinrich for their invention entitled "Method of using write—ok flag for radio frequency (RF) transponders (RF Tags)." On information and belief,

Intermec IP owns all rights and title to the '629 patent, a copy of which is attached hereto as Exhibit G.

16.    On information and belief, on June 4, 2002, the PTO issued U.S. Patent No. 6,400,274 ("the '274 patent") to Dah-Weih Duan, Daniel J. Friedman, Harley Kent Heinrich, Ian Bardwell-Jones, and Lou Ruggiero for their invention entitled "High-performance mobile power antennas." On information and belief, Intermec IP owns all rights and title to the '274 patent, a copy of which is attached hereto as Exhibit H.

17.    On information and belief, on August 6, 2002, the PTO issued U.S. Patent No. 6,429,775 ("the '775 patent") to Rene D. Martinez, Harley Kent Heinrich, Paul J. Sousa, and Li-Cheng R. Zai for their invention entitled "Apparatus for transporting radio frequency power to energize radio frequency identification transponders." On information and belief, Intermec IP owns all rights and title to the '775 patent, a copy of which is attached hereto as Exhibit I.

18.    On information and belief, on November 2, 2004, the PTO issued U.S. Patent No. 6,812,841("the '841 patent") to Harley Kent Heinrich, Vijay Pillai, and David E. Dieska for their invention entitled "Passive RFID tag that retains state after temporary loss of power." On information and belief, Intermec IP owns all rights and title to the '841 patent, a copy of which is attached hereto as Exhibit J.

## COUNT I

(Declaratory Judgment for Invalidity and Non-Infringement of the '807 patent)

19.    The averments of paragraphs 1-18 are repeated and realleged as if fully set forth herein.

1191166.1
4839-2392-2177\1

6

20. The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

21. Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

22. There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '807 patent.

23. None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '807 patent.

24. The '807 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT II

(Declaratory Judgment for Invalidity and Non-Infringement of the '561 patent)

25. The averments of paragraphs 1-24 are repeated and realleged as if fully set forth herein.

26. The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

27. Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

28.     There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '561 patent.

29.     None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '561 patent.

30.     The '561 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT III

(Declaratory Judgment for Invalidity and Non-Infringement of the '693 patent)

31.     The averments of paragraphs 1-30 are repeated and realleged as if fully set forth herein.

32.     The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

33.     Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

34.     There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '693 patent.

35.     None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '693 patent.

36.     The '693 patent and each of its claims are invalid, in whole or in part, for

failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT IV

(Declaratory Judgment for Invalidity and Non-Infringement of the '181 patent)

37.     The averments of paragraphs 1-36 are repeated and realleged as if fully set

forth herein.

38.     The Intermec Defendants' actions, including, but not limited to,

threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien

an objectively reasonable apprehension of suit.

39.     Alien manufactures RFID tags and readers, which, on information and

belief, the Intermec Defendants allege infringe the patents-in-suit.

40.     There is, therefore, a substantial, actual, and continuing controversy

between Alien and the Intermec Defendants as to the validity and infringement of the '181

patent.

41.     None of Alien's products, including, but not limited to, its RFID tags and

readers, infringe any valid claim of the '181 patent.

42.     The '181 patent and each of its claims are invalid, in whole or in part, for

failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT V

(Declaratory Judgment for Invalidity and Non-Infringement of the '632 patent)

43.     The averments of paragraphs 1-42 are repeated and realleged as if fully set

forth herein.

1191166.1
4839-2392-2177\1

9

44.    The Intermec Defendants' actions, including, but not limited to,
threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien
an objectively reasonable apprehension of suit.

45.    Alien manufactures RFID tags and readers, which, on information and
belief, the Intermec Defendants allege infringe the patents-in-suit.

46.    There is, therefore, a substantial, actual, and continuing controversy
between Alien and the Intermec Defendants as to the validity and infringement of the '632
patent.

47.    None of Alien's products, including, but not limited to, its RFID tags and
readers, infringe any valid claim of the '632 patent.

48.    The '632 patent and each of its claims are invalid, in whole or in part, for
failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT VI

(Declaratory Judgment for Invalidity and Non-Infringement of the '019 patent)

49.    The averments of paragraphs 1-48 are repeated and realleged as if fully set
forth herein.

50.    The Intermec Defendants' actions, including, but not limited to,
threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien
an objectively reasonable apprehension of suit.

51.    Alien manufactures RFID tags and readers, which, on information and
belief, the Intermec Defendants allege infringe the patents-in-suit.

52.     There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '019 patent.

53.     None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '019 patent.

54.     The '019 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT VII

(Declaratory Judgment for Invalidity and Non-Infringement of the '629 patent)

55.     The averments of paragraphs 1-54 are repeated and realleged as if fully set forth herein.

56.     The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

57.     Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

58.     There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '629 patent.

59.     None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '629 patent.

60.     The '629 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT VIII

(Declaratory Judgment for Invalidity and Non-Infringement of the '274 patent)

61.     The averments of paragraphs 1-60 are repeated and realleged as if fully set forth herein.

62.     The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

63.     Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

64.     There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '274 patent.

65.     None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '274 patent.

66.     The '274 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT IX

(Declaratory Judgment for Invalidity and Non-Infringement of the '775 patent)

67.     The averments of paragraphs 1-66 are repeated and realleged as if fully set forth herein.

1191166.1
4839-2392-2177\1

12

68.    The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

69.    Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

70.    There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '775 patent.

71.    None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '775 patent.

72.    The '775 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

## COUNT X

(Declaratory Judgment for Invalidity and Non-Infringement of the '841 patent)

73.    The averments of paragraphs 1-72 are repeated and realleged as if fully set forth herein.

74.    The Intermec Defendants' actions, including, but not limited to, threatening to sue Alien for patent infringement on or about May 8, 2006, have created in Alien an objectively reasonable apprehension of suit.

75.    Alien manufactures RFID tags and readers, which, on information and belief, the Intermec Defendants allege infringe the patents-in-suit.

76.     There is, therefore, a substantial, actual, and continuing controversy between Alien and the Intermec Defendants as to the validity and infringement of the '841 patent.

77.     None of Alien's products, including, but not limited to, its RFID tags and readers, infringe any valid claim of the '841 patent.

78.     The '841 patent and each of its claims are invalid, in whole or in part, for failure to satisfy the conditions of patentability set forth in Title 35 of the United States Code.

WHEREFORE, ALIEN PRAYS FOR THE FOLLOWING RELIEF:

A.     A declaration that (i) Alien's products do not infringe the patents-in-suit, and (ii) the patents-in-suit are invalid.

B.     A permanent injunction enjoining and restraining the Intermec Defendants, their respective officers, agents, servants, employees, attorneys, and all persons acting in concert with them, and each of them:

1.     From making any claims to any person or entity that Alien's products infringe any of the patents-in-suit;

2.     From interfering with, or threatening to interfere with, the manufacture, sale, license, or use of Alien's products by Alien, its distributors, customers, licensees, successors or assigns, and others; and

3.     From instituting or prosecuting any lawsuit or proceeding, placing in issue the right of Alien, its distributors, customers, licensees, successors or assigns, and others to make, use, or sell Alien's products.

