IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

INTERMEC IP CORP., a Delaware
corporation,

          Plaintiff,

          v.

ALIEN TECHNOLOGY CORP.,
a Delaware corporation,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 06-411-GMS

**REPLY BRIEF IN SUPPORT OF ALIEN TECHNOLOGY CORPORATION'S
MOTION TO DISMISS OR STAY, OR, IN THE ALTERNATIVE, TRANSFER**

Of Counsel:
Gregory P. Stone
Charles D. Siegal
Andrea Weiss Jeffries
Daniel A. Beck
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Chad M. Shandler (#3796)
shandler@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700

Attorneys for Defendant Alien
Technology Corporation

Dated: October 24, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.    INTRODUCTION ....................................................................................................... 1

II.   ARGUMENT ............................................................................................................... 3

      A.    The Court Should Consider The North Dakota Court's
            Forthcoming Ruling On Jurisdiction In North Dakota Before
            Deciding This Motion ........................................................................................ 3

      B.    The "First-Filed" Rule Requires That The Delaware Action
            Should Be Dismissed, Stayed, Or Transferred ............................................... 5

      C.    In the Alternative, The Delaware Action Should Be Transferred
            To The District Of North Dakota Under 28 U.S.C. § 1404(a) ..................... 11

            1.    The public interest factors weigh strongly in favor of
                  transferring the Delaware Action ........................................................ 12

            2.    The private interest factors weigh in favor of transferring
                  the Delaware Action .............................................................................. 16

III.  CONCLUSION .......................................................................................................... 17

# TABLE OF AUTHORITIES

Page

## Cases

*Allen v. Rohm & Haas Co. Retirement Plan,*
2006 WL 1980174 (W.D. Ky. July 10, 2006) ................................................. 6

*APV North America, Inc. v. Sig Simonazzi North America, Inc.,*
295 F. Supp. 2d 393 (D. Del. 2002) ............................................................ 8

*Bayer Bioscience N.V. v. Monsanto Co.,*
2003 WL 1565864 (D. Del. Mar. 25, 2003) ............................................... 11

*Black Diamond Equipment, Ltd. v. Genuine Guide Gear,*
2004 WL 741428 (D. Utah Mar. 12, 2004) ................................................... 6

*Cedars-Sinai Medical Center v. Revlon, Inc.,*
111 F.R.D. 24 (D. Del. 1986) .................................................................... 14

*Chicago, Rock Island & Pacific Co. v. Igoe,*
220 F.2d 299 (7th Cir. 1955) ..................................................................... 17

*Compagnie Des Bauxites De Guinea v. Insurance Co. of North America,*
651 F.2d 877 (3d Cir. 1981) ........................................................................ 6

*Corixa Corp. v. IDEC Pharmaceuticals Corp.,*
2002 WL 265094 (D. Del. Feb. 25, 2002) ................................................. 16

*EEOC v. University of Pennsylvania,*
850 F.2d 969 (3d Cir. 1988) ............................................................. 5, 6, 10

*Galileo Int'l. P'ship v. Global Village Communication, Inc.,*
1996 WL 452273 (N.D. Ill. Aug. 8, 1996) ................................................... 3

*General Products Machine Shop Inc. v. Systematic, Inc.,*
2006 WL 2051737 (D. Idaho July 20, 2006) ................................................ 7

*Genfoot, Inc. v. Payless Shoesource, Inc.,*
2003 WL 2295 3183 (D. Del. Dec. 3, 2003) ............................................. 13

*Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,*
342 U.S. 180 (1952) ................................................................................... 6

*Laboratory Corp. of Amer. Hldgs v. Chiron Corp.,*
384 F.3d 1326 (Fed. Cir. 2004) ................................................................... 9

## TABLE OF AUTHORITIES
### (continued)

Page

*Mattel Inc. v. Louis Marx & Co.*,
   353 F.2d 421 (2d Cir. 1965) .................................................................... 10

*Nilssen v. Osram Sylvania, Inc.*,
   2001 WL 34368395 (D. Del. May 1, 2001) ........................................... 12

*Ricoh Co., Ltd v. Aeroflex, Inc.*,
   279 F. Supp.2d 554 (D. Del. 2003) .......................................................... 3

*SAES Getters S.P.A. v. Aeronex, Inc.*,
   219 F. Supp.2d 1081 (S.D. Cal. 2002) ................................................... 10

*Save Power Ltd. v. Syntek Finance Corp.*,
   121 F.3d 947 (5th Cir. 1997) ............................................................. 6, 10

*Schumacher Elec. Corp. v. Vector Prod., Inc.*,
   286 F. Supp.2d 953 (N.D. Ill. 2003) ........................................................ 3

*Smart Techs., Inc. v. PolyVision Corp.*,
   2004 U.S. Dist. LEXIS 29483 (E.D. Va. Oct. 20, 2004) ...................... 10

*Spotless Enterprises Inc. v. The Accessory Corp.*,
   415 F. Supp.2d 203 (E.D.N.Y. 2006) ...................................................... 6

*Sumito Mitsubishi Silicone Corp. v. MEMC Electronic Materials, Inc.*,
   2005 U.S. Dist. LEXIS 5174 (D. Del. Mar. 30, 2005) ......................... 11

*Thales Airborne Systems S.A. v. Universal Avionics Systems, Corp.*,
   2006 WL 1749399 (D. Del. June 21, 2006) ......................................... 8, 9

*TrafficCast, Inc. v. Pritchard*,
   2005 WL 3002267 (W.D. Wis. Nov. 7, 2005) .......................................... 3

*Versus Technology, Inc. v. Hillenbrand Industries, Inc.*,
   2004 WL 3457629 (W.D. Mich. Nov. 23, 2004) ................................... 6, 9

*Walker v. Progressive Casualty Ins. Co.*,
   2003 WL 21056704 (W.D. Wash. May 9, 2003) ...................................... 6

### Federal Statutes

28 U.S.C. § 1404(a) ........................................................................................ 2

## TABLE OF AUTHORITIES
### (continued)

**Page**

### Other Authorities

17 James Wm. Moore, Moore's Federal Practice,
  § 111.13[1][o] (3d ed. 2001) ................................................................. 4, 13

## I.    INTRODUCTION

The first and principal argument in Intermec IP Corporation's ("Intermec IP's") answering brief (the "Answer") is easily resolved. Intermec IP contends that the North Dakota court does not have jurisdiction over Alien Technology Corporation's ("Alien's") first-filed declaratory judgment action, rendering the first-filed rule inapplicable. As Intermec IP concedes, however, discovery on jurisdictional issues in North Dakota has recently concluded, Alien has now submitted its brief in opposition to Intermec IP's pending motion to dismiss in that forum, and the North Dakota court is expected to quickly decide Intermec's motion. Alien respectfully submits that this Court should simply wait to see how the North Dakota court rules on jurisdiction before deciding the present motion. Alien is confident that the North Dakota court's ruling will dispose of Intermec IP's objection, and, for the reasons specified in detail in Alien's moving papers and below, this motion should then be granted accordingly.

Intermec's second argument – that some of the patents-in-suit are different between the two actions – misapprehends the first-filed rule and mischaracterizes the facts. This action involves ten Intermec IP patents for Radio Frequency Identification ("RFID") technology. Six of those patents are already at issue in the first-filed North Dakota Action. Three of the four remaining Intermec IP patents involve the same narrow subset of RFID technology – namely RFID tag identification and grouping – that is involved in three of the North Dakota patents. The tenth Intermec IP patent, patent no. 5,528,222, involves a comparatively simple design for the physical RFID tag. On

balance, the subject of this action is virtually identical to the first-filed North Dakota Action, and it falls squarely within the first-filed rule.

Finally, Alien's moving papers argued that this action should be transferred to North Dakota under 28 U.S.C. § 1404(a), even if the first-filed rule does not apply, primarily because it would be highly inefficient to let two actions proceed simultaneously in North Dakota and Delaware regarding Intermec's RFID patent claims against Alien. *See* Motion at 9-14.[1] Intermec IP erroneously contends in its Answer that "Alien argues in the alternative that even if the North Dakota Court does lack either subject matter or personal jurisdiction over the Intermec Companies, this case should be transferred." Ans. at 2. To the contrary, Alien's point was and is that overwhelming convenience factors favor transfer even apart from the first-filed rule, given that simultaneous actions would otherwise be pending in the two jurisdictions. For the reasons set forth in Alien's moving papers, which go largely unaddressed by Intermec IP's Answer, transfer is therefore appropriate under Section 1404(a).

---

[1]    Alien's opening brief is cited herein as "Motion at __."

- 2 -

## II.    ARGUMENT

### A.    The Court Should Consider The North Dakota Court's Forthcoming Ruling On Jurisdiction In North Dakota Before Deciding This Motion.

Intermec IP's opposition to Alien's Motion consists primarily of an argument that there is no jurisdiction in North Dakota. *See* Ans. at 5-11. The issue of jurisdiction is already pending before the court in North Dakota, where Intermec's motion to dismiss on jurisdictional grounds has been fully briefed by the parties following discovery. To the extent Intermec IP's Opposition asks this Court to decide the jurisdictional issue in North Dakota, Alien respectfully suggests that this Court lacks jurisdiction to do so. *See TrafficCast, Inc. v. Pritchard*, 2005 WL 3002267, at *3 (W.D. Wis. 2005).[2] *See also Ricoh Co., Ltd v. Aeroflex, Inc.*, 279 F. Supp. 2d 554, 557 (D. Del. 2003) (dictum: "[I]t is not this court's province to determine another court's jurisdiction. . . .").

Beyond the jurisdictional bar, as a matter of efficiency and comity, Alien suggests that this Court defer deciding Alien's present Motion until it can consider the North Dakota court's forthcoming ruling on jurisdiction, which Alien will promptly submit to this Court after its issuance. For this Court to evaluate the question of North

---

[2]    "Plaintiff argues since it is not subject to personal jurisdiction in the United States District Court for the District of Massachusetts the first to file rule should not be followed. Plaintiff filed its motion to dismiss for lack of personal jurisdiction and improper venue and its motion to transfer venue to the Western District of Wisconsin in the District of Massachusetts and both are currently pending. This Court does not have the authority to decide a motion pending in another federal district. *See Schumacher Elec. Corp. v. Vector Prod., Inc.*, 286 F. Supp. 2d 953, 955 (N.D. Ill. 2003) (*citing Galileo Int'l P'ship v. Global Village Communication, Inc.*, 1996 WL 452273, at *3 (N.D. Ill. Aug. 8, 1996))."

- 3 -

Dakota jurisdiction prior to that point would be unnecessary, and could result in conflicting judicial rulings. If that court denies the motion to dismiss, as Alien anticipates, the first-filed rule will apply, and Alien's motion to dismiss, stay, or in the alternative transfer should then be granted. That approach is consistent with the general rule that "[i]f the first-filed action is vulnerable to dismissal on jurisdictional or statute of limitation grounds, the court in the second-filed action should stay it or transfer it, rather than outright dismiss it." 17 James Wm. Moore, Moore's Federal Practice, § 111.13[1][o] at 111-97 (3d ed. 2001).

To be clear, Intermec IP is the wholly-owned subsidiary of Intermec Technologies Corporation ("ITC"). Intermec IP does nothing but own patents. ITC manufactures and sells RFID devices. In turn, ITC is a wholly-owned subsidiary of Intermec, Inc. (Collectively, the three entities will be referred to as the "Intermec Companies.") The Intermec Companies raised the same jurisdictional arguments Intermec IP makes here in their North Dakota motion to dismiss. Alien responded at length in its opposition memorandum and will not address those points in detail here, but will outline the responses set forth in its opposition in the North Dakota action, a true and correct copy of which is attached as Exhibit A hereto:

- Alien had reasonable apprehension of suit because the Intermec Companies expressly identified Alien in a public statement as an unlicensed infringer, and stated their intent to bring an enforcement action against Alien by the end of this year. *See* Exhibit A at pp. 8-12.

- 4 -

- Intermec, Inc. and ITC had further made comments in connection with standard-setting organizations, filed suit against a competitor, made private statements to Alien, made statements to Alien's customers, and made statements to the press, all of which gave rise to a reasonable apprehension of suit. *See id.* at 12-16.

- Intermec IP's parent, ITC, is subject to personal jurisdiction in North Dakota. ITC is authorized to do business in North Dakota, and files Foreign Corporation Annual Reports in North Dakota each year. *See id.* at 18-19. ITC's invoices show that it has directly sold over $2.1 million in goods and services to over 100 companies in North Dakota over the last five years. *See id* at 19-22.

- As the wholly-owned subsidiary of ITC and a mere instrumentality for asserting intellectual property litigation, Intermec IP is subject to personal jurisdiction in North Dakota. *See id.* at 22-25.

As demonstrated in Alien's opposition memorandum, Intermec IP's arguments regarding personal and subject matter jurisdiction are defective.

### B. The "First-Filed" Rule Requires That The Delaware Action Should Be Dismissed, Stayed, Or Transferred.

The first-file rule applies to the subsequent prosecution of "similar cases ... in different federal district courts." *See EEOC v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir. 1988); *see also Compagnie Des Bauxites De Guinea v. Insurance Co. of*

- 5 -

*North America*, 651 F.2d 877, 887 n.10 (3d Cir. 1981) (first-filed rule applies "when similar cases have been filed in different federal district courts."). The rule is pragmatic, and rests on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952). Federal courts have thus rejected Intermec IP's core contention that the first-filed rule inherently requires a single unified set of claims. As articulated by the Fifth Circuit:

> Syntek argues that the "first to file" rule does not apply in this case because neither the issues nor the parties are identical to those in the Original Action. The rule does not, however, require that cases be identical. The crucial inquiry is one of "substantial overlap."

*Save Power Ltd. v. Syntek Finance Corp.*, 121 F.3d 947, 950 (5th Cir. 1997). The claims in this action have "substantial overlap" with the North Dakota Action – they are unquestionably "similar cases" – and the first-filed rule governs accordingly.[3]

Alien's moving papers established in detail the substantial overlap between these two actions. *See* Motion at 5-6. The Motion and the attached declarations of John

---

[3]    The Fifth Circuit's description of the first-filed rule test as "substantial overlap" parallels the Third Circuit's statement in *University of Pennsylvania* that the rule applies to "similar cases." 850 F.2d at 971. The Fifth Circuit's "substantial overlap" description of the test has been approved and applied by district courts in many other circuits, including the Second, Fifth, Sixth, Ninth, and Tenth Circuits. *See, e.g.*, *Spotless Enterprises Inc. v. The Accessory Corp.*, 415 F. Supp. 2d 203, 206 (E.D.N.Y. 2006); *General Products Machine Shop Inc. v. Systematic, Inc.*, 2006 WL 2051737, at *1 (D. Idaho July 20, 2006); *Allen v. Rohm & Haas Co. Retirement Plan*, 2006 WL 1980174, at *1 (W.D. Ky. July 10, 2006); *Versus Technology, Inc. v. Hillenbrand Industries, Inc.*, 2004 WL 3457629, at *6-8 (W.D. Mich. Nov. 23, 2004); *Black Diamond Equipment, Ltd. v. Genuine Guide Gear*, 2004 WL 741428, at *1 (D. Utah Mar. 12, 2004); *Walker v. Progressive Casualty Ins. Co.*, 2003 WL 21056704, at *2 (W.D. Wash. May 9, 2003).

- 6 -

Stephen Smith and Glenn Gengel demonstrated the following facts – which went entirely unmentioned, much less rebutted in Intermec IP's Answer:

- All fourteen of the patents-at-issue in both actions are Intermec patents for Radio Frequency ID ("RFID"), an automatic identification method that remotely retrieves data from devices called RFID tags  *See* Gengel Decl., ¶ 2.

- Thirteen of the 14 patents-at-issue (all except the '222 Patent) relate to the reader-tag air interface protocol, a specific aspect of RFID technology  *See* Smith Decl , ¶ 2

- Six of the ten patents asserted in the Delaware Action were directly identified in the first-filed North Dakota Action. *See* Motion at 6.

- Three of the remaining four patents[4] in the Delaware Action are directed at the process of selecting a subset of tags from a larger group, which is the same subfield of RFID interface technology that is addressed by the '561 and '019 patents (expressly identified in both actions). *See* Smith Decl., ¶ 4.