1191166.1
4839-2392-2177\1                                        14

C.   Recovery of Alien's attorneys' fees and costs of suit incurred herein; and

D.   Any other relief the Court deems just and proper.


Dated:  June 16, 2006                              DORSEY & WHITNEY LLP

                                                   Sarah Andrews Herman (03399)
                                                   51 Broadway, Suite 402
                                                   PO Box 1344
                                                   Fargo, ND 58107-1344
                                                   (701) 235-6000

                                                   and

                                                   Gregory P. Stone
                                                   Munger, Tolles & Olson LLP
                                                   355 South Grand Avenue
                                                   35th Floor
                                                   Los Angeles, CA  90071
                                                   (213) 683-9100

                                                   ATTORNEYS FOR PLAINTIFF ALIEN
                                                   TECHNOLOGY CORPORATION


1191166.1
4839-2392-2177\1                    15

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORP., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:06-CV-51 |
| v. | ) ) ) | Judge Rodney S. Webb |
| INTERMEC, INC., a Delaware corporation, INTERMEC TECHNOLOGIES CORP., a Delaware corporation, and INTERMEC IP CORP., a Delaware corporation, | ) ) ) ) | Magistrate Judge Karen K. Klein |
| Defendants. | ) | |

### DECLARATION OF KENNETH COHEN

I, Kenneth Cohen, declare as follows:

1.    I am a Vice President and the Treasurer of Intermec Inc.

2.    I am also a Vice President and the Treasurer of Intermec IP Corp.

3.    I am also a Vice President and the Treasurer of Intermec Technologies Corp.

4.    In my positions with Intermec, Inc., Intermec Technologies Corp., and Intermec IP Corp. I have first-hand knowledge of the operation, line of business, and corporate structure of these companies.

5.    Both Intermec, Inc. and Intermec IP Corp. received service of the Complaint filed by Alien in this matter on June 5, 2006.  Intermec Technologies Corp. became aware that it had been named as an additional defendant in this case on or about June 21, 2006.

1

EXHIBIT

B

6.    As of June 1, 2006, the date I understand that Alien filed its Complaint, I was not aware of any statements of Intermec, Inc referencing Alien that could be referred to in Alien's Complaint other than the statements contained in the Transcript of the Q1 2006 Intermec, Inc. Earning Conference Call, dated May 8, 2006.

7.    The Q1 2006 Intermec, Inc. Earnings Conference Call was conducted from Everett, Washington and involved the asking of questions by a group of financial analysts. I am not aware of any analyst, located in the State of North Dakota, who participated in that call.

INTERMEC, INC.

8.    Intermec, Inc. is incorporated under the laws of Delaware and has its principal place of business in Everett, Washington.

9.    Intermec, Inc. is a holding company that does not manufacture any products and does not provide any services. It does not hold any assets in the State of North Dakota and does not serve any customer there or anywhere else.

10.    Intermec, Inc. does not manufacture any products or provide any services in the State of North Dakota.

11.    Intermec, Inc. does not maintain any offices or have any employees operating in the State of North Dakota.

12.    Intermec, Inc does not have a license to do business in the State of North Dakota.

13.    Intermec, Inc. has never filed a tax return in the State of North Dakota.

14.    Intermec, Inc. has not brought suit or, prior to Alien's initiation of this litigation, been sued in federal or state court in the State of North Dakota.

2

**INTERMEC IP CORP.**

15.    Intermec IP Corp. is incorporated under the laws of the State of Delaware and has its principal place of business in Henderson, Nevada.

16.    Intermec IP Corp. is a wholly-owned subsidiary of Intermec Technologies Corp. and its sole business is to own patents, license them, and collect royalties. It is the owner of all of the patents identified in Alien's First Amended Complaint for Declaratory Judgment, but does not manufacture any products and does not provide any services.

17.    Intermec, IP Corp. does not manufacture any products or provide any services in the State of North Dakota.

18.    Intermec IP Corp. does not maintain any offices or have any employees operating in the State of North Dakota and it does not own any assets located in that state.

19.    Intermec IP Corp. does not have a license to do business in the State of North Dakota.

20.    Intermec IP Corp. has never filed a tax return in the State of North Dakota.

21.    Intermec IP Corp. has not brought suit or, prior to Alien's initiation of this litigation, been sued in federal or state court in the State of North Dakota.

**INTERMEC TECHNOLOGIES CORP.**

22.    Intermec Technologies Corp. is incorporated under the laws of the State of Washington and has its principal place of business in Everett, Washington.

23.    Intermec Technologies Corp. is a wholly-owned subsidiary of Intermec, Inc. that manufactures and sells automated identification and data collection ("AIDC") products, systems and related services including RFID products, systems and services.

3

24.     Intermec Technologies Corp. does not manufacture any products in the State of North Dakota.

25.     Intermec Technologies Corp. does not maintain any offices or have any employees residing in the State of North Dakota and does not own any assets located in that state.

26.     Intermec Technologies Corp. does not have a license to do business in the State of North Dakota.

27.     Intermec Technologies Corp. has never filed a tax return in the State of North Dakota.

28.     In 2005, Intermec Technologies Corp. had $472,670,567.05 worth of sales in the United States. Of that total domestic sales figure, less than $270,000 was to customers located in the State of North Dakota. That represents approximately .0571% of Intermec Technologies' 2005 sales in the United States. Approximately $182,000 of the $270,000 represents sales to a single customer.

29.     Intermec Technologies Corp. has not sold any RFID products in the state of North Dakota.

4

30.    Intermec Technologies Corp. has not brought suit or, prior to Alien's initiation of

this litigation, been sued in federal or state court in the State of North Dakota.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and
correct and that this declaration was executed on June 28, 2006 in Everett, Washington.

Kenneth Cohen

5

EXHIBIT C



# FINAL TRANSCRIPT

## Thomson StreetEvents

### IN - Q1 2006 Intermec, Inc. Earnings Conference Call

Event Date/Time: May. 08. 2006 / 5:00PM ET



EXHIBIT

*C*

| THOMSON | www.streetevents.com | Contact Us | |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Kevin McCarty**
*Intermec, Inc. - Director of Investor Relations and Analysis*

**Larry Brady**
*Intermec, Inc. - Chairman, President and CEO*

**Steve Winter**
*Intermec, Inc. - President and COO*

**Rick Anderson**
*Intermec, Inc. - VP, Controller and Acting CFO*

## CONFERENCE CALL PARTICIPANTS

**Philip Alling**
*Bear Stearns - Analyst*

**Reik Read**
*Robert W. Baird & Co - Analyst*

**Andrew Abrams**
*Avian Securities - Analyst*

**Jeffrey Kessler**
*Lehman Brothers - Analyst*

**Chris Quilty**
*Raymond James - Analyst*

**David Sterman**
*Jesup & Lamont - Analyst*

**Ajit Pai**
*Thomas Weisel Partners - Analyst*

## PRESENTATION

**Operator**

Welcome to the Intermec first quarter 2006 earnings conference call. At this time, all participants are in a listen-only mode. After the presentation, we will conduct a question-and-answer session. (OPERATOR INSTRUCTIONS). Today's conference is being recorded. Should anyone object, they may disconnect at this time.

It is now my pleasure to turn the meeting over to your host, Mr. Kevin McCarty. Sir, you may begin your conference.

**Kevin McCarty** - *Intermec, Inc. - Director of Investor Relations and Analysis*

Thank you. Good afternoon, everyone, and welcome to Intermec's first quarter fiscal year 2006 earnings release conference call. Joining me on the call this afternoon is Larry Brady, Intermec's Chairman and Chief Executive Officer, Steve Winter, President and Chief Operating Officer, and Rick Anderson, Controller and acting Chief Financial Officer. Once we conclude our remarks this afternoon, we will open up the call for our question-and-answer period.