- The last patent in the Delaware Action, the '222 patent, describes the manufacture and structure of a flexible RFID tag. *See* Gengel Decl , ¶ 5.

These unchallenged facts establish "substantial overlap," *i e* close similarity, between the two cases  Alien has specifically alleged the majority of the patents in this

---

[4]     Nos. 6,286,762; 5,828,318; and 6,812,852

action in the prior North Dakota Action. To the extent Intermec IP names additional patents in this action, they almost all involve a narrow aspect of Intermec RFID technology that is already the subject of patents in the North Dakota Action. It is likely that the relevant witnesses, experts, evidence, and discovery will closely overlap between the two actions. The accused Alien products will be the same. Claim construction will likely involve substantially the same terms, technology, and issues.

Rather than engaging the facts presented by Alien showing substantial overlap, Intermec IP's Answer rests on a purported bright-line theory that the first-filed rule does not apply where some of the patents are different, citing to the unreported case of *Thales Airborne Systems S.A. v. Universal Avionics Systems, Corp.*, 2006 WL 1749399 (D. Del. June 21, 2006). *See* Ans. at 11-13.[5] In *Thales*, however, only four patents were at issue, two of which were not in common and which apparently involved a different technology than the two patents in the first-filed action. *See id.* at *4. Here,

_____

[5]    Intermec IP also cites to *APV North America, Inc. v. Sig Simonazzi North America, Inc.*, 295 F. Supp. 2d 393, 397 (D. Del. 2002). *See* Opp. at 12. That case involved a patent infringement action filed in Texas. The defendant's parent company subsequently filed suit in Delaware for declaratory relief, but added new affirmative claims for infringement of the defendant's *own* patents. Noting that "it is true that other courts in this jurisdiction have concluded that additional claims do not render an action 'different' for purposes of applying the first-filed rule," the court nonetheless found that "while the inventions are not entirely unrelated, they do involve different technologies and thus, different facts." 295 F. Supp. 2d at 397. *APV North America* thus does not stand for the proposition that different patents alone defeat the first-filed rule; rather the court's decision was premised on an express finding that the new patent claims asserted in the second forum involved different technology. Here, the technology is closely related and the first-filed rule is applicable. While relying on *APV North America*, Intermec IP has not made the slightest attempt to show that the technologies in the two cases are different.

- 8 -

the disputed technology for all of the patents is closely related, including the minority of patents that are not in common, so the opposite situation exists.

Intermec cites dicta in *Thales* stating that the first-filed rule appeared to be limited to cases involving the same patents. *See* 2006 WL 1749399, at *4.[6] Contrary to that dicta, however, the first-filed rule has been applied even where *no* patents were in common between two actions, because the disputed underlying technology was sufficiently similar. *See Versus Technology, Inc. v. Hillenbrand Industries, Inc.*, 2004 WL 3457629, at *6-8 (W.D. Mich. Nov. 23, 2004). In *Versus Technology*, the court concluded that the first-filed rule applied because "while the patents may be different, they involve similar technology, i.e., locating systems for assets and personnel using infrared and radio signals, and are closely related." *Id.* at *7. The *Versus Technology* decision was based on the district court's extensive analysis of how the first-filed rule relates to claims that are "similar," rather than strictly identical. *See id.* at *5-8. As the *Versus Technology* court concluded from the surveyed precedent, "[t]he claims in the two cases need not be identical; only substantial similarity of issues or substantial overlap in the cases need be shown." *Id.* at *5. *Versus Technology* reflects the controlling principle, as articulated by the courts of appeal, that *similarity* of subject

---

[6]    *Thales* cited to *Laboratory Corp. of Amer. Hldgs v. Chiron Corp.*, 384 F.3d 1326, 1328 (Fed. Cir. 2004) as support for this dicta. In *Laboratory Corp.*, however, the Federal Circuit simply described two actions as "parallel" in the course of summarizing the background of the parties' dispute. The Federal Circuit explained that it described the actions as "parallel" because they involved the same patents and parties. *See* 384 F.3d at 1328. The Federal Circuit did not in any way purport to thereby address or delimit the degree of subject matter similarity required by the first-filed rule.

matter, which has been defined as *substantial overlap*, is the fundamental test for invoking the first-filed rule.[7]

Similarly, in *Smart Techs., Inc. v. PolyVision Corp.*, 2004 U.S. Dist. LEXIS 29483 (E.D. Va. Oct. 20, 2004), the district court concluded that "[t]his Court is bound by the first-to-file rule" (*id.* at \*5) because of the similarity of the patented technology in the two actions, and did not require the patents to be identical:

> [T]hese parallel cases hinge on a court's determination of the same issue: which party violated whose 'interactive whiteboard' technology patents. The patents involved in the two cases may or may not be identical. However, they are substantially similar in that all the patents at issue involve 'interactive whiteboard' technology components. Litigating this singular issue in two different courts could result in conflicting judgments, undermining the enforcement of a court's decision. Thus, judicial economy calls for the consolidation of these cases.

*Id.*, at \*7-8. Accordingly, the *Smart Techs.* court granted the defendant's motion to transfer pursuant to the first-filed rule. *See id.*, at \*10.

Indeed, federal courts have recognized that the first-filed rule may also be applied in favor of a plaintiff who later amends his complaint to include new patent infringement claims that the opposing party had raised in a second-filed suit in another district. *See SAES Getters S.P.A. v. Aeronex, Inc.*, 219 F. Supp. 2d 1081, 1089-90 (S.D. Cal. 2002); *Mattel Inc. v. Louis Marx & Co.*, 353 F.2d 421, 424 (2d Cir. 1965). These

---

[7]     *See, e.g.*, *EEOC v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir. 1988) (citing "similar cases"); *Save Power Ltd. v. Syntek Finance Corp.*, 121 F.3d 947, 950 (5th Cir. 1997) (citing "substantial overlap").

cases further illustrate the controlling significance of overlapping subject matter in analyzing whether the first-filed rule applies.

Consistent with the legal principles and authority presented in *Versus Technology* and *Smart Techs.*, the facts cited in Alien's moving papers establish that the North Dakota Action has priority under the first-filed rule. Alien's Motion should be granted accordingly.

**C.    In the Alternative, The Delaware Action Should Be Transferred To The District Of North Dakota Under 28 U.S.C. § 1404(a)**

Alien's moving papers argued that, even apart from the first-filed rule, the Delaware Action should be transferred to North Dakota for convenience because of the tremendous efficiencies to be gained from consolidating Intermec's RFID patent claims. *See* Motion at 9-14. Where similar patent actions are simultaneously pending, transfer of the second-filed case for consolidation with the first-filed case is appropriate. *See Sumito Mitsubishi Silicone Corp. v. MEMC Electronic Materials, Inc.*, 2005 U.S. Dist. LEXIS 5174, at *9-*11 (D. Del. Mar. 30, 2005) (court transferred action to United States District Court for the Northern District of California, where another action that involved a "similar" patent was first filed); *Bayer Bioscience N.V. v. Monsanto Co.*, 2003 WL 1565864, at *2 (D. Del. Mar. 25, 2003). The public and private Section 1404(a) factors strongly support transfer of this action for consolidation with the North Dakota Action.

- 11 -

It is amazing the Intermec takes a contrary position. As discussed below, a year and a half ago, it argued in favor of a transfer in quite similar circumstances.

### 1.    The public interest factors weigh strongly in favor of transferring the Delaware Action

Alien's moving papers argued that the enforceability of the judgment weighed in favor of transfer, citing to *Nilssen v. Osram Sylvania, Inc.*, 2001 WL 34368395, at *4 n. 10 (D. Del. May 1, 2001). *See* Motion at 11. Intermec IP responds that the present cases are just in their preliminary stages. *See* Ans. at 17. The *Nilssen* case, however, was concerned with inconsistent judgments that might get reversed on appeal due to collateral estoppel. *See Nilssen*, 2001 WL 34368395, at *4 n. 10. The fact that the present actions are now in their early stages does not eliminate the risk of collateral estoppel conflicts down the road – instead it increases that risk, as various potentially conflicting rulings continue to accrue during the litigation process.

Alien next argued that practical considerations militate in favor of transfer, given the pending first-filed North Dakota Action that is directed to the same Intermec RFID technology as the Delaware Action. *See* Motion at 11-12. Plainly, there are overwhelming efficiency advantages to be gained from consolidating these two actions. Evading that point entirely, however, Intermec IP argues that transfer should not be ordered if there is no jurisdiction in North Dakota. *See* Ans. at 2, 18. Nowhere do Alien's moving papers ask the Court to transfer the Delaware Action to North Dakota if that forum is found to lack jurisdiction. Nor does Alien ask this Court to preemptively

- 12 -

decide the issue of North Dakota jurisdiction, as Intermec IP appears to imply it should. To the contrary, Alien's moving papers requested a transfer consistent with the general rule that "[i]f the first-filed action is vulnerable to dismissal on jurisdictional or statute of limitation grounds, the court in the second-filed action should stay it or transfer it, rather than outright dismiss it." 17 James Wm. Moore, Moore's Federal Practice, § 111.13[1][o] at 111-97 (3d ed. 2001); *see also Genfoot, Inc. v. Payless Shoesource, Inc.*, 2003 WL 22953183, at *1 (D. Del. Dec. 3, 2003) (transferring action under first-filed rule despite pendency of motion to dismiss in first-filed forum). While transfer to North Dakota would be perfectly appropriate, the better course here is to simply stay a decision on Alien's Motion until the Court has the benefit of the North Dakota court's decision on jurisdiction in North Dakota.

Apart from the jurisdictional issue, Intermec IP argues that this Court has already dealt with three of the patents-in-suit. *See* Ans. at 18. That prior litigation between the Intermec Companies and Symbol Technologies, however, was resolved prior to a *Markman* order, and did not result in a substantive judgment bearing on the patented technology. At this time, it is difficult to see that there would be any significant efficiencies gained from the Court's prior early-stage experience with three of the fourteen patents.

Indeed, Intermec IP's relative silence regarding the overwhelming efficiency advantages afforded by transfer is likely a result of the directly contrary position that the Intermec Companies took in last year in the Symbol Technologies litigation. On May

- 13 -

18, 2005, ITC moved under Section 1404(a) to transfer a patent action filed by Symbol Technologies in the Western District of Wisconsin, on the grounds that it could be consolidated with the patent litigation that was already pending between Intermec and Symbol Technologies in Delaware. *See* Exhibit B (a true and accurate copy of Intermec's Memorandum in Support of Motion to Transfer Venue). ITC contended that it was "critical" for preserving the interests of justice that those cases be consolidated, because they involved the same Symbol Technologies patent portfolio and accused Intermec products. *Id.* at 5-6. As ITC argued, "[c]ourts have consolidated patent infringement cases involving different but related patents even when the defendants are different." *Id.* at 6 (*citing Cedars-Sinai Medical Center v. Revlon, Inc.*, 111 F.R.D. 24 (D. Del. 1986). Accordingly, ITC contended that, even though different patents involving different technologies were at issue, the Wisconsin action should still be transferred. *See id.* at 7. Noting that it was unconvinced that the patents overlapped between the actions, the Wisconsin district court nonetheless agreed with ITC's arguments regarding the efficiency of consolidation, and granted transfer by order dated July 14, 2005. *See* Exhibit C, at 8-9 (a true and accurate copy of the opinion of the Wisconsin court). Here, where the overlap in disputed technology is much greater, the case for transfer under Section 1404(a) is even more compelling.

Finally, Intermec IP appears to question the ability of the North Dakota district court to handle patent cases. *See id.* While it is true that a substantial number of patent cases are handled each year by this Court, Alien submits that Intermec IP has failed to

make any a credible showing that the North Dakota court would be unqualified to preside over a patent case.

For the next public interest factor, Alien pointed out that North Dakota has far fewer cases and a faster docket, a very important factor favoring transfer. *See* Motion at 12. Admitting that each judge in this Court handles nearly three times as many cases as the judges in the North Dakota District Court, Intermec IP suggests efficiency would be improved by increasing their caseloads. Implausibly, it contends that administrative difficulty nonetheless "provides no basis for transfer." Opp. at 18-19. Contrary to Intermec IP's assertion, there is a very good reason for this case to be decided in a forum where the judges have one-third the case load. Intermec IP argues that the median time to trial in Delaware is 10.9 months, as opposed to 7.3 months in North Dakota. *See* Opp. at 19. Actually those numbers, set forth in Exhibits G and H to the Siegal Declaration (filed with Alien's moving papers), refer to the median time to *disposition* of a civil case in the two districts, rather than time to trial. The fact that North Dakota is half again faster to disposition of the median civil case indicates that trial would similarly be reached much quicker. Moreover, Intermec IP's contention that this dispute will be complex and time consuming, while likely true, cuts strongly against Intermec IP. It will be even more important to try this action in North Dakota if it is exceptionally time and resource consuming, rather than in a forum that has many more cases assigned to each judge, and requires a significantly longer time to disposition for

- 15 -

even the average case. The admitted complexity of the parties' dispute underscores the powerful public interest in transferring it to North Dakota under Section 1404(a).

### 2.    The private interest factors weigh in favor of transferring the Delaware Action

The private interest factors also support transfer under Section 1404(a), although they have somewhat less significance here than do the public interest factors. Litigating simultaneous actions would significantly burden Alien, and would strain its financial resources. *See* Motion at 13-14. Intermec IP's Opposition does not deny, or even address, that increased burden. Instead, Intermec IP attempts to establish that North Dakota would not by itself necessarily be a less expensive venue. *See* Opp. at 16-17. That ignores the point made by Alien regarding simultaneous litigation. Simply put, litigating these two overlapping actions at the same time would significantly exacerbate the burden on *everyone* – the courts, the jurors, and the parties.

By contrast, the only specific private interest factor that Intermec IP puts forward in favor of litigating this second action in Delaware (apart from its decision to file here) is the fact that both parties are incorporated in Delaware. While it is true that the state of a party's incorporation may be one legitimate consideration in choosing a venue, it is one factor among many. Here, the parties have no real connection to Delaware other than the bare fact of their incorporation in the state, and that factor is not particularly significant in the overall analysis. In *Corixa Corp v IDEC Pharmaceuticals Corp*, 2002 WL 265094, at *4 (D. Del. Feb. 25, 2002), the fact that

- 16 -

three of the parties were Delaware corporations did not prevent this Court from transferring the case, as the technology had "far-reaching implications." That is also the case here – RFIDs are used worldwide. *See also Chicago, Rock Island & Pacific Co. v. Igoe*, 220 F.2d 299, 304 (7th Cir. 1955) (plaintiff's choice of forum given less deference if few operative facts occurred in that forum).

## III.    CONCLUSION

For each of the foregoing reasons, Defendant Alien Technology Corporation respectfully requests this Court to defer ruling on this case until after a ruling by the United States District Court for the District of North Dakota rules on Plaintiff Intermec IP Corporation's motion to dismiss. At that time, it asks the Court to dismiss or stay this case. Alternatively, it requests the Court to transfer this case to the United States District Court for the District of North Dakota.