Before we begin our prepared remarks, I wish to remind investors that statements made during the course of this conference call that express the Company's or management's intentions, hopes, beliefs, expectations or predictions of the future are forward-looking statements. These forward-looking statements are contained within the meaning of the Securities Litigation

| THOMSON | www.streetevents.com | Contact Us |  |
|---|---|---|---|

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec Inc. Earnings Conference Call

Reform Act of 1995. It is also important to note that such – that the Company's actual results could differ materially from those projected in such forward-looking statements. Additional information concerning factors that could cause actual results to differ maturely is contained in the Company's press releases and in its filings with the Securities and Exchange Commission, including, but not limited to, the Company's annual report on Form 10-K for the year ending December 31, 2005, and other reports filed from time to time with the SEC. Copies of these filings may be obtained by contacting the Company or the SEC.

With that, I would like to turn the call over to Larry Brady, Intermec's Chairman and CEO. Larry? .

---

**Larry Brady** - Intermec, Inc. - Chairman, President and CEO

Thank you, Kevin. Our first-quarter performance, as indicated in our press release, indicates revenues of $227 million and earnings from continuing operations of $0.23 per share. On the surface, these are strong results for the first quarter. However, when we take into consideration several events of the quarter, our operating result is below expectations. In order to focus the later discussion on operating results, we will first discuss these individual events.

In March, we announced a final settlement with Hewlett-Packard concerning our battery management intellectual property. This settlement represents the last of the laptop computer manufacturers to settle. The entire proceedings have stretched over seven years, and resulted in settlements in our favor totaling more than $200 million.

The second item concerns the intended shutdown of our Swedish research facilities. You may recall that we implemented a cost reduction in 2003 involving the shutdown of our manufacturing facilities in Goteborg, but retained our research effort in the location. Our current strategy, aimed at the further improvement in our competitive posture, requires the relocation of all the contributing functions to Southeast Asia, including research and the supplier base.

As our press release indicated, this will entail a onetime cost of about $6 million. Of this cost, about 1 million is included as a charge to this quarter's result, and the remaining amount will be taken over the next three quarters. The approximate $8 million in annual savings, which this restructuring will allow, will commence when the required notification period for employees has been completed. The first of these savings will begin in the fourth quarter, and the full annualized rate should be reached in the first quarter of next year. Some reinvestment of the savings is intended.

Moving now to operating performance, we achieved product and service sales of $204 million, a 3.7% increase over the prior year and a historic high for a first quarter. First-quarter revenue also represents a 5 point growth advantage over the weighted average of our two largest competitors. However, the revenue figure is $5 million below the product and service range of 209 to $219 million that we provided at the beginning of the year.

Our GAAP EPS from continuing operations of $0.23 was favorably impacted by the IP settlement with HP in the amount of $0.16 per share. Restructuring charges related to our manufacturing centers in Sweden – that is our research centers in Sweden – was $1 million, impacting EPS by a negative $0.01 per share. The Company's GAAP earnings and EPS also include $1.9 million, or a negative $0.02 per share, of compensation expense recorded under the provisions of FAS 123(R). The tax provisions for the first quarter of 2006 was favorably impacted by $2.2 million from the conclusion of a Canadian tax audit, resulting in an effective tax rate of 21%.

In looking beyond the headline figures, results for our product lines and geographies varied significantly. In our largest region, North America, which represents 63% of total sales, revenues increased 19% over the first quarter of 2004.

However, in Europe, our second-largest region at 27% of total sales, revenues were considerably softer. Revenues in Europe fell 17% versus the prior year period. The currency impact on European revenues of a stronger dollar versus a year ago was a little over $5 million. Therefore, on a local currency basis, Europe's decline was about 9%.

---

| THOMSON | www.streetevents.com | Contact Us |  |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec Inc. Earnings Conference Call

This regional weakness, which has impacted the market for the past year, has negatively impacted our performance for the last two quarters. The smaller regions, Asia-Pacific and Latin America, were also mixed, with revenues up 19% and down 22%, respectively.

The same pattern also applies to our product revenues, although it is less severe. Our core Systems and Solutions product revenues were up 7.4% over the prior year period. The printer media business was down 9.9%, and our service business was up 8.5%. The decline in printer media was fully attributable to the European region...

Gross margins for the Company were slightly under 40%. Compared to the first quarter of 2005, declines were largely attributable to product margins and currency. The ratio of enterprise accounts in the top 50 customer group were about 30% of the total, versus the 40% level in the fourth quarter of 2005 and the 25% level in the first quarter of last year. So, mix was less a factor.

On a regional basis, the majority of the gross margin decline was in Europe, although margins in that region remained the highest of all regions.

Our SG&A expense of $77.8 million, including corporate expense, was off about $5 million. The increase in expense is due to two items primarily. Our research and development expense increased about $3 million; also, the current quarter includes about $2 million of stock option expense resulting from the adoption of FAS 123(R). As explained on our prior conference call, our R&D expenses are front-end loaded, and reflect the combination of product release timing and European regulatory compliance costs. The remainder of our expenses were effectively flat compared to the prior year period, as productivity and SG&A offset inflationary pressures from these costs.

Moving from the financial detail to a broader perspective, the sale of our last industrial automation business in the fourth quarter of last year is now providing benefit to our current performance. One contributor to the SG&A productivity just discussed is reduced corporate expense. The run rate of these expenses has declined from last year's first quarter run rate of about $23 million per year, to this year's first quarter run rate of under $20 million.

The approximate $100 million in improved net cash position achieved last year, largely from the proceeds of the sales of the industrial automation group, has enabled our anticipated share buyback. In March, our Board of Directors authorized the repurchase of $100 million in Intermec shares. It is also worthy of note that we generated a further $47 million improvement in our cash balance during the first quarter.

Two further events have occurred that deserve mention. First, Datalogic joined the list of Intermec RFID licensees as a result of their purchase of PSC. A provision of the Rapid Start license enables acquirers of licensees to be considered for license transfer. We approved this transfer for Datalogic in return for additional fees that will be treated as deferred revenue.

The second significant event which followed quarter end was the testimony to the continued strength of our Cisco alliance. Intermec was named Cisco Systems' Integrator of the Year for the second year in a row. This award follows a very successful cooperation between the two companies during the past year, the most recent evidence of which is cooperation in two commercial initiatives — firstly, the Forklift of the Future, a design alliance between Intermec, Cascade, Red Prairie and Cisco; and two, the Digital Communities Initiative, joining Intermec, Intel, Panasonic and Cisco, among other technology leaders, to help municipalities take advantage of mobile and wireless computing systems.

Before moving to our outlook for the quarter and the year, let me summarize our view of the current situation. Weak European markets are offsetting strong performance in North America. The markets in Europe have displayed general weakness for the past year, and have seen further deterioration as a result of the strong dollar for the last six months, and the customers' uncertainty associated with the pending implementation of the Reduction of Hazardous Substance regulations. The weak market is also contributing to declining margins, albeit from a relatively high level.

| THOMSON | www.streetevents.com | Contact Us |  |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

Last year, Intermec revenues grew by about 11%. Our two largest competitors grew at a weighted average growth rate of 3%. This large differential is difficult to sustain, as we saw in this year's first quarter, where our gross advantages shrunk to 5 points, from the 8 point advantage of last year. In this environment, we believe that growth for the second quarter will be about 5% over last year's second quarter. Growth for the full year should be about 7.5% over 2005.

We anticipate some strengthening in the second half of the year as a result of the European regulatory deadline on June 30, the current weakening of the dollar, and strong new product introductions. Specifically, our projected range of revenue for the second quarter is from 223 to $233 million. The projected sales for the full year range from 948 to $978 million, including the HP settlement.

EPS for the second quarter is projected to be $0.09, plus or minus $0.02, and for the year to be $0.82, plus or minus $0.10. All EPS forecasts are GAAP numbers, and include option expense, the individual items cited in the first quarter, as well as all restructuring costs for the year for the Swedish research changes. Kevin?