<br>

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Chad M. Shandler (#3796)
shandler@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700

Of Counsel:
Gregory P. Stone
Charles D. Siegal
Andrea Weiss Jeffries
Daniel A. Beck
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100

Dated: October 24, 2006

Attorneys for Defendant
Alien Technology Corporation

RLF1-3073599-1

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2006, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

### BY HAND DELIVERY

Jack B. Blumenfeld
Maryellen Noreika
Rodger D. Smith II
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19801

I hereby certify that on October 24, 2006, I have caused the foregoing to be sent by Federal Express to the following non-registered participants:

Carson P. Veach
Leland W. Hutchinson, Jr.
Jacob D. Koering
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606

Alyssa M. Schwartz (#4351)
schwartz@rlf.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALIEN TECHNOLOGY CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:06-cv-00051-RSW-KKK |
| | ) | |
| vs. | ) | |
| | ) | |
| INTERMEC, INC., INTERMEC | ) | |
| TECHNOLOGIES CORPORATION, and | ) | |
| INTERMEC IP CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**ALIEN TECHNOLOGY CORPORATION'S OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................................... 1

II.   STATEMENT OF FACTS ................................................................................................. 1

      A.    The Parties ............................................................................................................... 1

            1.    Plaintiff Alien ............................................................................................... 1

            2.    The Intermec Defendants ............................................................................. 2

      B.    Intermec's May 8, 2006 Earnings Conference Call .............................................. 3

      C.    Intermec's Other Statements And Actions Regarding Enforcement Of Its Patents .......... 4

            1.    Patent Assertions Made In Connection With Standard Setting ................ 4

            2.    Intermec's Repeated Attempts To License Alien ...................................... 5

            3.    Intermec's Filing and Threats of Filing RFID Patent Infringement
                  Lawsuits ........................................................................................................ 6

      D.    Procedural Posture of The Current Litigation Between Alien and Intermec ......... 6

III.  ARGUMENT ..................................................................................................................... 7

      A.    The Court Has Subject Matter Jurisdiction Over This Action Because There Is
            An Actual Controversy ........................................................................................... 7

            1.    Intermec Expressly Threatened Alien With An Infringement Suit .......... 8

            2.    Alien Had A Reasonable Apprehension Of Suit Under The Totality Of
                  The Circumstances ..................................................................................... 12

      B.    The Court Has Personal Jurisdiction Over All Of The Intermec Defendants ....... 16

            1.    ITC Is Subject To Personal Jurisdiction In North Dakota ...................... 17

                  a.    ITC Is Licensed To Do Business In North Dakota ....................... 17

                  b.    ITC Conducts A Substantial Amount Of Business In North
                        Dakota ............................................................................................. 19

            2.    Intermec, Inc. And IIP Are Subject To Personal Jurisdiction In North
                  Dakota .......................................................................................................... 22

      C.    Alien's Complaint Satisfies Rule 8 ....................................................................... 25

IV.   CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*3M Innovative Properties Co. v. InFocus Corp.,*
No. Civ. 04-0009, 2005 WL 361494 (D. Minn. 2005) ...........................................20

*Applexion S.A. v. Amalgamated Sugar Co.,*
95 C 858, 1995 WL 229049 (N.D. Ill. Apr. 17, 1995) ...........................................9

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,*
846 F.2d 731 (Fed. Cir. 1988) ...........................................8, 12

*B & J Mfg. v. Solar Indus.,*
483 F.2d 594 (8th Cir. 1973) ...........................................22

*Black & Veatch Const., Inc. v. ABB Power Generation, Inc.,*
123 F.Supp.2d 569 (D. Kan. 2000) ...........................................21

*BP Chem.,* 4 F.3d 975 (Fed. Cir. 1993) ...........................................15

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985) ...........................................17, 20

*C.R. Bard, Inc. v. Schwartz,*
716 F.2d 874 (Fed. Cir. 1983) ...........................................13, 14

*Cerner Corp. v. Visicu, Inc.,*
No. 04-1033, 2005 WL 2346987 (W.D. Mo. Sept. 26, 2005) ...........................................9

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,*
395 F.3d 1315 (Fed. Cir. 2005) ...........................................16

*Cygnus Therapeutics Sys. v. ALZA Corp.,*
92 F.3d 1153 (Fed. Cir. 1996), *overruled on other grounds,*
141 F.3d 1059 (Fed. Cir. 1998) ...........................................9, 10

*Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.,*
142 F.3d 1266 (Fed. Cir. 1998) ...........................................24, 25

*Dakcoll Inc. v. Grand Central Graphics, Inc.,*
352 F.Supp.2d 990 (D.N.D. 2005) ...........................................16

*Delta Systems, Inc. v. Indak Mfg. Corp.,*
2001 WL 103518 (Fed. Cir. 2001) ...........................................20

*DuPont Merck Pharm. Co. v. Bristol-Myers Squibb Co.,*
62 F.3d 1397 (Fed. Cir. 1995) ...........................................13

*Duratech Indus. Int'l, Inc. v. Bridgeview Mfg., Inc.,*
Case No. 3:05-CV-90-RSW (D.N.D. Apr. 21, 2006) ...........................................15

*Electronics for Imaging, Inc. v. Coyle,*
340 F.3d 1344 (Fed. Cir. 2003) ...........................................17

*EMC Corp. v. Norand Corp.,*
89 F.3d 807 (Fed. Cir. 1996) ...........................................7, 15

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Filertek, Inc. v. Medex, Inc*,
  No. 01C50034, 2002 WL 24039 (N.D. Ill. Jan. 8, 2002) ........................ 14

*Gen-Probe, Inc. v. Amoco Corp.*,
  926 F. Supp. 948 (S.D. Cal. 1996) ........................................25

*Hanson v. Denckla*,
  357 U.S. 235 (1958) .............................................................17

*Helicopteros Nacionales de Columbia, S.A. v. Hall*,
  466 U.S. 408 (1984) ........................................................17, 22

*In re Dr. Reddy's Laboratories, Ltd.*,
  No. 01 Civ. 10102, 2002 WL 31059289 (S.D.N.Y. 2002) .............13, 14

*Interdigital Tech. Corp. v. Oki Am., Inc.*,
  845 F. Supp. 276 (E.D. Pa. 1994) ..........................................25

*International Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ......................................................20, 22

*Ivoclar Vivadent, Inc. v. Hasel & ABCO Research LLC*,
  No. 02cv0316, 2003 WL 21730520 (W.D.N.Y. June 30, 2003) ...........15

*Korzyk v. Swank Entrprises, Inc,.*
  No. cv 04 343, 2005 WL 1378758 (E.D. Wash. 2005) ...................18

*Mastercard Int'l Inc. v. Lexcel Solutions, Inc.*,
  No. 03-Civ. 7157, 2004 WL 1368299 (S.D.N.Y. June 16, 2004) ..........9

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
  288 F.3d 1264 (11th Cir. 2002) ............................................23

*Metropolitan Life Ins. Co. v. Robertson-Ceco Co.*,
  84 F.3d 560 (2d Cir. 1996) ..................................................18

*Microchip Technology Inc. v. Chamberlain Group, Inc.*,
  441 F.3d 936 (Fed. Cir. 2006) ...............................................7

*Micro-Mega S.A. v. Jacklich*,
  No. 84cv2943, 1985 WL 1246 (E.D.N.Y. Jan.4, 1985) ...................13

*Nippon Electric Glass Co. v. Sheldon*,
  489 F.Supp. 119 (S.D.N.Y.1980) ...........................................12

*Northwest Territory Ltd. Partnership v. OMNI Properties, Inc.*,
  2005 WL 3132350 (D.Minn. 2005) .........................................22

*Ondeo Nalco Co. v. Eka Chems., Inc.*,
  No. Civ. A.01-337, 2002 WL 1458853 (D. Del. June 10, 2002) .........25

*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaish.*,
  57 F.3d 1053 (1995) .........................................................12

*Scott v. Canadian Nat. Ry. Co.*,
  No. 04-4758, 2006 WL 399692 (D. Minn. 2006) .........................19

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Scott v. Mego Int'l, Inc.*,
  519 F.Supp. 1118 (D. Minn. 1981) ..............................................22, 23, 24

*Sigma Tau Industrie Farmaceutichue Riunite S.P.A. v. Lonza, Ltd.*,
  36 F.Supp.2d 26 (D.D.C. 1999) ....................................................14

*Soma Medical Intern. v. Standard Chartered Bank*,
  196 F.3d 1292 (10th Cir. 1999)......................................................22

*Stairmaster Sports/Medical Prods., Inc. v. Pacific Fitness Corp.*,
  916 F. Supp. 1049 (W.D. Wash. 1994) ..........................................20

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)........................................................................10

*Super Products Corp. v. D.P. Way Corp.*,
  546 F.2d 748 (7th Cir. 1976)..........................................................10

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*,
  57 F.3d 1054 (Fed. Cir. 1995).........................................................16

*Technical Concepts, L.P. v. Zurn Industries, Inc.*,
  No. 0262827, 2002 WL 31027962 (N.D. Ill. 2002) ........................15

*Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*,
  395 F.3d 1324 (Fed. Cir. 2005)......................................................10

*West Interactive Corp. v. First Data Resources, Inc.*,
  972 F.2d 1295 (Fed. Cir. 1992).......................................................13

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ......................................................................17

**State Cases**

*Ensign v. Bank of Baker*,
  676 N.W.2d 786 (N.D. 2004) .........................................................20

**Other Authorities**

28 U.S.C. § 1391(b)-(c)........................................................................25

Declaratory Judgment Act, 28 U.S.C. § 2201(a) .....................................7

**Federal Rules**

Federal Rule of Civil Procedure 30(b)(6)......................................3, 7, 20, 24

Federal Rule of Civil Procedure 8 ............................................................1, 25

**Other Authorities**

Donald S. Chisum, *Patents* § 21.02.........................................................12

## I.    INTRODUCTION

In June 2006, plaintiff Alien Technology Corporation ("Alien") filed this action against

defendants Intermec, Inc., Intermec Technologies Corporation, and Intermec IP Corporation (collectively

"Intermec") seeking a declaration that ten of Intermec's patents related to radio frequency identification

("RFID") technology are invalid and not infringed by any Alien product. Intermec has moved to dismiss

on three grounds: (i) the Court lacks subject matter jurisdiction because Alien did not have a reasonable

apprehension of suit when it filed this action; (ii) the Court lacks personal jurisdiction over all of the

Intermec defendants; and (iii) Alien's complaint does not comply with Federal Rule of Civil Procedure 8.

As shown below, each of Intermec's arguments is without merit. Intermec's position is nothing

more than a ruse by Intermec to litigate this dispute in a forum which it believes will be more favorable to

it – the District of Delaware – and less favorable to Alien, which has a significant presence in North

Dakota through its manufacturing facility in Fargo. Indeed, just weeks after Alien filed this action,

Intermec filed suit in Delaware asserting six of the same patents at issue here, plus four other closely

related patents.[1] Accordingly, the Court should reject Intermec's arguments and deny its motion to

dismiss.

## II.    STATEMENT OF FACTS

### A.    The Parties

#### 1.    Plaintiff Alien

Plaintiff Alien, which is incorporated in Delaware and has its principal office in California,

manufactures and sells RFID products, including tags and readers.[2] Declaration of Glenn Gengel

---

[1] Alien has moved to dismiss the Delaware action or to transfer it to this Court. Declaration of Megan M. La Belle ("La Belle Decl."), ¶ 2. From its opposition to Alien's motion to dismiss in the Delaware action, it is clear that Intermec chose to sue Alien on some different patents in order to make the argument that its case was first filed, at least with respect to some patents.

[2] RFID systems typically consist of at least one "tag," which can transmit information, and a "reader," which can receive a signal from the tag that contains information. Gengel Decl., ¶ 2. The tag is placed on an object, such as a piece of merchandise. The information can identify the object to which the tag is

("Gengel Decl."), ¶¶ 2-3. Since 2004, Alien has maintained a manufacturing facility in Fargo, North

Dakota, where the allegedly infringing products are manufactured. *Id.*, ¶ 4. In addition, Alien has

invested approximately $15 million in a new manufacturing facility located in the North Dakota State

University Research and Technology Park in Fargo. *Id.*, ¶ 5, Exh. A. Over the next two years, Alien

plans to invest several million dollars to further expand the facility and intends to employ approximately

100 people, including engineers and technicians. *Id.*

     2.    The Intermec Defendants

    Intermec consists of three interrelated companies – Intermec, Inc., Intermec Technologies

Corporation ("ITC"), and Intermec IP Corporation ("IIP") – which operate together as the U.S. arm of the

Intermec companies worldwide. Declaration of Sarah A. Herman ("Herman Decl."), ¶ 5, Exh. G at 55:3-

11. Intermec, Inc., the parent company, is incorporated in Delaware and has its principal place of

business in Everett, Washington. *See* Defendants' Memorandum in Support of their Motion to Dismiss

("MTD") at 3. Intermec, Inc. is a holding company that "does not make, sell or provide any product,

system or service." *Id.* at 13.

    ITC, a wholly-owned subsidiary of Intermec, Inc., is the operating company that manufactures

and sells RFID devices, among other products. *Id.* at 3. ITC is incorporated in Washington and, like

Intermec, Inc., is headquartered in Everett, Washington. IIP is a wholly-owned subsidiary of ITC that is

incorporated in Delaware and has its principal office in Henderson, Nevada. *Id.* IIP owns the patents at

issue in the instant action. *Id.*

    Although the three Intermec defendants are separately incorporated, they effectively operate as

one company. For example, the Intermec defendants share many of the same officers and directors. La

Belle Decl., ¶ 9, Exh. D. Moreover, although ITC manufactures and sells products covered by patents

owned by IIP, there is no license agreement between the companies. Herman Decl., ¶ 5, Exh. G at 58:20-

---

affixed. RFID devices may be used for inventory control, to identify animals, for credit cards or drivers'
licenses, or a myriad other uses. *Id.*

59:24, 66:22-68:7. Indeed, ITC and Intermec, Inc. have made numerous public statements about licensing and enforcing patents, even though the patents are actually owned by IIP. Declaration of David Aaron ("Aaron Decl."), Exhs. A, C-Q. In this litigation, each of the Rule 30(b)(6) witnesses offered to date has testified on behalf of all three Intermec defendants. Herman Decl., ¶ 5, Exhs. E-G. Finally, the three companies issue consolidated financial statements, summaries of operation, and statements of income, and they file consolidated tax returns. *Id.*, ¶ 5, Exh. G at 36:16-37:2.

**B.    Intermec's May 8, 2006 Earnings Conference Call**

On May 8, 2006, Intermec held its first quarter earnings release conference call with the public and investment analysts. Aaron Decl., ¶¶ 2, 3, Exh. A. Four representatives of Intermec were present on the call, including Steve Winter, a Senior Vice President of Intermec, Inc. and the President and Chief Operating Officer of ITC. During the question and answer portion of the call, an analyst asked:

> One question on RFID and royalty revenues on a go-forward basis. You have a number of non-licensed companies out there selling products, some of which are winning large size contracts. How long can you wait before needing to step in and enforce the Rapid Start program?

Mr. Winter responded as follows:

> Let me take the first part first, which had to do with enforcement of IP rights. [¶] It's obviously disappointing if any customer were to do business with a supplier that is not licensed. But you know, we have consistently stated we will be pursuing infringers. We are putting together cases. We are looking at those who are most disruptive to the industry right now. And basically, preparations are underway with respect to unlicensed suppliers like Alien and others. And we expect those enforcement actions by the end of the year, or within this year.

*Id.* at 12.

Shortly after learning of this statement by Mr. Winter, Alien filed the instant lawsuit. When it did, Intermec confirmed that Alien had rightly understood its May 8 statement as a threat. Intermec said:

> Today's action by Alien Technology is not unexpected. We continue to believe, as we stated during our last quarterly conference call on May 8, that Alien, among others, makes and sells products that infringe Intermec RFID patents. We have consistently said we will pursue those companies that infringe our intellectual property patent estate. We continue our due diligence related to these matters.

Aaron Decl., ¶ 5, Exh. B.

C.   **Intermec's Other Statements And Actions Regarding Enforcement Of Its Patents**

1.   Patent Assertions Made In Connection With Standard Setting

Many industries, including the RFID industry, have attempted to standardize their technology

through private organizations known as standard-setting organizations ("SSOs"). EPCglobal and the

International Organization for Standards ("ISO") are two SSOs involved in setting standards for RFID

devices. Aaron Decl., ¶¶ 8, 14. To participate in EPCglobal and ISO, members must agree to disclose

certain of their patent claims – those that are both believed to be "necessary" to implement the standards

under development and for which they intend to pursue royalties (as opposed to allowing use of the

patented technology on a royalty free basis). *Id.*, ¶ 8, fn. 2. To the extent a member intends to pursue

royalties on its "necessary" patent claims, both EPCglobal and ISO require members to offer licenses on

reasonable and non-discriminatory ("RAND") terms. *Id.*

In the 2004-2005 time frame, Intermec declared to EPCglobal and ISO its intent to enforce on

RAND terms a total of eleven issued U.S. Patents against implementers of the standard(s).[3] *Id.*, ¶¶ 8-10,

14.[4] Months after Intermec submitted its final EPCglobal declaration on August 9, 2004, EPCglobal's

outside counsel, the law firm of Dann Dorfman Herrell and Skillman, determined that Intermec's patents

were not necessary to practice the standards for which they were declared. In response, Intermec

"[withdrew] its previous commitment to license this intellectual property and to do so on RAND terms."