---

**Kevin McCarty** - *Intermec, Inc. – Director of Investor Relations and Analysis*

Great. Thanks, Larry. Operator, at this time, we now would like to open up our call for our question-and-answer period.

---

## QUESTIONS AND ANSWERS

**Operator**

(OPERATOR INSTRUCTIONS). Philip Alling, Bear Stearns.

---

**Philip Alling** - *Bear Stearns – Analyst*

With respect to the lower guidance range that you just gave for EPS for the full year, is that inclusive of the impact of the HP settlement?

---

**Larry Brady** - *Intermec, Inc. – Chairman, President and CEO*

Yes it is, Philip. Those are all GAAP numbers, and so they have got all three or four of what you would call individual items in them, including HP, including the research facility restructuring costs, including the option expense.

---

**Philip Alling** - *Bear Stearns – Analyst*

With respect to the 16.5 million in operating profit that you mentioned as far as the – I just wanted to get a better sense of that in terms of the HP settlement in the current quarter. What tax rate did you apply to that for that to translate to a $0.16 impact?

---

**Larry Brady** - *Intermec, Inc. – Chairman, President and CEO*

We took the $23 million worth of revenues, subtract the $6.5 million worth of costs, applied a normalized 37% tax rate, and that's how we got the EPS number.

---

| THOMSON | www.streetevents.com | Contact Us |  |
|---|---|---|---|

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN : Q1 2006 Intermec, Inc. Earnings Conference Call

**Philip Alling** - *Bear Stearns - Analyst*

With respect to the Datalogic joining the Rapid Start program, I did see that the deferred revenue was up sequentially in the quarter. Should we just assume that the — well, perhaps you could give a little bit more color with respect to the increase in deferred from — compared to last quarter. And did that really reflect a payment from Datalogic to be part of that program?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

You know, there are a lot of items in deferred revenue, in addition to simply this activity. It is not a material amount relative to the amounts that we have talked about in the past.

**Philip Alling** - *Bear Stearns - Analyst*

Could you give us any color with respect to the royalty reports that you have received from the existing licensees to your Rapid Start program thus far?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

As you know, we said before we will not and cannot give you that color because we are violating the very confidentiality that is required of somebody who pulls those kind of numbers together. That would be — that would just be a serious flaw in our process were we to do that.

**Philip Alling** - *Bear Stearns - Analyst*

What general could you make about trends in the RFID space in terms of spending?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Again, the issue that we can comment on is our experience as compared to industry experience. Steve can certainly do that.

**Steve Winter** - *Intermec, Inc. - President and COO*

I think we can give you some general color on our feeling about the industry and where it's going. We have had — as of the end of the first quarter, we have about Gen 2 RFID pilots going. We are seeing good results from those pilots, a lot of interest in the products and its capabilities. We are seeing ever-increasing performance improvements from our own products, as well as other companies' products. And so, I think many of those customers are getting more confident that the Gen 2 product will provide the kind of capabilities they are interested in. And these pilots are starting to prove that out.

So, we anticipate we will see increasing activity through the year, and that, as we have said before, that 2006 will largely be proof of the Gen 2 pilots, with increasing installations in the second half. And 2007, we think, will be the year of significant installations of the product.

**Philip Alling** - *Bear Stearns - Analyst*

With respect to the CFO position, is there an update there in terms of the search that you have had underway?


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

May 08, 2006 / 5:00PM, IN - Q1 2006 Intermec Inc Earnings Conference Call

**Larry Brady** - *Intermec, Inc.* - *Chairman, President and CEO*

Sure is. We are down to two finalists. We are having our board meeting in mid May, and we'll take that opportunity when the folks are in to have those folks interviewed by the Audit Committee, and we would anticipate a decision shortly after that.

---

**Operator**

Reik Read, Robert W. Baird & Co.

---

**Reik Read** - *Robert W. Baird & Co* - *Analyst*

Larry, I just wanted to ask a little bit more about Europe. If I look at where the currency was, say, a couple of months ago versus where it is today, it is not that much of a change. So, I don't think — I would assume that currency wasn't a big surprise to you in terms of how things shook out sequentially. So that would leave RoHS. And I'm wondering, is that something that kind of caught you by surprise that slowed Europe down, or were there other factors as well?

---

**Larry Brady** - *Intermec, Inc.* - *Chairman, President and CEO*

I will let Steve answer that question. I think the answer broadly is that we understood the spending required and we understood the changes required. Some of the customer uncertainty came as a bit of a surprise in terms of — not the confusion so much as the — before June 30, you have got product that isn't qualified. And after June 30, you have got product that is. And so some people are slowing down purchases as it relates to — I just prefer to get — even though it is okay, I would still prefer to get product that is qualified. So, I will let Steve expand on that.

---

**Steve Winter** - *Intermec, Inc.* - *President and COO*

That basically is exactly what is happening. As customers start finding themselves approaching the deadline, as they consider new purchases, it has slowed them down as they look around and decide whether or not they want to finish up rollouts or start new rollouts with non-RoHS-compliant product, or wait until they're certain that they have RoHS-compliant product.

The other thing that's contributing to that is there is a lot of uncertainty in the EU about how certification of compliance will occur, and that varies by country. So, we anticipate over the next two months that a lot of that uncertainty will get resolved, and that we will see increasing sales in the third and fourth quarter in Europe, as companies become comfortable with those resolutions and start to buy again.

---

**Reik Read** - *Robert W. Baird & Co* - *Analyst*

You, Larry, had mentioned new products as part of your remarks. Can you give us a sense for how much new product development has been underway, what might be coming out over the course — in broad brush strokes, what might be coming out over the course of the next couple of months?

---

**Steve Winter** - *Intermec, Inc.* - *President and COO*

Sure, I will be glad to do that. We have several major introductions that will be happening in the third quarter, and a few in the second quarter. We will introduce a new scan engine, laser MEM scan engine this quarter, and other one in the third quarter, which completes our product line in that area.

---

 | www.streetevents.com | Contact Us | 

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May 08. 2006/5:00PM IN - Q1 2006 Intermec Inc. Earnings Conference Call

We will be introducing new vehicle mount units, new terminals, specifically aimed at transportation logistics and warehousing distribution. We continue to RFID enable virtually all of our commercial products that have an RFID application. And so, you will see more units coming out with RFID enablement in the printer area, and more fixed readers — portal readers, that type of thing. So, we'll continue to fill out our Gen 2 product line. We already have product in each one of the categories. But we'll continue to fill that out. And we'll see a new printer version released as well, a new metal value printer release.

---

**Reik Read** - *Robert W. Baird & Co - Analyst*

Have you guys seen any changes with respect to the compensation programs and/or how you incent resellers as changing any of your business in the — say, since the beginning of the year?

---

**Steve Winter** - *Intermec, Inc. - President and COO*

We haven't made significant changes to our compensation program for the channel. We have made some continued refinements, but we haven't made any significant changes. And so we haven't seen impacts as a result of that; none that we could point to as affecting results one way or the other.

---

**Operator**

Andrew Abrams, Avian Securities

---

**Andrew Abrams** - *Avian Securities - Analyst*

I was wondering if you could give us a little bit more on the European margins. If I remember correctly from the last conference call, you had a couple of large customers who were high-margin customers in Europe kind of postpone for at least some time. Would you expect as that business starts to recover in third and fourth quarter, margins to be coming back to where they had been historically? Or would you expect, because of RoHS and the fact that these guys are carrying almost two sets of inventory here and there, that margins will be a little on the lighter side? And also, if you could give us an update on progress with the DOD.