*Id.*, ¶ 11, Exh. I. Further, Intermec issued a publication asserting that, despite the assessment by

EPCglobal that its patents were not "absolutely required," any product made in accordance with the

---

[3] These patents are: U.S. Patent No. 4,739,328 ("the '328 patent"); U.S. Patent No. 5,030,807 ("the '807 patent"); U.S. Patent No. 5,777,561 ("the '561 patent"); U.S. Patent No. 5,828,693 ("the '693 patent"); U.S. Patent No. 5,850,181 ("the '181 patent"); U.S. Patent No. 5,912,632 patent ("the '632 patent"); U.S. Patent No. 5,995,019 ("the '019 patent"); U.S. Patent No. 6,429,775 ("the '775 patent"); U.S. Patent No. 6,288,629 ("the '629 patent"); U.S. Patent No. 6,812,841 ("the '841 patent"); and U.S. Patent No. 6,400,274 ("the '274 patent"). Aaron Decl., at 3-4, fn. 4, 6 and 7, fn.9.

[4] Alien's Complaint seeks declaratory judgments of invalidity and non-infringement of all of the patents listed in footnote 3, with the exception of the '328 patent which expired in July 2006.

standard without using its patents would be a "bare bones" product, devoid of "the features, functionality, reliability or cost profile customers are demanding." *Id*, ¶ 12, Exh. J at 2, 3-4, 6. In other words, Intermec contended that desirable features and/or functionality for RFID products could only be attained by using Intermec's patented technology. *Id*, ¶ 12; *see, e.g.*, Exh. J at 6 ("Every firm that wants to succeed in the RFID space will require IP licenses from Intermec").

In that same publication, Intermec threatened to pursue patent infringement claims against vendors and/or end users, telling end users to obtain "a representation and warranty that [RFID vendors, such as Alien] have obtained the Intermec licenses required for their RFID systems and an indemnity that ensures that your vendor will defend and hold you harmless from patent infringement claims. If you can't get these assurances from the vendor [*e.g.*, Alien], then understand the risk that is being undertaken." *Id*, ¶ 13, Exh. J at 6.

### 2. Intermec's Repeated Attempts To License Alien

Consistent with its public proclamations about enforcing its patent rights against RFID manufacturers, and the need for such manufacturers to take a license from Intermec in order to produce marketable products, Intermec has made several attempts to license its patents to Alien. First, in or about May 2004, the parties discussed a possible broad business relationship that would involve cross-licenses of intellectual property. *Id*, ¶ 15. Next, in July 2004, Intermec sent Alien a letter outlining its then-current RFID intellectual property licensing program. In this letter, Intermec asserted that a license to its patents would be necessary to manufacture and sell RFID products. *Id.*, ¶ 16, Exh. M at 1. And, finally, in May 2005, Intermec announced and publicized a licensing program called "Rapid Start," through which RFID vendors, such as Alien, could sign up for a broad license to Intermec's RFID and RFID-related patents. *Id.*, ¶ 17. Intermec sent Alien a letter, specifically offering its Rapid Start program to Alien. In that letter, Intermec again contended that its patents were required to produce any marketable RFID products:

> It is the belief of most industry experts, expressed during the standards
> setting process, that a number of Intermec's patents, beyond those
> Intermec donated on a royalty free basis, will be required by RFID

-5-

> equipment manufacturers to implement the comprehensive set of
> performance requirements called out by the EPCglobal Business Action
> Group (BAG).

*Id.*, ¶ 18, Exh. P.[5] Alien has not expressed any interest in joining any of Intermec's licensing programs.
*Id.*, ¶¶ 16, 18.

> 3.    Intermec's Filing And Threats Of Filing RFID Patent Infringement Lawsuits

In the midst of the dispute with EPCglobal and its attempts to license Alien, Intermec took yet

another step in its pattern of vigorously enforcing its patents. On June 6, 2004, IIP filed a patent

infringement suit asserting infringement of four RFID patents against Symbol Technologies Inc.

("Symbol" f/k/a Matrics, Inc.) – a manufacturer of RFID products that, like Alien, had refused to enter

into a license agreement with Intermec. *Id.*, ¶ 19, Exh. Q.

Consistent with Intermec's pronouncements, on at least several occasions over the past few years,

Alien customers or potential customers have relayed to Alien incidents of Intermec representatives

accusing Alien products of infringement and threatening to sue Alien. Declaration of Victor Vega ("Vega

Decl."), ¶¶ 3-6, Exh. A. Furthermore, several news articles have been published in Korea recently

detailing Intermec's history of using strong-arm tactics with respect to its RFID patents. La Belle Decl.,

¶ 14, Exhs. H-L.

**D.    Procedural Posture Of The Current Litigation Between Alien And Intermec**

In light of this history, and, in particular, Intermec's express threat of suit during the May 8, 2006

earnings conference call, on June 1, 2006, Alien filed this declaratory relief action. By this action, Alien

is seeking declarations of non-infringement and invalidity of the ten unexpired patents Intermec has

declared as either "necessary" to practice the EPCglobal standard, or, if not "absolutely required," then at

least necessary to manufacture a product with the functions and features demanded by the RFID

marketplace. *See* Aaron Decl., ¶ 10, Exh. H; *id.*, ¶ 12, Exh. J.

---

[5] The letter further stated that "[u]pon program closure, Intermec will continue as it has to protect the
value of its intellectual property for the benefit of our shareholders, customers, employees, and licensees."
*Id.*, Exh. P.

Just weeks later, on June 29, 2006, IIP filed a patent infringement lawsuit in Delaware,

contending that Alien infringes six of the ten patents asserted in this action, plus four additional patents.[6]

La Belle Decl., ¶ 2, Exh. A. On August 18, 2006, Alien filed a Motion to Dismiss or Stay, or, in the

Alternative, Transfer the Delaware Action to North Dakota. *Id.*, ¶ 2. IIP filed its opposition on October

2, 2006. *Id.*

The same day the Delaware Action was filed, Intermec moved to dismiss the current lawsuit.

After the motion to dismiss was filed, the parties agreed to some limited discovery on the issue of

personal jurisdiction, including the production of documents and a deposition pursuant to Federal Rule of

Civil Procedure 30(b)(6).[7] La Belle Decl., ¶ 4. Jurisdictional discovery is now complete, and Alien

hereby submits its Opposition to Intermec's Motion to Dismiss.

## III.    ARGUMENT

### A.    The Court Has Subject Matter Jurisdiction Over This Action Because There Is An Actual Controversy

In order for a federal court to exercise jurisdiction over an action under the Declaratory Judgment

Act, 28 U.S.C. § 2201(a), there must be an actual controversy between the parties. *EMC Corp. v. Norand*

*Corp.*, 89 F.3d 807, 810 (Fed. Cir. 1996).[8] Where a plaintiff seeks a declaration of patent non-

infringement or invalidity, courts apply a two-part test to determine whether an actual controversy exists:

(i) plaintiff must actually produce or be prepared to produce an allegedly infringing product; and (ii) the

patentee's conduct must have created an "objectively reasonable apprehension on the part of the plaintiff

---

[6] The six patents at issue in both actions are the '561 patent, the '181 patent, the '632 patent, the '019 patent, the '274 patent, and the '841 patent. The four new patents added to the Delaware action are the U.S. Patent No. 6,371,375 ("the '375 patent"), U.S. Patent No. 5,528,222 ("the '222 patent"), U.S. Patent No. 6,286,762 ("the '762 patent"), and U.S. Patent No. 6,812,852 ("the '852 patent"). La Belle Decl., ¶ 2, Exh. A.

[7] Alien also hoped to take some discovery on the issue of subject matter jurisdiction, but Intermec opposed, and Alien ultimately acceded to that position. La Belle Decl., ¶ 4, Exh. C.

[8] Federal Circuit law governs the question "whether an actual controversy exists under the Declaratory Judgment Act when the underlying merits of an action involve patent infringement and/or validity." *Microchip Technology Inc. v. Chamberlain Group, Inc.*, 441 F.3d 936, 940 (Fed. Cir. 2006).

that the patentee will initiate suit if the activity in question continues." *Id.* at 811. Here, the first prong of

the test is satisfied because Alien produces RFID products that allegedly infringe Intermec's patents. La

Belle Decl., ¶ 2. Exh. A, ¶ 18. Intermec contends, however, that Alien cannot demonstrate a reasonable

apprehension of suit.

The "reasonable apprehension" prong of the test is satisfied by an express charge of infringement.

"If defendant has expressly charged a current activity of the plaintiff as an infringement, there is clearly

an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more."

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988). In the absence

of an express threat, the court must consider the totality of the circumstances to determine if defendant's

conduct created an objectively reasonable apprehension of suit. *Id.*

> 1.     Intermec Expressly Threatened Alien With An Infringement Suit

During the May 8, 2006 earnings call, Intermec threatened to sue Alien for patent infringement.

As set forth above, Steve Winter, a Senior Vice President of Intermec, Inc. and the President and COO of

ITC, stated the following in response to an analyst's question about what Intermec planned to do about

competitors that had not joined its Rapid Start licensing program:

> It's obviously disappointing if any customer were to do business with a
> supplier that is not licensed. But you know, we have consistently stated
> *we will be pursuing infringers. We are putting together cases.* We are
> looking at those who are most disruptive to the industry right now. *And
> basically, preparations are underway with respect to unlicensed
> suppliers like Alien and others. And we expect those enforcement
> actions by the end of the year, or within this year.*

Aaron Decl., Exh. A (emphasis added). Thus, Intermec publicly announced that it was going to sue Alien

for patent infringement no later than December 2006.

On its face, Mr. Winter's statement that Intermec is "pursuing infringers," "putting together

cases," and preparing to bring actions against "unlicensed suppliers like Alien" "by the end of the year,"

constitutes an express charge of infringement that created in Alien a reasonable apprehension of suit.

This is confirmed by the case law, which makes clear that the reasonable apprehension test is satisfied by

statements much less direct than Mr. Winter's. *See Arrowhead*, 846 F.2d at 733, 737 (finding actual

controversy based on patent holder's letter to Arrowhead's customer stating that Arrowhead "is not licensed to use our process and we would therefore consider any use a direct patent infringement" because "by citing Arrowhead and only Arrowhead, and saying Arrowhead is not licensed, [the letter] produced an apprehension of litigation"); *Cerner Corp. v. Visicu, Inc.*, No. 04-1033, 2005 WL 2346987, *7 (W.D. Mo. Sept. 26, 2005) (statement that patent holder "intends 'to protect its interests' by 'actively policing the market' and 'aggressively pursuing infringers'" is sufficient to create objectively reasonable apprehension of suit); *Mastercard Int'l Inc. v. Lexcel Solutions, Inc*, No. 03-Civ. 7157, 2004 WL 1368299, *1, 4 (S.D.N.Y. June 16, 2004) (finding an express charge of infringement where defendant warned "that it may pursue a patent infringement suit against MasterCard for past or future conduct, and cite[d] to 'powerful evidence' of its patents' validity"); *Applexion S.A. v. Amalgamated Sugar Co*, 95 C 858, 1995 WL 229049, *1 (N.D. Ill. Apr. 17, 1995) (holding that Amalgamated's statement that it "has reason to suspect that the Applexion process infringes Amalgamated's patent" was an express charge of infringement).

Notwithstanding this clear and controlling case law, Intermec relies on *Cygnus Therapeutics Sys. v. ALZA Corp*, 92 F.3d 1153 (Fed. Cir. 1996), *overruled on other grounds*, 141 F.3d 1059 (Fed. Cir. 1998), to argue that Mr. Winter's statement was insufficient to give rise to reasonable apprehension of suit. MTD at 8-9. However, far from presenting a "remarkably similar situation," MTD at 8, *Cygnus* is inapposite.

As here, in *Cygnus*, the statement at issue was one made at an investor conference. However, unlike here, the statement at issue did not mention "putting together cases" in "pursu[it] [of] infringers." Nor did it specifically identify an accused infringer and indicate that preparations to file suit were underway against that accused infringer. It did not come close. All that occurred in *Cygnus* was a prediction by the CEO (Mr. Gerstel) that competitors would not enter the market with infringing products, because the patents had been proven to be strong:

> They won't market the products because we're not going to give them
> licenses and the patents are valid. In many cases, they've already been
> challenged and have been upheld. And our policy will be that we have

> spent a great deal of money developing this technology and we have a
> very strong proprietary position.

*Id.* at 1156. This statement is nothing more than a comment on the strength of the company's intellectual

property. Indeed, as the *Cygnus* court concluded, "[i]t is difficult to imagine a businessman in Mr.

Gerstel's position – when asked about his company's policy with respect to enforcement of its patents at a

meeting attended by institutional investors – responding any differently than Mr. Gerstel did to the

question from the audience." *Id.* at 1160.

Intermec crossed that line. Mr. Winter did not merely say that Intermec's patent portfolio is

strong, or even that he would expect "unlicensed suppliers, like Alien" to take licenses due to that

strength. Rather, he made a direct and unambiguous statement about initiating patent litigation against

"unlicensed suppliers, like Alien." Thus, contrary to Intermec's assertions, *Cygnus* does not stand for the

broad proposition that "statements of a patentee, reassuring investors that it will enforce its patent

portfolio, cannot give rise to a reasonable apprehension of suit on the part of an unlicensed company."

MTD at 8. *Cygnus* simply held that Mr. Gerstel's statement, which was very different than Mr. Winter's

statement, was not sufficient to create a reasonable apprehension of suit. *Cygnus*, 92 F.3d at 1160. *Cf.*

*Super Products Corp. v. D.P. Way Corp.*, 546 F.2d 748 (7th Cir. 1976) (finding a reasonable apprehension

of suit based on defendant's announcement to prospective investors that it was determined to defend its

patent rights).

Intermec also asserts that Mr. Winter's statement is insufficient to create a reasonable

apprehension because, at best, it referenced Intermec's Rule 11 investigation of a lawsuit against Alien,

not a lawsuit to be filed immediately. MTD at 7-8. This argument, too, lacks merit.

First, while it is true that the risk of an infringement suit must be "imminent," that does not mean

that Intermec had to be "on the verge of filing a patent-infringement action against Alien." *Id.* Rather, as

the Federal Circuit recently explained, "[t]his requirement of imminence reflects the Article III mandate

that the injury in fact be 'concrete,' and 'actual or imminent, not conjectural or hypothetical.'" *Teva*

*Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir. 2005) (quoting *Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). Here, the "injury" to Intermec's patent rights

certainly was not conjectural or hypothetical – Intermec had made it crystal clear that Alien was an

"unlicensed supplier" against whom it was preparing to seek recovery of its patent damages by way of a

patent infringement lawsuit. Indeed, even before Intermec expressly threatened to sue Alien during the

May 2006 earnings call, its conduct demonstrated that an actual controversy existed between the parties.

For example, as discussed above, and in greater detail below, Intermec had (i) repeatedly taken the

position that RFID devices could not be marketed without using the ten patents at issue in this case; (ii)

repeatedly offered Alien a license of those and other of its patents; (iii) threatened Alien's customers with

lawsuits for patent infringement; and (iv) sued another RFID manufacturer for patent infringement. *See*

*generally*, Aaron Decl.; Vega Decl., ¶¶ 3-6, Exh. A. Thus, under the standard articulated in *Teva*,

Intermec's actions clearly satisfied the imminence requirement.

      Second, Mr. Winter's statement made during the May 8 call is properly understood as a direct

threat to file suit against Alien. Indeed, when it was not yet concerned with trying to move this action out

of North Dakota, Intermec admitted as much. Hours after Alien filed this lawsuit, Intermec released the

following statement to the press:

> Today's action by Alien Technology is not unexpected. We continue to
> believe, *as we stated during our last quarterly conference call on May
> 8*, that Alien, among others, makes and sells products that infringe
> Intermec RFID patents.