---

**Steve Winter** - *Intermec, Inc. - President and COO*

Let me start with European margins. We don't specifically report European margins, so — but let me just comment in general. The things that have affected margins on a quarter-on-quarter basis — so, Q1 2005 to Q1 2006 — currency did have a significant impact. It was a little over $3 million between those two quarters. So, that had a significant impact. And we expect that the currency issue will improve as we go through the year, as the dollar has shown a trend to weaken a little bit.

The customers holding off purchases because of RoHS isn't specifically a margin issue; it's more a revenue issue for us. And we do expect improved revenues in the second half of the year from two things — one, RoHS gets resolved, and people get comfortable; and number two, we have several new products that are being introduced that will have a substantial impact in the second half. Those are products that are specifically interesting to the European market, where we are strong in transportation logistics and retail. So, we expect to see some success there from those products, as in other areas of the world as well.

The other thing that you asked was an update on the DOD. The AIT contract continues to be a good source of revenue for us. We recently won a substantial program with the government for their ammunition systems with the Army. And the — on the RFID side, it has been somewhat slow on the RFID side because I think there is still some uncertainty within the DOD about Gen 1 versus Gen 2. But there are new basic ordering agreements being issued for Gen 2-specific product, which should clear that up. And I would expect to see that continue to build in volume in the DOD as well.

---


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May.08.2006/5:00PM, IN—Q1 2006 Intermec, Inc. Earnings Conference Call

**Andrew Abrams** - *Avian Securities - Analyst*

Would you expect to see any substantial DOD revenue this year, or would we assume that that is all going to come in 2007?

**Steve Winter** - *Intermec, Inc. - President and COO*

With regard to RFID, or in general?

**Andrew Abrams** - *Avian Securities - Analyst*

RFID, AIT excluded.

**Steve Winter** - *Intermec, Inc. - President and COO*

No, we would see commercial being more significant this year than the DOD.

**Operator**

Jeffrey Kessler, Lehman Brothers.

**Jeffrey Kessler** - *Lehman Brothers - Analyst*

First, your tax rate benefited this quarter. The calculations for the remainder of the year, I believe you have said, are based on a full tax rate? (multiple speakers)

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes, let me explain that. We have talked off and on about different normalized tax rates. If you look at our tax rate for the full year, it's about 35%. It's the result of a 21% this quarter and about 37% in the remaining three quarters of the year.

**Jeffrey Kessler** - *Lehman Brothers - Analyst*

A follow-up channel question on the channel, and that is — did you see any — was there any marked difference in your channel sales versus your direct sales, with regard to any trends as far as Europe, either geographic or vertical market trends on channel versus direct?

**Steve Winter** - *Intermec, Inc. - President and COO*

Well, we saw, as Larry talked about in his remarks, we actually saw enterprise sales — high-volume, lower-margin enterprise sales decline as a percentage of total revenue compared to Q3 and Q4 of last year. And so — and that was spread broadly across the world. We saw more of our sales coming from our traditional higher-margin enterprise customers and our channel than we did from our low-margin enterprise customers. So, if anything, it was — that was less of a factor in the channel, and traditional enterprise business was more positive in the quarter.

---

| THOMSON | www.streetevents.com | Contact Us |  |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May 08, 2006 / 5:00PM, IN - Q1 2006 Intermec Inc. Earnings Conference Call

**Jeffrey Kessler** - *Lehman Brothers - Analyst*

And speaking of vertical markets, was there any — did you make any incursions into either new vertical markets, or was there any material gain in any specific vertical market that — other than warehousing and manufacturing that you might want to note?

**Steve Winter** - *Intermec, Inc. - President and COO*

Well, we continue to focus pretty much exclusively on our five vertical markets, which is industrial, transportation logistics, retail, consumer packaged goods, and government. And so those are the five that we focus pretty much exclusively on ourselves. Some of our channel partners also sell our products into other verticals. But it's not a specific target.

**Jeffrey Kessler** - *Lehman Brothers - Analyst*

I guess misstated my question a little bit, and that essentially was, was there any shift that you saw amongst those — amongst your core verticals in the quarter?

**Steve Winter** - *Intermec, Inc. - President and COO*

There wasn't a substantial shift. There is a continued trend toward strength in transportation logistics, and growth for us in retail; those are growing at higher rates than the other three markets. And that continued.

**Operator**

Chris Quilty, Raymond James.

**Chris Quilty** - *Raymond James - Analyst*

I just want to get some clarification on the guidance. The guidance that you provided, does that include the ongoing restructuring charges, anticipated restructuring charges with Goteborg?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes, $6 million is included in that number for the full year.

**Chris Quilty** - *Raymond James - Analyst*

And that also includes stock option expenses, all the onetime items in this quarter, and the HP?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Right. And the only issue there — all of that is true, Chris. The only issue is $1 million of that 6 is in this quarter; the remaining 5 are in the remaining three quarters, of the restructuring.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May 08 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Chris Quilty** - *Raymond James – Analyst*

Fair enough. Just a clarification on the stock option expensing this quarter, you had said to expect $0.03. You say in your press release $0.02. When I run the numbers on 1.9 million on your share count, I come up with $0.02. I guess I am trying to get at — when I filter through all these numbers and put out my pro forma number here for the quarter, which I know you guys are not allowed to mention that word, if it is $0.02 of stock option expenses, then you reported 0.05 relative to your guidance range of $0.04 to $0.08.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

It is $0.02. That is what we say in the press release.

**Chris Quilty** - *Raymond James – Analyst*

What is different about the math there?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

It depends on which part. What the first part of the math is are option expenses lower than we had communicated because of the different handling in one set of options versus a different one, and we were just wrong in our estimate. And so that is the delta there. The 1.9 million, as you point out, is $0.02, and that is what is included in our GAAP number. I think that's the way I say it.

**Chris Quilty** - *Raymond James – Analyst*

I thought — if I plug in 1.9 million in your share base, however, I come up with $0.03. There is a math issue there.

**Steve Winter** - *Intermec, Inc. - President and COO*

You have to tax-effect the 1.9 million.

**Chris Quilty** - *Raymond James – Analyst*

So that is pre-tax?

**Steve Winter** - *Intermec, Inc. - President and COO*

The 1.9 million is pretax.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

I'm sorry. The 1.9 is pre-tax. That's correct.

**Chris Quilty** - *Raymond James – Analyst*

And generally, we use the same corporate average tax rate?

| THOMSON | www.streetevents.com | Contact Us |  |
|---|---|---|---|

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec Inc Earnings Conference Call

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Generally, we are using — to try to bridge this conversation of an all-GAAP conversation, we are using a 37% incremental tax rate for those items for which we are doing a calculation of EPS impact.

**Chris Quilty** - *Raymond James - Analyst*

Got you. I will send my thank you letter to the SEC to make reporting that much easier.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes indeed.

**Chris Quilty** - *Raymond James - Analyst*

With regard to your Q2 guidance, it looks like you are guiding relatively weak relative to last year, and to where most of the consensus sits right now. Obviously, you have a look at where most of the models were for Q2. Is the biggest delta there between our expectations and where you are guiding to in your European outlook, or how would you characterize that?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

It's hard to say, because other people aren't talking about what their European outlook is. But I would guess that is the case. Chris, as you know, Europe tended to show its softness in retail first. And so our competitors took something of a hit in the first half of last year as it relates to Europe, which showed up for us in the latter half. And that is what I think the distinction is. But that is a bit of a guess since other people aren't doing their forecast by region.