Aaron Decl., Exh. B (emphasis added). In other words, Intermec confirmed that, during the May 8

earnings call, it had accused Alien of *actual* infringement and not merely *potential* infringement as it now

claims.

      Third, Intermec's assertion that an infringement suit was not imminent is belied by the fact that,

four weeks after Alien filed this declaratory relief action, IIP sued Alien for patent infringement. La Belle

Decl., ¶ 2, Exh. A. Intermec's proposition – *i.e.*, that on June 1 Intermec had no intention of suing Alien,

but by June 29 it had examined its extensive patent portfolio of over 140 patents to select the patents it

might pursue against Alien, obtained Alien's products, conducted a full examination of those products to

determine which patents to pursue, and prepared an infringement analysis of Alien's products against (at least ten) of its patents – defies logic

For these reasons, the Court should find that Mr. Winter's statements during the May 8, 2006 earnings call constituted an express charge of infringement sufficient to create in Alien a reasonable apprehension of suit.[9]

       2.    <u>Alien Had A Reasonable Apprehension Of Suit Under The Totality Of The Circumstances</u>

Even if Mr. Winter's statement is not considered an express charge of infringement, under the totality of the circumstances, Intermec's conduct created an objectively reasonable apprehension of suit. Courts must evaluate the totality of the circumstances because a party "should not be subject to manipulation by a patentee who uses careful phrases in order to avoid explicit threats." *Phillips Plastics Corp v. Kato Hatsujou Kabushiki Kaish*, 57 F.3d 1053 (1995). Some of the factors courts consider are: (1) general announcements to the industry in trade papers; (2) threats or statements to customers; (3) suits against customers; (4) suits against others (*i.e.*, competitors) involving the same patents; (5) a history of litigation between the parties; (6) an opinion by counsel for the patent owner; (7) assertions made during license negotiations; and (8) suits abroad on analogous foreign patents. *See* Donald S. Chisum, *Patents* § 21.02. Several of these factors are present in this case.

First, Intermec made statements in connection with EPCglobal and ISO that gave rise to a reasonable apprehension of suit. As discussed above, Intermec declared a number of patents as necessary to implement the standard, meaning anyone that manufactured RFID products implementing the standard would be infringing several Intermec patents. Aaron Decl., ¶¶ 8-10. Moreover, even after EPCglobal's

---

[9] Intermec suggests that a reasonable apprehension of suit cannot be based on the statements during the May 8 earnings call because Alien failed to show "any contact between it and any of the Intermec Defendants regarding the patents-in-suit." MTD at 9. It is axiomatic, however, that "a reasonable apprehension may be found in the absence of *any* communication from defendant to plaintiff." *Arrowhead*, 846 F.2d at 736 (emphasis in original); *see also Nippon Electric Glass Co. v. Sheldon*, 489 F.Supp. 119, 121 (S.D.N.Y.1980) ("The accusation [of infringement] need not be made directly to the declaratory judgment plaintiff, but may be made to its customers or the industry at large.").

outside counsel determined that the patents were not in fact necessary, Intermec continued to claim that

its intellectual property was required to manufacture "marketable" RFID products, *i.e.*, products with the

features and functionality that customers desire. *Id*, ¶¶ 11-12. To that end, Intermec warned end users

that they should obtain "a representation and warranty that [RFID vendors, such as Alien] have obtained

the Intermec licenses required for their RFID systems and an indemnity that ensures that your vendor will

defend and hold you harmless from patent infringement claims. *If you can't get these assurances from*

*the vendor [e.g., Alien], then understand the risk that is being undertaken.*" *Id*, ¶ 13, Exh. J. at 6

(emphasis added).

Where, as here, the defendant has threatened the entire industry, courts find that a reasonable

apprehension of suit exists. As explained in *In re Dr. Reddy's Laboratories, Ltd.*:

> It is true that the comments made by aaiPharma regarding potential
> infringement suits were directed at generic omeprazole manufacturers as
> a whole and not DRL specifically. For purposes of DRL's reasonable
> apprehension that it would be subject to an infringement suit, however,
> this is a distinction without a difference: *threats of infringement suits*
> *against an entire product industry can create reasonable apprehension*
> *among all individual members of that industry.*

No. 01 Civ. 10102, 2002 WL 31059289, *7 (S.D.N.Y. 2002) (emphasis added); *see also DuPont Merck*

*Pharm. Co. v. Bristol-Myers Squibb Co.*, 62 F.3d 1397, 1401 (Fed. Cir. 1995) (finding reasonable

apprehension based in part on defendant's threat to bring patent infringement suits against generic drug

manufacturers who attempt to market their products during the twenty-year period after the patent was

first filed); *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 n6 (Fed. Cir. 1983) (listing notice of

infringement in trade journals as a factor in favor of finding a reasonable apprehension of suit); *Micro-*

*Mega S.A. v. Jacklich*, No. 84cv2943, 1985 WL 1246, at *3 (E.D.N.Y. Jan.4, 1985) ("For example, if the

patentee has threatened to sue for infringement the plaintiff's customers or warned the industry to which

plaintiff belongs of patentee's rights, both situations have been held to be sufficient.").

Second, in June 2004, IIP filed a patent infringement suit against another RFID manufacturer for

infringement of, *inter alia*, the '632 patent and '019 patent, both of which are at issue in this case. Aaron

Decl., ¶ 19, Exh. Q. It is well settled that suits against competitors involving the same or related patents

weigh in favor of finding a reasonable apprehension. *See, e.g.*, *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1298 (Fed. Cir. 1992) ("[A] patent owner's willingness and capacity to enforce its patent rights is pertinent to the inquiry for an actual controversy."); *C.R. Bard*, 716 F.2d at 881 n.6 (including "lawsuits against other manufacturers of similar products" as factor in finding a reasonable apprehension of infringement); *Filertek, Inc. v. Medex, Inc.*, No. 01C50034, 2002 WL 24039, *1 (N.D. Ill. Jan. 8, 2002) (patent holder's previous infringement suit against competitor was factor in favor of reasonable apprehension).

Third, Intermec has made statements to Alien's actual or potential customers accusing Alien products of infringement and threatening to sue Alien. Vega Decl., ¶¶ 3-6, Exh. A. This conduct, too, is the type that creates a reasonable apprehension of suit. *C.R. Bard*, 716 F.2d at 881 (stating that courts have relied on actual or threatened suits against customers in finding a reasonable apprehension of suit); *Sigma Tau Industrie Farmaceutichue Riunite S.P.A. v. Lonza, Ltd.*, 36 F.Supp.2d 26, 30 n. 5 (D.D.C. 1999) ("The threat of infringement does not have to be directed against plaintiffs specifically. It is sufficient to create a reasonable apprehension if plaintiffs' customers, or other competitors, are threatened.").

Fourth, Intermec has made statements to the press and/or public that gave rise to Alien's reasonable apprehension of suit. For example, Intermec has made several announcements to the Korean RFID industry recently about how it intends to enforce its patents, not only against allegedly infringing manufacturers like Alien, but against resellers and end users of those manufacturers' products as well. La Belle Decl., ¶ 14, Exhs. H-L. The articles explain that, in or around July 2005, Intermec sent letters to several companies in Korea trying to "persuade" them to join the Rapid Start licensing program. *Id.*, ¶ 14, Exh. K. This was understood by the RFID industry as a "gesture of intimidation." *Id.*, ¶ 14, Exh. L. Moreover, when a prominent Korean vendor of RFID systems joined Intermec's licensing program, members of the RFID community believed that "Intermec is mounting a patent offensive" and that "Intermec's exercise of its [intellectual property rights] is perhaps imminent." *Id.*, ¶ 14, Exh I. As explained above, "threats of infringement suits against an entire product industry can create reasonable

apprehension among all individual members of that industry." *Dr. Reddy's*, 2002 WL 31059289, at *7.

Fifth, Intermec's conduct in connection with its repeated attempts to get Alien to enter into a license agreement also created a reasonable apprehension of suit. In July 2004 and May 2005, Intermec tried to persuade Alien to join its licensing program by asserting that its patents were necessary to manufacture and sell RFID products. Aaron Decl., ¶¶ 16-18. In addition, Intermec warned Alien that, "[u]pon program closure, Intermec will continue as it has to protect the value of its intellectual property for the benefit of our shareholders, customers, employees, and licensees." *Id.*, Exh. P. In other words, Intermec was threatening to sue Alien if it did not join the program, which is sufficient to create a justiciable controversy. *See, e.g.*, *Norand*, 89 F.3d at 811 (reasonable apprehension exists where a patent holder threatens an infringement action if plaintiff fails to take a license); *Duratech Indus. Int'l, Inc. v. Bridgeview Mfg., Inc.*, Case No. 3:05-CV-90-RSW (D.N.D. Apr. 21, 2006) ("An objective person in Duratech's position could only conclude that Bridgeview had already decided that Duratech was infringing its patents and that Bridgeview intended to bring suit unless Duratech gave into its license demands."); *Ivoclar Vivadent, Inc. v. Hasel & ABCO Research LLC*, No. 02cv0316, 2003 WL 21730520, *4-5 (W.D.N.Y. June 30, 2003) (finding reasonable apprehension based on letter from defendant ABCO stating that "(1) several of [plaintiff's] marketed products "may infringe" ABCO patents, (2) ABCO had pursued patent infringement litigation for nearly two years against another alleged infringer...and (3) it "will be enforcing [its] patents against other infringers.").

Finally, Intermec's actions since this declaratory relief action was filed confirm that Alien had a reasonable apprehension of suit. *See Technical Concepts, L.P. v. Zurn Industries, Inc.*, No. 0262827, 2002 WL 31027962, *5 (N.D. Ill. 2002) (citing *BP Chem. Ltd v. Union Carbide Corp.*, 4 F.3d 975, 980 (Fed. Cir. 1993), for the proposition that "subsequent events can reinforce the correctness of the conclusion that an actual controversy existed"). For example, less than a month after Alien filed the instant action, Intermec sued it for patent infringement. La Belle Decl., ¶ 2, Exh. A. Perhaps even more revealing, hours after Alien's lawsuit was filed, Intermec made the following statement to the media:

> Today's action by Alien Technology *is not unexpected.* We continue to
> believe, *as we stated during our last quarterly conference call on May
> 8, that Alien, among others, makes and sells products that infringe
> Intermec RFID patents. We have consistently said we will pursue
> those companies that infringe our intellectual property patent estate.*
> We continue our due diligence related to these matters.

Aaron Decl., Exh. B (emphasis added). This statement raises many questions about Intermec's current

position that Alien had no reasonable apprehension of suit: If Intermec had not created a reasonable

expectation of suit, then why did Intermec's spokesperson say that Alien's lawsuit was "not unexpected"?

And, if Intermec admits that it said on May 8 that Alien "makes and sells products that infringe Intermec

RFID patents" and has consistently promised to pursue infringers, then how can Intermec maintain that

Alien had no reasonable apprehension of suit when it filed the complaint on June 1, 2006?

The answer to these questions is simple. There was an actual dispute between Intermec and Alien

at the time this declaratory relief action was filed, and Intermec admitted as much within hours of its

filing. Now that Intermec wants this dispute to be resolved in its forum of choice (*i.e.*, the District of

Delaware), not here in North Dakota, it is distorting history and ignoring reality. As the overwhelming

evidence shows, Intermec expressly threatened Alien during the May 8 earnings call and engaged in a

course of conduct prior and subsequent thereto that easily satisfies the reasonable apprehension test.[10]

## B.    The Court Has Personal Jurisdiction Over All Of The Intermec Defendants

The Intermec Defendants contend that they are not subject to suit in North Dakota. In order to

establish personal jurisdiction in a patent infringement case, a plaintiff must show both that the state long-

---

[10] On June 29, 2006, the day it filed this motion to dismiss and the Delaware action, Intermec sent a letter
to Alien stating that IIP "does not presently intend to file a lawsuit" against Alien with respect to the four
patents in this case that were not asserted in the Delaware action, *i.e.*, the '807, '693, '629, and '775
patents. La Belle Decl., ¶ 3, Exh. B. Presumably, the purpose of that letter was to try to eliminate Alien's
reasonable apprehension as to those four patents. It is true that "a patentee defending against an action for
a declaratory judgment of invalidity can divest the trial court of jurisdiction over the case" by filing a
covenant not to sue. *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir.
1995). In order for such a covenant to be effective, however, it must extend to all past, present, and future
acts of the alleged infringer. *Id.* Thus, Intermec's statement that it does not "presently intend" to sue
Alien on the four identified patents, does not constitute a covenant not to sue and has no impact on the
reasonable apprehension analysis.

arm statute applies and that the requirements of due process are satisfied. *See Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1319 (Fed. Cir. 2005). Under the North Dakota long-arm statute, this Court is authorized to exercise jurisdiction to the fullest extent allowed by due process. *Dakcoll Inc. v. Grand Central Graphics, Inc.*, 352 F.Supp.2d 990, 994 (D.N.D. 2005). Due process requires that there be sufficient minimum contacts between the defendant and the forum state such that the "maintenance of the suit does not offend the traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980) (internal quotations omitted).

Where, as here, plaintiff alleges that general jurisdiction exists, the Court may hear this lawsuit if Intermec has "continuous and systematic [general business] contacts" with North Dakota, even if the injuries at issue in the lawsuit do not arise out of Intermec's activities directed at the forum. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). In addition, Intermec must have purposefully availed itself of the privilege of conducting activities within North Dakota, "thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

1.    ITC Is Subject To Personal Jurisdiction In North Dakota

Intermec avers that "ITC is not subject to general jurisdiction in North Dakota because its contacts with North Dakota are, at best, random, sporadic and attenuated." MTD at 13. It bases this argument on the following: (1) ITC is not located in North Dakota; (2) it is not licensed to do business in North Dakota; (3) it has no offices or employees in North Dakota; and (4) less than $270,000 or 0.0571% of ITC's sales in 2005 were to customers in North Dakota. *Id.* at 13-14. This argument should be rejected on both legal and factual grounds.

It is well settled that a physical presence in the forum state is not required for personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."); *Electronics for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1351 (Fed. Cir. 2003).

Rather, the question is whether ITC's contacts with North Dakota are continuous and systematic such that it should reasonably anticipate being haled into court in this forum. *World-Wide Volkswagen*, 444 US. at 297. Based on the facts uncovered during discovery, the answer to that question is a resounding "yes."

### a.    ITC Is Licensed To Do Business In North Dakota

In his declaration in support of Intermec's motion to dismiss, Kenneth Cohen, a Vice President and the Treasurer of all three Intermec defendants, and one of the individuals selected by all three Intermec defendants as their corporate representative on the issue of business conducted in North Dakota, stated that ITC "does not have a license to do business in the State of North Dakota." Declaration of David S. Becker In Support of Defendants' Motion to Dismiss, Exh. B, ¶ 26. Mr. Cohen reaffirmed this statement at his 30(b)(6) deposition on September 29, 2006. Herman Decl., ¶ 5, Exh. G at 25;18-26:3. Mr. Cohen explained that the decision whether to obtain a license to transact business in a given state is within his purview, and that Intermec obtains such a license when it has a "significant nexus" with and a "presence" in the state. *Id*, ¶ 5, Exh. G at 26:4-28:20. Mr. Cohen further testified that ITC has a license to do business in about 48 of the 50 states, but not in North Dakota. *Id*, ¶ 5, Exh. G at 28:21-25.