**Chris Quilty** - *Raymond James - Analyst*

And with regard to retail, you had some notable success in the second half of 2004, and we haven't seen much activity since. What is your outlook? And I know you don't have a huge exposure to the retail market. And how key are partners — and I know in the past, Cisco has been a good partner in that regard — towards addressing the retail market?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Cisco has been critical just in terms of the vertical awareness. And so they wind up being a big help for us in terms of the credibility in a market where we have got limited share. But I think what you are talking about is not so much a conversation that we talk about all of our wins in retail, as it's the only way we can wind up getting around to explaining margin differentials. And it is certainly fair to say that we continue, as Steve said, to have success in the vertical market, but it is a larger number of smaller individual wins that characterizes our performance in the — so we are winning 5 and 10 instead of 20 and $30 million accounts at this point.

**Chris Quilty** - *Raymond James - Analyst*

One question on RFID and royalty revenues on a go-forward basis. You have a number of non-licensed companies out there selling products, some of which are winning large size contracts. How long can you wait before needing to step in and enforce the Rapid Start program?

| THOMSON | www.streetevents.com | Contact Us |  |
|---|---|---|---|

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

May. 08. 2006/5:00PM, IN - Q1 2006 Intermec Inc Earnings Conference Call

A secondary question to that – and I don't want to go off into a mindless technology debate – but recent developments in HF technology, specifically in pharma – does that run the risk of sapping away some of your future royalty streams, if it all moves – at the item level, it moves to HF? Or is it your general feeling that that will all swing back to a near-field UHF Gen 2 Rapid Start technology?

**Steve Winter** - *Intermec, Inc. - President and COO*

Let me take the first part first, which had to do with enforcement of IP rights. You know, with the Rapid Start program, we did provide a substantial choice of license suppliers to the industry. We have 19 licensees, multiple licensees in every product category. So, we think there is an excellent choice out there.

It's obviously disappointing if any customer were to do business with a supplier that is not licensed. But you know, we have consistently stated we will be pursuing infringers. We are putting together cases. We are looking at those who are most disruptive to the industry right now. And basically, preparations are underway with respect to unlicensed suppliers like Alien and others. And we expect those enforcement actions by the end of the year, or within this year.

The second part of your question had to do with high frequency. There is a significant debate going on about high frequency versus Gen 2. Some of the majors are saying that they would not allow multiple RFID technologies within the confines of their businesses, especially those that do more than just pharma; but they do pharma as well as grocery and general merchandising. But there also is a camp that says that high frequency, especially in pharma, is something that is useful and a good standard for them. So I think the answer is the debate is still on. I don't think that it has been decided yet. And I think there is going to be a lot of resistance to having multiple technologies in a store, especially since that is going to add to the cost of the overall system, as you have multifrequency reading devices and multifrequency tags, several tag types in a store.

So I think that is still an open debate. We don't think that it will impact our overall royalty streams, based on what we have been projecting and talking about. We think that the market will basically mature at the kinds of rates that we have been talking about. So, it wouldn't detract from the kind of royalty streams we have been talking about in our guidance.

**Chris Quilty** - *Raymond James - Analyst*

Great. If I can sneak one more in with regard to guidance. The plus or minus $0.10, which, I think, is what you gave as the spread on the $0.82 baseline guidance -- what would you attribute to that broader range? The original guidance you gave us back several months ago gave an all-in $0.10 range, and you basically doubled the variance here. Is that primarily due to RFID licensing, or are there other factors?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

It's a really good question, Chris. And the best explanation I can give you is one is safer than the other, having come from where we have come from. But the spending is pretty crisp, and I think that we are getting very comfortable with margin being fundamentally an upside as compared to a downside surprise. And therefore, the answer -- the legitimate answer to your question -- and it doesn't explain why the change in range -- but the answer to your question is that the sales level and industry growth and market growth are, at a time of transition, the biggest uncertainties in our numbers.

**Operator**

David Sterman, Jesup & Lamont.


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN Q1/2006 Intermec Inc. Earnings Conference Call

**David Sterman - Jesup & Lamont - Analyst**

This is a little bit of a rehash of some recent questions, but just looking at the gross margin and the comments you just made about maybe a little bit of an upside bias to gross margins in here, rather than a downside — backing out currency effects and other factors, can you give us just a little sense of what you think from the new product introductions, from what you are seeing, pricing out there, and other factors — that maybe you could shed light on why you might see gross margin strengthening from here, and maybe — and not a further deterioration?

**Steve Winter - Intermec, Inc. - President and COO**

Sure. When we were reviewing our first-quarter results, we saw some encouraging signs that unfortunately got overshadowed by a revenue miss in an important category, which is service. But basically, when we look at our product gross margins, our overall product gross margins, in the first quarter we had an uptick of about 0.5% versus the fourth quarter, which was what we had expected. And we saw the same sort of increase in our supplies business. Service was down, and it was down primarily because of the revenue miss. It's pretty heavily impacted when the revenue is missed.

So, that aside, we think, going forward we're on with the predictions we have for absorption, based on the current forecast for product revenue, with the additional material purchase efficiencies that we'll get through the year. We think there is plenty of reason to believe that we are going to have an improvement in gross margins. Last year we didn't obtain the typical improvement in gross margins that we did this — that we have in the past. That was primarily a result of the large influx of enterprise business in the second half. But as we look at enterprise business levels going forward, we look at absorption and material efficiencies, we think we'll see the traditional uptick in gross margins throughout the year.

**David Sterman - Jesup & Lamont - Analyst**

And is it safe to say that, again, currency notwithstanding, or sales mix issues notwithstanding, that pricing is relatively stable, last quarter and now here into the second quarter?

**Steve Winter - Intermec, Inc. - President and COO**

The pricing is — the erosion that we are seeing in pricing is not unusual compared to what we have been seeing over the last couple of years, and not outside of the planning parameters that we use for declines in ASPs. So, we don't see anything unusual there.

**David Sterman - Jesup & Lamont - Analyst**

You have been kind of building up the balance sheet here for, I guess, several years now with the divestitures and the cash flow. Beyond the share buyback, is there anything else that you can talk about in terms of uses of cash?

**Larry Brady - Intermec, Inc. - Chairman, President and CEO**

I don't think so at this time. I think we are — having excess cash is a new experience for us, and so we are moving fairly cautiously in that arena until we sort out being comfortable with the approach we are taking. And I think it's undeniably true that when we conclude this existing authorization, that we'll revisit the question of how should we be spending our money. And the fact of the matter is that RFID will be further along the development trail at the time, and we'll have more of a sense of investment required to grow, as well as any potential for adding to our technology capabilities through acquisition. So, I think that is a jury that is still out. We would like to continue to be on the conservative side of the way we run our balance sheet in the near-term.

| THOMSON | www.streetevents.com | Contact Us |  |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec Inc. Earnings Conference Call

**David Sterman** - *Jesup & Lamont* - *Analyst*

Is it your sense that the share buyback will be taking place here at current levels, or is it more of -- should the share price weaken further?

**Larry Brady** - *Intermec, Inc.* - *Chairman, President and CEO*

No, I think our intention is to buy back shares, and I think we'll probably commence reasonably soon. We obviously haven't been buying back shares during the quiet period. But we would anticipate that we will commence that activity in the not-too-distant future.

**Operator**

Ajit Pai, Thomas Weisel Partners.

**Ajit Pai** - *Thomas Weisel Partners* - *Analyst*

When you look at your balance sheet at the end of December and then April, if you look at the current assets and net after-tax assets, you dropped them by about 50 million, from 100.6 million to 49.6 million. And your long-term (indiscernible) tax assets go up. Is that because your business plan for this year, in terms of the expected profitability, has changed?