Mr. Cohen's testimony that ITC is not licensed to do business in North Dakota is flat out wrong. On or about June 26, 2006, Alien obtained from the North Dakota Secretary of State a Certificate of Good Standing, which provides that ITC has been authorized to transact business in North Dakota since July 1, 1999. *Id*, ¶ 2, Exh. A. Mr. Cohen testified that this is the type of documentation received when a company is licensed to do business in a state. *Id*, ¶ 5, Exh. G at 26:4-12; 69:7-11; La Belle Decl., ¶ 11 Exh. F. Thus, despite Intermec's repeated assertions to the contrary, ITC is in fact licensed to do business in North Dakota and has been for the past seven years.[11] Courts have held that evidence that a defendant

---

[11] In addition, ITC filed a Foreign Corporation Application in North Dakota in 1999, which stated that ITC intended to conduct the following business in North Dakota: "Sales of machines or devices used in or related to all lawful activities incidental to data communications." Herman Decl., ¶ B, Ex. 2 at 1. Since 1999, ITC has filed a Foreign Corporation Annual Report in North Dakota every year, including in 2006. *Id*, ¶ 2, Ex. B. In those annual reports, ITC indicated that the business activities in which it was actually engaged included "development, manufacture, and sale of machines or devices used in or related to

-18-

has a license to conduct business in the forum state is a factor in favor of finding the requisite minimum

contacts. *See, e.g., Metropolitan Life Ins. Co. v. Robertson-Ceco Co.*, 84 F.3d 560, 570-71 (2d Cir.

1996); *Korzyk v. Swank Entrprises, Inc.*, No. cv 04 343, 2005 WL 1378758, *11 (E.D. Wash. 2005).

More importantly, Intermec's own witness testified that ITC only obtains such a license when it has a

"significant nexus" with and a "presence" in the forum state. Thus, based on Mr. Cohen's testimony

alone, it is clear that ITC is subject to personal jurisdiction in North Dakota. Nevertheless, as detailed

below, ITC has other significant contacts with North Dakota that make the question of personal

jurisdiction an easy one for the Court to resolve.

> b.     ITC Conducts A Substantial Amount Of Business In North Dakota

Contrary to what Intermec claims, ITC conducts a substantial amount of business in North

Dakota. Although Intermec says that less than $270,000 or 0.0571% of ITC's sales in FY 2005 were to

customers in North Dakota, that data is unreliable for several reasons. First, in maintaining that ITC made

only $270,000 in sales to North Dakota companies in 2005, Intermec relies on and cites to Mr. Cohen's

declaration. MTD at 14. During his deposition, however, Mr. Cohen admitted that he had no personal

knowledge of the basis for this figure. Herman Decl., ¶ 5, Exh. G at 30:6-33:13. According to Mr.

Cohen, he was "given the numbers" by someone, perhaps from accounting, but does not know anything

about how this number was calculated. *Id.* Because this information is not based on Mr. Cohen's

personal knowledge, it should be disregarded by the Court. Federal Rule of Evidence 602; *see also, e.g.,*

*Scott v. Canadian Nat. Ry. Co.*, No. 04-4758, 2006 WL 399692, *5 (D. Minn. 2006).

Even if the Court were to consider the $270,000 figure for FY 2005 despite its lack of evidentiary

support, that figure is not probative of ITC's actual sales in North Dakota. The $270,000 figure accounts

only for Intermec's direct sales in North Dakota, not its indirect sales. During discovery on Intermec's

motion, ITC admitted that it in sells its products in three ways: (1) direct sales; (2) indirect sales through

---

computer and data communications." *Id.* Finally, ITC has designated an agent for service of process in
North Dakota. *Id.*, ¶ 3, Exh. C.

partners or "resellers"; and (3) indirect sales through distributors. Herman Decl., ¶ 5, Exh. F at 18:19-19:9; La Belle Decl., ¶ 10, Exh. E. Moreover, Intermec admitted that at least 50% of ITC's sales are made through resellers and distributors, Herman Decl., ¶ 5, Exh. E at 75:14-21; Exh. F at 19:10-20-13, and that the invoices produced by Intermec did not reflect any sales made to North Dakota through such "indirect" channels. *Id.*, ¶ 5, Exh. F at 13:12-24:18, 32:16-33:14, 41:7-42:25; La Belle Decl., ¶ 7. Intermec's 30(b)(6) witnesses testified that ITC's resellers and distributors sell nationwide, including to North Dakota, so additional ITC products are likely present in that forum. Herman Decl., ¶ 5, Exh. F at 32:16-33:5, 37:25-38:5.[12] Thus, the $270,000 likely under-represents, potentially significantly, the sales of ITC products that have been made in North Dakota.

Third, while the defendant's percentage of sales in the forum state can be relevant to the jurisdictional analysis, the Supreme Court has rejected any rigid test for determining personal jurisdiction. *Burger King,* 471 U.S. at 478. The "criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative," rather, the Court must examine "the quality and nature of the activity." *International Shoe Co. v. Washington,* 326 U.S. 310, 159-160 (1945). Here, the invoices produced by Intermec (which, as noted above, even if the Court agrees to consider them, reflect only direct sales to North Dakota) indicate that ITC has sold goods and services to *more than 100* companies and governmental entities in North Dakota over the past five years, totaling approximately *$2.1 million*. La Belle Decl., ¶ 7; Herman Decl., ¶ 5, Exh. F at 24:19-25:9. In a state with a small population like North Dakota, that is a substantial amount of business. *See, e.g., 3M Innovative Properties Co. v. InFocus Corp.,* No. Civ. 04-0009, 2005

---

[12] In addition to the increased sales from resellers and distributors, Intermec has testified that ITC sells its products to many nationwide stores like Home Depot, WalMart, and PepsiCo. Herman Decl., ¶ 5, Exh. F at 47:13-50:17. Sales to those companies would be invoiced to the forum in which the company was headquartered even though many of the products will end up in chains in other states, like North Dakota. *Id.*, ¶ 5, Exh. F at 52:4-53:10, 85:20-86:23, 92:17-93:20, 108:12-109:25. For example, the invoices that the Intermec Defendants produced did not indicate any sales to Home Depot in North Dakota. Independent evidence reflects, however, that Home Depot stores, including the one located in Fargo, North Dakota, use ITC products. *Id.*, ¶ 5, Exh. F at 102:2-103:1; Gengel Decl., ¶ 6, Exh. B.

WL 361494, *3 (D. Minn. 2005) ("[T]he fact that the defendant's revenues from sales in the forum state

amount to only a small percentage of that defendant's total sales does not render the actual dollar amount

of the sales insignificant for personal jurisdiction purposes ") (citing *Delta Systems, Inc. v. Indak Mfg.*

*Corp.*, 2001 WL 103518, *3 (Fed. Cir. 2001)).[13]

      In addition to sales made to North Dakota companies, ITC conducts other business here as well.

In particular, in or about September 2002, ITC entered into an agreement with Microsoft Business

Solutions ("MBS"), which is headquartered in Fargo and is one of the largest companies in North Dakota.

Herman Decl., ¶ 5, Exh. E at 12: 9-13:3, 30:22-31:13; La Belle Decl., ¶ 12, Exh. G. Pursuant to that

agreement, ITC and MBS formed an "alliance" that was intended to help ITC sell its products and

services to MBS's partners and customers. Herman Decl. ¶ 5, Exh. E at 27:23-31:13; La Belle Decl.,

¶ 12, Exh. G. Intermec's website prominently displays this alliance with MBS and includes substantial

information about the various products and services offered in connection with that alliance. La Belle

Decl., ¶ 12, Exh. G. And while Intermec now contends that the alliance with MBS was unsuccessful and

is no longer being pursued, the fact is that ITC purposefully availed itself of the protections of North

Dakota by entering into a business arrangement with a significant company in that state. *See Black &*

*Veatch Const., Inc. v. ABB Power Generation, Inc.*, 123 F.Supp.2d 569, 576 (D. Kan. 2000) (holding that

defendant was subject to personal jurisdiction in Kansas in part because it entered into an agreement with

Kansas company Black & Veatch "with full knowledge that Black & Veatch has its principle place of

business in Kansas, and that it would perform a substantial amount of the contract in Kansas"). Indeed,

even today, ITC continues to broadcast the alliance with MBS on its website, presumably because of the

---

[13] The cases cited by Intermec are easily distinguished. In *Ensign v. Bank of Baker*, 676 N.W.2d 786, 791
(N.D. 2004), the court found that the defendant bank was not subject to general jurisdiction because "the
Bank occasionally loans money to North Dakota customers, it does not solicit customers in North Dakota,
and the loans are originated in Montana." Here, by contrast, Intermec regularly sells its products to the
100 or more customers it has in North Dakota. Similarly, in *Stairmaster Sports/Medical Prods., Inc. v.
Pacific Fitness Corp.*, 916 F. Supp. 1049, 1053 (W.D. Wash. 1994), the court held that defendant was not
subject to general jurisdiction because, unlike Intermec, it did not make any direct sales into the forum
state.

goodwill generated by the Microsoft brand name, or perhaps because the alliance is actually still ongoing.[14] La Belle Decl., ¶ 12, Exh. G.

Finally, the evidence also demonstrates that, over the past five years, numerous employees of ITC have traveled to North Dakota. La Belle Decl., ¶ 8; Herman Decl., ¶ 5, Exh. E at 23:24-24-16, 25:25-26:8 & Exh. F at 43:1-19. Many of these individuals made repeated trips to North Dakota where they would spend days in the forum servicing customers, nurturing customer relationships, and attempting to generate additional business. *Id.*, ¶ 5, Exh. F at 76:5-77:1, 79:6-80:1; La Belle Decl., ¶ 8. These types of contacts support a finding of personal jurisdiction. *See International Shoe*, 326 U.S. at 159; *Soma Medical Intern v. Standard Chartered Bank*, 196 F.3d 1292, 1296 (10th Cir. 1999); *Northwest Territory Ltd. Partnership v. OMNI Properties, Inc.*, 2005 WL 3132350, *4 (D. Minn. 2005).

Considering the totality of the circumstances – ITC's license to do business in North Dakota, its direct and indirect sales to North Dakota, its relationship with MBS, and its employees' multiple business trips to North Dakota – it is clear that ITC's contacts in the aggregate are the type of continuous and systematic contacts sufficient to subject it to general jurisdiction in North Dakota. *Helicopteros*, 466 U.S. at 420. Furthermore, the assertion of personal jurisdiction in this case comports with "traditional notions of fair play and substantial justice" because North Dakota "most certainly has an interest in providing a forum for a resident [Alien] who claims that a foreign corporation is attempting to prevent it from manufacturing and marketing its product." *B & J Mfg. v. Solar Indus.*, 483 F.2d 594, 598-99 (8th Cir. 1973). Accordingly, the Court should deny ITC's motion to dismiss for lack of personal jurisdiction.

2.      Intermec, Inc. And IIP Are Subject To Personal Jurisdiction In North Dakota

Intermec asserts that the Court lacks personal jurisdiction over Intermec, Inc. because it is a

---

[14] During his deposition, Intermec's witness Jeff Johnson testified that information regarding the MBS alliance was still on the website because Intermec had not updated the website recently. Herman Decl., ¶ 5, Exh. E at 15:13-16:1. However, Alien has searched the Intermec website and it appears to be updated on a regular basis. La Belle Decl., ¶ 13. By way of example, Intermec posts its quarterly SEC filings as well as recent press releases, including a press release on June 29, 2006 announcing the filing of the Delaware Action. *Id.*, ¶ 13.

holding company that "does not make, sell or provide any product, system or service to anyone, let alone residents of State of North Dakota." MTD at 13. Intermec similarly argues that IIP is not subject to personal jurisdiction in North Dakota because it does not conduct any business in this forum. *Id* at 12. However, based on ITC's contacts with North Dakota and the close relationship between the three Intermec defendants, Intermec, Inc. and IIP are both subject to jurisdiction in North Dakota as well.

With respect to Intermec, Inc., a parent corporation may subject itself to jurisdiction by virtue of its subsidiary's activities in that forum if "the companies [are organized and are] operated so that one corporation is an instrumentality or adjunct of the other corporation." *Scott v. Mego Int'l, Inc.*, 519 F.Supp. 1118, 1125-26 (D. Minn. 1981). In other words, if the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity, then the subsidiary's business will be viewed as that of the parent and the latter will be said to be doing business in the jurisdiction through the subsidiary for purposes of asserting "personal jurisdiction." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268-69 (11th Cir. 2002). In deciding whether the subsidiary is a "mere instrumentality," courts consider several factors, such as whether the companies maintain offices at the same location, share directors and officers, issue consolidated financial statements, and file consolidated tax returns. *Mego*, 519 F. Supp. at 1126.

In this case, the evidence makes clear that the Intermec defendants actually operate as one company despite their separate incorporation. Intermec, Inc. and ITC both have their headquarters in the same location in Everett, Washington, and there is significant overlap in the officers and directors of the three companies. La Belle Decl., ¶ 9, Exh. D. Mr. Cohen, for example, is the Treasurer for all three of the Intermec defendants, while Mr. Anderson is a Vice President, Controller, and Acting Chief Financial Officer of Intermec, Inc., a director and Vice President of ITC, and a director of IIP. *Id.* There is just one Intermec website (www.Intermec.com), and it identifies ITC as a "division" of Intermec, connoting a single company. Further, when one clicks on the "corporate information" or "investor information" links of the Intermec website, she is directed to a single page with information about Intermec, Inc. *Id.*, ¶¶ 12-

13. Indeed, in this case, all of the Rule 30(b)(6) witnesses offered by the defendants to date have testified on behalf of all three Intermec defendants. Herman Decl., ¶ 5, Exhs. E-G. In fact, there is so much overlap between these companies that Intermec itself appears to be confused. In their motion to dismiss, Intermec identifies Steve Winter as the President and COO of Intermec, Inc., MTD at 7, when Mr. Winter is actually the President and COO of ITC. La Belle Decl., ¶ 9, Exh. D. Moreover, Intermec posted a press release on its website announcing the lawsuit filed against Alien in Delaware, which states that the lawsuit was filed by Intermec, Inc. even though it was actually filed by IIP. *Id.*, ¶ 13.

In addition, Mr. Cohen testified that the three companies issue consolidated financials, summaries of operations, and statements of income, and they file consolidated tax returns. Herman Decl., ¶ 5, Exh. G at 36:16-37:2. He further testified that, although ITC manufactures and sells products covered by IIP's patents, ITC does not need to have (and thus, does not have) any licenses from IIP because the companies are "related." *Id.*, ¶ 5, Exh. G at 58:20-59:24, 66:22-68:7. Indeed, there are many examples in the record where Intermec, Inc. or ITC discuss RFID patents, offer to license those patents, and threaten to enforce patent rights even though IIP is the only entity of the three that has any ownership rights with respect to the patents. Aaron Decl., Exhs. A, C-Q. Moreover, there are instances when representatives of Intermec, Inc. talk about products and services, for example during the May 8 earnings call, even though Intermec, Inc. is a holding company that does not manufacture or sell any products. Aaron Decl., Exh. A. In short, because of the nature of the relationship among the Intermec defendants, the parent Intermec, Inc., is subject to personal jurisdiction in North Dakota based on the activities of its wholly-owned subsidiary in that forum. *See Mego*, 519 F. Supp. at 1126.

IIP, a wholly-owned subsidiary of ITC that owns the patents in suit, is subject to personal jurisdiction in North Dakota under *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1271 (Fed. Cir. 1998). In that case, plaintiff Dainippon filed a declaratory relief action against defendants CMF Technologies, Inc. ("CMF") and CMFT, Inc. ("CMFT"). CMF was the operating company and a competitor of Dainippon, while CMFT was a wholly-owned subsidiary of CMF and the owner of the patents at issue. *Id.* at 1267. Like here, the CMF defendants moved to dismiss for lack of personal

- 24-

jurisdiction. The district court found that CMF was subject to jurisdiction but that CMFT was not, and then dismissed the entire action because CFMT, as the owner of the patents, was a necessary and indispensable party. *Id.* at 1266.

The Federal Circuit reversed and held that, based on the parent-subsidiary relationship between CFM and CFMT, it was "reasonable and fair" to subject CFMT to personal jurisdiction. The court explained:

> Stripped to its essentials, CFM contends that a parent company can incorporate a holding company in another state, transfer its patents to the holding company, arrange to have those patents licensed back to itself by virtue of its complete control over the holding company, and threaten its competitors with infringement without fear of being a declaratory judgment defendant, save perhaps in the state of incorporation of the holding company. This argument qualifies for one of our "chutzpah" awards. While a patent holding subsidiary is a legitimate creature and may provide certain business advantages, it cannot fairly be used to insulate patent owners from defending declaratory judgment actions in those fora where its parent company operates under the patent and engages in activities sufficient to create personal jurisdiction and declaratory judgment jurisdiction.