**Rick Anderson** - *Intermec, Inc.* - *VP, Controller and Acting CFO*

This is Rick Anderson. That had to do with the transaction in Europe and the fact that we are no longer permanently reinvesting our retained earnings in the UK entities from our IAS division that we divested. So, that was previously in the current deferred tax asset at year-end because of that utilization of tax ramifications (indiscernible) it had to do with repatriating those earnings.

**Ajit Pai** - *Thomas Weisel Partners* - *Analyst*

So that decision was made after December 31, 2005?

**Larry Brady** - *Intermec, Inc.* - *Chairman, President and CEO*

Correct.

**Ajit Pai** - *Thomas Weisel Partners* - *Analyst*

Even though the divestiture was complete before that date?

**Larry Brady** - *Intermec, Inc.* - *Chairman, President and CEO*

Correct. The transfer of funds and then the subsequent transition of funds occurred in 2006.

 
© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

F I N A L   T R A N S C R I P T

May. 08. 2006 / 5:00PM IN - Q1 2006 Intermec Inc Earnings Conference Call

**Ajit Pai - Thomas Weisel Partners - Analyst**

So, nothing to do with a change in your perception of broad profitability by geography?

---

**Larry Brady - Intermec, Inc. - Chairman, President and CEO**

No. Absolutely not. (multiple speakers)

---

**Ajit Pai - Thomas Weisel Partners - Analyst**

The second question would be -- just looking at your gross margins, we spent a lot of time on it -- I think a number of questions. (indiscernible) broadly looking out, maybe three to four years in the future, historically you have said that competing with your two competitors -- [Zebra] on the barcode printer side, and now your mobile printer side as well, and then Symbol on the mobile computing and scanner side -- their gross margins have been significantly, I think, maybe 600 to 1000 basis points higher than yours when you look at that separately.

You have always said that there isn't really -- scale doesn't provide such significant advantage in this business. Can you give us sort of a refresh on your strategy, about where you think the gross margins can go to over time? And even over the past maybe six quarters, you have grown faster than both of your peers. What would it take to get gross margins to comparable gross margin to them?

---

**Larry Brady - Intermec, Inc. - Chairman, President and CEO**

Just broadly -- and Steve may want to comment in more detail -- broadly, I think what we have said is that scale can provide as much as about a 3 point advantage in gross margin. It's not something that knocks us out of the box, but it is that sort of advantage. It is our belief that historically we have been disadvantaged by royalties included in the gross margin, and in the future we are going to be advantaged by gross margins in the future. So, we see that as one major offset or shift in the way those margin numbers operate.

The second thing is it is undeniably true -- and I think we have said that in the past -- with the manufacturer -- that the research and development manufacturer and supply chain activities carried out through our Swedish facilities have disadvantaged us in product costs in the printer area, which is a part of the reasoning behind the relocation that you are seeing now. And we could see -- now understanding it's only a percent of our total business, so it has a weighted average that is less than the complete number -- but we can see an improvement in margins in the printer area north of 5 points.

---

**Ajit Pai - Thomas Weisel Partners - Analyst**

In the printer area. But for the overall business, what would you expect the gross margins to be, maybe about three years out?

---

**Larry Brady - Intermec, Inc. - Chairman, President and CEO**

I hesitate to make any conclusion about three years out, because it depends on competitive behavior. But if you just talk about the trends that I just described, the answer would be 3, 4 points.

---

**Ajit Pai - Thomas Weisel Partners - Analyst**

In terms of the fact that you mentioned on this call that you might be taking some legal action against folks that have not been signed up so far for Rapid Start at some point during this year, could you give us some color as to what the potential impact on

THOMSON | www.streetevents.com | Contact Us | 15

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May 08, 2006 / 5:00PM, IN - Q1 2006 Intermec Inc Earnings Conference Call

your SG&A line could be of taking such action, or whether similar to the (indiscernible) settlements you might have it not impacting your expense line in the near-term?

---

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

The answer to the question which you asked that we have given in the past and are still comfortable with is that -- A., we intend to defend ourselves; B., that we see the annual expense of that defense as being equal to or less than the amount of deferred revenue that we are getting from the fixed fees on the front end of the program; so, a number of less than, say, 4.5 million annually. I hate to be more specific about that, because we don't want to constrain our ability to defend. And I think it is also fair to say that in the past, what we have said is it's only logical that we would wait until the recovery from an action, at least would manage to pay us back our court cost, before we would launch such a program.

I think given the circumstances that we are currently looking at -- that is, the amazing propensity of people to take business well below cost, and the amazing publicity which such actions receive -- that we are apt to move in advance of where we would have originally intended. And indeed, the limitation on when we will take action now is more related to just the [wickets] that we have to go through -- that is, (indiscernible) product, and disassemble the product and understand that infringement is occurring. Because we've got a certain obligation, before we just go out and willy nilly start filing lawsuits, to demonstrate that there's cause of action. So that is the path that we are currently on.

---

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

When you are looking at the verticals right now -- you've talked about what happened in Europe, but when you look at the U.S. markets, are there any verticals right now that you see are still very significant in terms of how robust they are? And which verticals do you think are most at risk of becoming weaker?

---

**Steve Winter** - *Intermec, Inc. - President and COO*

The verticals that are the strongest worldwide are, for us, primarily transportation logistics. We are seeing a lot of strength in that vertical. And we continue to see that a lot of our growth is occurring there. We are seeing a lot of good growth in field service, which is both an application and a vertical. But field service has tended to be a very good growth opportunity as well. And we see that continuing to be a very strong opportunity.

Retail for us -- because we are a smaller player, and so there is a lot of good growth opportunity for us -- has been good. And so from a pure growth year-on-year perspective, those three areas are providing the most strength. There is still reasonable growth -- market rate growth in transportation -- excuse me -- in industrial, consumer packaged goods, and the DOD and government area. As far as risk of downturn, retail probably tends to be the most volatile. The others are showing fairly steady growth.

---

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

And when you look at the DOD, and you look at the (indiscernible) are you watching a reallocation of resources there temporarily that might create a stronger rebound in this business maybe next year?

---

**Steve Winter** - *Intermec, Inc. - President and COO*

What do you mean by reallocation?

---

| THOMSON | www.streetevents.com | Contact Us |  |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May 08, 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Ajit Pal** - *Thomas Weisel Partners - Analyst*

(indiscernible) the resources that perhaps are allocated for the supply chain and tightening it which would actually result in spending — right now, near-term spending on the kind of products that you would provide the DOD with, or other departments, defense departments — are you seeing any kind of cutback in spending in those areas to be — that is orders getting pushed out, or are you not seeing any of that right now?

**Steve Winter** - *Intermec, Inc. - President and COO*

What we are seeing is that the — certainly the Iraq war has pulled funds away from what would traditionally be spent on programs such as supply chain improvements and in-transit visibility. And what we are seeing is a concentration of spending in programs that will have a more direct impact on the outcome. So ammunition tracking systems, for example, is an area where money is being spent. Standard retail systems are not — which retail to the government means supply chain — are not being spent on as they have been in the past, at the same levels. We do anticipate that as the conflict tapers off, and as more budget becomes available, that those programs continue to have a huge return on investment opportunity, and therefore would be attractive targets for additional spending.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

You disappointed me. You didn't ask me about the (multiple speakers)

**Ajit Pai** - *Thomas Weisel Partners - Analyst*

The sale of the Cincinnati [land]? I thought if you had some news there, you might volunteer it.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

The fact is we have made some progress. We have gotten environmental approval for the Brownfield site. We are more optimistic today about concluding that activity this year than we have ever been.

**Operator**

Chris Quilty, Raymond James.