*Id.* at 1271. [internal citations omitted.] For these reasons, IIP is subject to personal jurisdiction in North Dakota too.[15]

### C.   Alien's Complaint Satisfies Rule 8

Intermec's final argument is that the complaint should be dismissed because Alien failed to satisfy Federal Rule of Civil Procedure 8 by not "identify[ing] specific products that are non-infringing." MTD at 15-16. Under Rule 8, however, "[p]laintiff need not identify, in the complaint, specific products by name, so long as they are sufficiently identified in some way." *Interdigital Tech. Corp. v. Oki Am., Inc.*, 845 F. Supp. 276, 283 (E.D. Pa. 1994). Here, Alien identified the non-infringing products as its "RFID tags and readers." *See, e.g.*, First Amended Complaint, ¶ 21. This is sufficient to put Intermec on notice of the products at issue. Indeed, in the Delaware action filed less than a month after the instant

---

[15] Because all of the Intermec Defendants are subject to personal jurisdiction in North Dakota, venue is also proper in this district. 28 U.S.C. § 1391(b)-(c).

suit, Intermec was able to identify specific Alien products it believes are infringing. La Belle Decl., ¶ 2,

Exh. A, ¶ 18. In any event, even if Alien's complaint was deficient (which it is not), the cases make clear

that any dismissal shall be with leave to amend. *See Ondeo Nalco Co. v. Eka Chems., Inc.*, No. Civ.

A 01-337, 2002 WL 1458853, *2 (D. Del. June 10, 2002); *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp.

948, 964 (S.D. Cal. 1996).

## IV.   CONCLUSION

For the foregoing reasons, Alien respectfully requests that the Court deny Intermec's motion to

dismiss on all grounds.

Respectfully Submitted,

Dated: October 13, 2006

/s/ Sarah Andrews Herman
Sarah Andrews Herman
Bar Number 03399
DORSEY & WHITNEY LLP
51 North Broadway, Suite 402
P.O. Box 1344
Fargo, ND 58107-1344
Telephone: (701) 235-6000
Fax: (701) 235-9969

and

Gregory P. Stone
Andrea Weiss Jeffries
Megan M. La Belle
MUNGER TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Fax: (213) 687-3701

ATTORNEYS FOR PLAINTIFF ALIEN
TECHNOLOGY CORPORATION

# EXHIBIT B

10

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SYMBOL TECHNOLOGIES, INC.,

        Plaintiff,

v.

INTERMEC TECHNOLOGIES CORP.,

        Defendant.

Case No. 05-C-0256-C

**JURY TRIAL DEMANDED**

---

### DEFENDANT INTERMEC TECHNOLOGIES CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C., § 1404(A) (CORRECTED)

---

#### INTRODUCTION

This action is now the fourth lawsuit currently pending between plaintiff Symbol Technologies, Inc. ("Symbol") and defendant Intermec Technologies Corporation ("Intermec"). All three prior cases are pending in the District of Delaware. In one of those cases, Symbol has sued Intermec, claiming that the same products (bar code readers) accused of infringement in this case also infringe four other patents asserted there. *Symbol Technologies, Inc. v. Intermec Technology Corp.*, No. 05-146-SLR (D. Del. filed March 10, 2005) (hereinafter the "Symbol Delaware Action"). *See* Declaration of Arvin Danielson, ¶¶ 4-5 (copy attached to Intermec's § 1404(a) Motion as Exhibit A). *See also*, Complaint, ¶ 9 ("bar code readers"). Thus, transfer is warranted 28 U.S.C., § 1404(a).

Symbol's choice to attack the same product group in two infringement actions raises many common issues of fact such as how Intermec's accused products function and whether sales of those products precluded any sales of Symbol products causing lost profits. These

common questions warrant transfer and consolidation. Moreover, because Symbol is not entitled to greater recovery if it proves that Intermec's products infringed multiple claims or multiple patents than it would be if it merely proves the infringement of a single claim, the failure to consolidate this action with the Symbol Delaware Action risks inconsistent damage determinations were Symbol to succeed in proving infringement in both cases.[1]

Critically, this case, the only one filed by either party outside of Delaware, has absolutely no connection with the Western District of Wisconsin. Symbol, a Delaware corporation, is based in Holtsville, New York. Complaint, ¶ 2. The two patents in suit list inventors who, at the time of patenting, resided in New York. No document or witness having knowledge pertaining to the validity or infringement of the asserted patents appears to be located in this district. *See* Danielson Declaration, ¶ 3.

Intermec is a Washington corporation based in Everett, Washington. Declaration of Robert Rainier, ¶ 3 (copy attached to Intermec's § 1404(a) Motion as Exhibit B). Intermec has no office in this district, has never sued or been sued in Wisconsin, has attended no trade shows here and does not advertise in Wisconsin based publications. Rainier Decl., ¶¶ 6-9. Intermec employs over 2,500 employees. *Id.*, ¶ 4. Only five Intermec employees reside in Wisconsin. *Id.* ¶ 5. Only one of those resides in this district. *Id.* Virtually all of Intermec's documents relevant to its accused products and the witnesses having knowledge of those products reside outside of this district, principally in the Seattle, Washington area. *Id.*, ¶ Danielson Decl., ¶ 3.

Until recently, Intermec had an OEM purchasing agreement with Symbol under which Intermec purchased Symbol's laser scan engines for use in Intermec's bar code scanning

---

[1] Intermec, of course, denies that any of its products infringe any Symbol patent and asserts that it has a valid license from Symbol to build its products using the bar code scanning engines that Intermec purchased from Symbol. Until this defense is proven, of course, Intermec runs the risk of inconsistent results if it must defend largely the same set of accused products in two separate infringement actions. That risk warrants transfer and consolidation.

products That agreement contained a covenant which, with certain stated exceptions, precluded patent infringement suits between the two companies On June 7, 2004, Intermec IP Corp. sued Matrics, Inc.—then an independent competitor of Intermec—in the District of Delaware (cause No. 04-357-GMS) for infringing certain Intermec patents on Radio Frequency Identification or "RFID" technology. In August, 2004, Symbol agreed to acquire Matrics. Thereafter, Symbol claimed that the OEM Agreement's covenant mandated Intermec's dismissal of its patent infringement claim against the former Matrics products.

When Intermec IP Corp. refused to dismiss its infringement claims against the Matrics products, Symbol declared the OEM Agreement terminated and began aggressively suing Intermec. On March 10, 2005, Symbol filed civil action No. 05-146-SLR seeking a declaratory judgment that it had rightly terminated the OEM Agreement because of Intermec's alleged breach arising from its continuing infringement claims against the Matrics products.

On March 10, 2005, Symbol also filed the Symbol Delaware Action asserting four patents allegedly pertaining to Intermec's bar code reader products At least one of those patents claims aspects of bar code reading technology as an element of the claimed invention. Intermec counterclaimed for patent infringement in that action, asserting six of its own patents against Symbol At least one of Intermec's counterclaim patents also involves bar code readers

Thus, transfer of this action for convenience to the District of Delaware under 1404(a) is warranted, for multiple reasons First, no material connection to this district exists. Second, this action raises common questions of law and fact with the Symbol Delaware Action Third, judicial economy warrants transfer of this action for consolidation with the related and earlier filed Symbol Delaware Action

3

Alternatively, transfer of this action for convenience of the parties and witnesses to the District of Washington, where Intermec is headquartered, is also warranted

## ARGUMENT

**I.    TRANSFER OF THIS ACTION TO DELAWARE IS COMPELLED BOTH BY THE CONVENIENCE OF THE PARTIES AND BY JUDICIAL ECONOMY.**

A motion to transfer venue is governed by 28 U.S.C. § 1404(a), which provides: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." There is no question that this action might have been brought in the District of Delaware (where the other actions between these parties are already pending) or in the District of Washington (where Intermec is located). In deciding a motion to transfer venue for convenience, this Court must consider all of the relevant circumstances using the three statutory factors as placeholders. *Coffey v. Van Doren Iron Works*, 796 F.2d 217, 219 n.3 (7th Cir. 1986) (three statutory factors: convenience of parties, convenience of witnesses and interests of justice). In this case, each of the factors warrants transfer of this action to the District of Delaware, or, at minimum, a transfer to the District of Washington

First, no material events relevant to this case occurred in Wisconsin. The inventions claimed in the patents in suit were not created or developed here. The accused products were not designed and are not manufactured here. Danielson Decl., ¶¶ 6-7. These products are sold nationally. *Id.* No particular concentration of sales suggests that this District offers any advantage in access to relevant proof

Where the forum chosen is not the site of material events, the plaintiff's choice is entitled to no special weight or deference. *United States v. Payne and Dolan, Inc.*, 2003 WL 23185881 at *3 (W.D.Wis.) (plaintiff's choice "will not receive deference" absent material events);

4

*Castleberg v Covenant Healthcare, L L C*, 2002 WL 32345613 at *2 (W D.Wis ) In fact, the absence of material events occurring within this District weighs in favor of transfer. *Liberty Mutual Fire Inc Co v The Nordic Group of Companies, Ltd*, 2001 WL 34382016 at *7 (W D Wis ) ("Other than the fact that the original policy was issued and delivered in Wisconsin. no events, material or otherwise, took place in Wisconsin. This factor weighs in favor of transferring venue")

The geographic convenience of the parties and of the witnesses both favor transfer Intermec is not aware of any potential witness who resides in this district or in the State of Wisconsin or any relevant documents which are located here. *See* Danielson Decl., ¶ 3  This case presents no question of Wisconsin law. Delaware is far closer to Symbol's New York headquarters, witnesses and documents than is Wisconsin

Second, and more critically, litigating these infringement claims in Delaware is the only way to preserve the interests of justice  Symbol's tactic of attempting to gain leverage over Intermec by splitting its patent portfolio into multiple attacks on the same group of Intermec products filed in separate actions in different districts is wholly unfair and inappropriate. It is well recognized that "related litigation should be transferred to a forum where consolidation is feasible." *Coffey*, 796 F 2d at 221.

Consolidation is governed by Rule 42(a), F R Civ P [2]  That rule only requires a common question of law or fact for cases to be consolidated  "Common questions of law and fact do not have to predominate" for consolidation to be warranted. *Saudi Basic Industries Corp v Exxonmobile Corp*, 194 F Supp 2d 378, 416 (D N J. 2002) (*quoting* 8 MOORE'S FEDERAL

---

[2] Under Rule 42(a), of course, a prerequisite for consolidation is that the cases be pending in the same court  Thus, it is for the transferee court to decide whether consolidation is actually warranted  Intermec argues here only that consolidation is sufficiently feasible to warrant transfer for judicial economy under 28 U S C., § 1404(a). *See Coffey*, 796 F 2d at 221 (related actions should be transferred for consolidation)

PRACTICE, § 42.10 at 42-8). Actions "involving the same parties are apt candidates for consolidation." *Hanes Companies, Inc. v. Ronson*, 712 F.Supp. 1223, 1230 (M.D. N.C. 1988) (*quoting* C. Wright and A. Miller, FEDERAL PRACTICE AND PROCEDURE, § 2384, p. 263 (1971)). "Consolidation of tort actions sharing common questions of law and fact is commonplace." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990).[3]

Courts have consolidated patent infringement cases involving different but related patents even when the defendants are different. *Cedars-Sinai Medical Center v. Revlon, Inc.*, 111 F.R.D. 24 (D. Del. 1986). In *Cedars-Sinai*, the court ordered consolidation to avoid inconsistent results:

> Where a jury is the trier of fact on common issues of fact, it should be the *sole* determiner of those issues. Only consolidation, before a single jury, at least on the issues of validity, enforceability and infringement, would protect the plaintiff's constitutional rights.

*Cedars-Sinai*, 111 F.R.D. at 32 (emphasis original). In this instance, consolidation is warranted both by the economy of deciding common issues only once and to avoid subjecting Intermec to the risk of inconsistent results. Because Intermec products accused in this Court are also accused in the Symbol Delaware Action, judicial economy is served by having only one determination of how those products—bar code readers—technically function.

The Delaware court is already well familiar with the basic technology claimed in the patents which are asserted by Symbol in the Symbol Delaware Action. Symbol just concluded an infringement claim under the same patents against another company. *Symbol Technologies. Inc. v. Proxim, Inc.*, 1:01-CV-00801-SLR. When Symbol filed the Symbol Delaware Action, it designated that case as "related" to the *Proxim* litigation, causing the infringement claim against Intermec to be assigned to the same judge.

---

[3] The infringement of a patent, of course, is a tortuous act.

Where the patents in two cases involve the same general technology, "consolidating the parties' dispute in front of one judge would reduce the need for duplicative time consuming tutorials ..." *Broadcom Corp. v Agere Systems, Inc.*, 2004 WL 1176168 at *1 (W.D.Wis.); *Broadcom Corp. v Microtune, Inc.*, 2004 WL 503942 at *4 (W.D.Wis.) (case transferred to a district "familiar with the general silicon-based tuner technology" at issue). Although there are a total of twelve patents asserted in the two cases (two by Symbol here; four by Symbol in its Delaware complaint and six by Intermec in its Delaware counterclaim) claiming many separate inventions involving several different technologies, there are sufficient technical similarities between this case and several of the patents in suit in Delaware to warrant transfer to avoid the necessity to educate two federal judges in basically the same technology.

The patents in this case address certain aspects of bar code reading and decoding technology. The Abstract of U.S. Patent No. 5,243,655 (asserted by Symbol in this case) states that the claimed invention relates to "[a] system for representing and recognizing data in machine readable graphic image form . ." The Abstract of U.S. Patent No. 5,457,308 (also asserted by Symbol in this case) states that it relates to "[a] method for combining decoded scan fragments" of a bar code to permit the code to be read from the fragments.

U.S. Patent No. 5,892,971 (asserted by Intermec in Delaware) claims a portable battery-powered hand-held data processing device incorporating "an indicia reader input system" in combination with other elements. Claim 1, '971 Patent. One "indicia reader" disclosed in the '971 Patent is a bar code reader. *See* '971 Patent, Col. 23, Lns. 29-35. Because of the "all elements" rule of patent cases, it will be necessary to determine whether Symbol's products involve "an indicia reader input system" of the type claimed by Intermec in the '971 Patent. *See RF Delaware, Inc. v Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1266 (Fed. Cir. 2003)

7

("there can be no infringement ... if even one limitation of a claim or its equivalent is not present"). Thus, Symbol may argue in Delaware that its bar code readers are sufficiently different from the "indicia reader input system" claimed in the '971 Patent to avoid infringement on that basis. If so, the workings of bar code readers will be relevant to resolving of the Symbol Delaware Action.

U.S. Patent No. 5,157,687 (asserted by Symbol against Intermec in Delaware) claims a combination including "a hand-held bar code reader" having:

> a light source for directing light toward a bar code symbol to be read and a light
> detector responsive to reflected light from a bar code symbol to generate an
> electrical signal containing bar code data

'687 Patent, Claim 1. Again, understanding any differences between the reader claimed in the '687 Patent and other methods of reading bar codes that may be incorporated in Intermec's bar code reader products may be an important issue in resolving claims made under the '687 Patent. Although the Symbol Delaware Action also involves other patents raising other technical issues, the technical similarities described above are uncontroverted.

More importantly, however, even were this Court to determine that the patents asserted here are so different from the patents asserted in the Symbol Delaware Action that the underlying technologies have nothing material in common, transfer for consolidation would still be warranted because of common damage questions and to avoid exposing Intermec to the risk of inconsistent damage decisions. Such common questions arise whenever the same products are accused of infringing multiple patents.

Regardless whether Intermec's bar code readers infringe one claim of any one of Symbol's patents or every claim of every Symbol patent, Symbol could only be entitled to one damage award. It is well-established that damages for patent infringement do not increase with the number of claims infringed. *Square Liner 360 Degrees. Inc v. Chisum*, 1981 WL 48168.

8

215 U.S.P.Q. 1110, 1119 (D. Minn. 1981) (rejecting plaintiff's argument that special verdict

omitting some claims warranted overturning damages verdict as insufficient: "Damages are not

affected by the number of claims infringed. Plaintiff's rationale is contrary to law...").