**Chris Quilty** - *Raymond James - Analyst*

You had mentioned that most of the printer and media business was weak due to Europe. Does that thereby imply that you had a very strong North American sales with the Systems and Solutions business? And can you give us sort of a sense of where that strength primarily was, either by product line or vertical market, within the North American market?

**Steve Winter** - *Intermec, Inc. - President and COO*

Sure, I can do that. We grew about 19% in North America, is what we reported. So we did have a very robust growth. That was — we had good sales growth in Printer and Media in North America, but not unusual growth. But the primary growth was in the Systems and Solutions area. And the primary growth by vertical was in field service and transportation and logistics. Systems and Solutions, for example, was 24% up in North America; 19% overall, 24% for Systems and Solutions.

| THOMSON | www.streetevents.com | Contact Us |  |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May 08, 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Chris Quilty** - *Raymond James - Analyst*

And is that driven by — I mean, you gave us your enterprise mix. But are these generally, the higher growth rates, due to a higher concentration of enterprise in North America? Or is it pretty much status quo in terms of the size of the orders you brought in in the first quarter?

**Steve Winter** - *Intermec, Inc. - President and COO*

No. In fact, the orders are tending to be a little bit smaller and a little bit broader than they were in the fourth quarter of last year and the third quarter of last year.

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes, the enterprise mix quarter-on-quarter, Chris, is up slightly from 25 to 30% of the largest 50. But that's not material.

**Chris Quilty** - *Raymond James - Analyst*

Your Q2 guidance, obviously, includes what you are seeing halfway up through the second quarter here. But can you give us a little bit better analysis of what you saw on perhaps a month-by-month basis going back to January, and how you see the order book trending going out into the end of the June quarter?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes. It's a really dangerous place to go, because the first month in the quarter is just not very reflective of how we are going to see it happen. And so what we would be doing is misleading you if we said January and February were weak and March came on strong, or that we have seen a shift in — we haven't seen any shift in the generalized trends and weaknesses versus strengths that we saw from — the difference between January and May.

**Chris Quilty** - *Raymond James - Analyst*

Did you give an assumed foreign exchange range associated with your guidance?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

We did not, but we typically have been using 124, Chris, for the Euro, which is the big thing for us. So, it's slightly favorable right now at 1.27, and in the first quarter it was running about 120.

**Chris Quilty** - *Raymond James - Analyst*

And for your stock option expenses, you didn't provide a breakout by cost of goods sold and SG&A, which somewhat clouds our year-ago comparables. Is that something that you will provide in the 10-Q, or is it something you are just not going to break out?

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

We will provide it in the Q.

THOMSON                www.streetevents.com                Contact Us      

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Chris Quilty** - *Raymond James - Analyst*

Do you have those numbers with you?

---

**Rick Anderson** - *Intermec, Inc. - VP, Controller and Acting CFO*

No, but the cost of sales is a fairly small number out of the total stock option expenses.

---

**Chris Quilty** - *Raymond James - Analyst*

For primarily SG&A?

---

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes.

---

**Chris Quilty** - *Raymond James - Analyst*

I just wanted to make sure, after working through the numbers, in terms of your guidance that you provided — if I take the $0.16 benefit from Goteborg — or sorry, from HP, pull that out of your guidance, add back $0.06 for the facility shutdown, that gets me to about $0.72. If I scratch out another $0.02 from that from the tax benefit you had in this quarter, it gets me to about $0.70, plus or minus 10 — your presumed range here, minus those onetime items, looks like it's $0.60 to $0.90, and the prior guidance had been $0.75 to $0.85. Am I doing the math right?

---

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

I am struggling a little bit. We tried to — the 16 is correct. The 6 is correct. I think the number that you gave me for stock option expense was a quarter as compared to the year.

---

**Chris Quilty** - *Raymond James - Analyst*

No, I didn't include stock option expense, because you had a $0.02 benefit here in the first quarter, which I wouldn't give you credit for, on a sort of pro forma basis.

---

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Yes, I can't go to pro forma. I don't recognize the term. But what we tried to do is give you that in the press release specifically by individual calculation of EPS. And it is true that relative to the full year number, it includes $16.5 million, which we are saying is $0.16, from — because, roughly, $1 million pre-tax is $0.01. $0.16 from the HP settlement and $0.06 from the Goteborg offsetting that, for about a $0.10 benefit associated with those two items. Is that the question you asked? Is there another element?

---

**Chris Quilty** - *Raymond James - Analyst*

The only other thing I wouldn't give you credit for is a $0.02 tax benefit here in the first quarter.

---

| THOMSON | www.streetevents.com | Contact Us | 19 |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

May 08, 2006 / 5:00PM, IN - Q1 2006 Intermec, Inc. Earnings Conference Call

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

I understand. That's the 35 versus 37% number. I'm sorry; it was 21% in the first quarter. We think it's going to be 37 in each of the next three, which will average 35 for the full year.

---

**Chris Quilty** - *Raymond James - Analyst*

Right, and that's what (multiple speakers)

---

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

You are right about not giving us credit for that.

---

**Chris Quilty** - *Raymond James - Analyst*

And I think most models reflect probably a 37% tax rate.

---

**Larry Brady** - *Intermec, Inc. - Chairman, President and CEO*

Plus or minus.

---

**Chris Quilty** - *Raymond James - Analyst*

Can you give us anymore color on the Forklift initiative, which is something new here?

---

**Steve Winter** - *Intermec, Inc. - President and COO*

The Forklift initiative is, basically we introduced a Forklift of the Future concept in Q1, which was a collaboration between Cisco, Intermec, Red Prairie and Cascade. Cascade is the world's largest provider of material handling systems for forklifts; so basically, the forks, the clamps, the other things that you put onto the front of the fork truck, or lift truck, to have them handle the material.

There are several pieces of that which — that are important. One is a specially-designed load backrest and clamping mechanism to accept antenna systems for RFID, in a way the gives you maximum reading performance. The second piece of that is a new terminal — vehicle-mounted terminal which Intermec is introducing in the third quarter, which will provide some new capabilities. And then the next is some real-time location systems capabilities using Cisco as a partner to add some productivity enhancements to the way forklifts can be used that go beyond just the benefits of RFID itself.

So, it's kind of — it's a productivity enhancement system, marrying the capabilities of the four companies — including Red Prairie on warehouse management systems — that goes beyond what you could get by just slapping RFID on a forklift by itself.

---

**Chris Quilty** - *Raymond James - Analyst*

And your sense or business case for this relative to focusing on fixed mounted portal sort of readers is — do you think this is going to become a bigger market or equally sized market to the fixed readers?

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

May. 08. 2006 / 5:00PM, IN - Q1 2006 Intermec Inc. Earnings Conference Call

**Steve Winter** - *Intermec, Inc. - President and COO*

We actually think it will have more appeal than the traditional dock door system. And the reason is, there is typically one forklift for four dock doors. And so it's just less expensive to go that way. The other reason is, by putting the RFID reading on the forklift, you can automate multiple transactions, multiple separate transactions that occur today in one transaction on a forklift. You can do receipts processing, PO verification, cross-docking, put-away, all in kind of one fell swoop by putting it on a forklift as opposed to having those being separate transactions. So, it's a significant productivity enhancement as well, as a result of doing it with a forklift.

**Operator**

I am showing no further questions at this time, sir.

**Kevin McCarty** - *Intermec, Inc. - Director of Investor Relations and Analysis*

Great. Thank you, operator. That will conclude our call for the this afternoon. We want to thank everybody for joining us, and goodnight.

---

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2006, Thomson Financial. All Rights Reserved.

---


© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.