The patent owner has the right to exclude an infringing product from the market. His

damages for breach of that exclusion right are "the difference between his pecuniary condition

after the infringement, and what his condition would have been if the infringement had not

occurred." *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507

(1964). Thus, where the patent owner has multiple rights to exclude the same product from the

same market (*i.e.*, the accused product infringes more than one patent claim), the patent owner

still has the right to only one recovery:

> To allow recovery of a royalty on Aro's sales after receipt of the equivalent of a
> royalty on Ford's sales, or to allow any recovery from Aro after receipt of full
> satisfaction from Ford, would not only disregard the statutory provision for
> recovery of 'damages' only, but would be at war with virtually every policy
> consideration in this area of the law.

*Aro*, 377 U.S. at 510 (only "nominal damages" available against contributory infringer because

full recovery already received from the direct infringer).

Thus, where a single patent owner attacks a single defendant's product or group of

products with different patents in different actions—as Symbol has done here—common

questions of law and fact abound. If the damages are to be measured by lost profits, the patent

owner must prove what sales of its own products were lost because of the sales of the infringing

products. *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 653 (Fed. Cir.

1985) (patent owner must prove that he "would have made the sale of a product 'but for' the

infringement"). "This rule calls for a reconstruction of the way the market would have

developed in the absence of infringement." *Grain Processing Corp. v. American Maize Products*

*Co.*, 979 F. Supp. 1233, 1236 (N.D. Ind. 1997). Thus, no matter how many Symbol patents or

9

claims an Intermec scanner product may have infringed, Symbol cannot recover more than the profit value of its own lost own lost sales. *State Industries, Inc v Mor-Flo Industries, Inc*, 883 F.2d 1573, 1577 (Fed.Cir. 1989) (accepting *Panduit* test for lost profits which includes "the amount of profit [the patentee] would have made")

As the *Aro* Court demonstrated, the same limitation applies under a reasonable royalty analysis. 377 U.S. at 510 (no additional royalty from contributory infringer where full infringement recovery from direct infringer already received). "A reasonable royalty is generally an amount which a person desiring to manufacture and sell a patented article as a business proposition would be willing to pay as a royalty to the patent owner." *Armco, Inc v Republic Steel Corp*, 707 F.2d 886, 891 (6th Cir. 1983) Where the patented article is protected by more than one patent, the value of a reasonable royalty on less than all of the patents required to legally make, use and sell that article is obviously zero "as a business proposition." No one would willingly pay any meaningful price for the license to one patent when licenses to additional patents are also necessary to legally manufacture and sell the (partially) licensed article. Where the accused product is covered by multiple patents, the only reasonable royalty greater than zero is one paid for the right to manufacture the article free and clear of all applicable patent claims

Thus, common questions of law and fact concerning at least damages and the working of Intermec's accused products arise because Symbol has already accused the same products addressed in this action of infringing other patents in the earlier filed Symbol Delaware Action. "One of the primary objectives of consolidation is to prevent separate actions from producing conflicting results" *International Paving Systems, Inc v. Van-Tulco, Inc*, 806 F.Supp. 17, 22 (E.D.N.Y. 1992). The only effective way to avoid conflicting results given the facts presented is

10

to grant the instant motion. *Cedars-Sinai*, 111 F.R.D. at 32 (single jury must determine common fact issues to avoid inconsistent results). These factors strongly suggest that transfer and consolidation are warranted.

Intermec recognizes that the presence of common issues, while a prerequisite to consolidation, does not automatically require consolidation. *Rohm & Haas Co. v. Mobil Oil Corp.*, 525 F.Supp. 1298, 1309 (D. Del. 1981). The transferee court will also have to consider and balance any prejudice to Symbol which would result from consolidation with the Symbol Delaware Action. Intermec does suggest, however, that the presence of common issues is sufficient to warrant transfer. *See Coffey*, 796 F.2d at 221 (transfer is warranted if consolidation is shown to be "feasible"). Arguments about whether consolidation is in fact warranted under the balancing test are for the transferee court to decide.

Regardless, the possibility of prejudice to Symbol from a transfer and consolidation is obviously remote in this case. Symbol could have easily brought all infringement claims directed against the same Intermec products in a single action. Instead, it decided to forum shop. One reason for Symbol's conduct might be to gain leverage over Intermec by needlessly increasing its defense costs by multiplying pending actions. Because such a tactic is illegitimate, precluding its success cannot constitute undue prejudice to Symbol. *See* 28 U.S.C., § 1927.

Another reason might be Symbol's attempt to "end-run" the schedule of the Symbol Delaware Action by obtaining an infringement judgment from this Court (a relatively fast docket where Intermec has not yet filed any infringement counterclaims) before judgment in Delaware (where Intermec has filed infringement counterclaims and where the case may proceed more slowly because 10 patents are involved) can be rendered. Because this reason is also not a

11

legitimate concern, however, it also does not constitute the type of prejudice that would prevent consolidation upon transfer.

## CONCLUSION

For the above stated reasons, Intermec's Motion to Transfer Venue Pursuant to 28 U.S.C., § 1404(a) must be *GRANTED*.

DATED this $\underline{26}$ day of May, 2005.

Respectfully submitted:

By: *Eugenia G. Carter*

Attorneys for Defendant
Intermec Technologies Corp.
WHYTE HIRSCHBOECK DUDEK S.C.

Eugenia G. Carter
State Bar No. 01011447
One East Main Street, Suite 300
Madison, WI 53703-3300
(608) 255-4440 (telephone)
(608) 258-7138 (facsimile)

FREEBORN & PETERS LLP
Leland W. Hutchinson, Jr.
Carson P. Veach
Jennifer L. Fitzgerald
Jeffrey M. Hansen
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606-6677
(312) 360-6503 (telephone)
(312) 360-6572 (facsimile)

109440

12

# EXHIBIT C

ı

0 5 -  5 2 8

DOCKET # **27**
U.S. DISTRICT COURT
WEST DIST. OF WISC:C

JUL  1  4 2005

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

THERESA :
CASE .

SYMBOL TECHNOLOGIES, INC ,

OPINION AND
ORDER

Plaintiff,

05-C-256-C

v

INTERMEC TECHNOLOGIES CORP ,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Symbol Technologies, Inc. seeks declaratory, injunctive and monetary relief

against defendant Intermec Technologies Corp  for infringing U.S. Patents Nos  5,243,655

and 5,457,308, relating to bar code technology.  The case is before the court on defendant's

motion to transfer the case under 28 U.S C. § 1404(a) and plaintiff's motion to file a sur-

reply declaration in response to defendant's reply brief in support of its motion to transfer.

Subject matter jurisdiction is present under 28 U.S C. §§ 1331 and 1338.

I will grant plaintiff's motion to file a sur-reply and consider the parties' arguments

concerning the applicability of a purchasing agreement between them and whether the need

for a consistent interpretation of that agreement warrants a transfer.  Although I am not

convinced that the patents in dispute overlap those pending in suits filed in the District

A TRUE COPY, Certified
_JUl 1 9 2005_
Theresa M  Owens, Clerk
U.S. District Court
Western District of Wisconsin
By: _____ Deputy Clerk

1

Copy of this document has been
provided to: _Counsel_
this _14_ day of _July_ 20 _05_
by _____
S. Vogel, Secretary to
Judge Barbara B. Crabb

Court for the District of Delaware, it does appear that it will be necessary in this case and in the Delaware cases to interpret the parties' purchasing agreement in order to determine whether and to what extent the parties agreed to forgo infringement suits against each other. I conclude therefore that the interests of justice would be served by transferring this case to the district court in Delaware.

From the facts alleged in the complaint, the exhibits attached to defendant's reply brief in support of its motion to transfer venue and the facts averred in the affidavits submitted by the parties, I find for the sole purpose of deciding this motion that the following facts are undisputed and material.

## FACTS

Plaintiff Symbol Technologies, Inc. is a Delaware corporation with its headquarters in Holtsville, New York. Plaintiff is a global leader in secure mobile information systems that integrate application-specific hand-held computers with wireless networks for data, voice and bar code data capture. Plaintiff's product lines include items such as bar code scanners, advanced data capture products, radio frequency identification technology, hand-held and fixed mount mobile computers and wireless local and wide-area networks. Plaintiff is registered to do business in the state of Wisconsin.

Defendant Intermec Technologies Corp. is incorporated in the state of Washington

2

and has its principal place of business in Everett, Washington. Defendant designs, manufactures and sells portable data collection equipment, including bar code scanning and reading devices. Defendant is registered to do business in Wisconsin and regularly transacts business in Wisconsin.

In addition to suing defendant in this court, plaintiff has sued defendant for infringement of four different patents in the District of Delaware, U.S. Patent Nos. 5,029,183, 5,479,441, 5,157,687, and 6,473,449, all of which relate to power saving modes of operation for wireless local area networks and techniques developed for sending data from point to point in a wireless network. Although the technologies that are the subject of the lawsuits in both Wisconsin and Delaware may be used together, as for example, by incorporating a bar code reader in a wireless network, they are distinct, just as a car radio's technology is wholly different from a car engine's technology, notwithstanding the fact that they are both used in a car.

Plaintiff and defendant entered into a purchasing agreement regarding plaintiff's bar code reader and scanner products. The agreement includes a forum selection clause under which the parties agree to try all disputes relating to the agreement in Delaware. For purposes of this decision, the crucial section is § 18(k), which reads:

> Covenants. During the Term of the Agreement each Party shall not sue (or bring a counterclaim against) the other party for any claim of infringement . . . of any patent, whether now or hereinafter in existence, against or relating

3

to any product except for (i) bar code readers to the extent that they use CCD sensor technology, and (ii) RFID Reader Products and RFID Tags except to the extent that they read bar codes

The parties' agreement is specified to last from January 1, 2004 to December 31, 2006. In § 9(d), it provides that accrued rights and obligations survive termination.

## OPINION

### A. Plaintiff's Motion for Leave to File Sur-reply

As a general rule, arguments not raised until the reply brief are deemed waived. Carter v. Tennant Co., 383 F.3d 673, 679 (7th Cir. 2004) (arguments presented for first time in reply brief are deemed waived) (citing Aps Sports Collectibles, Inc. v. Sports Time, Inc., 299 F.3d 624, 631 (7th Cir. 2002)). In this case, however, I can consider the new arguments raised by defendant, because I am granting plaintiff's request to file a sur-reply brief, giving plaintiff an opportunity to explain why it believes that the new arguments are without merit.

### B. Defendant's Motion for Change of Venue

Defendant has moved to transfer this case to the District of Delaware because plaintiff has suits pending in that district against defendant for infringement of four different patents. Plaintiff has asked the court in Delaware to declare that plaintiff was entitled to

4

terminate the purchasing agreement between the parties, thus permitting it to file suits for patent infringement despite the covenant in the agreement not to sue; defendant has filed a counterclaim in that suit for breach of contract. According to defendant, the products at issue in the Delaware action overlap the products at issue in this action and both cases will involve certain provisions of the purchasing agreement, such as the provisions addressing immunity from infringement suits and the forum selection clause. Defendant argues that transfer is justified to obtain consistent determinations regarding the applicability of the purchasing agreement and of the covenant not to sue in particular. Plaintiff agrees that the purchasing agreement provides defendant immunity from infringement for products that use scan engines purchased from plaintiff. Decl. of Aaron Bernstein, dkt. #17, at ¶5. However, plaintiff contends that such products are not at issue in this case, so the purchasing agreement and its forum selection clause do not apply.

In a motion to transfer venue brought pursuant to 28 U.S.C. § 1404(a), the moving party bears the burden of establishing that the transferee forum is "clearly more convenient." Coffey v. Van Dorn Iron Works, 796 F.2d 217, 219-20 (7th Cir. 1986). In weighing the motion, a court must decide whether the transfer serves the convenience of the parties and witnesses and will promote the interest of justice. 28 U.S.C. 1404(a); Coffey, 796 F.2d at 219-20; Roberts & Schaefer Co. v. Merit Contracting, Inc., 99 F.3d 248, 254 (7th Cir. 1996) (question is whether plaintiff's interest in choosing forum is outweighed by either

5

convenience concerns of parties and witnesses or interest of justice) The court should view these factors as placeholders among a broader set of considerations and evaluate them in light of all the circumstances of the case. Coffey, 796 F 2d at 219 n.3  Other courts have found that such broader considerations include the situs of material events, ease of access to sources of proof and plaintiff's choice of forum. Harley-Davidson, Inc. v. Columbia Tristar Home Video, 851 F Supp 1265, 1269 (E D. Wis 1994); Kinney v. Anchorlock Corp., 736 F. Supp. 818, 829 (N D. Ill. 1990) "Factors traditionally considered in an 'interest of justice' analysis relate to the efficient administration of the court system," Coffey, 796 F.2d at 221, such as whether a transfer would help the litigants receive a speedy trial and whether a transfer would facilitate consolidation of related cases. Id.

It is unclear why Wisconsin would be more convenient to try this case than Delaware; defendant contends that Delaware is geographically closer to plaintiff's New York headquarters, witnesses and documents. Plaintiff points out that its choice of forum is entitled to great deference. However, courts have held that if plaintiff's chosen forum is not the situs of material events, a plaintiff's choice has weight equal to the other factors and will not receive deference. Chicago, Rock Island & Pacific Railroad Co. v. Igoe, 220 F.2d 299, 304 (7th Cir. 1955) (plaintiff's choice of forum given less deference if few operative facts occurred in that forum); see also Carillo v. Darden, 992 F. Supp. 1024, 1026 (N D. Ill. 1998); Sanders v. Franklin, 25 F Supp 2d 855, 858 (N D. Ill. 1998) Nothing in the record

6

suggests that material events occurred in Wisconsin. Because it is questionable that Wisconsin is particularly convenient to either party, I will focus on the interest of justice factor exclusively in deciding whether to transfer this case to the District of Delaware

It is undisputed that plaintiff has sued defendant for infringement of U.S. Patent Nos. 5,029,183, 5,479,441, 5,157,687, and 6,473,449 in the District of Delaware. Defendant is adamant about the possibility of overlap between the technologies at issue in both the Wisconsin and Delaware actions  It suggests, for example that a bar code reader (the technology at issue in Wisconsin) may be incorporated into a wireless network (the technology at issue in Delaware).  Given this overlap, the court in the Delaware action will most likely have to address the importance of the bar code technology in that action and in doing so, decide whether the terms of the purchasing agreement apply. I find this argument dubious, given plaintiff's statement that it is not suing defendant on any of defendant's products using plaintiff's scan engines but I need not decide whether it is correct because the deciding factor is the need to construe the purchasing agreement  Some court will have to determine whether the agreement has been terminated validly, whether the covenant between the parties survives termination and if it does, whether the covenant applies to the technology at issue in this case.  It would be best for the parties and for the resources of the federal courts, considered as a whole, to have one construction applicable to all the disputes between the parties. Thus, I conclude that the interests of justice weigh heavily in favor of

7

a transfer, particularly because the agreement contains a forum selection clause. <u>See, e.g.,</u> <u>Stephan v. Goldinger</u>, 325 F.3d 874, 878-79 (7th Cir. 2003) (contractual venue clauses generally are valid) (citing <u>Carnival Cruise Lines v. Shute</u>, 499 U.S. 585, 593-95 (1991)); <u>Heller Financial, Inc. v. Midwhey Powder Co.</u>, 883 F.2d 1286, 1290-91 (7th Cir. 1989) (forum selection clause does not offend due process so long as it is freely negotiated and is not unreasonable and unjust). Although the Delaware court will be free to consolidate the cases or not, a transfer of the case to that court will would allow consolidation if the court should deem it appropriate. <u>Coffey</u>, 796 F.2d at 221 ("related litigation should be transferred to a forum where consolidation is feasible").

## ORDER

IT IS ORDERED that

1. Plaintiff Symbol Technologies, Inc.'s motion to file a sur-reply is GRANTED;

2. Defendant Intermec Technologies Corp.'s motion to transfer the case to the

8

United States District Court for the District of Delaware is GRANTED.

Entered this 14th day of July, 2005

BY THE COURT:

*Barbara B. Crabb*

---

BARBARA B. CRABB
District Judge

9